**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

United States of America,                                    Case No. 3:10CR522

               Plaintiff

    v.                                                                  **ORDER**

Alex David Cook,

               Defendant

This is a criminal case in which the government has charged the defendant, Alex David Cook, with possession and distribution of child pornography.

Pending is defendant's motion to suppress and motion in limine. [Doc. 25]. Following an evidentiary hearing on July 6, 2011, the motion is decisional.

For the reasons that follow, the motion is granted in part and denied in part.

**Background**

At about 7:00 a.m. on September 15, 2010, F.B.I. agents Craig Schulte, Steven Smith and Paul Pape, accompanied by seven local police officers, executed a search warrant at the defendant's apartment in Lima, Ohio. The basis for the warrant, which authorized a search for evidence of child pornography, was information Agent Schulte had obtained from F.B.I. agents in Oklahoma. That information provided the probable cause for the search warrant.

After the agents had knocked, the defendant and his roommate came to the door. They were asked to wait outside during the search. The defendant was not told that he was under arrest; nor was he handcuffed. He was not told he had to stay—but he also was not told that he was free to leave.

Without reciting the Miranda warnings or securing a waiver of the rights referenced in the warnings, Agent Pape questioned the defendant. He told the him the F.B.I. was there to execute a search warrant on his computer. He also told the defendant there was cause to believe he had child pornography on his computer because its IP address belonged to him. He asked the defendant if there could be child pornography on his computer.

The defendant acknowledged that he had a computer and that it contained images of child pornography.

Agent Pape is a Bureau polygraph examiner. At some point he told the defendant that he could, if he wished, take a polygraph examination. He explained that part of his role was to make sure that people with child pornography have not been molesting children.

Agent Pape said asking persons to take a polygraph examination was part of child pornography investigations, but that taking the examination was voluntary. He stated the examination would be conducted at the Lima F.B.I. office. The procedure, Pape said, would take about two hours and agents would return the defendant to his apartment.

The defendant agreed to the examination. Agent Schulte, with defendant in the front seat and Agent Pape in the back seat, drove to the F.B.I. office. The examination room is an interior room without windows. The door was closed during the examination.

2

Before beginning the examination, Agent Pape asked the defendant to read a computer display of the standard Bureau advice of rights (Ex. 1) and consent polygraph interview forms. (Ex. 2). After the defendant appeared to do so, he signed the forms *via* an electronic keypad.

At some point either before or during the examination, the defendant asked to go to the restroom. Agent Schulte accompanied him, but waited outside by the door to the Bureau's office.

The results of the polygraph examination were inconclusive due, according to Agent Pape, to the low temperature in the examination room.

After the examination, Agent Pape used his computer to prepare a statement summarizing information which the defendant had provided during the examination. (Ex. 3). He asked the defendant to read the statement and make corrections. The defendant signed the statement.

The defendant asked what would happen. He was told nothing would happen immediately, and that it could be several months before anything would happen due to the time needed to analyze the defendant's computer. Thereafter, Pape said, the defendant would receive a target letter. At which point, Pape advised, the defendant should obtain an attorney and contact the U.S. Attorneys office.

While being returned to his apartment, or shortly after arriving there, the defendant mentioned that he had some digital memory sticks in his truck.  The defendant signed a consent to search form for the vehicle. (Ex. 4).

Later that day, agents returned to the apartment, desiring to search for seize a digital camera. The defendant signed a consent to search his apartment. (Doc. 5). His roommate had also signed a consent for a search of the apartment.

The defendant's version of the course of events, as contained in his memo in support of his motion to suppress (Ex. 7),[1] differs substantially from the agents' testimony.

Thus, according to the assertions in his brief:

• After the polygraph, the Agents' questioning became more intense;

• The defendant attempted to make a phone call, asked to leave, and asked to talk to a lawyer, but was told he could not and/or did not need to do so;

• He was at the F.B.I. office for several (*i.e.,* more than two) hours;

• Agent Pape told the defendant he could leave when he signed the statement;

• He signed the statement which Agent Pape had prepared without reading it;

• The statement does not accurate reflect what he said to the agents;

• When asked what the statement was, Agent Pape told the defendant it was simply a letter informing the prosecutor that there was no reason to proceed with the case.

During their testimony, Agents Schulte and Pape denied each of those allegations.

I credit their testimony, and find that defendant's allegations about what occurred during the polygraph examination/interview are not accurate. I see no reason for the agents to testify untruthfully, and the defendant has suggested none.

## Discussion

### 1. Custodial Interrogation

Defendant claims that the questioning outside his home and during the polygraph examination/interview constituted custodial interrogation. I agree.

### A. The Defendant Was "In Custody"

---

[1] The defendant did not testify or present any evidence. The government moved for admission of his brief into evidence.

4

"[T]he only relevant inquiry" for determining whether an individual is in custody is "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). This depends on: 1) "the circumstances surrounding the interrogation"; and 2) whether a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thomas v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted).

> Among the factors a court considers when making this determination, are:
>
> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indica of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*U.S. v. Salvo*, 133 F.3d 943, 950 (6th. Cir. 1998) (quoted in *Coomer v. Yukins*, 533 F.3d 477, 486 (6th Cir. 2008)) .

Ten law enforcement officers, some with drawn weapons and others wearing bullet-proof vests, and most in police regalia, had awakened the defendant at 7 a.m. and served and executed a search warrant. They asked him to wait outside, in the company of at least two F.B.I. agents and while other officers were present. while they executed their warrant. While doing so, Agent Paul questioned him about having child pornography on his computer.

Then Agent Pape asked the defendant to accompany the agents "voluntarily" to their office for a polygraph examination. The form of the "invitation" was, at least, in part, such that a person who had not molested children would be encouraged, if not induced to take an apparently exculpatory—but in fact, inculpatory—examination. Though later informed of (and waiving) his

5

constitutional rights, the defendant, who had apparently already concluded that it was in his interest to be polygraphed about child molestation, would have been unlikely, despite the Miranda warnings, to ask to leave or become unwilling to submit to the examination.

I find it more likely than not that the agents conducted at least a patdown frisk of the defendant before placing him in their car. If so, this added to the impression that the defendant was not free to leave.

To be sure, in response to a question from me, Agent Paul testified that the defendant was neither handcuffed nor searched before entering the agents' car. And the defendant offered no evidence to the contrary.

But in more than thirty years on the bench, I have never known of officers neglecting to take at least minimal steps to ensure a suspect is not armed before placing him in a vehicle. So I find it likely that the agents frisked the defendant before putting him in their car.[2] It is appropriate to take judicial notice that checking for weapons before putting a suspect in a police car is standard procedure.

Once the polygraph examination was underway the agents permitted the defendant to use the restroom, Agent Schulte accompanied the defendant to and fro. By placing himself by the office front door while the defendant was in the restroom, Agent Schulte communicated, at least implicitly if not deliberately, that the defendant could not exit.

The defendant, a nineteen-year-old college student, had had no prior experience with law enforcement officers. In all likelihood he was unaware of the gravity of his situation or its potential

---

[2] That I find it likely that the defendant was frisked before getting in the car reflects no concern that Agent Paul testified untruthfully—he probably misunderstood my question about a search as meaning a more extensive search, such as would occur incident to an arrest.

6

outcome—a felony record, a lengthy term of imprisonment, and life-long obligation to register as a sex offender. Indeed, as noted, Agent Paul had described the consequences of the polygraph examination as being potentially exculpatory.

In any event, the responses the defendant received after the polygraph exam as to what would happen next—in effect, "go talk to the prosecutor"—gave no indication of what he faced. That oblique response, given after the government had, for all practical purposes, completed its collection of evidence for use in the instant prosecution, could not have put the defendant on guard, or made him more attentive to his constitutional rights.

The agents testified that the defendant at no time asked to or sought to leave, though he was free to do so. That fact only slightly countervails the indicia of custody that the defendant, I believe, would otherwise have felt. Had the agents told the defendant he could stay or go, as he wished, and not just told him he was not under arrest, circumstances would have been a good bit different.

To be sure, interrogation that occurs in a defendant's home generally is not "custodial." *See, e.g., Beckwith v. U.S.*, 425 U.S. 341, 346 n. 7, 347 (1976) (citation omitted) (suspect, questioned in his home, "hardly found himself in the custodial situation described by the *Miranda* Court as the basis for its holding[,]" because Miranda concerned "the principal psychological factor" of "isolating the suspect in unfamiliar surroundings 'for no purpose other than to subjugate the individual to the will of his examiner'"); *Commer v. Yukins*, 533 F.3d 477, 486 (6th Cir. 2008).

But in-home interrogation can sometimes be "custodial." *See generally Orozco v. Texas*, 394 U.S. 324, 326 (1969) (holding that a suspect was in custody while being held in own home, despite his comfort and familiarity with the surroundings); *U.S. v. Flack*, 2009 WL 5031320, 2 (E.D. Tenn.) (defendant handcuffed following officers' entry into his home was in custody during forty minute

interrogation); *U.S. v. Stark*, 2009 WL 3672103, *4 (E.D. Mich.) (defendant "was subject to custodial interrogation when he was questioned by the six police officers in front of his home at 2:00 in the morning."); *see also U.S. v. Lopez*, 2004 WL 250516, *7 (E.D.Mich.) (defendant in custody while officers conducting consent search of her home; officers rebuffed her request to leave to check on her children; one officer acknowledged that he was there "to keep an eye" on persons present).

In this case, the defendant had not admitted the officers voluntarily. He was, moreover, not *inside* his home; rather, in accordance with the agents' instructions (no doubt of a peremptory nature), he was outside and in the company of at least two agents. Eight other agents or officers were on the premises.

The agents' actions, though not involving physical restraint, as in *Flack* and *Lopez*, nonetheless constituted virtual confinement, whereby a reasonable person would not have felt free to leave. There is simply no likelihood that a nineteen-year-old defendant with no prior experience with the law would feel free to walk away from two F.B.I. agents shortly after they raided his home under the authority of a judicial warrant.

I conclude, accordingly, that the defendant was, from the moment ten officers appeared at his door, in custody, as the law of custodial interrogation defines that term. I find that a reasonable person under the totality of these circumstances simply would not have felt free to leave the company of the agents until, done with their investigatory work, they drove him home.

### B. The Agents "Interrogated" the Defendant

There can be no doubt that the agents interrogated the defendant. *Rhode Island v. Innis*, 446 U.S. 291, 300-02 (1980) (interrogation is "express questioning or its functional equivalent" that law enforcement officers "should know [is] reasonably likely to elicit an incriminating response.").

After telling the defendant why they were there and what, *via* the search warrant, they would be doing, the agents proceeded, both while the search was occurring and later during the polygraph examination, deliberately to elicit incriminating information.

While the search was going on, they learned that the defendant had a computer that contained images of child pornography. Thereby, they enabled the prosecutor to prove the elements of possession and knowledge *vis-a-vis* the current charges.

Agent Paul's description of the purpose for inviting the defendant to be polygraphed—to exculpate himself from suspicion of child molestation (which no doubt was a graver concern than being found in possession of child pornography) was no doubt true, and served important law enforcement purposes.

But describing the examination in those terms masked a concurrent intent: namely, to get the defendant to come willingly to the F.B.I. office for interrogation, and thereby to learn further details about his offenses. The statement Agent Paul successfully procured is important evidence in the government's prosecution.

From the outset, therefore, the agents sought deliberately to obtain incriminating information from the defendant. Doing so, they necessarily interrogated him.

Because the agents did not immediately advise the defendant of his rights under *Miranda*, I suppress any statements by the defendant at and outside his apartment.

The effect of the pre-examination warnings and whether the defendant voluntarily waived his constitutional rights to silence and counsel require, however, further consideration.

**2. The Miranda Warnings**

9

## A. The Prior Statements Did Not Taint the Examination

The first question is whether the warnings which Agent Paul gave cleansed his examination and the defendant's ensuing statements of the taint of the originally procured unlawful statements. I find that they did.

Under *Oregon v. Elstad*, 470 U.S. 298, 335 (1985), "an admission or confession obtained in violation of Miranda taints a subsequent confession unless the prosecution can show that the taint is so attenuated as to justify admission of the subsequent confession." This determination takes into account "the time that passes between confessions, the change in place of interrogations, and the change in identity of interrogators[.]" *Id.* at 310.

More recently, in *Missouri v. Seibert*, 542 U.S. 600, 615 (2004) (plurality opinion), a plurality of the Court recently instructed courts to examine:

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

Assuming *Seibert* controls,[3] I conclude that the Miranda warnings preceding the polygraph examination obviated any taint from the defendant's initial statements about having a computer with images of pornography. Though inadmissible due to the failure to warn at the outset, I do not find that the agents coerced the defendant into making those statements. Despite the custodial nature of

---

[3] An issue not entirely free from doubt, in light of *Seibert*'s status as a plurality opinion. *See U.S. v. Cundiff*, 555 F.3d 200, 210 (6th Cir. 2009) ("there has been some confusion about whether the plurality or concurring opinion controls. Most circuits have assumed that Justice Kennedy's concurrence operates as the controlling precedent, though others have raised doubts about whether his concurrence actually represents the narrowest grounds for decision.").

the circumstances, I do not find those circumstances caused his will to be overborne when he responded to the agents' initial questions (which appear to have been few and brief).

I find, moreover, that the purpose of those questions was as much to facilitate execution of the warrant as it was to elicit incriminating statements. The officers found two persons on the premises; each had a computer. Knowing which was whose and whether they were shared was important, and served to limit the seizure and computer search to the defendant's computer.

I do not find that the agents knowingly evaded their obligation to give Miranda warnings. While they should have anticipated that the circumstances triggered the duty to warn, there is no reason to believe that they knew that such was the case when they questioned the defendant outside his apartment.

There was some, but not a complete connection between the subject of the first two sessions. The common thread was the defendant's possession of child pornography on his computer. But outside the home, as noted, the agents' questions appear to have focused on what was where.

Though not the sole purpose, Agent Paul's polygraph session had at least to some extent a distinct focus: to find out whether the defendant had molested children. Learning this information had no direct relationship to a federal interest and would not necessarily aid prosecution of the pending charges. To be sure, admission of molestation could lead to state prosecution and might well lead to an enhanced federal sentence.

Most importantly, learning as soon as possible whether there are child victims is of clear importance to the welfare and well-being of any such victims. Wanting to polygraph the defendant to find out such information not only differs from the subject of the initial questioning—it serves important social purposes.

11

I do not find that Agent Paul deliberately exploited the taint of the original illegality. He did not use what he had learned outside the defendant's apartment as a springboard for conducting the examination. The defendant's post-examination signed statement confirmed and expanded on what he had earlier said. It also enhances the likelihood of conviction. But these were not the agent's sole purpose in inducing and conducting the polygraph examination.

There are, though, circumstances that militate against a finding that the warnings dissipated the taint. Agent Paul was the interrogator in both sessions. The record does not specify how much time passed between the two sessions, but the lapse of time appears to have been brief—probably an hour or less.

On balance, however, I conclude that the Miranda warnings served their purpose of alerting the defendant to his rights of silence and counsel. While prompted by the examination's putative exculpatory purpose to participate, he nonetheless knew beforehand that he did not have to speak further to the agent, he had a right to counsel and anything he said would be used against him. That knowledge dissipated the taint of the initial *Miranda* violation.

## B. Voluntariness of the Examination-Related Statements

The defendant does not contend that the Miranda warnings were defective, or that he did not understand them when the agent displayed the advice of rights/waiver form on his computer.

The issue, thus, is whether the defendant voluntarily waived his rights to silence and counsel and likewise voluntarily made his incriminating statements during the polygraph examination.

I find that, in light of prevailing law, he willingly went to the F.B.I. office, submitted to the examination, responded to Agent Paul's questions and signed the resulting confession. I find, as

12

well, that the voluntary quality of those actions was not undone by the implicit duplicity in how Agent Paul described the purpose of the examination.

To be sure, the examination had an exculpatory purpose. But that was not all—of equal, if not greater importance from Agent Paul's standpoint was elicitation of as much detail as possible about what was on the defendant's computer, how it came to be there and what the defendant did with it.

If this was not the primary purpose, and the putative inculpatory purpose of lesser import (if not, indeed, a pretext for getting the defendant to take the examination), then Agent Paul, in all likelihood, would have terminated the examination once he became aware of the inconclusiveness of its results, due to the conditions in the room.

Whatever Agent Paul's purposes were, his failure to warn the defendant that more was at stake than simply being exculpated of potential charges of child molestation did not, as a matter of law, make the defendant's submission to submit to the examination involuntary. An interrogator can lawfully use deceit to induce an otherwise uncoerced and willing confession. *See, e.g., U.S. v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009); *Terrell v. Morris*, 1990 WL 120960, *2 (6th Cir.) (unpublished disposition) ("allegation of police deceit does not render an otherwise valid confession involuntary and inadmissible."); *U.S. v. Siler* 2011 WL 353885, *10 (E.D.Tenn.) (deception is not forbidden and does not alone render a confession involuntary.").

I conclude, accordingly, that the defendant's statements during and signed statement after the polygraph examination are admissible.

**Conclusion**

For the foregoing reasons, it is

13

ORDERED THAT the defendant's motion to suppress and motion in limine [Doc. 25] be, and the same hereby is granted in part and denied in part.

So ordered.

/s/ James G. Carr
Sr. United States District Judge