1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF OHIO
2                        WESTERN DIVISION

3   UNITED STATES OF AMERICA,      )  Docket No. 3:10CR522

4            Plaintiffs,           )  Toledo, Ohio

5                 v.               )  July 6, 2011

6   ALEX DAVID COOK,               )        Suppression Hearing

7            Defendants.           )

8   ------------------------------

9              TRANSCRIPT OF SUPPRESSION HEARING
                BEFORE THE HONORABLE JAMES G. CARR
10                UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Plaintiffs:   United States Attorneys' Office
                          By:  Gene Crawford
13                        Four SeaGate, Suite 308
                          Toledo, Ohio 43604
14                        (419) 259-6376

15

16  For the Defendant:    Donna Grill
                          Office of the Federal Public Defender
17                        617 Adams Street
                          Toledo, Ohio 43604
18                        (419) 259-7370

19  Court Reporter:       Angela D. Nixon, RPR, CRR
                          1716 Spielbusch Avenue
20                        Toledo, Ohio 43624
                          (419) 260-5259

21

22

23  Proceedings recorded by mechanical stenography, transcript

24  produced by notereading.

25

```
1            COURTROOM DEPUTY:  Case number 3:10CR522, United

2   States of America versus Alex Cook, matter called for

3   suppression hearing.

4            THE COURT:  Okay.  The record should show that

5   government's represented by assistant U.S. attorney, Gene

6   Crawford and Tom Secor.  Defendant's present in court

7   represented by federal public defender Donna Grill.  And

8   with you, Ms. Grill, is?

9            MS. GRILL:  Melissa Salinez.

10           THE COURT:  Okay.  I apologize for being a bit

11  late.  I had a probation orientation and that went a little

12  longer than I thought.  Matter comes on for suppression

13  hearing, the government ready to proceed?

14           MR. CRAWFORD:  Yes, Your Honor, if I could.  I'd

15  appreciate the opportunity to make a brief opening

16  statement.

17           THE COURT:  Sure.  Of course.

18           MR. CRAWFORD:  Your Honor, we are here this

19  morning on Mr. Cook's motion to is suppress his statement

20  made to FBI, special agents in September of 2010.  And when

21  the government read Mr. Cook's motion and its allegations,

22  quite frankly we were caught off guard.  They are

23  allegations that if there were any truth whatsoever to

24  them, we would expect to have heard about them months ago.

25  And in all candor, Judge, they probably would have ended
```

1    the prosecution right then and there.  As it turns out,

2    those allegations didn't come to light until only recently

3    notably after this case was set for trial.  And the

4    material allegations motions are untrue, and we think the

5    result is going to be that this full confession to

6    possession, receipt, distribution of child pornography

7    would be admissible at trial, it would be presented to a

8    jury, and they would have the opportunity to consider it in

9    determining the guilt of this witness.

10            THE COURT:  Ms. Grill?

11            MS. GRILL:  Your Honor, thank you.  First, I am

12   going to move for a separation of witnesses.  The

13   government does have two witnesses present today, although

14   I think one is technically the case agent, but for the

15   record, I would still move for a separation of witnesses.

16            THE COURT:  Anybody who expects to be a witness

17   in this case, I'll have you wait outside until called to

18   testify with the exception of the case agent.

19            MS. GRILL:  Your Honor, I'm not going to make any

20   further opening.  Our motion was presented and filed with

21   The Court.

22            THE COURT:  Basically you're contesting both

23   the -- the -- essentially contesting the admissibility of

24   the statements that your client made; is that correct?

25            MS. GRILL:  Correct, Your Honor.  And primarily,

1  there was a typed-written statement that was signed by

2  Mr. Cook, my understanding not typed by him but signed by

3  him.

4           THE COURT:  Also, if I recall your motion, not

5  read by him, according to him --

6           MS. GRILL:  Correct, Judge.

7           THE COURT:  -- before signing?

8           MS. GRILL:  Correct.

9           THE COURT:  And the interrogation occurred at

10  home?

11           MS. GRILL:  The interrogation occurred at the FBI

12  office, and my client --

13           THE COURT:  So go ahead.

14           MS. GRILL:  And my client was driven to the FBI

15  office by the FBI agents directly after the search of the

16  hope was conducted.

17           THE COURT:  Okay.  In which case I think you

18  should probably go forward, Mr. Crawford.

19           MR. CRAWFORD:  Yes, Your Honor, we are prepared

20  to call our first witness.  Special Agent Craig Schulte.

21                       CRAIG SCHULTE,

22  was herein, called as if upon examination, was first duly

23  sworn, as hereinafter certified, and said as follows:

24           THE COURT:  And will you tell me your name

25  please?

```
 1   A.        Yes, sir my name is Craig William Schulte.

 2             THE COURT:  Craig?

 3   A.        Yes, sir, C-R-A-I-G.

 4             THE COURT:  And how do you spell the last name?

 5   A.        S-C-H-U-L-T-E.

 6             THE COURT:  And you are a special agent with the

 7   FBI?

 8   A.        Yes, Your Honor.

 9             THE COURT:  How long have you been so employed?

10   A.        Just over two years.

11             THE COURT:  And before that what did you do?

12   A.        I was a police officer in Northwest Indiana for

13   14 years.

14             THE COURT:  And before that?

15   A.        Police officer with Indiana University in various

16   campuses.

17             THE COURT:  For about how many years?

18   A.        About a year-and-a-half.

19             THE COURT:  And before that?

20   A.        College student.

21             THE COURT:  And where are you currently

22   assigned -- where are you currently assigned to the bureau?

23   A.        Currently assigned to the Lima resident agency of

24   the Cleveland division.

25             THE COURT:  And how long have you been there?
```

1  A.        I've been in that office just at two years.

2           THE COURT:  Okay.  And are you a case agent in

3  this case?

4  A.        Yes, Your Honor.

5           THE COURT:  Mr. Crawford?

6                    DIRECT EXAMINATION

7  BY MR. CRAWFORD:

8  Q.        Special Agent Schulte, at some point last year

9  did you become involved in an investigation of receipt and

10  distribution of child pornography in Lima?

11  A.        I did.

12  Q.        Could you please describe the background of that

13  investigation, please?

14  A.        Yes, I was sent a notice from the Oklahoma

15  division of the FBI.  Special Agent Whisman who works in

16  that office was conducting an undercover Internet operation

17  in which he loaded some child pornography that he wanted to

18  make our office aware of and possibly for us to start an

19  investigation.

20  Q.        And was special agent Whisman able to identify a

21  source of the child pornography that he was downloading?

22  A.        He was.  He suspected the source of the child

23  pornography that he downloaded and received was from Alex

24  Cook.  That was based upon software that he used during the

25  undercover operation which revealed an Internet protocol

1    address, IP address.

2    Q.        Could you just briefly describe the process of

3    how Special Agent Whisman was able to download this, or I

4    guess download this pornography that Mr. Cook had on his

5    computer?

6    A.        Sure.  Special Agent Whisman was using a software

7    client which works on the Gnutella network on the Internet,

8    which is essentially a file sharing network which allows

9    peer to peer file sharing so that individuals can send and

10   receive files between each other direct across the

11   Internet.  Special Agent Whisman, in his undercover

12   operation, was using this software on the Gnutella network

13   to identify anyone.

14             THE COURT:  Who do you spell Gnutella?

15   A.        I believe it's G-N-U-T-E-E-L-L-A.

16             THE COURT:  And what is that?  I'm not familiar.

17   A.        Your Honor, I don't know all the specifics of how

18   exactly it's configured or all the software and hardware

19   involved; however, for instance, a person could download an

20   Internet program called Lime Wire, and Lime Wire is a

21   software that you can load on your personal computer and

22   use it to search the Internet for other file sharing users

23   that may want to give you files or share files with you or

24   receive files from you.  It's a mechanism to send and

25   receive files from one person to another across the

1    Internet.

2            THE COURT:  Okay.

3    BY MR. CRAWFORD:

4    Q.        And you mentioned an IP address.  What is an IP

5    address?

6    A.        An IP address is essentially street address for a

7    computer on the Internet.  It's how computers are

8    identified as a unique computer against another that may

9    also be on the Internet at the same time.

10   Q.        And was Special Agent Whisman able to identify an

11   IP address as the source of the pornography he was

12   downloading?

13   A.        He was.

14   Q.        And what did he do with that IP address?

15   A.        Special Agent Whisman researched that IP address

16   to find who the Internet provider was who owns that IP

17   address.  All Internet providers on the Internet own a

18   certain block of Internet protocol addresses, IP addresses,

19   which they will lease to their subscribers.

20   Q.        And who was the Internet service provider for

21   that IP address that Special Agent Whisman identified?

22   A.        Time Warner Cable.

23   Q.        And what did Special Agent Whisman do next to

24   further identify the owner of that IP address?

25   A.        Special Agent Whisman issued Time Warner Cable a

```
 1    subpoena asking for the subscriber name, address and

 2    particulars for that particular IP address.

 3    Q.        And what did that subpoena reveal?

 4    A.        That subpoena revealed that that particular IP

 5    address belonged to Alex Cook on Knollwood Drive in Lima,

 6    Ohio.

 7    Q.        And Special Agent Schulte, do you see Alex Cook

 8    in the courtroom today?

 9    A.        I do.

10    Q.        Could you identify him for The Court?

11    A.        Yes, he's seated at the defendant's table wearing

12    a light blue shirt and a darker colored tie.

13              THE COURT:  How do you spell Knoll --

14    A.        Knollwood is K-N-O-L-L-W-O-O-D, and then Drive in

15    Lima, Ohio.

16              THE COURT:  Knollwood Drive?

17    A.        Correct.

18              MR. CRAWFORD:  Your Honor, could the record

19    reflect that Special Agent Schulte identified the

20    defendant?

21              THE COURT:  So noted.

22              MR. CRAWFORD:  Special Agent Schulte, after

23    Special Agent Whisman learned of this IP address belonging

24    to Mr. Cook, what did he do next?

25    A.        His next logical step was to send a notice to my
```

1    office, the Lima resident agency and let us know that he

2    suspected a person in our area of responsibility possess

3    child pornography and was sharing it on the Internet.

4    Q.        Did you take some steps that ultimately led up to

5    obtaining a search warrant for that Knollwood address?

6    A.        I did.

7              MS. GRILL:  Excuse me, I can't -- I can't hear

8    Gene as well as I probably should be able to.  Is that

9    microphone on?

10   BY MR. CRAWFORD:

11   Q.        I'm sorry, Special Agent Schulte, you were

12   speaking of a search warrant that you retained for the

13   Knollwood residence?

14   A.        Yes, based on the information that Special Agent

15   Whisman sent me, I conducted an investigation which led up

16   to obtaining a search warrant for the residence that Alex

17   cook was residing in.

18   Q.        And briefly, what were the items that you were

19   looking for in the search warrant?

20   A.        We were looking for any electronic device which

21   may possess child pornography, which could be used to

22   communicate on the internet, share those files.

23   Q.        When you say devices, are you talking computers

24   only or something much larger?

25   A.        We're speaking of first and foremost modems that

1  would connect a computer to the internet, any kind of

2  routers that would assist in connection to the internet,

3  computers, whole systems, laptop computers, portable

4  storage devices such as external hard drives, thumb drives,

5  CD-ROM discs, any kind of media that would possess that

6  type of information and could be used to facilitate sharing

7  those types of files on the Internet.

8  Q.       And what was the date that you executed the

9  search warrant?

10  A.       September 15th of 2010.

11  Q.       Could you briefly describe what happened when you

12  arrived at that residence on Knollwood Drive and executed

13  the warrant?

14  A.       Yes, myself, other agents and task force officers

15  arrived at the residence.  We knocked at the front door and

16  announced that we were with the Federal Bureau of

17  Investigation and that we had a search warrant.  Nobody

18  immediately came to the door.  We allowed quite a bit of

19  time for someone to respond because it was early in the

20  morning that we were executing the search warrant.  We

21  realized that the occupants of the residence may be asleep

22  or in bed.  Eventually the residents of the apartment came

23  to the front door and opened the front door.

24  Q.       Who were the residents of the apartment?

25  A.       Alex Cook and Ian Douglas.

```
 1              THE COURT:  I-A-N?
 2   A.         Yes, Your Honor, I-A-N.
 3   BY MR. CRAWFORD:
 4   Q.         Is Douglas the common spelling?
 5   A.         Yes, it is.
 6   Q.         Were any guns drawn at the time that you executed
 7   the search warrant?
 8   A.         Officers may have had guns in their hands.  I
 9   wouldn't be able to speak to each agent or task force
10   officer as I was more at the front, but no weapons were
11   directly pointed at the occupants.
12              THE COURT:  How many officers were present?
13   A.         I believe we had a mix of ten agents and task
14   force officers approximately.
15              THE COURT:  What's task force?
16   A.         Task force is an innocent images task force based
17   out of the Toledo resident agency of the FBI, specifically
18   targeting these types of violations that exploit children.
19              THE COURT:  Are they all federal or state cases?
20   A.         There are some local law enforcement officers
21   from both Toledo Police Department and from Lima Police
22   department.
23              THE COURT:  And how were you attired?  In other
24   words, did you have ordinary business clothes on or Swat
25   uniform or whatever they're called?
```

1    A.        Yes, myself and Agent Pape were both addressed in

2    suit and tie, and other members of the search warrant team

3    had FBI markings on them, protective vests, things

4    consistent with searching a -- or serving a search warrant.

5    Q.        Special Agent Schulte, did anyone break open the

6    door?

7    A.        No, we did not.

8    Q.        Do you have any recollection of any either

9    Mr. Ian/or Cook being placed in handcuffs or restrained?

10   A.        I do not.

11   Q.        Were either Mr. Douglas or Mr. Cook told they

12   were under arrest at any time?

13   A.        They were not.

14   Q.        Were either of them told they couldn't leave?

15   A.        No, they were not.

16   Q.        Any other show of force that you can recall that

17   was made at the time of the execution of the warrant?

18   A.        We asked both Mr. Cook and Mr. Douglas to exit

19   the premises for a safety precaution so agents and officers

20   serving the search warrant to make sure there was no one

21   else in the residence, there were no hazards that would

22   pose a risk to the agents and officers serving the search

23   warrant, so both individuals did step outside the residence

24   and waited with agents in front of the residents until we

25   could be sure it was a safe environment to enter.

```
 1   Q.        Okay.  Did anyone question Mr. Cook at the

 2   residence?

 3   A.        I believe Special Agent Pape did.

 4   Q.        Were you present for that questioning?

 5   A.        I was not.

 6             THE COURT:  How do you spell that name?

 7   A.        P-A-P-E.

 8   BY MR. CRAWFORD:

 9   Q.        Did anyone question Mr. Douglas at the residence?

10   A.        Yes, I conducted a brief interview with

11   Mr. Douglas with Special Agent Steven Smith present.

12   Q.        Did you read a Miranda warning to Mr. Douglas?

13   A.        I did not.

14   Q.        Was he under arrest at any time?

15   A.        He was not.

16   Q.        And what did Mr. Douglas tell you?

17   A.        Well, first I explained to Mr. Douglas the reason

18   why we were at the residence, that we were specifically

19   seeking device mechanisms that might contain child

20   pornography to transmit over the Internet.  I asked

21   Mr. Douglas if he was aware of any computers inside the

22   residence, and if they had Internet access.  And

23   Mr. Douglas acknowledged that, yes, there were computers

24   inside the residence.  He explained that he has his own

25   personal computer and that Mr. Cook also has his own
```

1    personal computer.  I asked Mr. Douglas if he ever observed

2    any child pornography on either of the computers.  And

3    Mr. Douglas said he had not, that he does not use

4    Mr. Cook's computer and that Mr. Cook does not use his

5    computer.  I asked Mr. Douglas if -- well, first of all,

6    how he gets access to the Internet from his computer.  He

7    explained that it was done via a wireless router and that

8    he had to input a password to get access to the router,

9    that it was not an unsecured router that anyone could use,

10   that he specifically needed to use a password to use that

11   router and get onto the Internet.  Mr. Douglas also

12   explained that he had never seen Mr. Cook in possession of

13   child pornography, and he himself was never in possession

14   of it, he does not view child pornography.

15   Q.        After you finished talking to Mr. Douglas, what

16   did your investigators do next?

17   A.        At that point Special Agent Smith asked

18   Mr. Douglas if it would be okay once our search was under

19   way if Special Agent Smith could conduct an analysis of

20   Mr. Douglas' computer on site to confirm what he had told

21   me.  Mr. Douglas said that that would be okay.  At that

22   point, we allowed Mr. Douglas to -- I need to correct

23   myself there.  Mr. Douglas stated possession of -- or with

24   Special Agent Smith, and at that point Special Agent Pape

25   came outside the residence and indicated that he was done

1    speaking with Mr. Cook.

2    Q.        And after you spoke briefly with Special Agent

3    Pape, what happened with Mr. Cook?

4    A.        At that point, Mr. Cook accompanied Special Agent

5    Pape towards my vehicle.  Special Agent Pape indicated to

6    me that Mr. Cook was agreeable to coming to our resident

7    agency to discuss our investigation, and so at that point,

8    we all went to my vehicle and proceeded to get in to drive

9    to the resident agent.

10   Q.        Was Mr. Cook placed under arrest at that time?

11   A.        He was not.

12   Q.        Was he handcuffed?

13   A.        No, he was not.

14   Q.        Was he told that he couldn't leave?

15   A.        No, he was not.

16   Q.        Was he told he had to go to the FBI office to

17   give a statement or for any other reason?

18   A.        No, he was not.

19   Q.        Could you just briefly describe Mr. Cook's

20   demeanor at the time you all got in your car to go to the

21   office?

22   A.        Sure.  Mr. Cook was friendly, relaxed.  It was a

23   very casual type of atmosphere.  In fact, during the drive

24   from Mr. Cook's apartment to the resident agency, we talked

25   about Mr. Cook going to college and some of his interests

1    in engines and being a mechanic and so forth.

2    Q.        Any concerns about Mr. Cook being under the

3    influence of drugs or alcohol or otherwise incompetent to

4    make free choices?

5    A.        No, I didn't detect any condition of that nature.

6    Q.        About how long was the car trip to the FBI

7    office?

8    A.        About five or ten minutes, depending on traffic.

9    At max ten minutes.

10   Q.        Who all was in the car at the time?

11   A.        It was myself driving; Mr. Cook was in the front

12   passenger seat, and Special Agent Pape was in the back

13   seat.

14   Q.        And what happened when you arrived at the Lima

15   office?

16   A.        We arrived on the Pier Street side of the street

17   and, which is a non-public entrance, it's an employee-only

18   entrance.  And I actually opened up the door, and Mr. Cook

19   and Agent Pape and myself walked up the stairway to the

20   second floor where our office is located.  And Agent Pape

21   and Mr. Cook waited outside in the hallway for me to unlock

22   the office and come around to our public entrance to the

23   office.  Special Agent Pape and Mr. Cook came to the

24   office, and our interview room is right off of our main

25   lobby, so they both entered there and started to sit down

```
 1   and conduct an interview.

 2   Q.       And --

 3           THE COURT:  Before Mr. Cook got in the car, was

 4   he searched in any way, a pat down?

 5   A.       I don't specifically -- I did not pat Mr. Cook

 6   down.  I don't remember specifically if he was or was not.

 7           THE COURT:  Is there a practice or protocol with

 8   regard to conducting any sort of search before placing in a

 9   bureau vehicle?

10   A.       If they're in custody, Your Honor, we certainly

11   would.  If we're not, we feel relatively safe, we don't.

12           THE COURT:  What was he wearing, do you remember?

13   It was September?

14   A.       It was.  I believe blue jeans and a T-shirt.

15           THE COURT:  So could conceal a weapon or

16   whatever?

17   A.       And when we initially made the contact at the

18   apartment, Mr. Cook and Mr. Douglas were not wearing jeans.

19   They were wearing like shorts, kind of sleeping wear.  So

20   he had gotten dressed in the presence of agents.  I wasn't

21   there when he got dressed, but he would have been

22   accompanied when he put his clothes on, I would imagine.

23   Q.       Special agent Schulte if -- If I could get back

24   to the apartment.  Was there a mention of having Mr. Cook

25   taking a polygraph at the examination of the FBI office?
```

```
1    A.        I wasn't present for that conversation.

2    Q.        So back to the FBI office, and you said you just

3    arrived, and he was placed into a conference room?

4    A.        Correct.

5    Q.        Told he couldn't leave?

6    A.        No.

7    Q.        In handcuffs?

8    A.        No.

9    Q.        Was he ever placed in any sort of a holding cell

10   or any other type of contain many room?

11   A.        No.  And the door remained unlocked in the

12   interview room.  He had access back to the lobby area and

13   out our front door.

14   Q.        I'm sorry, you said it was locked or unlocked?

15   A.        It was not locked.

16             THE COURT:  Closed?

17   A.        Yes, closed.

18   Q.        And once you were all seated in the conference

19   room, what was Mr. Cook's demeanor at that time?

20   A.        Again, very relaxed, agreeable to what was going

21   on.

22   Q.        Okay.  And at some point in time did you provide,

23   did either you or Special Agent Pape provide Mr. Cook with

24   a Miranda warning?

25   A.        Yes, Special Agent Pape did.
```

1   Q.        Your Honor, could I approach the witness please?

2             THE COURT:  Sure.

3   BY MR. CRAWFORD:

4   Q.        Special Agent Schulte, handing you what's been

5   marked as Government's Exhibit 1, do you recognize that

6   document?

7   A.        I do.

8   Q.        How do you recognize it?

9   A.        I recognize this to be our standard Advice of

10  Rights form FD-395.  My signature is affixed at the bottom.

11  Q.        I see there are two witness lines there.  Which

12  signature is yours?

13  A.        Bottom one.

14  Q.        And there is another line above that on the

15  right-hand side that is labeled signed, whose signature is

16  there?

17  A.        That's Mr. Alex Cook's.

18  Q.        And how do you know that that's his signature?

19  A.        I recognize it.  And also I watched him sign this

20  form.

21  Q.        And who's the other signature on this document?

22  A.        Special Agent Paul Pape.

23  Q.        Was he present when the -- when this -- this

24  warning was provided to Mr. Cook?

25  A.        Yes, he's the one that provided it to him.

1    Q.        Could you please describe how this document was

2    presented to Mr. Cook?

3    A.        Yes, I recall Special Agent Pape telling Mr. Cook

4    that we needed to advise him of his rights, and I believe

5    he just presented to Mr. Cook and allowed him to read it

6    over.  After Mr. Cook was done reading it, Special Agent

7    Pape asked if he had any questions or if he understood it.

8    Mr. Cook acknowledged that he did.

9    Q.        And what format was this document presented to

10   Mr. Cook in?

11   A.        It was presented in electronic format on the

12   computer screen.

13   Q.        Could you, I guess, describe what sort of

14   opportunity Mr. Cook would have had to review the document

15   on the computer screen?

16   A.        Yes.  The computer screen was presented to

17   Mr. Cook, and he was able to read it over just as I could

18   see it as well.

19   Q.        And how was he able to then sign this document if

20   it was on the computer screen?

21   A.        Vice has a signature pad, and Mr. Cook was able

22   to use that signature pad to affix his signature onto the

23   form, and he could actually see it populate on the form as

24   he signed.

25   Q.        Okay.  And as you observed Mr. Cook sign the

1    signature pad?

2    A.        I did.

3    Q.        And to your best of your recollection, did he

4    take an opportunity, a reasonable amount of time to review

5    the document before signing it?

6    A.        Yes.

7    Q.        Can you estimate at all approximately how long he

8    looked at the document?

9    A.        Probably around a minute or less, but it was --

10   it seemed appropriate for the amount of time he would need

11   to look it over and understand it.

12   Q.        Thank you.  Your Honor, we would ask that the

13   Government's Exhibit 1 be admitted for the purposes of this

14   hearing?

15            THE COURT:  Any objection?

16            MS. GRILL:  No objection, Your Honor.

17            THE COURT:  It will be admitted.

18            What happened to the rights form after it was

19   signed?  Was it displayed, or was it saved and closed or --

20   A.        I could not see it any longer after he signed it.

21   I don't know the specific process because this is from the

22   polygraph instrument, so I'm not familiar with that

23   particular instrument and how it functions, but I do know

24   that you can see the form at the time of signing it as I

25   signed after Mr. Cook did.  But after that, I'm not sure of

 1    the specific operation.

 2    Q.        Was there any discussion of a polygraph or

 3    consent to a polygraph after the Miranda warning?

 4    A.        Yes, Special Agent Pape then brought up onto the

 5    computer screen a polygraph consent form and went over the

 6    form with Mr. Cook.

 7    Q.        Your Honor, could I approach the witness, please?

 8              THE COURT:  Of course.

 9    BY MR. CRAWFORD:

10    Q.        Special Agent Schulte, handing you what's been

11    marked as Government's Exhibit 2.  Do you recognize that

12    document?

13    A.        I do.

14    Q.        How do you recognize it?

15    A.        This is the consent to interview with polygraph

16    form.  It's a standardized form within the Federal Bureau

17    of Investigation, it's number FD-328.

18    Q.        Does your signature appear on this document?

19    A.        It does.

20    Q.        And where is it?

21    A.        It's on the first witness line.

22    Q.        And do you see two other signatures there?

23    A.        I do.

24    Q.        And can you identify those?

25    A.        Special Agent Paul Pape's on the examiner line,

1    and Alex D. Cook is on the examining line.

2    Q.        How do you know that that's Alex Cook's

3    signature?

4    A.        Again, I recognize the signature, and I watched

5    Mr. Cook sign the form.

6    Q.        Okay.  And how is this document presented to

7    Mr. Cook for his review?

8    A.        In the same fashion that the Advice of Rights

9    form was presented to him on the computer screen.

10   Q.        And to your recollection, Mr. Cook take a

11   reasonable amount of time to review it?

12   A.        He did.  And in fact, during the -- during the

13   form being put up on the screen, Special Agent Pape

14   referred to various lines within it, read them out loud.

15   Q.        Did -- with regard to either Government's Exhibit

16   1 or 2, did Mr. Cook have any questions about the

17   documents?

18   A.        He did not.

19   Q.        Did he have any hesitation in signing them?

20   A.        He did not.

21   Q.        Any indication to you, through body language or

22   otherwise, that he didn't understand the nature of these

23   two documents?

24   A.        No.

25             MR. CRAWFORD:  Your Honor, I would ask that The

```
 1   Court --
 2              THE COURT:  Any objection?
 3              MR. CRAWFORD:  Admit Government's Exhibit 2.
 4              MS. GRILL:  No, Your Honor.
 5              THE COURT:  It will be admitted.
 6   BY MR. CRAWFORD:
 7   Q.        Special Agent Schulte, what happened after these
 8   two rights forms were signed?
 9   A.        I at that point Special Agent Pape told me he was
10   going to begin his interview, and that I could leave the
11   room, and I did.
12   Q.        And did you return to the room at any particular
13   time?
14   A.        I did after for a brief moment.  I don't remember
15   at what point in Special Agent Pape's interview or how much
16   time transpired from me first leaving the room, but
17   Mr. Cook needed to use the restroom at some point, so I
18   retrieved the key that we use for the common area restroom
19   that's outside on the second floor of the federal building
20   there in Lima, and assisted getting Mr. Cook the key and
21   getting him access to the restroom there.
22   Q.        Did you follow him into the restroom at all?
23   A.        No.
24   Q.        Tell him that he had to come back after using the
25   restroom?
```

1    A.        No.  I just waited at the front door of the FBI

2    office because there's -- the public just can't walk into

3    the office, they would need someone to actually let them

4    in.  So it would make it easier for Mr. Cook to return, I

5    just waited at the front door.

6    Q.        Was this restroom in a common area of the

7    building or in the FBI proper?

8    A.        It's in the common area of the building.

9    Q.        And did Mr. Cook come back?

10   A.        He did.

11   Q.        And at some time did the polygraph examination

12   end?

13   A.        It did.  Special Agent Pape came into the open

14   area of our office, kind of the central area of the office

15   where I was sitting and waiting and advised me that the

16   interview had concluded and giving a brief synopsis of the

17   interview.

18   Q.        Did you go into the interview room after speaking

19   with Special Agent Pape?

20   A.        I did.

21   Q.        And what was Mr. Cook's demeanor when you saw him

22   after the polygraph?

23   A.        Again, relaxed, agreeable to what was going on,

24   didn't voice any objection.

25   Q.        What did you say to Mr. Cook?

1    A.        I advised Mr. Cook that our search team was

2    nearly finished at his residence, and that I received a

3    phone call from one of the members of the search team with

4    some questions and that I wanted to ask him a few

5    questions.  He agreed to that, and I asked him who owned an

6    Ipod that was found on top of the refrigerator inside the

7    kitchen.  I don't remember Mr. Cook's answer to that.  I

8    also asked him if he recalled who owns or why there was a

9    thumb drive in a DVD case close to their entertainment

10   center.  And Mr. Cook didn't recall that there was a thumb

11   drive there, didn't know whose it might be.  And I also

12   asked Mr. Cook if there were anything that would be of

13   interest to our investigation out in his vehicle that was

14   parked out in front of the apartment, and Mr. Cook said

15   that there wasn't, that he recalled.  That he had some

16   camera memory sticks or, you know, devices that could hold

17   pictures for a digital camera and that we were welcome to

18   take those from his truck and analyze them and see if there

19   was anything of evidence for our case on those.

20   Q.        And where was his truck at this time?

21   A.        It was still parked in front of his apartment.

22   Q.        And where were you and Mr. Cook?

23   A.        We were in the office at the FBI at our resident

24   agency inside the interview room.

25   Q.        Okay.  And after having this closed interview

 1   with Mr. Cook, where did you go?

 2   A.        At that point Special Agent Pape, myself and

 3   Mr. Cook went back downstairs the way we came into the

 4   building and got into my vehicle.  Again, Mr. Cook in the

 5   front seat, and Mr. -- or Special Agent Pape in the back

 6   seat, drove.

 7   Q.        And then at some point did you arrive back at his

 8   residence?

 9   A.        We did, after a brief drive back to the

10   apartment, we arrived there and exited the vehicle.

11   Q.        And what did you intend to do when you arrived at

12   the apartment?

13   A.        I intended to obtain a consent to search for

14   Mr. Cook's vehicle, so I went to my trunk and got out a

15   consent to search form and I read it over to Mr. Cook,

16   filled it out and asked Mr. Cook if he would give us

17   consent to search his truck.  He agreed and signed the

18   form.

19   Q.        Okay.  Your Honor, may I approach the witness?

20             THE COURT:  Sure.

21   BY MR. CRAWFORD:

22   Q.        Special Agent Schulte, handing you what's been

23   marked Government's Exhibit 4, do you recognize this

24   document?

25   A.        I do.  This is a standard consent to search form

1    that we use when asking someone for consent to search.

2    It's form FD-26, and my signature's affixed to the bottom

3    underneath the witness line.

4    Q.        And was this the form that you just referred to

5    as being with Mr. Cook before searching his truck?

6    A.        Yes.

7    Q.        You'll notice that there are four numbered items

8    on Government's Exhibit 4.  Did you read each of those to

9    Mr. Cook?

10   A.        I did.

11   Q.        And did Mr. Cook sign this form?

12   A.        Yes, he did.

13   Q.        And where is his signature?

14   A.        His signature's on the signature line right under

15   line four that says I authorize these agents to take any

16   items which they determine may be related to their

17   investigation.

18   Q.        How do you recognize Mr. Cook's signature?

19   A.        Again, I recognize it from the other two

20   instances, and I also personally observed Mr. Cook sign the

21   form.

22   Q.        And what are the other two signatures on the

23   document?

24   A.        Special Agent Paul Pape's signature and my

25   signature below his.

```
1   Q.        And briefly, did you search the truck?

2   A.        Yes, I did.

3   Q.        And what did you discover in the truck?

4   A.        There was no other items that were of interest to

5   us in the investigation besides the photo memory sticks

6   that Mr. Cook told us about at the FBI office, so I took

7   possession of those.

8   Q.        What did you do then?

9   A.        At that point we left the area with no incident.

10  Q.        And did you have an occasion to return to the

11  apartment later that day?

12  A.        We did.  Once I returned to the office, I met up

13  with members of the search team, they were not still at the

14  apartment when we returned with Mr. Cook.  I spoke with

15  Special Agent Rus, who is at the search warrant location,

16  and I advised him that we were just coming back from

17  picking up these photo memory sticks which were used in

18  Mr. Cook's digital camera which he told us about.  And

19  Special Agent Rus told us that they did not recover a

20  digital camera at the search location.  At that point we

21  decided it would be in our best interest of the

22  investigation to return and review that digital camera, at

23  the very least, if not take possession of it for analysis.

24  So we returned to Mr. Cook's residence shortly thereafter

25  and found Mr. Cook to be leaving the residence in his
```

 1    vehicle with a female passenger.

 2    Q.        Did you have a conversation with Mr. Cook?

 3    A.        Yes.  Mr. Cook stopped to talk with us, and we

 4    advised him that we were mistaken, we thought that myself

 5    and Agent Pape, when we were there earlier, I thought that

 6    the search team already had possession of his digital

 7    camera and that we didn't, and that I asked him if it would

 8    be okay for me to retrieve that digital camera.  Mr. Cook

 9    agreed that it would be all right.  I presented Mr. Cook

10    with another consent to search form to document his giving

11    us consent to retrieve that digital camera.

12    Q.        Your Honor, may I approach the witness, please?

13              THE COURT:  Yep.

14    BY MR. CRAWFORD:

15    Q.        Agent Schulte, giving you what's been marked

16    Government 5, do you recognize this?

17    A.        I do.  This is another FD-26 consent to search

18    form used by the Federal Bureau of Investigation.

19    Q.        It's a consent to search what?

20    A.        This is a consent to search the residence at 1268

21    Knollwood Drive in Lima, Ohio.

22    Q.        And you'll notice on this form that there were

23    four numbered items.  Did you read each of those to

24    Mr. Cook?

25    A.        In this particular case, I don't specifically

1    recall.  It is my general practice to, but I just don't

2    specifically recall.

3    Q.        And is Mr. Cook's signature on this document?

4    A.        It is.

5    Q.        And where is it?

6    A.        It's located on the signature line.

7    Q.        And how do you recognize his signature?

8    A.        I recognize it from the other instances of the

9    signature, and I also, again, personally observed him

10   signing this form.

11   Q.        Okay.  Approximately how long after presenting

12   Government's Exhibit 4 to Mr. Cook did you present

13   Government's Exhibit 5, do you recall?

14   A.        I can say with certainty it wasn't more than a

15   half hour.  I mean, we drove to the resident agency, had a

16   brief conversation and drove back.  So if I -- I don't

17   specifically recall, but I can approximate it to be about a

18   half hour.

19   Q.        And what are the other two signatures on the

20   document?

21   A.        My signature is on the witness line, and Special

22   Agent Brian Rus signed below me.

23            MR. CRAWFORD:  Your Honor, I would ask The Court

24   admit Government's Exhibit 4 and 5 for purposes of this

25   hearing.

1          THE COURT:  It will be admitted.

2    BY MR. CRAWFORD:

3    Q.        Special Agent Schulte, quickly, how were you able

4    to retrieve the camera from the residence?

5    A.        Mr. Cook accompanied us into his residence, took

6    us to his bedroom where he retrieved the digital camera.  I

7    don't remember specifically from where in the bedroom, but

8    we stood in his bedroom and he handed it to me and I turned

9    it on and quickly looked through it to see if it contained

10   any images that would be of interest in our investigation.

11   Q.        And what was his demeanor during this time?

12   A.        Again, agreeable, relaxed.

13   Q.        Special Agent Schulte, if I can just take you

14   back for a second on the matter of timing, can you estimate

15   the amount of time between when you first got into the car

16   with Mr. Cook to go to the Lima office, the time that had

17   elapsed between that moment and the time you returned him

18   to his residence?

19   A.        I don't specifically recall, but I would estimate

20   it to be maybe a couple hours tops.

21          MR. CRAWFORD:  Your Honor, could I approach the

22   witness, please?

23          THE COURT:  You may.

24   BY MR. CRAWFORD:

25   Q.        Special Agent Schulte, I'm handing you what's

1   been marked as Government's Exhibit 6.  Do you recognize

2   that document?

3   A.        I do.

4   Q.        How do you recognize it?

5   A.        This is a resume with Alex Cook's name on it.

6   This is a document, it's a photocopy of a document which

7   was found inside Mr. Cook's bedroom by Special Agent

8   Jonathan Jones.

9   Q.        If you'll notice one of the headings is

10  education.  Could you please read what the document -- what

11  the resume says about Mr. Cook's high school education?

12           MS. GRILL:  Your Honor, I'm going to object at

13  this point, I don't think this has been in any way

14  authenticated or anything even close to that other than

15  saying it was a document found in my client's bedroom.  At

16  this point we don't even know who created the document,

17  when it was created.

18           THE COURT:  Mr. Crawford?

19           MR. CRAWFORD:  Your Honor, I'll just simply ask

20  him if he has any reason to believe that Mr. Cook has any

21  reading difficulties at all.

22           THE COURT:  Any?

23           MR. CRAWFORD:  Reading difficulties, Your Honor.

24  Special Agent Schulte --

25  A.        Not to my knowledge.  He didn't express any type

1  of those difficulties at any time while he was in my

2  presence.

3          MR. CRAWFORD:  Okay.  Thank you.

4          THE COURT:  I think it's -- the circumstances

5  sufficiently authenticate the document to make it

6  reasonably likely that it's something he had prepared, and

7  the resume is usually something that somebody, though not

8  always, gives reasonably accurate information.  I think the

9  objection goes to the weight and not the admissibility for

10  this proceeding.  We're not in trial.

11          MR. CRAWFORD:  True, Your Honor, simply for this

12  proceeding.  The fact whether it's a foundation, whether

13  it's hearsay --

14          THE COURT:  I understand, so I'll admit it solely

15  for this proceeding.

16          MR. CRAWFORD:  Thank you, Your Honor.

17          THE COURT:  You may proceed.

18          MR. CRAWFORD:  Your Honor, could I approach the

19  witness?

20          THE COURT:  Sure.

21  BY MR. CRAWFORD:

22  Q.       Special Agent Schulte, I'm handing you what's

23  been mark as Government Exhibit 7.  Do you recognize that

24  document?

25  A.       I do.

```
 1   Q.        And how do you recognize it?

 2   A.        This is the defendant's motion to suppress.

 3   Q.        If I draw your attention to page 2 --

 4   A.        Yes.

 5   Q.        -- the last paragraph, first sentence, last

 6   partial paragraph.  Would you please read that sentence,

 7   beginning with after the interrogation?

 8   A.        After the interrogation an agent typed a

 9   statement and told Mr. Cook he could leave when he signed

10   the statement.

11   Q.        At any time did you tell Mr. Cook that he could

12   not leave until he signed the statement?

13   A.        No.

14   Q.        You ever give Mr. Cook any impression or

15   indication that he was being detained until he signed the

16   statement?

17   A.        Never.

18   Q.        I draw your attention to page five.  Second

19   paragraph from the bottom begins with here Mr. Cook was

20   driven to the FBI office.  Notice the third sentence it

21   begins at that point.  Could you read that sentence,

22   please?

23   A.        Sure.  At that point, Mr. Cook became distressed

24   and expressed his desire to leave.

25   Q.        At any point in time in your interactions with
```

```
 1   Mr. Cook, did he become distressed?

 2   A.        No.

 3   Q.        Did he express his desire to leave in any way?

 4   A.        No, not at all.

 5   Q.        Last two sentences, could you please read those

 6   of that same paragraph?

 7   A.        Mr. Cook picked up his phone but was told to put

 8   the phone away until they finished -- until they were

 9   finished.  There are also indications that he told the

10   agents that he would like a lawyer.

11   Q.        Was Mr. Cook ever told to put a phone away?

12   A.        No.

13   Q.        Do you have any recollection of Mr. Cook even

14   having a phone that day?

15   A.        I do not.

16   Q.        Any indications at all that Mr. Cook desired a

17   lawyer?

18   A.        No.

19   Q.        Turn your attention to page seven.  First full

20   paragraph, could you read the first sentence that begins

21   with here agents indicated?

22   A.        Here agents indicated that the form was a

23   standard form required to proceed with a polygraph test.

24   Q.        Did you ever tell Mr. Cook that any of the forms

25   that he was signing were standard forms?
```

1    A.        No, I did not.

2    Q.        Did you tell him that he was required to sign

3    them?

4    A.        No.

5    Q.        Page 8, the middle paragraph begins here, when

6    questioning intensified, could you read the rest of that

7    sentence, please?

8    A.        Sure.  Here when questioning intensified,

9    Mr. Cook opened his cell phone to make a call.

10   Q.        Mr. Cook ever open his cell phone to make a call

11   that you're aware of?

12   A.        No.

13   Q.        Did you, at any time, tell Mr. Cook to put a cell

14   phone away?

15   A.        No, I did not.

16   Q.        Third sentence in that paragraph, would you

17   please read that begins shortly thereafter?

18   A.        Shortly thereafter, Mr. Cook told the agent I

19   would like a lawyer.

20   Q.        At any time did Mr. Cook say, quote, I would like

21   a lawyer?

22   A.        No, he did not.

23   Q.        And lastly, Special Agent Schulte, on page nine,

24   first full paragraph, could you read the third sentence,

25   beginning with when Mr. Cook?

```
 1    A.        When Mr. Cook asked what the statement said, he

 2    was told it was a letter to the prosecutor saying there was

 3    no reason to go further with the case.

 4    Q.        Did you ever tell Mr. Cook that he was signing a

 5    letter to the prosecutors telling them not to go further

 6    with the case?

 7    A.        Never.

 8              MR. CRAWFORD:  Your Honor, I would ask The Court

 9    to admit Government's Exhibit 7 for this hearing.

10              THE COURT:  Okay.  It's already part of the

11    record, so I'll admit it.

12              MR. CRAWFORD:  Your Honor, I have no further

13    questions for Special Agent Schulte.

14              THE COURT:  Ms. Grill, cross examination.

15                          CROSS EXAMINATION

16    BY MS. GRILL:

17    Q.        Good morning.

18    A.        Good morning.

19    Q.        I just have a couple of questions, and I want to

20    take you back to when you guys showed up.  And by "you

21    guys," I mean the team of ten people I think you said; is

22    that correct?

23    A.        Approximately.

24    Q.        Okay.

25              THE COURT:  What time is it -- I apologize,
```

1    Ms. Grill, but what time was this?  You said it was early.

2    A.        Without looking at my notes, I can't recall the

3    specific time, but I would say around 7:00 or earlier in

4    the morning.

5            THE COURT:  Between 6:00 and 7:00, more towards

6    7:00 give or take?

7    A.        Yes, Your Honor.

8            THE COURT:  It wasn't 4:00, 2:00?

9    A.        It was definitely after 6:00, most likely later

10   than 6:30.

11   BY MS. GRILL:

12   Q.        It's you, and I think you said Agent Smith were

13   both in suits; is that correct, I'm sorry?

14   A.        Myself and Special Agent Pape were both in suits.

15   Q.        Okay.  So two of you are in suits, the rest of

16   the team of almost ten are in various gear, some with,

17   what, bullet proof vests on; is that correct?

18   A.        Correct.

19   Q.        That have FBI on the back; is that correct?

20   A.        Some said police, some said FBI.

21   Q.        Okay.  So when you initially show up, you knock

22   on the door, correct?

23   A.        Yes.

24   Q.        And eventually, because it's early in the

25   morning, somebody does come down and answer the door,

```
 1   correct?

 2   A.         That's correct.

 3   Q.         So two agents with suits on and approximately

 4   eight other people with some sort of gear indicating FBI or

 5   other police agencies; is that correct?

 6   A.         Not all of the search team was in front.  We had

 7   various members of the team also located in back of the

 8   residence.  They would not have been in view.

 9   Q.         Okay.  How many are in view when Alex opens the

10   door?

11   A.         I wouldn't be able to say.  It was myself and

12   Agent Pape are the first at the door.  I did not take a

13   look behind me to know how many would be visible to

14   Mr. Cook or Mr. Douglas as they answered the door.

15   Q.         But certainly more than just the two of you,

16   correct?

17   A.         Yes.

18   Q.         Okay.  And again, some, at least, in vests with

19   FBI on the back, correct?

20   A.         Yes.

21   Q.         And you said while no guns were actually pointing

22   at Mr. Cook or Mr. Douglas, there were some members with

23   guns drawn; is that correct?

24   A.         Correct.

25   Q.         And initially, you brought Mr. Douglas and
```

1   Mr. Cook outside of the house, correct?

2   A.        That is correct.

3   Q.        Did you go in and do an initial sweep of the

4   house, or I don't know what the technological term is, but

5   you looked around the house quickly; is that correct?

6   A.        Members of the search team did.  I remained out

7   front.

8   Q.        Okay.  With Mr. Douglas and Mr. Cook?

9   A.        Correct.

10  Q.        Okay.  And then were Mr. Cook and Mr. Douglas

11  brought back into the home, or did they remain outside

12  during the search?

13  A.        Mr. Cook was -- went back into the residence with

14  members of the search team.  I remained outside with

15  Mr. Douglas for a brief while to talk with him as I

16  indicated earlier.

17  Q.        Okay.  And at some point, you indicated during

18  your direct examination, both Mr. Douglas and Mr. Cook were

19  allowed to change clothing; is that correct?

20  A.        Mr. Douglas would have changed clothing after I

21  left because he stayed in my presence until I left.

22  Q.        Okay.  Did you go back into the residence then

23  during the search?

24  A.        I don't believe I did.  I don't specifically

25  recall, but I don't think I did.

1    Q.        So you don't know where Mr. Cook was sitting

2    during the search or who was sitting with him or any of

3    that; is that correct?

4    A.        That's correct.

5    Q.        Okay.  Now, I wanted to touch on just very

6    briefly, initially Mr. Crawford questioned you about the IP

7    address for the computer.  An IP address is actually going

8    to go to a residence; isn't that correct, not necessarily a

9    specific computer?

10   A.        That depends on how -- what the configuration of

11   the computers and the network are inside the residence.  It

12   certainly could go directly to a computer, or it can also

13   go to a modem or it can go to a router.  Every device on a

14   network has an IP address, whether it's a computer or just

15   a computer device.

16   Q.        But it's not necessarily linked specifically to

17   one computer; isn't that correct?

18   A.        That's correct.

19   Q.        Okay.  And Mr. Douglas, his computer was using

20   the same IP address as Mr. Cook's computer; is that

21   correct, while it was at least at that residence?

22   A.        There certainly would have been times when this

23   occurred.

24   Q.        And you said, I want to make sure I understand,

25   you said during your direct examination that there was

1   actually a password that Mr. Douglas used in order to

2   connect to the Internet; is that correct, or did I

3   misunderstand that?

4   A.        That's correct.  The wireless router, which is

5   essentially a radio that transmits data to and from

6   computers so that you don't have to have them hard wired,

7   oftentimes require an encryption key so that other people

8   outside the residence cannot use that radio to communicate

9   to the Internet.  And in this particular case, that router,

10  that radio was secured and required the knowledge of the

11  encryption key or pass code to use it and access the

12  internet, according to Mr. Douglas.

13  Q.        Eventually Alex Cook leaves his residence, comes

14  outside, and you've been outside that whole time, correct?

15  A.        As I recall, yes.

16  Q.        Okay.  And he's dressed by that point when he

17  comes back out?

18  A.        Yes.

19  Q.        And was the plan already at that point to go down

20  to the FBI office, or was that discussion then happening

21  when he came out of the residence?

22  A.        Initially before searching the residence or even

23  arriving to the residence, Special Agent Pape and I had

24  discussed that we hoped Mr. Cook would cooperate and come

25  to the resident agency, but we weren't sure how that would

1    evolve.

2    Q.      Okay.  And so when Alex comes out of his

3    residence before you guys get in the car to drive to the

4    office, do you and Mr. Pape, or Agent Pape, and Alex Cook

5    have a conversation about going down to the FBI office?

6    A.      Special -- Special Agent Pape communicated to me

7    that Mr. Cook was willing to voluntarily come to the office

8    with us and be interviewed.

9    Q.      Okay.  So by that point you guys were just

10   getting into the car, is that fair?

11   A.      Correct.  Yes.

12   Q.      And does Alex say anything like, hey, let me grab

13   my keys?

14   A.      I don't recall anything like that.

15   Q.      Was the assumption then at that point you were

16   going to be driving him to the FBI office?

17   A.      Yes, I think there was some casual conversation,

18   we'll just take my car, and my car was at the end of the

19   sidewalk and accessible, easily accessible to take.

20   Q.      Okay.  And you're stating it was about a five to

21   ten minute drive?

22   A.      Approximately.

23   Q.      Is this -- I don't know Lima real well, is this

24   back roads, main roads?

25   A.      Main roads.

```
1    Q.        Main roads?

2    A.        Yeah.

3    Q.        And when you show up to the Lima office, how many

4    agents are at the Lima office, assigned to the Lima office,

5    I should say?

6    A.        There's three agents currently assigned to the

7    office.

8    Q.        Do you have administrative staff also there every

9    day?

10   A.        We do.  There's usually one administrative

11   person.

12   Q.        Now, the day that you show up with Mr. Cook, do

13   you know about what time that is in the morning?

14   A.        I'd say shortly after 7:00 a.m.

15   Q.        Okay.  Is anyone at the office yet that morning?

16   A.        All of our personnel were assisting with the

17   search, so there was nobody else in the office when Special

18   Agent Pape and myself arrived.  That's why I had to unlock

19   the office and go around to let Special Agent Pape and

20   Mr. Cook in.

21   Q.        And you mentioned earlier in your direct

22   examination that you can't just walk into the FBI office,

23   you have to be let into the FBI office; is that correct?

24   A.        That's correct.

25   Q.        Do you have to be let in even -- strike that.
```

```
 1   The building that the FBI office is in, how many floors is
 2   that building?
 3   A.         Two floors.
 4   Q.         Two floors.  And the office is on the second
 5   floor?
 6   A.         That's correct.
 7   Q.         And take stairs or an elevator to get up to the
 8   second floor; is that correct?
 9   A.         That's correct.
10   Q.         Is there any security or anything on the first
11   floor to allow you up to the second floor, or can people go
12   up to the second floor?
13   A.         People can just go up to the second floor.
14   There's various offices, IRS is up on the second floor with
15   us, bankruptcy court is on the second floor.  Down on the
16   first floor is Social Security and RV and other military
17   recruiters, and there is no access point security.  There's
18   no guard at the door as you would see in a lot of federal
19   buildings.  The public has open access to come to the
20   second floor and knock on the front door of the FBI.
21   Q.         But to get into the FBI office, somebody has to
22   be there to let them in, correct?
23   A.         Yes, that's correct.
24   Q.         The opposite then is the doors from the inside to
25   get out are unlocked?
```

1   A.        That's correct.

2   Q.        While you guys were in the car, and I'm sorry I'm

3   jumping around here, but did you and/or Agent Pape discuss

4   with Alex that his statement was going to be taken or that

5   Alex was getting ready to submit to a polygraph or anything

6   about a polygraph, was there anything about what was going

7   to happen at the FBI office discussed with him in the car?

8   A.        No, not specifically.  I thanked Mr. Cook for his

9   willingness to come to our office and try to shed some

10  light on our investigation, but most of the conversation

11  during our travel back to the office was general

12  conversation about Mr. Cook's interests and education and

13  going to school in Lima, et cetera.

14  Q.        Okay.  And you had stated during your direct

15  examination that at no time did Mr. Cook tell you that he

16  had any sort of reading difficulties; is that correct?

17  A.        That is correct.

18  Q.        And you didn't hear him tell Mr. Pape or Agent

19  Pape that he had any reading difficulties; is that correct?

20  A.        That is correct.

21  Q.        Did anyone ask him if he had any reading

22  difficulties?

23  A.        Specifically, that wording no.

24            THE COURT:  Was he asked if he could read?

25  A.        He was asked if he could understand the Advice of

1    Rights form, but specifically asked if he could read, no.

2    Q.        And initially, I was just going to ask you about

3    the Advice of Rights form.  So you're present when he signs

4    the computer pad for the Advice of Rights form, correct?

5    A.        That's correct.

6    Q.        And neither you nor Agent Pape actually read to

7    him each line of that form; is that correct?

8    A.        Not that I recall.

9    Q.        Okay.  It was just sort of shown to him on a

10   computer screen and you said he took less than a minute,

11   but what, in your estimation, would be enough time to

12   review it and then he signed the form, is that accurate?

13   A.        That's correct.

14   Q.        Okay.  And then secondly -- what was submitted as

15   Government's Exhibit 2, I'm used to letters, sorry, we do

16   letters usually for defense.  Number 2, again, was each

17   line of this read to Mr. Cook by either you or Mr. Pape

18   while you were standing there?

19   A.        I don't recall each and every line being read to

20   him, but I do recall Special Agent Pape referring to

21   several of the lines and explaining what they meant, and

22   because this isn't really standardized language that common

23   public would normally see, it seemed appropriate that Agent

24   Pape would refer to some of the statements on the form and

25   just give a brief explanation about them.

```
 1   Q.        And none of this was audio recorded, correct?

 2   A.        That is correct.

 3   Q.        None of this was video recorded, correct?

 4   A.        That's correct.

 5   Q.        And in fact, the FBI does not make -- it's not

 6   their policy to record statements; is that correct?

 7   A.        That is correct.

 8   Q.        Either audio or video; is that correct?

 9   A.        That's correct.  We -- if we would like to do

10   that, we'd need to get approval from our special agent in

11   charge of the division.

12             THE COURT:  Would that be somebody in Cleveland

13   or Toledo?

14   A.        In Cleveland.

15             THE COURT:  Did Steve have to get somebody's

16   approval?

17   A.        I don't believe so.  He has the authority.

18   BY MS. GRILL:

19   Q.        And then I want to make sure I --

20             THE COURT:  For whatever it's worth, I'll repeat

21   a comment that I made several years ago.  I think it's an

22   unfortunate policy on the part of the bureau, it's one that

23   many police departments have long since abandoned and save

24   both audio and videotapes interrogations, that's nothing

25   you can change, right?
```

```
 1   A.        Yes, Your Honor.

 2             THE COURT:  I really think that it's unfortunate.

 3   I had a case some years ago where it would have made all

 4   the difference in the world, but that's neither here nor

 5   there.

 6             Go ahead, Ms. Grill.

 7             MS. GRILL:  It may save some court time.  We may

 8   not be sitting here.

 9   A.        I understand.

10             MS. GRILL:  I apologize.

11   BY MS. GRILL:

12   Q.        Mr. Crawford read to you several excerpts of our

13   motion that we filed.

14   A.        Yes.

15   Q.        But I want to make sure that I understand where

16   you actually physically were during most of the

17   polygraph -- polygraph exam and questioning of my client.

18             You weren't actually present in the room; is that

19   correct?

20   A.        That's correct.  After Mr. Cook signed his

21   consent to polygraph, I left the room.

22   Q.        Okay.  So you can, obviously answer what you

23   observed?

24   A.        That's correct.

25   Q.        But you don't know what may or may not have
```

```
 1    occurred with Mr. Pape present; is that correct, Agent
 2    Pape?
 3    A.        That is correct.
 4    Q.        Okay.  And there was a statement typed; is that
 5    correct?
 6    A.        Yes.
 7    Q.        Okay.  And I don't think --
 8              THE COURT:  Was that after the polygraph
 9    examination?
10    A.        My knowledge of when that was typed would be
11    based off of Special Agent Pape relaying that to me.  He
12    told me that it was typed during the interview.
13              THE COURT:  During -- during the polygraph
14    examination, is that what you mean by the interview?
15    You'll tell us I'm sure.
16    A.        During the time that I was out of the room, it
17    was typed.
18              THE COURT:  Okay.  And how long -- I apologize,
19    how long were you out of the room?
20    A.        I, again, don't specifically recall, but I can
21    say maybe an hour.
22              THE COURT:  You didn't punch a time clock?
23    A.        I did not, sir.
24              THE COURT:  Give or take.
25    A.        Yes, Your Honor.
```

```
 1   BY MS. GRILL:

 2   Q.        And my question was you're not the one who typed

 3   up this statement, correct?

 4   A.        That's correct.

 5   Q.        Okay.  Did you type up anything for Mr. Cook to

 6   sign?

 7   A.        No.

 8   Q.        Okay.  And I know you had testified earlier that

 9   Mr. Cook was never told he could not leave?

10   A.        That's correct.

11   Q.        At least not by you, correct?

12   A.        That's correct.

13   Q.        Was he ever told he could leave specifically?

14   A.        I don't -- I don't recall him ever being told he

15   could specifically leave.  I don't --

16   Q.        When -- when the drive was occurring to the FBI

17   office, was there any discussion about how Mr. Cook was

18   going to get back to his home from the FBI office?

19   A.        I don't specifically recall any discussion of

20   that nature.

21   Q.        Had you assumed, in your mind, that you were

22   going to be the one, or someone from your office, would be

23   the one driving him back?

24   A.        Without a doubt we would never leave someone

25   stranded like that.
```

1              MS. GRILL:  One moment, Your Honor.  Your Honor,

2      we have nothing further.  Thank you.

3              THE COURT:  Mr. Crawford, anything further?

4              MR. CRAWFORD:  No, Your Honor.

5              THE COURT:  I have to break for lunch, and

6      unfortunately I've got a very full schedule.  Can we resume

7      this Friday?  I'm sorry, Agent Pape will probably take

8      about the same amount of time?

9              MS. GRILL:  I would think.

10             MR. CRAWFORD:  It would be some time less, Your

11     Honor, half an hour or so, but the background and all of

12     that sort of information Special Agent Schulte has provided

13     for us.  Special Agent Pape was the agent who actually

14     conducted the polygraph, and that would be the bulk of the

15     information.

16             THE COURT:  I could be back, I imagine, by 1:00.

17     Why don't we resume at 1:00 and see where we get.

18     Ms. Grill, do you expect to call any witnesses presently?

19     Do you know yet, or would you rather wait and see?

20             MS. GRILL:  I'm not going to be calling any

21     witnesses, Your Honor.  And as far as time, I wouldn't

22     think that would take any longer than I did with Agent

23     Schulte.

24             THE COURT:  Let's resume at 1:00, and we'll see

25     how far we get.  I've just got an extremely full afternoon.

1          MS. GRILL:  May I ask Mr. Crawford one other

2     question about a different matter?  Thank you, Your Honor.

3     Sorry.

4          THE COURT:  We'll try and finish.  I can't go

5     much past 1:30 so.

6          MS. GRILL:  If it would work better for The Court

7     to --

8          THE COURT:  I should be done, maybe it might work

9     that we can resume late afternoon, 430, 5:00, finish up.

10    I'm sure everybody would prefer to finish up today.

11         MS. GRILL:  Whatever is better for The Court.

12         THE COURT:  That's fine.  I put way too much in

13    this afternoon.

14         MR. CRAWFORD:  Your Honor, we'll make an effort

15    to start at 1:00 and see if we complete, and if not

16    complete it later this afternoon.

17         THE COURT:  I assume he comes from Lima.

18         MR. CRAWFORD:  Agent Schulte did, Special Agent

19    Pape is from Toledo.

20         THE COURT:  Okey dokey.  I'll see you back at

21    1:00.

22              (A brief recess was taken.)

23         THE COURT:  Sorry.  Obviously lunch went longer

24    than expected on something longstanding.  I'm going to try

25    to move my 1:30 to 2:00.  I'll do what I can to kind of

```
 1    finish this up.  So Mr. Crawford, call your next witness.
 2              MR. CRAWFORD:  Your Honor, the government calls
 3    Special Agent Paul Pape.
 4                            PAUL PAPE,
 5    was herein, called as if upon examination, was first duly
 6    sworn, as hereinafter certified, and said as follows:
 7              THE COURT:  And agent, would you tell me your
 8    name, please.
 9    A.        My name is Paul Pape, P-A-P-E.
10              THE COURT:  And you are an FBI agent?
11    A.        Yes, sir.
12              THE COURT:  How long have you been so employed?
13    A.        I've been employed with the FBI for 14 years.
14              THE COURT:  Before that.
15    A.        Prior to that I was a state trooper in The State
16    of Ohio for seven years.
17              THE COURT:  Okay.  And before that?
18    A.        Before that I was a worker in my father's
19    restaurant.
20              THE COURT:  And where are you assigned, and what
21    do you do currently?
22    A.        Currently I am a polygraph examiner.  I've been
23    in that capacity for two years.  I am assigned out of the
24    Cleveland division under the security division of the FBI.
25              THE COURT:  You conducted the examination of
```

1   Mr. Cook that we were talking about earlier?

2   A.        Yes, I did.

3            THE COURT:  Although I guess you weren't here

4   when we were talking about it?

5   A.        No, sir.

6            THE COURT:  In about two or three sentences, tell

7   me what kind of training, what did you do to become a

8   polygraph examiner, and what sort of training, experience,

9   have you had in that regard?

10  A.        All FBI polygraph examiners go to the Defense

11  Academy of Credibility Assessment, that is a DOD training

12  facility for polygraph examiners.  It is a 16 week in-house

13  polygraph academy conducted at Fort Jackson, South

14  Carolina.  During that time, we receive extensive training

15  on polygraph instrument, practical exercises, interview

16  interrogation and conduct approximately 60 practice

17  polygraph tests on basic training soldiers in different

18  scenarios.

19           THE COURT:  And in the two years or so that

20  you've been assigned this duty with the bureau, about how

21  many examinations would you estimate roughly you've done?

22  A.        300.

23           THE COURT:  Okay.  Mr. Crawford?

24           MR. CRAWFORD:  Thank you, Your Honor.

25                      DIRECT EXAMINATION

```
1   BY MR. CRAWFORD:

2   Q.        Special Agent Pape, do you recall being involved

3   in a child pornography investigation in September of 2010?

4   A.        Yes, I do.

5   Q.        And you specifically recall being involved in the

6   execution of a search warrant at a residence in Lima, Ohio?

7   A.        Yes, sir.

8   Q.        Could you please describe what your role in

9   executing that search warrant was?

10  A.        My role was as a polygraph examiner, I

11  accompanied the search team on the majority of our search

12  warrants for child pornography matters, and that was my

13  role on this day is to accompany the search team, basically

14  when the search team secured the facility, then I came in

15  after that to conduct interviews, that type of thing.

16  Q.        At the time that the officers were executing the

17  search warrant, do you have any recollection of any --

18  anyone other than -- anyone outside the team, any residents

19  of the apartment being in handcuffs, being arrested or

20  otherwise detained?

21  A.        No, sir.

22  Q.        And do you specifically recall the address that

23  you served the search warrant?

24  A.        I believe it was on Knollcrest (sic), it was an

25  apartment complex.  I don't recall the specific apartment
```

```
 1  number.
 2  Q.        Do you recall who the residents of the apartment
 3  were?
 4  A.        Yes, Mr. Cook, and there was a another resident
 5  there, another male college student.  I don't recall his
 6  name offhand.
 7  Q.        Any other residents of that apartment?
 8  A.        No, sir.
 9  Q.        Did anyone question Mr. Cook at the apartment
10  that morning?
11  A.        Yes, I did.
12  Q.        Anyone else present when you were questioned?
13  A.        There was a task force member in the living room,
14  but he wasn't, I don't believe he was even within ear shot.
15  He was doing this searching of the area while I was talking
16  to Mr. Cook in that area.
17  Q.        Did you provide -- at the time did you indicate
18  to Mr. Cook that he was under arrest in any way?
19  A.        No.
20  Q.        That he had to answer any questions?
21  A.        No.
22  Q.        Did you provide Mr. Cook with a Miranda warning
23  at that time?
24  A.        No.
25  Q.        Could you briefly describe for The Court what
```

1  Mr. Cook told you as a result of the question?

2  A.      Yes, I talked to Mr. Cook briefly in that living

3  room area.  I told him why the FBI was here, what the

4  search warrant pertained to, that we investigate computer

5  matters like this of child pornography on computers, and

6  told him that the FBI just doesn't show up at your

7  residence on a hunch.  There was cause to believe that

8  there was child pornography on the computer.  The

9  investigation had shown that the IP address of that

10 computer belonged to Mr. Cook, and we were here executing

11 that search warrant regarding that child pornography

12 matter.

13 Q.      And Mr. Cook tell you anything about his

14 computers in the house?

15 A.      Yes.  During that conversation when I elaborated

16 all that to Mr. Cook and asked where the computers were and

17 if there was child pornography -- could there be child

18 pornography on his computers, he said that there was some

19 child pornography images on his computer, and the computer

20 was upstairs in his bedroom.

21 Q.      At any time did you ask Mr. Cook if he would be

22 willing to take a polygraph?

23 A.      Yes, I told him during this conversation that

24 part of our role in the FBI is to make sure that people

25 that have child pornography on the computers have not

1    advanced or evolved into people that are molesting children

2    or that type of violation.  And part of the way that we

3    determine if they have or if they haven't is to offer a

4    polygraph examination to determine what the extent of his

5    involvement in child pornography was.

6    Q.        Did you indicate that Mr. Cook had to take a

7    polygraph examination?

8    A.        No.  Quite the opposite.  I told him this is a

9    voluntary procedure that we go through for everyone

10   involved in child pornography matters.  I explained what

11   the process would be.  We would transport him to the Lima

12   FBI office because it's the closest available, and it's

13   conducive to conducting polygraph tests as opposed to his

14   apartment.  We'd bring him there.  It would be about a

15   two-hour process to conduct the polygraph examination.

16   When we were done, we'd bring him back to his apartment.

17   Q.        What was his demeanor at the time you were

18   talking to him at the apartment?

19   A.        It was very polite, cordial.  We were having a

20   cordial conversation, basically a straight-forward

21   conversation about what the facts were, why we were there

22   and what the next steps would be.

23   Q.        Did his body language or words give you any

24   impression that he did not understand what you were saying

25   or that he was hesitant about talking to you?

1   A.        No, not at all.

2   Q.        And did Mr. Cook, in fact, agree to come take a

3   polygraph examination?

4   A.        Yes, he did.

5   Q.        Would you please describe, I guess, the process

6   of actually getting to the point where you were going to

7   administer the examination?

8   A.        How we got there?

9   Q.        Yes.

10  A.        Okay.  Once he agreed to take the polygraph test,

11  I told -- I went and told Agent Schulte that Mr. Cook had

12  said there was child pornography images on the computer,

13  computer is upstairs.  I believe he had to get dressed, put

14  his shoes on, something to that effect.  We went upstairs

15  with him in his bedroom, and I don't recall if he had to

16  change clothes or put shoes on, he did something to that

17  effect.  When he was ready to go, we went downstairs and

18  left the apartment, myself, Agent Schulte and Mr. Cook.  We

19  walked to the end of the complex where we had my car

20  parked.  We got in my car, and we took about, a probably no

21  more than a ten minute drive to the office in downtown

22  Lima.

23  Q.        Was he handcuffed before being put into your car?

24  A.        No, not at all.  We walked side by side and

25  explaining where we were going and further what the process

1    would be, again, very cordial conversation between us.

2    Q.        At any time before you left, had he been told he

3    was under arrest for any reason?

4    A.        No, quite the opposite.  We hold him he's not

5    under arrest, it was voluntary, something for him to do.

6    And he understood that, and we gave him a ride down to the

7    FBI office.

8    Q.        What happened when you arrived at the FBI office?

9    A.        We got to the FBI office, our office is on the

10   second floor, so we came, I don't recall if we took the

11   stairs or the elevators, but we came in our office.  To the

12   left as we entered the front door is an interview room.

13   That's where the polygraph would take place.  So we entered

14   the interview room, he sat down, I prepared a polygraph,

15   basically turned my computer on and booted up the system.

16   Q.        At any point did you read, or did you provide a

17   Miranda warning to Mr. Cook?

18   A.        Yeah.  Once my computer system was ready to go, I

19   informed Mr. Cook there's two forms that I'm going to show

20   him and let him read, and you'll digitally sign them.  One

21   form is the polygraph consent form I.  I tell him again

22   this is a voluntary procedure.  This form explains you

23   don't have to answer questions if you don't want to.  The

24   polygraph is a voluntary part of the investigation.  The

25   other form is the Advice of Rights form, and I told him,

```
 1   just like I tell everyone, you would be familiar with any
 2   type of Advice of Rights form if you watch any type of cop
 3   shows at all.  Per FBI headquarters, we show these rights
 4   and have you sign these rights as well.
 5   Q.       Okay.  We've got a stack of exhibits in front of
 6   you if you can look at Exhibit 1.  Do you recognize that
 7   document?
 8   A.       Yes.
 9   Q.       What is it?
10   A.       Exhibit 1 is the Advice of Rights form.
11   Q.       And Mr. Cook had an opportunity to review this?
12   A.       Yes, he did.
13   Q.       How was it presented to him?
14   A.        I pulled this form up on my computer, and this
15   particular form I type in the top place, date and time.  I
16   told Mr. Cook this particular form on my computer I can
17   center the verbiage so I don't have to scroll up or down
18   and I tell him that.  When I centered that writing on the
19   screen, turned my computer to Mr. Cook.  I said this is the
20   Advice of Rights form I told you about.  What I want you to
21   do is read it over.  If you have any questions or don't
22   understand anything, let me know.  If not, we're going to
23   sign on the digital signature pad.
24   Q.       Did Mr. Cook take some time to review the
25   computer screen?
```

```
1   A.        He did the normal time it would take to read
2   eight or nine lines.
3   Q.        Okay.  And did he sign the document?
4   A.        Yes, he did.
5   Q.        How did he sign it?
6   A.        It's a digital signature pad for our computer
7   program.  Everything's computerized that we do, so there's
8   a signature pad just like basically at Wal-Mart.  You sign
9   on that, and I press accept and it populates it on the
10  screen.
11  Q.        And where on Exhibit 1 is Mr. Cook's signature?
12  A.        It's underneath all the verbiage where it said
13  sign.
14  Q.        And did you observe Mr. Cook sign the digital
15  signing pad?
16  A.        I did.
17  Q.        And if you could look at Government's Exhibit 2.
18  What is Exhibit 2?
19  A.        Exhibit 2 is a polygraph consent form.
20  Q.        Is this also a form that you showed Mr. Cook?
21  A.        It is.  This is very similar to the Advice of
22  Rights form in that it tells you you can refuse to take the
23  polygraph.  You don't have to answer questions, that type
24  of verbiage.
25  Q.        Was he provided an opportunity to read this form?
```

```
 1   A.        Yes, he was.

 2   Q.        And the amount of time that he took, was that

 3   consistent with someone who actually would have read the

 4   form?

 5   A.        Yes, this form is the first one I show to him,

 6   and on this particular form, I can't center it, so when I

 7   show him the form, I tell him when you're done reading down

 8   to the bottom, let me know and I will scroll down the rest

 9   of the way so you can finish reading.

10   Q.        Does Mr. Cook's signature appear on this

11   document?

12   A.        It does.

13   Q.        Where is it?

14   A.        Under examinee.

15   Q.        And did you observe Mr. Cook sign the signature

16   pad for this document?

17   A.        I did.

18   Q.        Let me direct your attention, if I could, to the

19   section titled label and consent.  There are four lines for

20   places with check marks.  Do you see those?

21   A.        Yes.

22   Q.        You'll notice one of the checked lines, the

23   second one, could you read that one for the record, please?

24   A.        I understand that the examination room does not

25   contain an observation device.
```

```
 1   Q.        Did the room contain an observation device?

 2   A.        It did.

 3   Q.        And what was that device?

 4   A.        It's a -- it's a bubble camera that's in a corner

 5   of the room.

 6   Q.        Does it -- at the time, did it have the

 7   capability to make any recording of what was going on in

 8   the room?

 9   A.        Not to my knowledge, and I know it doesn't record

10   any audio.  To the best of my knowledge, I thought it was

11   simply a security camera in case something happened in

12   there that I needed assistance because there's a monitoring

13   screen, but I'm not aware that it had any capability of

14   recording anything.

15   Q.        Was Mr. Cook made aware of the presence of the

16   camera?

17   A.        He was.  And I told him there was a monitoring

18   device and you can see it.  It's up in the corner of the

19   room.  I just mischecked that box.  I should have checked

20   the first one.

21   Q.        At the time that you checked the box indicating

22   suggestion there wasn't an observation -- was it ever your

23   intent to deceive Mr. Cook?

24   A.        No, I just mischecked because I knew it wasn't

25   recorded or monitored so I just mischecked that.
```

```
 1   Q.        Never attempted to mislead him or force by making
 2   this mistake on the document?
 3   A.        No, sir.
 4   Q.        After signing the forms, what happened next?
 5   A.        During the forms that are signed, Agent Schulte
 6   is in there as well.  He witnesses that and signs this item
 7   as well.  Once the forms are done, then I excuse Agent
 8   Schulte.  He leaves the room, and then we start conducting
 9   the various phases of the polygraph examination.
10   Q.        Just very briefly, what are those phases?
11   A.        There's three phases to the polygraph
12   examination, the pretest, in test and the post test.  The
13   pretest is part where we talk about all the questions on
14   the polygraph test.  We talk about the reason we're there,
15   and discuss all the questions in detail so a fair test can
16   be administered in that there's no surprises, you're going
17   to know what the questions are, and I give you the option
18   to explain what your answer would be so when you take the
19   test there's no ambiguities as to what do I mean by the
20   questions, or is this the right answer or is this not the
21   right answer.
22   Q.        So what was Mr. Cook's demeanor during the
23   pretest questions?
24   A.        Again, he was very cordial throughout the -- our
25   entire contact.  He wasn't -- didn't appear to be nervous
```

1    or anxious or anything.  He was very cordial.

2    Q.       Was he told at any time he could not leave until

3    he took the polygraph examination?

4    A.       No.

5    Q.       And at some point did you administer a polygraph

6    test?

7    A.       Yes.

8    Q.       And could you briefly describe what the questions

9    were that were asked during the polygraph examination?

10   A.       The relevant questions for this type of polygraph

11   test are -- deal with any sexual contact with children, so

12   the relevant question would be have you had any contact --

13   have you had any sexual contact with a child, have you put

14   any child in any sexual situation.  And, again, during the

15   pretest, we discussed those questions in detail as to what

16   do I mean by sexual contact, what do I mean by sexual

17   situations.  So as when he takes the test, or anyone takes

18   the test, they're well aware of what I'm talking about,

19   what the scope of those questions are.  And if they had,

20   they have the opportunity in the pretest to discuss what

21   they may have been or may not have been to air all those

22   situations out.

23   Q.       At any time during this process, did Mr. Cook say

24   or do anything that suggested to you that perhaps he didn't

25   understand what you were asking him, or he didn't

```
 1   understand the process that he was participating in?

 2   A.        No.

 3   Q.        What were the results of the polygraph?

 4   A.        The official polygraph results are going to be --

 5   well, they were inconclusive.  There is three poll

 6   outcomes.  They can fail the test.  You can pass the test,

 7   or you can be anywhere in between that's inconclusive.  For

 8   Mr. Cook's test, it was very poor electrodermal response

 9   activity, basically meaning the room was very cold, and it

10   wasn't conducive to being able to read that channel on the

11   polygraph.  So because of that, I wasn't able to make a

12   conclusive result from the polygraph exam.

13   Q.        Did his demeanor change at all during and after

14   the polygraph?

15             THE COURT:  I couldn't hear your question.

16             MR. CRAWFORD:  I'm sorry, Judge.

17             THE COURT:  No problem.

18   BY MR. CRAWFORD:

19   Q.        Did Mr. Cook's demeanor change at all during the

20   polygraph?

21   A.        No.

22   Q.        About how long was the polygraph exam?

23   A.        I would estimate two hours from the time we

24   started with the forms until finish time when we were ready

25   to transport him back to the apartment.
```

1   Q.        And maybe more specifically, from the time he

2   was, I guess had the apparatus attached to him and was

3   answering your questions, about how long was that process?

4   A.        The actual in test of the polygraph, maybe 15

5   minutes at most.

6             MR. CRAWFORD:  Your Honor, could I approach the

7   witness, please?  Your Honor, may I approach the witness

8   please?

9             THE COURT:  Of course.

10  BY MR. CRAWFORD:

11  Q.        Special Agent Pape, I'm handing you what's been

12  marked as Government's Exhibit 3.  Do you recognize that

13  document?

14  A.        Yes.

15  Q.        And what is that document?

16  A.        That is a typed statement that I typed out for

17  Mr. Cook during our polygraph examination.

18  Q.        And this is -- and who provided the information

19  that went into this statement?

20  A.        Mr. Cook did.

21  Q.        And could you, I guess, explain, again, how is it

22  recorded?

23  A.        How is it recorded?

24  Q.        Typed, recorded, however you produced the

25  statement?

1    A.        Again, all of our polygraph documents are

2    computerized now, so during the -- during the pretest,

3    Mr. Cook and I discussed his possession of child

4    pornography and the things that went along with that as to

5    how did he get involved in that, what type of images he was

6    looking at, what type of search categories he used, what

7    type of arousal to different ages and genders he was

8    aroused to.  All that was discussed during the pretest to

9    prepare him for the actual test.  This statement is taken

10   at the end of our time together.  Basically when we're all

11   through and there's no more information to gather, I told

12   Mr. Cook that I wanted to get a summary of, a typed summary

13   of what we talked about during our time together so there

14   would be no misunderstandings as to what I heard or what he

15   said, that type of thing.  So I pull up my screen to pull

16   this -- to type this on there.  And during that time, I

17   basically rehashed what we've talked about during the

18   polygraph.  I ask Mr. Cook, okay, we talked about your

19   possession of child pornography.  Tell me how that started.

20   Okay.  We talked about the images that you downloaded, tell

21   me what type of images they were.  And we continue that to

22   make this statement.

23   Q.        Did Mr. Cook have the opportunity to correct, if

24   necessary, anything that was in this statement?

25   A.        Yes.  Once I have the statement finished being

1    typed, I, again, turn the screen to Mr. Cook and I tell

2    them I want you to read this over and see if this is an

3    accurate summary of what we talked about today.  For this

4    particular one it was two pages, so I said I'm going to

5    have you read the first page.  I had to scroll down, read

6    the first page, let me know if there's anything you want to

7    change or add or delete.  If it sounds like a proper

8    summary of what we talked about, the first page I'm going

9    to have you initial, and then I'm going to flip to the

10   second page, I'm going to have you read that.  Let me know

11   if that's good as well, and then I'll have you sign on that

12   if that's a proper summary of what we've talked about.

13   Q.      Did you give Mr. Cook some time to read the

14   statement?

15   A.      I did.

16   Q.      Can you estimate in any way how much time he

17   took?

18   A.      It wasn't anything out of the ordinary of reading

19   a page statement.

20   Q.      Was it --

21   A.      I knew he was reading it because when he got down

22   to a certain level, he had to tell me to scroll down

23   because it couldn't fit on one screen, so I scrolled down

24   when he said to scroll down, and we got to the bottom of

25   the first page, and he told me he was done.  I clicked on

1    the box and had him initial the first page and moved on to

2    the second page, and did that as well.

3    Q.        On the first page of the lower right-hand corner,

4    what is that marked?

5    A.        That is his initials ABC.

6    Q.        Did you observe Mr. Cook initial this statement?

7    A.        I did.  He can't initial unless I click a box for

8    him to do that.

9    Q.        Did he initial a piece of paper, or was this also

10   electronic?

11   A.        It was electronic.  He was reading the screen and

12   used the electronic pad to make the initials where I put

13   the box to make the initials.

14   Q.        On the second page there are two signatures

15   there, whose signatures are those?

16   A.        Those are that of Mr. Cook and myself.

17   Q.        And how do you know that Mr. Cook signed or made

18   the first signature there?

19   A.        I watched him sign it.

20   Q.        Was that, again, on a digital signing pad?

21   A.        Yes, it was.

22            MR. CRAWFORD:  Your Honor, I'd ask for the

23   purposes of this hearing that The Court admit Exhibit 3.

24   Judge, I'd just ask for the purposes of this hearing if we

25   could admit Exhibit 3 to Mr. Cook's statement.

 1           THE COURT:  Of course.

 2    BY MR. CRAWFORD:

 3    Q.        And Special Agent Pape, if you could just very

 4    briefly summarize what Mr. Cook's statement was?

 5    A.        Mr. Cook told me that he had been viewing adult

 6    pornography since he was 17 years old.  He started viewing

 7    child pornography when he began his traveling construction

 8    job.  He said he first started doing it out of curiosity

 9    because he related a story to me about him being molested

10    or fondled when he was at a Boy Scout camp when he was 11

11    years old, and because of that, he was curious to see what

12    that person was experiencing or feeling, so he explored

13    child pornography as a way to determine that.  He said he

14    used Lime Wire Peer to Peer network.  He searched under

15    child porn category.  He found thousands upon thousands of

16    pictures depicting child pornography.  One particular image

17    he said reminded him of his ex-fiance, so he said there

18    would be several pictures of her on there.  Most of that he

19    said would be clothed but still in sexually provocative

20    younger pictures.  He said he doesn't necessarily get

21    aroused by the sexual activities, and he doesn't want to

22    see adults with children, but he does find naked children

23    and children in the low teenage age range to be sexually

24    arousing to him.  He said he has opportunity to be around

25    these types of individuals at church as a Sunday school

1    teacher, and at Scout camp, as a Scout leader, he has those

2    age ranges of individuals that he supervises.  He said he's

3    not alone with those types of individuals, but he did say

4    that he can equate those types of real people, if you will,

5    to the images he sees in child pornography, although he

6    says he wouldn't do anything physically to them out of fear

7    of punishment and reputation damage.  He still can see that

8    some pictures of child pornography look like some of the

9    people or children that he associated with.

10   Q.       And at what point did the interview and

11   procedures at the Lima office conclude?

12   A.       Once we were, again, the statement thing is very

13   close to the end.  Once that was complete, he signed that

14   statement and kind of closed off the computer, told him

15   that we were basically finished, I needed to go talk to

16   Agent Schulte and let him know, because he was in other

17   rooms in the office, and then we would bring him back to

18   his apartment.

19   Q.       And at some point did you return to the

20   apartment?

21   A.       Yes.  After I talked to Agent Schulte and he came

22   back in, we explained basically to Mr. Cook what the

23   procedure was from here on in, and we returned, drove him

24   back to his apartment.

25   Q.       And at the time you left the FBI office, can you

1   compare his demeanor to -- his demeanor for the previous

2   hours that you had been with him?

3   A.         It was the same demeanor.  He was very cordial to

4   us both.  I think at this point he may be a little more

5   apprehensive about what's going to happen next and how much

6   trouble am I in.

7              THE COURT:  When you say, quote, explain the

8   procedure, closed quote, what generally did you tell him?

9   A.         Explain the procedure?

10             THE COURT:  Yeah.

11  A.         Of what happens next?

12             THE COURT:  Yeah.

13  A.         He asked what's going to happen now.  I told him

14  we're done, we'll bring him back.  He asked what's going to

15  happen now.  And I told him same thing I tell everyone what

16  happens in these cases, nothing will happen soon.  There

17  will be a several-month delay in anything because the

18  computers need to be analyzed, the FBI CART team is backed

19  up with these analyzing.

20  Q.         What's CART team?

21  A.         Computer Analysis Response Team.  Those are the

22  individuals that analyze the hard drives and do those types

23  of analytical work.  They're very backed up.  So nothing

24  happens soon.  So I explain to him it will be several

25  months before you hear anything.  Typically what happens is

```
 1   you would receive, in most cases, you receive a letter from
 2   the U.S. attorney's office telling you that you're a target
 3   of investigation, you need to obtain counsel and have them
 4   contact the U.S. attorney's office to proceed further.
 5   Typically that's what happens, and I told him typically
 6   what happens.  And that's the process and explanation I
 7   gave him as to what happens.
 8             THE COURT:  You mentioned the likelihood of
 9   prosecution?
10   A.        I don't know if I mentioned the likelihood or if
11   we got into the prosecution topic.  Basically what I told
12   him at that point was there's nothing going to happen for a
13   while.  You're in limbo.  It's not going to go away, but
14   when we're conducting our investigation, when it's
15   finished, it will be handed over to the U.S. attorney's
16   office.  They will decide if they're going to prosecute or
17   not.  And if they do, you'll receive a letter in most cases
18   that they're going to prosecute.
19   Q.        At some point when you returned to his residence,
20   did you participate in any way in the search of his truck?
21             THE COURT:  I couldn't hear your question.
22             MR. CRAWFORD:  Sorry, Judge.
23   BY MR. CRAWFORD:
24   Q.        When you returned to Mr. Cook's residence, did
25   you participate in the search of his truck in any way?
```

1   A.       Yes.  We got back to the residence, his truck was

2   there.  I believe he said something about having a couple

3   discs or CDs or something in there.  Agent Schulte asked if

4   he would mind if he looked through the truck and obtained

5   those.  Mr. Cook said there's no problem doing that.  He

6   signed a consent form authorizing us to do that.

7   Q.       Could you look at Exhibit 4, please?

8   A.       Yes.

9   Q.       Do you recognize that document?

10  A.       I do.

11           THE COURT:  I apologize.  Who raised the issue or

12  question about the truck, do you know?

13  A.       I don't recall how that issue came up, Judge,

14  whether it was in small casual conversation and Mr. Cook

15  volunteered that he had some things in his truck, or if

16  Agent Schulte was informed that he had things in his truck.

17  I don't know how that came up.

18  Q.       Turning to Exhibit 4, again, could you just

19  briefly describe what this document is?

20  A.       That's a standard FBI form consent to search

21  form.  That's a form that we provide individuals which say

22  read and sign, that gives us consent to do whatever it is,

23  in this case it's to search the truck.

24  Q.       Did Mr. Cook sign this form?

25  A.       Yes, he did.

```
1   Q.        Where's his signature?

2   A.        It's the top signature, on top of signature.

3   Q.        How do you know that that's his signature?

4   A.        I was there when he signed it.

5   Q.        Did you observe him sign?

6   A.        Yes, I did.

7   Q.        Is your signature on here as well?

8   A.        It is.

9   Q.        Where is that?

10  A.        Right underneath Mr. Cook's.

11  Q.        Okay.  Thank you.  And one last exhibit, Special

12  Agent Pape, if you could look at Exhibit 7, please.  Do you

13  recognize that document?

14  A.        Yes, sir.

15  Q.        And what is it?

16  A.        This is the defendant's motion to suppress.

17  Q.        And have you had a prior opportunity to review

18  that document?

19  A.        I have.

20  Q.        If you can turn to the second page, the last

21  paragraph, there's a sentence that begins after the

22  interrogation?

23  A.        Yes, sir.

24  Q.        Could you just please read that?

25  A.        After the interrogation, an agent typed a
```

```
 1   statement that told Mr. Cook he could leave when he signed

 2   this statement.

 3   Q.        Did you ever give Mr. Cook an indication that he

 4   could only leave if he signed the statement?

 5   A.        Never.

 6   Q.        Did you ever indicate that he could not leave

 7   until he did sign a statement?

 8   A.        No, I did not.

 9   Q.        Could you turn to page five, please.  There's a

10   paragraph in the middle of that page here Mr. Cook was

11   driven, do you see that?

12   A.        Yes, sir.

13   Q.        The third sentence begins at that point.  Would

14   you please read that sentence?

15   A.        At that point Mr. Cook became distressed and

16   expressed his desire to leave.

17   Q.        Do you recall at any time on September 15th,

18   either at his apartment or the FBI office, that Mr. Cook

19   became distressed?

20   A.        Never.

21   Q.        Do you recall any point in time when he expressed

22   his desire to leave?

23   A.        No, sir.

24   Q.        The last two sentences of that paragraph, could

25   you read those?
```

```
 1  A.        Mr. Cook picked up his phone but was told to put

 2  his phone away until they were finished.  There are also

 3  indications that he told the agent that he would like a

 4  lawyer.

 5  Q.        Do you recall Mr. Cook ever having a phone?

 6  A.        I don't recall him having a phone.

 7  Q.        Do you ever recall him picking up a phone or

 8  being told to put it away?

 9  A.        No.

10  Q.        And were there any indications to you that

11  Mr. Cook wanted a lawyer?

12  A.        No, sir.

13  Q.        Let's move to page seven, please.  The first full

14  paragraph sentence begins, dear agents, could you please

15  read that sentence?

16  A.        Here agents indicated that the form was a

17  standard form required to proceed with the polygraph test.

18  Q.        At any time did you indicate that Mr. Cook had to

19  sign some forms in order to take a polygraph?

20  A.        No, sir.

21  Q.        Page 8, the first full paragraph begins here,

22  when questioning intensified.  Could you please read those

23  first two sentences of that paragraph?

24  A.        Here when the questions intensified Mr. Cook

25  opened his cell phone to make a call.  The agent told
```

1    Mr. Cook to put the phone away.

2    Q.       And read the third sentence too, please.

3    A.       Shortly thereafter, Mr. Cook told the agent, I

4    would like -- I would like a lawyer.

5    Q.       Any recollection or knowledge of Mr. Cook opening

6    a cell phone to make a call?

7    A.       No, sir.

8    Q.       Anyone ever tell Mr. Cook to put a cell phone or

9    any other phone away?

10   A.       No.

11   Q.       At any time did Mr. Cook say, quote, I would like

12   a lawyer?

13   A.       No.

14   Q.       All right.  And finally, Special Agent Pape on

15   page nine, first full paragraph begins with hereafter

16   questioning Mr. Cook, could you read the next two

17   sentences?

18   A.       The agent told Mr. Cook to sign the statement and

19   he could leave.  When Mr. Cook asked what the statement

20   said, he was told it was a letter to the prosecutor saying

21   there would be no reason to go further with the case.

22   Q.       At any time did anyone, you or anyone else, tell

23   Mr. Cook that his statement was, in fact, a letter to

24   prosecutors telling them there was no reason to go forward

25   with the case?

```
 1    A.        Never.

 2              MR. CRAWFORD:  Your Honor, I have no further

 3    questions.

 4              THE COURT:  Ms. Grill?  I think I will adjust my

 5    schedule to be available until 2:30, and then I can resume

 6    late in the afternoon.

 7              MS. GRILL:  Good afternoon.

 8              THE WITNESS:  Good afternoon.

 9                        CROSS EXAMINATION

10    BY MS. GRILL:

11    Q.        I want to take you back to when the search

12    initially started, okay.  You were there, along, obviously,

13    with Agent Schulte and other members of the task force,

14    correct, at my client's residence?

15    A.        Yes, ma'am.

16              THE COURT:  I'm having a little trouble hearing

17    you.

18              MS. GRILL:  I'm sorry.

19              THE COURT:  No problem.

20    BY MS. GRILL:

21    Q.        When Mr. Cook initially opened the door, he and

22    Mr. Douglas, the other resident in the house, were taken

23    outside; is that correct?

24    A.        I was not on the initial search entry team, but I

25    do recall them being outside.
```

```
 1   Q.        Okay.  And then at some point Mr. Cook went back

 2   into the residence, was that with you?

 3   A.        Yes.

 4   Q.        Okay.  And did he remain then with you during the

 5   entire time the search was occurring while he was at the

 6   residence?

 7   A.        Yes.  We went back inside, initially I think he

 8   showed us some knives, or I believe they were knives

 9   because the search team wanted to make sure, and he

10   volunteered, hey, I've got a couple knives, and we brought

11   him back in to show them where those were.  And he remained

12   with me in the living room.  As I said, I believe we did --

13   we did go upstairs for a change of clothes or shoes or

14   something and then came back down.

15   Q.        And you accompanied him upstairs while he changed

16   his clothes?

17   A.        I, along with someone else.  I was in the area

18   with him.  I wasn't right next to him.

19   Q.        Okay.  And then he came back downstairs and

20   was -- remained in the living room then until you guys

21   left?

22   A.        Yes, it wasn't very long that we were there

23   before we left.

24   Q.        How long would you say?

25   A.        Maybe 20 minutes, if that.  It was a very short
```

 1   conversation we had, or I had, with him.

 2   Q.       And during this conversation then you explained

 3   to him he could have an opportunity to take a polygraph

 4   test, correct?

 5   A.       Yes.  Yes.

 6   Q.       And he consents?

 7   A.       Yes.

 8   Q.       Is that correct, and then you take him, you and

 9   how many agents escort him outside the residence, do you

10   remember?

11   A.       Probably just me escorting him outside because

12   Agent Schulte was outside.

13   Q.       Okay.  And then at some point did he say let me

14   grab my keys and I'll follow you out to the FBI office?

15   A.       No, I don't recall that.

16   Q.       Okay.  So you, Agent Schulte and Mr. Cook ride in

17   the car to the FBI office; is that correct?

18   A.       Yes.

19   Q.       And about how far of a drive is that?

20   A.       Maybe ten minutes.

21   Q.       Okay.  And I know when you initially got there

22   the office was locked, so Agent Schulte had to go inside,

23   unlock the doors --

24   A.       Right.

25   Q.       -- and allow everybody in, correct?  You then

1    proceed directly into the polygraph examination room; is

2    that correct or no?

3    A.        Yeah.  When you first come in, it's our entrance

4    way.

5    Q.        Okay.

6    A.        And off of the entrance way is the interview room

7    where the polygraph was conducted.

8    Q.        Okay.  Are all polygraphs conducted in that room?

9    A.        Not necessarily.  When I do polygraphs in Lima, I

10   use that room.

11   Q.        Okay.

12   A.        It's available room.

13   Q.        And is it a, I'm assuming a typical interview

14   room?

15   A.        Yeah.  You have a desk and a couple chairs.  This

16   room might have had a computer station behind it on the

17   wall, but it's just a plain room, no windows, it's an

18   interior room of the building.

19   Q.        And prior to talking further then with Mr. Cook,

20   you said you showed him an Advice of Rights form, is that

21   accurate?

22   A.        The first one I showed him was a polygraph

23   consent form.

24   Q.        Oh, okay.  So you get your computer booted up,

25   you show him the polygraph consent form initially; is that

```
1    correct?

2    A.        Yes.

3    Q.        And you said you can't bring this form up

4    entirely on the screen?

5    A.        That's correct.

6    Q.        Have him sign this form; is that correct?

7    A.        Yes.

8    Q.        Then you bring up the Advice of Rights form on

9    the computer screen; is that correct?

10   A.        Yes.

11   Q.        And did you read to him each line of this form?

12   A.        I did not.

13   Q.        You let him read it, you're hoping he understands

14   it, and he signs it?

15   A.        Right.  I told him read the form, let me know if

16   you understand it.  If you do, would you sign that form.

17   Q.        Okay.  And then you start with the polygraph

18   test; is that correct, or the phase one?

19   A.        The pretest, yes.

20   Q.        Right.  And really the pretest is really the

21   pre-polly interview, is that accurate?

22   A.        Well, the pretest is comprised of these forms.

23   It is also comprised of an administrative form basically

24   giving his name, date of birth, those types of particulars,

25   arrest history, work history, just an administrative form
```

1    we use to populate the other forms that we have to fill

2    out, explanation of the polygraph, how it works, how the

3    test is conducted, what is based on.  It's basically a

4    thumbnail of what the polygraph does and what all the

5    components are that are going to be attached to it.

6    Q.        It's also an interview of the client, correct?

7    A.        After I get done with that is when we discuss the

8    questions on the test, and during that part, yeah, it's a

9    scoping out of the questions, the relevant questions, and

10   also talking about what we're here for.

11   Q.        Okay.  And how long did that portion of the test

12   take?

13   A.        That typically takes between 45 minutes and an

14   hour, and that was consistent with this.

15   Q.        And you said during this time that the room was

16   cold?

17   A.        Yeah.

18   Q.        Is that correct?

19   A.        Yeah, it was cold in the room.  There's not a

20   very good heating system in that particular room.

21   Q.        And let me go back and also ask you, Government's

22   Exhibit 3, the typed-out statement?

23   A.        Yeah.

24   Q.        None of this was typed out during phase one or

25   phase two; is that correct?

```
 1   A.        That's correct.
 2   Q.        So it was typed out after the administration of
 3   the polygraph test?
 4   A.        Yes.
 5   Q.        Okay.  I'm going to say hook up to the test,
 6   correct, when he got hooked up?
 7   A.        After that?
 8   Q.        Correct.
 9   A.        Right.
10   Q.        Is that when the -- okay.  Now, you said during
11   this whole time he did not appear to be nervous?
12   A.        Well, no more nervous than anyone else when
13   you're taking a polygraph.  There are nerves when I take a
14   polygraph, but nothing out of the ordinary.
15   Q.        Okay.  When you administered the polygraph
16   questions, so that's after phase one, we're into phase two
17   of the polygraph test.  After you administered those
18   questions, you actually told Mr. Cook that he was reacting
19   to some of the questions; is that correct?
20   A.        That is --
21   Q.        Now, you said today that you decided that the
22   test had been inconclusive, and part of the reason was
23   because the room was significantly cold, is that fair is
24   that --
25   A.        Cold enough to effect your sweat gland activity.
```

1    Q.      But you told Mr. Cook that he had actually

2    reacted to a couple of the questions; is that correct?

3    A.      Yes, he had.

4    Q.      I'd like to talk a little bit about how this

5    typing started.  This is really paraphrased, is that

6    accurate, this typed-written statement is a paraphrase

7    of --

8    A.      Right.  This is not a verbatim transcript of what

9    he said.

10   Q.      Okay.  And so the word desensitization that is

11   used in paragraph two of Government's Exhibit 3, that is

12   not Mr. Cook's word that he came up with, is it?

13   A.      No.  During our pretest, and we talked about

14   reasons that people have for viewing child pornography.

15   Q.      I didn't ask that.  I asked is this Mr. Cook's

16   word?

17   A.      You're asking how that word came about.

18   Q.      I didn't ask you that.  I actually asked you the

19   word desensitization, was that Mr. Cook's word that day?

20   A.      That would be a word that I would use.

21   Q.      Okay.  And you said throughout this time he

22   remained calm and was not distressed; is that correct?

23   A.      Yes, he was not distressed.

24   Q.      Okay.  So he had ten FBI agents come to his home,

25   around that amount, correct?

1    A.          Okay.

2    Q.          Who came into his house and searched his house,

3    top to bottom, correct?

4    A.          Correct.

5    Q.          And your testimony here today is that during this

6    time and during his questioning when you questioned him, he

7    remained calm and was not distressed?

8    A.          Correct.

9    Q.          Okay.  Now, did you ever tell him specifically

10   that he was free to leave at any time?  Did you ever tell

11   him he was free to leave at any time?

12   A.          Yeah, that was explained during the initial

13   portion about what these forms meant.

14   Q.          You specifically stated to him he could leave at

15   any time?

16   A.          Among other things, yes.

17   Q.          Did you then explain to him that you or Agent

18   Schulte or whomever would be able to drive him home at any

19   time also?

20   A.          I don't believe I went into detail as to how he

21   would get home.

22   Q.          Okay.  And in talking about The Government's

23   Exhibit 3, how long did it take him to read that statement

24   specifically?

25   A.          I think I said nothing out of the ordinary.  It

1    wasn't an absorbent amount of time, but he wasn't breezing

2    through it either.

3    Q.        5 minutes, 10 minutes, 20 minutes?

4    A.        When he is reading that, I am also reading that

5    so I can see when to scroll down.

6    Q.        Did you read it out loud to him?

7    A.        No, I did not.

8    Q.        Was it ever printed out for him to read?

9    A.        No, I didn't have a printer.

10   Q.        And the exam, as you stated on the other form

11   that he signed, Exhibit 2, the exam was not monitored or

12   recorded, correct?

13   A.        Yes, ma'am.

14   Q.        Nor was the pretest recorded or monitored,

15   correct?

16   A.        No.

17   Q.        Prior to the search even taking place, your drive

18   on the way to the house that morning, were you with Agent

19   Schulte?

20   A.        I could have been.  I don't recall.

21   Q.        Let me ask you this, do you recall any

22   discussions with Agent Schulte prior to even arriving at

23   the house about bringing Alex Cook back for a polygraph

24   exam?

25   A.        That would have been discussed.

```
 1            MS. GRILL:  I don't think I have anything

 2   further, Your Honor.

 3            THE COURT:  Okay.  Mr. Crawford, any redirect?

 4            MR. CRAWFORD:  Judge, just briefly.

 5            THE COURT:  Sure.

 6                    REDIRECT EXAMINATION

 7   BY MR. CRAWFORD:

 8   Q.       Special Agent Pape, could you take a look at

 9   Exhibit 1, 2 and 4.  Are those the consent forms that you

10   either signed or witnessed that day?

11   A.       Yes, they are.

12   Q.       And at the time that Mr. Cook signed them, is

13   there any indication that his consent was involuntary in

14   any way?

15   A.       No.

16   Q.       And then just one other small point, if you would

17   have indicated in the questioning on cross examination that

18   you, Agent Schulte and Mr. Cook, were at his residence for

19   the entire time of the search, would that have been a

20   misstatement?

21   A.       That we were --

22   Q.       Did you leave before the search was -- the search

23   team had completed their search?

24   A.       Oh, yes, yes.

25   Q.       So you were not there for the entire search of
```

1   the apartment?

2   A.        No.

3             MR. CRAWFORD:  I have no further questions, Your

4   Honor.

5             THE COURT:  Ms. Grill, anything further?

6             MS. GRILL:  No, Your Honor.  Thank you.

7             THE COURT:  You may step down.  Any further

8   witnesses?

9             MR. CRAWFORD:  Not for the government, Your

10  Honor.

11            THE COURT:  Okay.  All your exhibits been

12  offered?

13            MR. CRAWFORD:  Yes, they have, Your Honor.

14            THE COURT:  Ms. Grill, any witnesses?

15            MS. GRILL:  No, Your Honor.  I have no witnesses.

16            THE COURT:  Any exhibits?

17            MS. GRILL:  I have no exhibits, Your Honor.

18  Thank you.

19            THE COURT:  How do you want to proceed from here?

20            MS. GRILL:  Your Honor, I would prefer if -- I

21  don't know if The Court's inclined to take this under

22  advisement or inclined to rule today?  I think this is more

23  of an assessment -- I don't believe any further legal

24  argument's.

25            THE COURT:  I would agree.

1          MS. GRILL:  We've included all the case law

2    immediately --

3          THE COURT:  Why don't I simply take it under

4    advisement and get you an opinion hopefully within the next

5    couple of weeks, okay.

6          MR. CRAWFORD:  Thank you, Your Honor.

7          THE COURT:  Thank you.  That will conclude this

8    proceeding.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2

3         I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    s:/Angela D. Nixon

7    --------------------------              -----------

8    Angela D. Nixon, RPR, CRR              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25