1                     UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF OHIO
2                          WESTERN DIVISION

3    UNITED STATES OF AMERICA,      )  Docket No. 3:10CR522

4              Plaintiffs,          )  Toledo, Ohio

5                 v.                )  September 7, 2011

6    ALEX DAVID COOK,               )  JURY TRIAL

7              Defendant.           )

8    -----------------------------

9              TRANSCRIPT OF JURY TRIAL, VOLUME 2
              BEFORE THE HONORABLE JAMES G. CARR
10               UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the Plaintiffs:    Gene Crawford & Thomas O. Secor
                            Office of the U.S. Attorney
14                          Four SeaGate, Suite 308
                            Toledo, Ohio 43604
15                          (419) 259-6376

16   For the Defendant:     Elizabeth Kelley
                            13938A Cedar Road, Suite 285
17                          Cleveland, Ohio 44118
                            (216) 410-6923

18

19

20   Court Reporter:        Angela D. Nixon, RPR, CRR
                            1716 Spielbusch Avenue
21                          Toledo, Ohio 43624
                            (419) 260-5259

22

23   Proceedings recorded by mechanical stenography, transcript

24   produced by notereading.

25

```
 1              THE COURT:  Ready to go?  Any issues or problems?

 2              Good morning.  And you may be seated.

 3              Call your next witness; and who is your next

 4  witness and what are we going as to hear?

 5              MR. SECOR:  Amy Allen.

 6              THE COURT:  Pardon me?

 7              MR. SECOR:  Amy Allen.

 8              THE COURT:  And what generally will she be

 9  talking about?

10              MR. SECOR:  She will be talking about one of the

11  individuals depicted in some of the photos that were viewed

12  yesterday.

13                        AMY ALLEN,

14  was herein, called as if upon examination, was first duly

15  sworn, as hereinafter certified, and said as follows:

16              THE COURT:  You have to sit about this distance

17  from the microphone.  Okay.

18              And please tell the ladies and gentlemen your

19  name.

20  A.         Amy Allen.

21              THE COURT:  And how do you spell your last name?

22  A.         A-L-L-E-N.

23              THE COURT:  Oh, Allen, okay.  And what is your

24  community of residence?

25  A.         Where I live?
```

```
 1              THE COURT:  Just town.
 2   A.         I live in Clawson, Michigan.
 3              THE COURT:  Where?
 4   A.         Clawson, Michigan.
 5              THE COURT:  And what is your occupation?
 6   A.         I'm a victim witness specialist for Homeland
 7   Security investigations.
 8              THE COURT:  And how long have you done that?
 9   A.         Almost three years.
10              THE COURT:  And before then what sort of jobs did
11   you do?
12   A.         I was a forensic interview specialist at a child
13   Advocacy Center in Oakland County, Michigan.
14              THE COURT:  About how long did you do that?
15   A.         Over 12 years.
16              THE COURT:  And in your present job, what do you
17   do?  Just give us a paragraph or two description.
18   A.         Sure.  My primary duties are to respond to
19   victims and witnesses, primarily child exploitation, human
20   trafficking and human rights violations.
21              THE COURT:  Very good.  Mr. Secor.
22                        DIRECT EXAMINATION
23   BY MR. SECOR:
24   Q.         In June of 2007 were you working as an
25   interviewer with Oakland County Child Advocacy Center?
```

1   A.          Yes, I was.

2   Q.          And pursuant to working for the advocacy center,

3   did you have occasion to become involved in an

4   investigation of an individual by the -- initials L.R?

5   A.          Yes, I did.

6   Q.          And how did that come about?

7   A.          I received a referral from a Homeland Security

8   agent regarding a child exploitation case that he was

9   investigating at that time.

10              THE COURT:  Maybe just an inch or so back.

11  There's a little bit of feedback.

12  BY MR. SECOR:

13  Q.          What was the investigation about with L.R?

14  A.          There was an investigation regarding him

15  producing child pornography and sexually assaulting the

16  child that he was producing the images of.

17  Q.          And as a result of that investigation, did you

18  have occasion to interview a number of victims?

19  A.          Yes, I did.

20  Q.          And did you have an occasion to interview what at

21  the time was an eight year old girl?

22  A.          Yes.

23  Q.          And how many times did you interview her?

24  A.          I interviewed her forensically one time.

25  Q.          And approximately how long did you have

1    face-to-face contact with her?

2    A.        During that interview a little over an hour,

3    about an hour and 15 minutes probably.

4    Q.        And did she tell you what had had happened to

5    her?

6    A.        Yes, she did.

7    Q.        Did you learn later on whether or not any

8    photographs had been taken of her?

9    A.        I learned then, and also she gave me statements

10   of other photographs that were taken of her.

11   Q.        Was a pseudonym given to this individual?

12   A.        Yes.

13   Q.        And what was that name?

14   A.        Jenny.

15   Q.        Was there a series of photos that were made of

16   quote, unquote, Jenny?

17   A.        Yes.

18   Q.        And have you had an opportunity to review and

19   view a number of those?

20   A.        Yes.

21   Q.        Did you have an occasion to view a image that was

22   sent to you by our office --

23   A.        Yes, I did.

24   Q.        -- or by the FBI?

25   A.        Correct.

```
 1   Q.       And when you reviewed that image, have you seen

 2   that image before?

 3   A.       Yes, I had.

 4   Q.       Was that image an image of the Jenny?

 5   A.       Yes, it was.

 6   Q.       How many times have you viewed that image?

 7   A.       Three or four.

 8   Q.       For this case?

 9   A.       For this case?  For this case two times.

10   Q.       And one of those times, was that August 29?

11   A.       Yes, it was.

12   Q.       And did you have an occasion to view that image

13   this morning?

14   A.       Yes, I did.

15   Q.       I'd like you to view this image and tell the jury

16   whether or not the image you viewed this morning on

17   August 29th and today is the same individual that you

18   interviewed back in 2007?

19            THE COURT:  What exhibit number is this?

20            MR. SECOR:  This is Exhibit 5, Your Honor.

21   BY MR. SECOR:

22   Q.       Now that you've been able to view Exhibit 5, have

23   you seen this before?

24   A.       I didn't view it just now.

25            THE COURT:  It wasn't displayed.
```

```
1    A.        There you can see it on the different screen,

2    but, yes, it's the same image.

3    Q.        And you can say based upon your interview and

4    your viewing of this image, that this image depicts a real

5    human being?

6    A.        It is.

7    Q.        Thank you.  I have nothing further.

8              MS. KELLEY:  No questions, Your Honor.

9              THE COURT:  You may step down.  You're free to go

10   or you're welcome to stay.  It's entirely up to you.

11             THE WITNESS:  Thank you very much.

12             THE COURT:  Next witness, please.

13             MR. CRAWFORD:  Judge, the government would call

14   detective Roy Shepard.  The detective's testimony will be

15   similar to Ms. Allen's.  He will identify another image as

16   a known victim.

17             MS. KELLEY:  Excuse me, Your Honor.  We'd be

18   happy to stipulate to the fact that two of these images are

19   indeed real people.

20             MR. SECOR:  We certainly would have loved to have

21   that before we --

22             THE COURT:  Time out.  Let's approach.

23                  (A side bar conference was had on the

24                  record.)

25             MR. SECOR:  Your Honor, we brought this --
```

```
 1              THE COURT:  You can speak in a normal tone, they
 2   can't hear.
 3              MR. SECOR:  We brought this witness from The
 4   State of Washington, and we are not going to accept a
 5   stipulation.
 6              MS. KELLEY:  Okay.  That's fine.
 7                   (Side bar concluded.)
 8              THE COURT:  Okay.
 9                        ROY SHEPARD,
10   was herein, called as if upon examination, was first duly
11   sworn, as hereinafter certified, and said as follows:
12              THE COURT:  Will you please tell the ladies and
13   gentlemen who you are.
14   A.        My name is Roy Shepard.  I'm a detective with the
15   Richland Police Department in Richland, Washington.
16              THE COURT:  And roughly where is Richland,
17   Washington?
18   A.        It's up in the east, kind of the central, south
19   central, east side of Washington state.
20              THE COURT:  Okay.  And how long have you worked
21   with that police department?
22   A.        Eighteen years now.
23              THE COURT:  And before that did you have law
24   enforcement experience?
25   A.        Just the military.
```

```
 1              THE COURT:  And what just -- generally what are
 2   your current duties, or what were your duties relative to
 3   what this case is all about?
 4   A.           Well, I'm currently a detective for the Richland
 5   Police Department.  I've been assigned as a detective for
 6   the last eight years.  One of the things I investigate are
 7   child abuse, child sexual or child physical cases.
 8              THE COURT:  Okay.  Mr. Crawford.
 9                        DIRECT EXAMINATION
10   BY MR. CRAWFORD:
11   Q.           Detective Shepard, in 2005 did you become
12   involved in an investigation, sexual abuse of a minor named
13   K.F?
14   A.           Yes.
15   Q.           Can you briefly describe that investigation.
16   A.           She had reported that she was sexually abused by
17   her father between -- when she was between the ages of 10
18   and 11 years old.  And she reported that the sexual abuse
19   had been videoed, and so we investigated that and uncovered
20   some video evidence of this.  And as it turned out -- a
21   little later it turned out that she was the victim in an
22   unknown series called "The Vicky Series" so it was later
23   identified that the National Center of Exploited Children
24   had this unknown "Vicky Series" of this young lady being
25   sexually abused, but I didn't know who it was until K.F.
```

1   had come forward to tell us about the abuse, which was five

2   years later.  She had just turned 16 when she reported the

3   abuse.

4   Q.      Did you have an opportunity to interview K.F?

5   A.      Yes.

6   Q.      Did you have an opportunity to personally

7   identify her or personally observe her, rather, for

8   identification purposes?

9   A.      Yes.

10  Q.      And have you viewed images of K.F. engaged in

11  sexual activity?

12  A.      Yes.

13  Q.      And at the time you were interviewing her, could

14  you identify her as the person depicted in the images of

15  sexual activity that you viewed?

16  A.      Yes.

17  Q.      If I could hand to you Government's Exhibit 6, do

18  you recognize that item?

19  A.      Yes, I have my initials on it.

20  Q.      What is it?

21  A.      It's a DVD of a video image of some sexual abuse

22  of K.F.

23  Q.      I'm going to show you the video now and ask if

24  you'd be able to identify this individual as K.F.

25                  (Video playing)

```
 1   BY MR. CRAWFORD:
 2   Q.       Detective Shepard, was this the individual you
 3   interviewed by the name of K.F?
 4   A.       Yes.
 5   Q.       I have no further questions.
 6            MS. KELLEY:  One question, sir.
 7                          CROSS EXAMINATION
 8   BY MS. KELLEY:
 9   Q.       Did you ever use the name Alex Cook during the
10   course of your testimony?
11   A.       No.
12            MS. KELLEY:  Thank you.  No more questions.
13            THE COURT:  Anything further?
14            MR. CRAWFORD:  No, Your Honor.
15            THE COURT:  You may step down.  You're free to
16   go, or you're welcome to stay.  Who is your next witness,
17   and what's he or she --
18            MR. CRAWFORD:  Judge, the next witness will be
19   Special Agent Craig Schulte of the FBI.
20            THE COURT:  Okay.
21            MR. CRAWFORD:  And Special Agent Shulte is the
22   case agent in this case.  He will testify about his
23   involvement in the investigation.
24                          CRAIG SCHULTE,
25   was herein, called as if upon examination, was first duly
```

1   sworn, as hereinafter certified, and said as follows:

2           THE COURT:  Agent, will you please tell the

3   ladies and gentlemen your name and spell your last name for

4   us, please.

5   A.          Yes, my name's Craig Schulte.  My last name is

6   spelled S-C-H-U-L-T-E.

7           THE COURT:  And what is your occupation and

8   profession?

9   A.          I'm a Special Agent with the Federal Bureau of

10  Investigation.

11          THE COURT:  And how long had you been that?

12  A.          Since February of 2009.

13          THE COURT:  And before that did you have any law

14  enforcement experience?

15  A.          I did, Your Honor.  Prior to my hiring of the

16  FBI, I was a police officer in Northwest Indiana for 14

17  years.

18          THE COURT:  And before that, any law enforcement

19  experience?

20  A.          I was also a police officer with Indiana

21  University for a couple of years.

22          THE COURT:  And before that?

23  A.          Primarily a college student.

24          THE COURT:  Okay.  And where are you currently

25  signed?

1    A.        I'm currently assigned to the Lima resident

2    agency of the FBI, basically our office in Lima, Ohio.

3              THE COURT:  Okay.  And please tell the ladies and

4    gentlemen generally the span of duties and whether you

5    focus on any particular area.

6    A.        My duties encompass investigating various

7    violations of federal law and national security matters, so

8    I don't necessarily have one primary expertise.  I

9    investigate virtually all matters that come through our

10   door at the Lima office.

11             THE COURT:  And just generally what sorts of

12   matters would that be?

13   A.        Sure.  Those matters can range from white collar

14   crimes such as embezzlements and mortgage fraud all the way

15   through armed robberies.  And also those duties include

16   cyber crime, the exploitation of children, crimes committed

17   on the Internet.

18             THE COURT:  Okay.  Mr. Crawford?

19                      DIRECT EXAMINATION

20   BY MR. CRAWFORD:

21   Q.        Agent Schulte, what is an FBI lead?

22   A.        FBI lead is when another division such as Chicago

23   or Oklahoma City, some other office outside of our

24   Cleveland division, which is overall what I work for, sends

25   us a message saying they'd like us to do something

```
 1    investigatory for them.
 2    Q.         And last year did you receive a lead from an
 3    Oklahoma FBI office?
 4    A.         I did.
 5    Q.         And what sort of lead was it?
 6    A.         The lead was to review images and video file that
 7    an agent had downloaded over the Internet from his office
 8    in Oklahoma City, CD-ROM that he sent me was comprised of
 9    images that he downloaded and that he believed came from
10    subscriber, an Internet subscriber in Lima, Ohio.
11    Q.         And what was the agent -- Oklahoma agent's name?
12    A.         The agent in Oklahoma was Richard Wisman.
13    Q.         All right.  And what did you do with this disc
14    that he sent you?
15    A.         I reviewed the contents of the disc to see if
16    they appeared to be illegal.
17    Q.         And what did you conclude?
18    A.         I concluded that the images on the disc did
19    appear to be what I suspected to be child pornography.
20    Q.         And what do you understand child pornography to
21    be?
22    A.         I understand child --
23               THE COURT:  You may proceed.  I apologize for
24    interrupting.
25    Q.         What do you understand child pornography to be?
```

1   A.        As defined in the law, I understand it to be the

2   lucudious exhibition of the genital area of children,

3   children engaged in sexual conduct such as oral sex, sex

4   involving penetration of penis and vagina, beastality,

5   masochistic and sadistic type of behaviors such as bondage,

6   basically those type of activities.

7   Q.        And you mentioned the lead came with possible

8   location from where the pornography came from?

9   A.        Correct.  Enclosed along with the CD-ROM disc was

10  a Time Warner subpoena return indicating that the IP

11  address that Special Agent Wisman had identified during his

12  undercover download session was subscribed to by an

13  individual by the name of Alex Cook who resided at 1268

14  Knollwood Drive in Lima, Ohio.

15  Q.        What did you then do to continue your

16  investigation?

17  A.        From that point I went to the area of 1268

18  Knollwood Drive and conducted some surveillance to try to

19  corroborate that, and Alex Cook does live at that location.

20  Q.        What did you learn during your surveillance?

21  A.        During the surveillance I noticed two vehicles

22  parked directly in front of 1268 Knollwood.  To give some

23  sort of a visualization of 1268 Knollwood, it's a row of

24  townhome type of apartments, and the front door leads out

25  directly to a parking lot, so there were two vehicles

```
 1    parked directly in front of the door for 1268 Knollwood.
 2    One of those vehicles was a red four door Chevrolet
 3    pick-up, which I ran the registration on.
 4    Q.        What did you learn about the registration?
 5    A.        When I ran the registration, it came back to Eva
 6    and Jerry Cook from Fredericktown, Ohio.  Realizing it was
 7    the same last name as the subscriber for the IP address, I
 8    then ran Bureau of Motor Vehicles inquiry for any driver's
 9    licenses for Alex Cook out of Fredericktown, specifically
10    Knox County, Ohio.  When I did that it returned there was
11    an Alex Cook that resided at the same address that the
12    vehicle was registered to.  So from that point I was able
13    to conclude that most likely Alex Cook did live at that
14    residence, and most likely he was driving the vehicle
15    registered to somebody else in the household that he lived
16    with.
17    Q.        You mentioned another vehicle that was parked in
18    front of that address.
19    A.        Correct.
20    Q.        What did you learn about that vehicle?
21    A.        That was a black Dodge pickup.  Just to get a
22    better picture of who may also live at that residence, I
23    ran that registration and learned that that registration
24    came back to an Ian Douglas, who also was registered to
25    Fredericktown, Ohio.  So I also found that it was quite
```

```
 1    likely that perhaps Ian Douglas and Alex Cook lived

 2    together.   I found it to be more than coincidental that

 3    both of them would be from Fredericktown and have their

 4    vehicles parked outside of 1268 Knollwood.

 5    Q.        Approximately how many times did you conduct

 6    surveillance at the Knollwood apartment?

 7    A.        Approximately five times.

 8    Q.        Did you identify any other individuals as living

 9    at that apartment?

10    A.        I did not.

11    Q.        Did you identify any other vehicles frequently

12    parked there?

13    A.        I did not.

14    Q.        All right.  And after conducting the

15    surveillance, what did you do to continue the

16    investigation?

17    A.        Well, also during our surveillance, myself and

18    another agent, observed two individuals that met the

19    overall description of Ian Douglas and Alex Cook as

20    provided by their Bureau of Motor Vehicles driver's license

21    return.  So we also visually knew that two other

22    individuals that resembled Alex Cook and Ian Douglas

23    resided at the residence.

24    Q.        After gathering that information, what did you do

25    with it?
```

1    A.        With that information, I approached the U.S.

2    Attorney's Office here in Toledo, and eventually that led

3    up to us obtaining a search warrant for the residence from

4    the Magistrate Judge here in this district.

5    Q.        And when you got to the -- well, you obtained a

6    search warrant?

7    A.        That's correct.

8    Q.        And did you execute it?

9    A.        Yes, we did.

10   Q.        Could you just generally describe how you

11   executed the search warrant?

12   A.        Yes, on September 15th of 2010, myself, other

13   agents and task force officers, which are local police

14   officers that work in coordination with the FBI, executed

15   the search warrant at 1268 Knollwood.  Basically we went to

16   the residence early in the morning sometime around 7:00

17   a.m., knocked on the front door, announced that we were the

18   FBI and that we had a search warrant, and eventually the

19   residents of that particular location came down and let us

20   into the residence.

21   Q.        How many residents did you encounter at the

22   apartment?

23   A.        Two, Ian Douglas and Alex Cook.

24   Q.        All right.  And approximately how many officers

25   were present to execute the warrant?

1   A.        Approximately nine or ten.

2   Q.        And were they armed?

3   A.        Yes.

4   Q.        And why were they armed?

5   A.        As law enforcement officers when we're executing

6   a search warrant in a residence believed to be involved in

7   illegal activity, we're not sure what we'll encounter so

8   it's important for us to be armed in the event that we are

9   confronted with some type of violence or resistance.

10  Q.        Did you encounter any safety concerns when you

11  were executing the warrant?

12  A.        Alex Cook and Ian Douglas were cooperative.

13  However, there were some weapons inside the residence,

14  there was no attempt to resist us or to try to use those

15  weapons.

16  Q.        I mean, were these just hunting weapons?

17  A.        Correct.

18            MS. KELLEY:  Objection.  Excuse me, I didn't get

19  that last sentence.

20  BY MR. SECOR:

21  Q.        These weapons, were they just hunting rifles,

22  shot guns that type of thing?

23  A.        Correct, I'm not sure what type of weapon, they

24  were long guns.

25  Q.        Not hand guns?

```
 1    A.         Correct.

 2    Q.         Approximately how many?

 3    A.         I believe two.

 4    Q.         Did you have an opportunity to speak to

 5    Mr. Douglas?

 6    A.         I did.

 7    Q.         Okay.  And after speaking with him, what did you

 8    do?

 9    A.         After speaking with Mr. Douglas, myself, Special

10    Agent Pape and Alex Cook drove over to the Lima office of

11    the FBI.

12    Q.         Okay.  Had you arrested Mr. Cook?

13    A.         No, we did not.

14    Q.         Did you indicate to him that he was under arrest?

15    A.         No, I did not.

16    Q.         Did you detain him in any way?

17    A.         No.

18    Q.         Did you instruct him that he had to come with you

19    to the Lima RA office?

20    A.         No, I did not.

21    Q.         Was he threatened in any way?

22    A.         No, he was not.

23    Q.         And while you were at his residence, did you

24    encounter anyone else that came to the residence, any

25    neighbors?
```

1    A.         No.

2    Q.         So you indicated that you, Special Agent Pape and

3    Mr. Cook went to the Lima RA office?

4    A.         Correct.

5    Q.         What's the RA office?

6    A.         It's just where we work.  It's a smaller office

7    that is located in Lima.  It's part of the Cleveland

8    division, but it's -- it makes us more accessible to the

9    residence of that particular area.

10   Q.         And what did you do once you got to the Lima RA

11   office?

12   A.         Myself, Agent Pape and Alex Cook entered the side

13   door of the federal building, which is an employee

14   entrance, walked up the stairs and unlocked the office and

15   let Special Agent Pape and Alex Cook into the area.

16           From there, upon getting into our lobby there's a

17   small interview room off to the side of the lobby, and Alex

18   Cook and Special Agent Pape and myself entered the

19   interview room.

20   Q.         And what was Mr. Cook's demeanor at this time?

21   A.         Relaxed, very cooperative, agreeable to

22   everything that was going on.

23   Q.         Okay.  And after the three of you were in the

24   interview room --

25   A.         Yes.

1    Q.        -- and then what happened after that?

2    A.        At that point, Special Agent Pape told Mr. Cook

3    that he'd like to interview him, but to do so, we would

4    need to provide him an advice of his rights.  Special Agent

5    Pape has a computer that has the advice of rights on the

6    computer in the electronic format, so Special Agent Pape

7    showed that computer screen to Mr. Cook and allowed him to

8    read the advice of rights.

9    Q.        At this time do you have any reason or any

10   indication that Mr. Cook could not read?

11   A.        No.

12   Q.        And in investigating his background, did you

13   learn anything about his education, rather?

14   A.        At that particular point I had not discovered

15   this yet, but at the at the search warrant location at 1268

16   Knollwood, agents located a resume which was for Alex Cook

17   which indicated that he had some education.  And also

18   during our ride to the resident agency, Mr. Cook did tell

19   us that he was enrolled in college at Northwestern Ohio,

20   which is also where agents had observed him during the

21   surveillance, including myself, to actually go physically

22   in the morning.  So we were able to logically conclude

23   that, yes, he's a college student.

24   Q.        Okay.  Let me show you what's been marked as

25   Government's Exhibit 8.

```
 1              THE COURT:  What number?

 2              MR. SECOR:  It's 8, Your Honor.

 3   BY MR. SECOR:

 4   Q.         Do you see Government's Exhibit 8, Agent Schulte?

 5   A.         I do.

 6   Q.         What is that document?

 7   A.         That document is our standard advice of rights

 8   form for the FBI.

 9   Q.         Okay.  And do you recognize this particular

10   document?

11   A.         I do.

12   Q.         And how do you recognize that?

13   A.         This is the document that was signed by myself,

14   Special Agent Pape and Mr. Alex Cook on September 15th of

15   2010.

16   Q.         Let me draw your attention to some items here.

17   Okay.  What is this information?

18   A.         That information is where we were physically when

19   Mr. Cook was provided this advice of rights, the specific

20   date and specific time.

21   Q.         Okay.  How about this information?

22   A.         This information is basic advice of rights that

23   we give to individuals that we wish to interview.  Even if

24   they're not in custody sometimes we'll provide these to a

25   person so that they have a clear understanding of what
```

```
1    their rights are.

2    Q.        Okay.  And was Mr. Cook afforded an opportunity

3    to review these rights?

4    A.        Yes, he was.

5    Q.        And did he give any indication, have any

6    questions or any indication that he didn't understand them?

7    A.        No.

8    Q.        At the bottom there are a number of signatures,

9    do you see those?

10   A.        I do.

11   Q.        Okay.  Do you recognize that signature?

12   A.        I do.

13   Q.        You mentioned a computer that was used to display

14   this.  There's a signature here.  How is someone able to

15   sign if it's on a computer screen?

16   A.        Just like when you're at a department store and

17   signing a credit card machine, the signature line will pop

18   up, and using an electronic pen, the individual can sign on

19   the screen to affix a signature to the document.

20   Q.        Did you observe Mr. Cook sign the signature pad?

21   A.        I did.

22   Q.        And there's some additional signatures here.

23   What are those signatures?

24   A.        The first signature is Special Agent Pape's

25   signature, and the second one is my signature.
```

```
 1   Q.        So you were a witness to the advice of rights?

 2   A.        Yes, I was.

 3   Q.        And the time there, what does that indicate?

 4   A.        That's the time after the agents finished signing

 5   the document.

 6   Q.        Okay.  After you secured the advice of rights

 7   form, what did you do?

 8   A.        I remained inside the room.  Special Agent Pape

 9   provided Mr. Cook with another document.

10   Q.        And at some point in time did you leave?

11   A.        I did.  After -- after Special Agent Pape went

12   through the second document, explained it, I left the room.

13   Q.        Were you present for an interview -- were you

14   present for Special Agent Pape's interview with Mr. Cook?

15   A.        I was not.

16   Q.        And where -- where were you located physically

17   with respect to the interview room once you left?

18   A.        I was just outside the interview room in our

19   general office area of the Lima office.

20   Q.        Okay.  And in terms of distance, approximately

21   how far away from the interview room is that?

22   A.        Approximately 20, 25 feet.

23   Q.        Is the interview room sound proofed in any way?

24   A.        No, it is not.

25   Q.        And did you hear any sort of yelling or commotion
```

```
 1   coming from the interview room while Special Agent Pape and

 2   Mr. Cook were there?

 3   A.        Not at all.

 4   Q.        At any point in time did Mr. Cook leave the room?

 5   A.        Yes.  At one point Special Agent Pape came into

 6   the general office area and asked me to retrieve the key

 7   for the restroom which is out in the common area of the

 8   federal building, outside of our FBI space so that Mr. Cook

 9   could use the restroom.

10   Q.        And did Mr. Cook use the restroom?

11   A.        He did.  I don't recall if we gave Mr. Cook the

12   key to the restroom or if one of us unlocked it for him,

13   but we allowed him to go into the restroom and we went back

14   to the resident agency or our office and stood just at the

15   front door.

16   Q.        Did anyone accompany him to the restroom?

17   A.        No, we didn't go inside the restroom.

18   Q.        And at some point in time did Mr. Cook return?

19   A.        He did.  He came back down the hallway to our

20   office and went back into the space.

21   Q.        Had his demeanor changed at all after leaving the

22   room and coming back?

23   A.        Not at all.

24   Q.        After Mr. Cook returned, what happened then?

25   A.        Special Agent Pape and Mr. Cook, I assume,
```

1    resumed their interview.  I went back into the general

2    office space of the resident agency and waited for the

3    interview to conclude.

4    Q.        And again, while you're waiting for the interview

5    to conclude, did you hear any yelling or any sort of

6    commotion coming from the interview room?

7    A.        No, I did not.

8    Q.        And then you indicated -- I assume at some point

9    the interview with Special Agent Pape ended?

10   A.        That's correct.  Special Agent Pape came into the

11   general office area again and informed me that the

12   interview had concluded, told me if I had any further

13   questions for Mr. Cook, I was welcome to present those to

14   him, and I did.  I had spoke with some of the other agents

15   that were at the search location, and as a result of that

16   conversation, I asked Mr. Cook a few questions.

17   Q.        What was the nature of those questions?

18   A.        Generally questions about things that the search

19   team had found inside the residence, such as an Ipod,

20   memory stick for, like, a thumb drive type of device.  We

21   just kind of want to get an idea of whose those were.  And

22   the thumb drive was found inside a DVD case, we found that

23   to be somewhat peculiar so we were asking -- I specifically

24   asked Mr. Cook about that and why that thumb drive was

25   inside the DVD case.

```
 1   Q.        Is what is a thumb drive?
 2   A.        Portable storage device for data used for
 3   computers instead of floppy discs or CD-ROM discs.  It's
 4   another mechanism to store your files.
 5   Q.        What did Mr. Cook say about these items?
 6   A.        He didn't recall specifically anything about the
 7   thumb drive, could not explain why it was in the DVD case.
 8   I believe he indicated that the Ipod was his.  After he
 9   gave those answers, I also asked him if there was anything
10   he could think of that might be inside his vehicle that was
11   parked outside the residence that would help in our
12   investigation.  Mr. Cook replied that he had some memory
13   sticks that go inside a digital camera to store digital
14   photos, and he told me we were welcome to take a look at
15   those memory sticks if we wanted to.
16   Q.        At the time you talked to Mr. Cook after his
17   interview with Special Agent Pape, did you compare his
18   demeanor from the time you arrived at the Lima office, to
19   the time you finished the interview.  Any changes, could
20   you describe those?
21   A.        No, it was completely the same, very calm,
22   relaxed, agreeable with what was going on, cooperative.
23   Q.        At some point in time did you return Mr. Cook to
24   his apartment?
25   A.        I did, myself and Special Agent Pape again did
```

1    drive Mr. Cook back to his residence at 1268 Knollwood.

2    Q.        What did you do when you got there?

3    A.        Once we arrived, I retrieved a consent to search

4    form from the trunk of my car again wanting Mr. Cook to be

5    fully aware that he had the right to refuse the search if

6    he didn't wish for me to search his vehicle.  Mr. Cook

7    agreed to allow me to search his vehicle and sign the

8    consent to search form.

9    Q.        Let me show you Government's Exhibit 13.  Do you

10   recognize that document?

11   A.        I do.

12   Q.        And what is that document?

13   A.        That is our standard consent to search form that

14   is used in the FBI.

15   Q.        And the information there that I've just

16   highlighted, what is that information?

17   A.        That's a general description of Mr. Alex Cook's

18   pick-up truck and his Ohio registration plate number DGV

19   5204.

20   Q.        How about this information?

21   A.        These are general advice of rights, so to speak,

22   for a consent to search.  These are statements that I read

23   to Mr. Cook advising him that he had the right to refuse

24   the search and that he was giving us his permission

25   voluntarily.

```
 1    Q.        Did he have any questions about this form?

 2    A.        He did not.

 3    Q.        And did he seem to understand what you were

 4    explaining to him in terms of what this form indicates?

 5    A.        Yes.

 6    Q.        There's some signatures at the bottom.  There's a

 7    date.  What is that date?

 8    A.        The date is the date that we were actually at

 9    Alex Cook's residence, September 15, 2010.

10              THE COURT:  Does it indicate the time?

11    A.        Your Honor, this particular form does not.

12              THE COURT:  Do you recall about what time the

13    form -- you arrived at the car and the form was executed,

14    Ballpark?

15    A.        I would say roughly -- I would say somewhere

16    between 9:30 and 11:00.

17    Q.        There's a line there that says signature.  And

18    whose signature is above that line?

19    A.        Alex Cook.

20    Q.        And how do you know that that's his signature?

21    A.        I know because I watched him sign it both on this

22    form and the advice of rights form so I recognize it and I

23    also personally observed him sign it.

24    Q.        And below that there's a line that says

25    "witness."  Whose signature is on that line?
```

1    A.         Special Agent Pape.

2    Q.         And there's another signature below that.  Whose

3    signature is that?

4    A.         That's my signature.

5    Q.         Okay.  And after you got consent to search the

6    truck, what did -- what did you do?

7    A.         Well, Mr. Cook provided us with the memory sticks

8    that were inside his truck, and then I did an overall

9    search of the truck both inside and out, and I did not

10   locate any other items that I thought would be of interest

11   to our investigation.

12   Q.         At that point in time did you leave?

13   A.         Yes, we did.

14   Q.         Did Mr. Cook accompany you when you left?

15   A.         He did not.

16   Q.         And did you have an occasion later that day to

17   again return to Mr. Cook's apartment?

18   A.         I did.  Upon returning back to the Lima resident

19   agency, I met with other agents that were involved in the

20   search, and I indicated to them that we had retrieved the

21   memory sticks used for Mr. Alex Cook's digital camera.  At

22   that time the other agents who had been involved in the

23   search indicated to me that they had not found a digital

24   camera, and that there most likely still was a digital

25   camera inside the residence at 1268 Knollwood which might

```
 1    have evidence relating to our investigation.  So at that

 2    point, myself and two other agents went back to the

 3    resident to see if we could initiate contact with Mr. Cook

 4    again and asked him for consent to have that digital camera

 5    to be able to search it.

 6    Q.        Approximately how long after you searched

 7    Mr. Cook's truck did you return to seek consent to search

 8    his apartment?

 9    A.        I would say maybe half hour, 45 minutes.

10    Q.        Let me show you -- well, once you got to --

11    returned to the apartment, what did you do?

12    A.        When we returned to the apartment, Mr. Alex Cook

13    was actually inside his truck just leaving the residence.

14    He stopped and talked to us, and we asked for his consent

15    to obtain that digital camera.  I provided Mr. Alex Cook

16    with another consent to search form explaining to him after

17    reading to it and agreeing to it he signed it.

18    Q.        Let me show you what's marked as Government's

19    Exhibit 14.  And what's that document?

20    A.        That is our consent to search form.

21    Q.        Is it a form similar to the one we just viewed

22    for the truck?

23    A.        It is.

24    Q.        And what does this information indicate here?

25    A.        This is specifically telling Mr. Cook that we
```

1    would like to search the residence at 1268 Knollwood Drive

2    in Lima, Ohio.

3    Q.        Did you read this form to Mr. Cook?

4    A.        I did.

5    Q.        And did he have any, excuse me, any questions

6    about it?

7    A.        He did not.

8    Q.        Did he seem to indicate that he understood?

9    A.        Yes.

10   Q.        And at the bottom, what do we have there?

11   A.        The bottom we have my signature and Special Agent

12   Rus' signature on the witness line.  And above that where

13   it says "signature," we have Mr. Alex Cook's signature, and

14   it is dated for September 15th, 2010.

15   Q.        Who's Special Agent Russ?

16   A.        Special Agent Russ is another agent that works

17   with me in the Lima resident agent.

18   Q.        After you got this consent to search form, what

19   did you do?

20   A.        Mr. Cook took us into his residence, he walked us

21   upstairs and into his bedroom.  He retrieved a digital

22   camera from the room and handed it to me.

23   Q.        What did you do with the camera?

24   A.        I flipped through the images on the camera memory

25   and did not find anything of interest to our investigation.

```
 1   Q.         Okay.  At any time while you were with Mr. Cook,
 2   did he indicate that his roommate may have possessed child
 3   pornography?
 4   A.         No, he did not.
 5   Q.         Did he indicate that anyone else, any third party
 6   may have possessed child pornography?
 7   A.         No, he did not.
 8   Q.         Did he make any claims that his identity had been
 9   stolen?
10   A.         No, he did not.
11   Q.         Did he make any claims that his computer had been
12   hacked in any way?
13   A.         No, he did not.
14   Q.         Let me show you Government's Exhibit 1.  Do you
15   recognize that item?
16   A.         Yes, this is a package which contains the laptop
17   computer, which is reported to be Alex Cook's, which was
18   taken from 1268 Knollwood Drive on September 15th, 2010.
19              THE COURT:  I missed that.  Is that marked as an
20   exhibit?
21              MR. CRAWFORD:  It's Exhibit 1, Judge.  I don't
22   think we have a sticker on it, but it's on our witness list
23   as Exhibit 1.  I'm sorry, it is Exhibit 7.  I apologize.
24   BY MR. SECOR:
25   Q.         When was the first time that you saw Exhibit 7?
```

1   A.        I believe the first time I saw Exhibit 7 was to

2   ship it to Toledo, Ohio so that another agent can -- could

3   get it to our computer lab to have it analyzed.

4   Q.        Was it the actual computer, or was it packaged in

5   this packaging?

6   A.        It was packaged in this packaging.

7   Q.        At the time you shipped it, what condition was it

8   in?

9   A.        It was in similar condition to how you see it

10  with the exception of this red tape here.  The red tape

11  that is most dominant on the package is from me repackaging

12  it later in the investigation.  But the way it looked

13  originally was just with this evidence tape here, initialed

14  by Special Agent Russ and dated for September 15th, 2010.

15  That tape still remains partially on the package.

16  Q.        So it was sealed with the tape that you just

17  described?

18  A.        Correct.

19  Q.        Were there any other alterations, any other seals

20  or breaks in the packaging when you sent it?

21  A.        No, there was not.

22  Q.        You said now there's some additional tape on it?

23  A.        Correct.  After the forensic analysis of the

24  computer, it was sent back to our Cleveland office where we

25  commonly hold our evidence.  Coming up to this trial, I

1   requested that Cleveland send me this piece of evidence so

2   that we would have it available for today.  When Cleveland

3   sent it back to me, the tape seal that was put on the

4   package by Special Agent Russ had been broken open, and the

5   package was just stapled shut.  So I -- after I examined

6   the evidence to make sure that it was, in fact, the

7   computer, by serial number, that we had seized on

8   September 15th.  I repackaged it so that, you know, I could

9   maintain the integrity of the evidence until today.

10  Q.      Okay.  If I could just ask you to open the

11  package to see the computer.

12  A.      Sure.  The tape is delicate tape, and that's on

13  purpose so that if it's tampered with, it's obvious there's

14  no way to really put the tape back together once it's

15  broken open.

16  Q.      What are the items in that evidence bag?

17  A.      Inside the evidence bag is a Hewlett Packard

18  laptop computer bearing serial number C as in Charles, N as

19  in Nora, F as in Frank, 9131, J as in John, Q as in queen,

20  Y as in young.

21  Q.      Are there other items in there?

22  A.      There are.  There's a power supply and related

23  power cord to go into the wall, and also the battery, the

24  ion battery for the computer is also inside the package.

25  There's nothing else inside the package.

```
 1   Q.        Now, you mentioned that you sent this package to
 2   the Toledo Police Department?
 3   A.        I actually sent it to Special Agent Steven Smith,
 4   who is a special agent at the Toledo resident agency.
 5   Q.        At some point in time did Toledo Police
 6   Department computer crime section analyze the computer?
 7   A.        Yes, they did.
 8   Q.        Did you receive a report from them?
 9   A.        I did.
10   Q.        After receiving that report, what did you do with
11   it?
12   A.        One of the reports that was generated from a
13   forensic analysis of the computer is a CD-ROM disc commonly
14   referred to as an FTK report, FTK referring to the program
15   that's used to do the analysis, Forensic Tool Kit.
16              THE COURT:  DK?
17   A.        T as in Tom.  Forensic Tool Kit Report or FTK
18   report is on a CD-ROM disc which I reviewed and found that
19   the report contained images of suspected child pornography
20   both in the form of video and still images.
21   Q.        Did you systematically review these images to
22   whether or not they were images of child pornography?
23   A.        I did.
24   Q.        Do you have any training or any sort of protocol
25   in determining what image may be child pornography and what
```

```
 1   may not be?
 2   A.        Yes.  I use the same factors as I described
 3   earlier that I used when I was looking through the lead
 4   disc that was sent to me by Special Agent Wisman.  Again,
 5   being cognizant of the potential age of the person
 6   depicted, whether there was pubic hair development, whether
 7   there was breast development, the various clothing that's
 8   worn by the individual in the photo, if it's appropriate,
 9   if the individual is posed in unnatural or sexual poses, if
10   the person depicted is in sexually suggestive poses or
11   poses that seem to try to get a response from the person
12   viewing them, also if the individuals in those photos or
13   videos are engaged in any type of sex act as I described
14   earlier.
15   Q.        You indicated I believe that the FTK report is an
16   analysis of that laptop computer?
17   A.        That's correct.
18   Q.        You also had a disc from Special Agent Wisman in
19   Oklahoma?
20   A.        Yes.
21   Q.        Were the images from the analysis from the
22   computer, did you can compare them to any of the images
23   that Special Agent Wisman sent?
24   A.        Yes.  Several of them were exactly the same.
25   Q.        And after reviewing these images, did you take
```

```
 1    any steps to determine whether any of the children depicted
 2    were known victims?
 3    A.        Yes.  As a standard procedure we make a copy of
 4    the FTK report and we send it to the National Center for
 5    Missing and Exploited Children.  That is done so that the
 6    National Center for Exploited Missing Children can try to
 7    identify victims for us.  It's a requirement for us to
 8    notify all victims of a federal crime that they have been
 9    victims and offer assistance so National Center for Missing
10    and Exploited Children, which we refer to as NCMEC, sends
11    me a report back, and two of those images were known
12    victims they were aware of and provided me the information
13    for people that could verify that these persons were real
14    and that they were, in fact, juveniles and minors at the
15    time.
16              MR. SECOR:  Your Honor, I have no further
17    questions.
18              THE COURT:  Okay.  Mrs. Kelly?
19              MS. KELLEY:  Thank you.
20                   CROSS EXAMINATION
21    BY MS. KELLEY:
22    Q.        Good morning, sir.
23    A.        Good morning, ma'am.
24    Q.        You stated several times during the course of
25    your testimony that Alex was relaxed and cordial and
```

```
 1    cooperative, correct?

 2    A.        That's correct.

 3    Q.        And he was like that during the course of the

 4    entire morning, correct?

 5    A.        That's correct.

 6    Q.        Through the search?

 7    A.        That's correct.

 8    Q.        And through the interrogation?

 9    A.        That's correct.

10    Q.        Through approximately, what, four or five hours

11    of being with your search team?

12    A.        It wasn't that long.

13    Q.        Three hours maybe?

14    A.        We could estimate it somewhere probably around

15    three hours.

16    Q.        And this is a young man who, to the best of your

17    knowledge at that point in time, other than a couple

18    traffic tickets, had had no prior involvement with law

19    enforcement, correct?

20    A.        As far as I knew, that's correct.

21    Q.        And ten agents showed up at his door that

22    morning, correct?

23    A.        Approximately, yes.

24    Q.        Some of them armed, correct?

25    A.        Correct.
```

```
 1    Q.         And took various items out of his apartment,

 2    correct?

 3    A.         That's correct.

 4    Q.         And he indeed willingly consented to giving you

 5    those materials, correct?

 6    A.         Yes, ma'am.

 7    Q.         And all during that time he was relaxed and

 8    cordial and cooperative?

 9    A.         Yes.

10    Q.         That's hardly the demeanor of a guilty man, is

11    it?

12    A.         I wouldn't be able to comment on how particular

13    individuals would or wouldn't respond over the years.  I've

14    experienced a wide array of how people act.

15    Q.         I want to talk a little bit about the roommate,

16    Ian Douglas.  When was the last time your office had any

17    contact with Mr. Douglas?

18    A.         We served him with a trial subpoena I would say

19    sometime last week.

20    Q.         Then he's expected to testify in this case?

21    A.         Potentially.

22               MS. KELLEY:  Your Honor, could we approach?

23                     (A side bar conference was had.)

24               MS. KELLEY:  Your Honor, two times during voir

25    dire yesterday when the government read its witness list,
```

```
 1    it did not mention Mr. Douglas' name.  Is he indeed going

 2    to be presented as a witness?

 3              MR. SECOR:  He may.

 4              THE COURT:  Why didn't you mention him?

 5              MR. SECOR:  Frankly, Tom, he's a rebuttal

 6    witness.  Well, I wasn't certain that we were going to use

 7    him until she, in her opening, mentioned this third

 8    mysterious party.

 9              MS. KELLEY:  He's hardly a --

10              MR. SECOR:  He's on the government's witness

11    list.

12              THE COURT:  Is he on the witness list?

13              MS. KELLEY:  But not when you read it in court

14    yesterday.

15              THE COURT:  Well, that -- if you were notified by

16    the witness list that he may be a witness, then you're on

17    notice whether they read it off or not.

18              MS. KELLEY:  Okay.

19              THE COURT:  I would have expected that you would,

20    but I don't think it's anything --

21                   (side bar concluded)

22              THE COURT:  Ladies and gentlemen, why don't we

23    take about a 15 minute break.  Don't talk about the case,

24    and we'll resume at five of.  Okay.

25                   (A brief recess was had.)
```

```
 1              THE COURT:  You may be seated.  Thank you.  Thank

 2    you for your patience.  You understand you remain under

 3    oath?

 4    A.          Yes, Your Honor.

 5              THE COURT:  Ms. Kelly, you may continue.

 6    BY MS. KELLEY:

 7    Q.          Agent Schulte, we were discussing, as you will

 8    recall, Ian Douglas, the roommate --

 9    A.          Yes.

10    Q.          -- before we went on break.

11    A.          Yes, ma'am.

12    Q.          Now, did you conduct any investigation into

13    Mr. Douglas?

14    A.          We spoke with him briefly at the -- I personally

15    spoke with him briefly at the scene of the search.

16    Q.          And he, I would assume, denied having any child

17    pornography on his computer, correct?

18    A.          That is correct.

19    Q.          All right.  And he denied, I would assume, ever

20    using Alex's computer, correct?

21    A.          That is correct.

22    Q.          All right.  And when you eventually received the

23    report on this case, did you conduct any further

24    investigation of Mr. Douglas?

25    A.          I personally did not, but I know that other
```

```
1    investigation was done by other agents.
2    Q.        Who were they?
3    A.        Special Agent Steven Smith.
4    Q.        And what sort of investigation did he conduct?
5    A.        He conducted a scan -- on-site scan of
6    Mr. Douglas' computer --
7    Q.        Understand --
8    A.        -- to see if it did obtain any, or if it did have
9    any images of child pornography.
10   Q.        But what I'm specifically referring to is any
11   investigation of Mr. Douglas after at that search that
12   morning in September.
13   A.        The search team looked for various items of
14   evidence of child pornography that could have led us to
15   Mr. Douglas or --
16   Q.        I understand that --
17   A.        -- mr. Cook.
18   Q.        -- but my question was, after the search was
19   executed and concluded that morning in September, did you
20   or anyone from your office conduct any further
21   investigation of Ian Douglas?
22   A.        No, ma'am.
23   Q.        Thank you.  Now, when you ran a car registration
24   search on the vehicle parked outside Mr. Cook's apartment,
25   you found it was registered to Jerry and Eva Douglas, his
```

```
 1    parents, didn't you?

 2    A.        No, I found that it was registered to Jerry and

 3    Eva Cook.

 4    Q.        Cook, I'm sorry Jerry and Eva Cook, Alex's

 5    parents, correct?

 6    A.        Yes.

 7    Q.        Okay.  And you left open the possibility that

 8    someone else was using the vehicle registered in their

 9    name, correct?

10    A.        That's correct.

11    Q.        You left open the possibility that their son,

12    Alex, was using that vehicle, correct?

13    A.        That's correct.

14    Q.        All right.  Now, when you conducted the search of

15    the IP address, you found that that address was registered

16    to Alex Cook, didn't you?

17    A.        Special Agent Wisman is actually the one that

18    issued that subpoena, but, yes, I found that the return

19    from Time Warner indicated Alex Cook as the subscriber to

20    the IP address.

21    Q.        But you never left open the possibility that

22    anyone else would use that IP address, did you, or use that

23    computer, did you?

24    A.        We left open that possibility.

25    Q.        Did you explore that with Mr. Douglas?
```

```
 1    A.        We did.

 2    Q.        But you didn't conduct any further investigation

 3    after the search that morning, did you?

 4    A.        There was no need to.

 5    Q.        All right.  Now, when -- strike that.

 6              Had Alex ever been the subject of an

 7    investigation into child pornography prior to that morning?

 8    A.        Not that I'm aware of.

 9    Q.        All right.  Now, when he signed a consent to

10    search, you gave him a copy of that form, didn't you?

11    A.        I don't think I gave him a copy.  I don't recall

12    doing that.

13    Q.        You don't recall giving him a copy of of the

14    search, of the consent to search?

15    A.        I don't, no.

16    Q.        Did anyone from your office?

17    A.        I don't specifically remember.  I don't believe

18    so.

19    Q.        All right.  How about the consent to search the

20    vehicle?

21    A.        I don't believe so.

22    Q.        Didn't give him a copy of that?

23    A.        I don't believe so.

24    Q.        Didn't give him copies of anything else from that

25    morning?
```

```
 1   A.        I think we may have given him a copy of a receipt

 2   indicating what we took from his vehicle.  We may have

 3   written out a receipt.

 4   Q.        All right.  Now, the only -- strike that.

 5             You only found images of child pornography on his

 6   laptop, correct?

 7   A.        That is correct.

 8   Q.        You didn't find any images on the camera?

 9   A.        Correct.

10   Q.        When you were searching the truck, you didn't

11   find any kiddy porn magazines, did you?

12   A.        No, ma'am.

13   Q.        He -- it was he, in fact, who turned over to you

14   the memory sticks for his digital camera, correct?

15   A.        That is correct.

16   Q.        And you didn't find any images on that?

17   A.        No, ma'am.

18   Q.        You didn't find any child pornography images on

19   his Ipod, did you?

20   A.        No, ma'am.

21   Q.        You didn't find any other evidence of child

22   pornography in that apartment or around his person, did

23   you?

24   A.        No, ma'am.

25   Q.        All right.  Now, you stated during cross
```

```
1    examination that you read to Alex the form for consent to

2    search of the vehicle, do you recall saying that?

3    A.        Yes, ma'am.

4    Q.        You read that form to him?

5    A.        I did.

6    Q.        Okay.  And you also read another consent to

7    search form to him, correct?

8    A.        That is correct, ma'am.

9    Q.        Why did you read those documents to him?

10   A.        It's just how I conduct business.  I want to be

11   sure that the person completely understands.

12   Q.        Okay.  And in fact, those consent forms are

13   pretty small, aren't they?

14   A.        They are.

15   Q.        They're brief, relatively large writing?

16   A.        Yes.

17   Q.        Okay.  And they're clearly marked in bold across

18   the top, consent, aren't they?

19   A.        They are.

20   Q.        Okay.  The same thing with the consent to an

21   interview form, that's just a one-page document, isn't it?

22   A.        I'm not familiar with that form.  It's not a form

23   that I generally use.

24   Q.        Okay.  But that's basically the Miranda rights as

25   we call them, isn't it?
```

```
 1   A.        I was confused I thought you were referring to a

 2   separate form.  The advice of rights form is a one-page

 3   form.  I am familiar with that one.

 4   Q.        Yeah.  And that's basically what we all hear from

 5   watching the legal shows, you have the right to remain

 6   silent, et cetera, correct?

 7   A.        That is correct.

 8   Q.        And just about everyone in America knows those

 9   rights, correct, if they watch any TV at all?

10   A.        I believe so, ma'am.

11   Q.        So most people are familiar with that?

12   A.        Yes, ma'am.

13   Q.        Okay.  And did you or anyone from your office

14   give Alex a copy of that form?

15   A.        I don't believe so, ma'am.

16   Q.        Okay.  Now, you said that during the time that

17   Alex was at the FBI headquarters, the subject of his

18   reading disability never came up, correct?

19   A.        That's correct.

20   Q.        Okay.  And you gentlemen, and I guess there were

21   two women on the search too, you all had never met him

22   before, had you?

23   A.        No, ma'am.

24   Q.        You were complete strangers?

25   A.        Correct.
```

```
 1   Q.        So even though he felt relaxed, he appeared
 2   relaxed and cooperative with you, you wouldn't call
 3   yourself a long time friend of his, would you?
 4   A.        No.
 5   Q.        Okay.  And you said that during the course of
 6   your preliminary investigation into this case, you
 7   discovered that Alex was a college student, correct?
 8   A.        Yes.
 9   Q.        But did you inquire into the type of program he
10   was enrolled in?
11   A.        We spoke about that.
12   Q.        And what was that?
13   A.        Alex indicated to myself and Special Agent Pape
14   during the ride to the resident agency that he was involved
15   in an automotive type of program working on engines.   I
16   think he told us he expected to become a diesel mechanic.
17   Q.        Okay.  So that's -- that's intense manual labor,
18   but that doesn't require the reading, for instance, that,
19   say, getting an associates or a bachelors degree in
20   philosophy would?
21             MR. CRAWFORD:  Judge, I don't know what this is.
22             THE COURT:  I would tend to agree.  That's
23   something you can argue to a jury, but I'm not sure he's
24   competent to answer that question.
25             MS. KELLEY:  All right.  All right.
```

```
 1   BY MS. KELLEY:

 2   Q.         I apologize, I can't read my writing.  And did

 3   you conduct -- did you conduct any further investigation

 4   into those hunting rifles?

 5   A.         Personally, I did not.  I'm aware that the other

 6   agents ran the serial numbers on those to make sure that

 7   they were not stolen.

 8   Q.         So indeed they were registered, correct?

 9   A.         I don't know if they were registered, but I know

10   that they were not stolen, at least as reported at the

11   National Crime Information Center, NCIC.

12            MS. KELLEY:  Thank you.  May I have a moment,

13   Your Honor?

14            THE COURT:  Of course.

15            MS. KELLEY:  Thanks.  Thank you.  No more

16   questions.

17            THE COURT:  Redirect?

18            MR. CRAWFORD:  Judge, can we discuss an issue at

19   side bar?

20            THE COURT:  Sure.

21                (A side bar conference was had.)

22            MR. CRAWFORD:  Judge, one of the key questions on

23   cross examination --

24            THE COURT:  Please speak a little louder.

25   Seriously they can't hear us.
```

```
 1            MR. CRAWFORD:  -- was the investigation of
 2    Mr. Douglas.  There are several reasons that they didn't
 3    investigate Mr. Douglas.  A chief reason was that he
 4    admitted -- one of the chief reasons was that
 5    Mr. Douglas -- Mr. Cook admitted on site during the warrant
 6    there was probably child pornography on his computer.  That
 7    is one of the key reasons why they didn't investigate
 8    Mr. Douglas for it, and Special Agent Shulte wasn't saying
 9    that presume --
10            THE COURT:  Because of my order, sure.
11            MR. SECOR:  But I think she's opened the door.  I
12    think she's opened the door.
13            MS. KELLEY:  First of all, I was under the
14    impression that he was going to bring that in anyway based
15    on our pretrial that we had last week.  You said that --
16            THE COURT:  That could only be on rebuttal if
17    Mr. Cook takes the stand.
18            MS. KELLEY:  And which he will.  And we will --
19    and he'll deny that he ever made those statements.
20            MR. SECOR:  He can deny it then, but he has a
21    right to explain why he didn't conclude any further any
22    investigation of Mr. Douglas.
23            MS. KELLEY:  That's fine.
24            THE COURT:  I'm not so sure that it would.  If
25    the defendant did not take the stand, I'm not sure that
```

```
1    this opens the door because he didn't say we gathered
2    information that led us to believe that it would be
3    computer -- there would be -- it would be found on his
4    computer.  If he takes the stand, then you can bring him
5    back and have him recalled.  I don't suggest if you want to
6    wait, I'll let you examine on this in the event that Cook
7    takes the stand, and you can recall Agent Schulte --
8              MR. SECOR:  All right.
9              THE COURT:  -- rather than --
10             MR. SECOR:  That's fine.
11             THE COURT:  -- sort of skating on a bit of thin
12   ice, and I don't know how thin it is, okay.
13             MR. SECOR:  Fair enough.
14             MR. CRAWFORD:  No questions, Your Honor.  The
15   next witness would be a representative from Time Warner
16   cable.
17             THE COURT:  What is that individual going to tell
18   us.
19             MR. CRAWFORD:  That individual is aware the way
20   Time Warner obtains its records about IP address and how
21   Time Warner was able to respond to the subpoena.
22             THE COURT:  Okay.  And what's the person's name?
23             MR. CRAWFORD:  We'll find out.  It's a difficult
24   spelling, Judge.
25                       MATTHEW GRUSZECKI,
```

```
 1   was herein, called as if upon examination, was first duly

 2   sworn, as hereinafter certified, and said as follows:

 3              THE COURT:  You may be seated.  And about this

 4   distance from the microphone, okay.  Maybe pull up a few

 5   more inches, not too close otherwise we get feedback.

 6              Will you tell the ladies and gentlemen your name,

 7   please?

 8   A.       My name is Matthew Gruszecki.

 9              THE COURT:  And one minute, please.

10              And how do you spell your last name?

11   A.       G-R-U-S-Z-E-C-K-I.

12              THE COURT:  Okay.  And what is your community of

13   residence, city or town do you live in?

14   A.       Columbus, Ohio.

15              THE COURT:  And are you employed?

16   A.       Yes.

17              THE COURT:  By whom?

18   A.       With Time Warner Cable.

19              THE COURT:  And what is your job, what do you do?

20   A.       I am an analyst and a custodian of records.

21              THE COURT:  And what, in a paragraph or so, give

22   me and the ladies and gentlemen a bit of a job description.

23   A.       Basically my job is reporting and storage of

24   records.  I generate daily reports for management as well

25   as file and retain all of our local records.
```

```
 1              THE COURT:  How long have you done that job?
 2    A.        I've been doing this job for ten-and-a-half years
 3    now.
 4              THE COURT:  And have you had any particular
 5    training to do it?
 6    A.        I have a Bachelors Degree in computer information
 7    systems.
 8              THE COURT:  Okay.  And how do you go about doing
 9    your job?
10    A.        Most of our job is -- or my job is through
11    computer systems, a lot of database work, pulling records,
12    using interfaces that we have developed for a user friendly
13    retrieval.
14              THE COURT:  User friendly means you're user
15    friendly.
16    A.        Yeah, myself, user friendly.  I also work with a
17    lot of query languages to develop in-depth reporting.  A
18    lot of what I do currently is involved with phone system
19    reporting as well as subscriber reporting.
20              THE COURT:  You said stone?
21    A.        Phone.
22              THE COURT:  Phone, okay.  Mr. Crawford, you may
23    proceed.
24                        DIRECT EXAMINATION
25    BY MR. CRAWFORD:
```

1   Q.        Do your duties include any responsibility for

2   maintaining records concerning identification of IP

3   addresses associated with customer accounts?

4   A.        Yes, they do.

5   Q.        Can you just describe what those duties are?

6   A.        Our duty is to ensure that the systems that are

7   capturing IP addresses and identifying them with customer

8   equipment are functioning properly.  And then maintaining

9   those records for the required length of time.

10  Q.        And what is an IP address?

11  A.        An IP address is an internet protocol address.

12  It's a unique identifier out on the internet that

13  associates a particular device with that number.

14  Q.        And through an IP address are you able to

15  determine what particular machine or what particular human

16  being is using that IP address at a given time?

17  A.        Yes, we are able to determine what particular

18  machine, based on the unique identifier on the machine.

19  Q.        But you don't have any way of knowing what person

20  is using that machine necessarily at the time?

21  A.        No, we do not know the person.  We know who it

22  is -- who is responsible for that account, but we do not

23  know an actual person.

24  Q.        All right.  Sir, let me show you a document.

25  It's Government's Exhibit 4.  Are you able to see ha?

1    A.        Not yet, no.  Oh, there it is.

2    Q.        Are you familiar with that type of document?

3    A.        Yes, I am.

4    Q.        And what type of document is that?

5    A.        That is a subpoena response letter that we

6    produce when we are ordered by a court to provide customer

7    information about who had an IP address at a given time.

8    Q.        And what sort of information is contained in this

9    document?

10   A.        This document contains a subscriber's name,

11   physical residential address, telephone number that we have

12   on file, e-mail address, how they're paying for their

13   service as well as how long they've had service with our

14   company.

15   Q.        Is this information that's reflected in this

16   document collected and maintained in the ordinary course of

17   Time Warner's business?

18   A.        Yes, it is.

19   Q.        All right.  And does the information collected in

20   here or depicted in this document accurately reflect the

21   manner in which IP addresses are recorded and maintained

22   and how they're associated with accounts at Time Warner?

23   A.        Yes, they are.

24   Q.        And what happens to IP address data such as this

25   after it's collected by Time Warner?

```
 1   A.        We retain the IP address data, who it was
 2   registered to for a period of 180 days, at which time then
 3   that data is purged.
 4   Q.        And is it this sort of IP address regular -- IP
 5   address information regularly collected and stored by Time
 6   Warner?
 7   A.        Yes, it is.
 8             MR. CRAWFORD:  Judge, I have no further
 9   questions.
10             THE COURT:  Okay.  Ms. Kelly, any questions?
11             MS. KELLEY:  Yes, very brief.  Thank you.
12                       CROSS EXAMINATION
13   BY MS. KELLEY:
14   Q.        Good morning, sir.
15   A.        Good morning.
16   Q.        I'm Elizabeth Kelly, and I represent Alex Cook.
17   When someone signs up with your service, are they required
18   to put on that form if anyone else will be using that
19   computer which corresponds with the IP address?
20   A.        No, they are not.
21             MS. KELLEY:  Thank you.  No more questions.
22             THE COURT:  Okay.  Mr. Crawford?
23             MR. CRAWFORD:  Nothing further, Judge.
24             THE COURT:  You can step down.  You may go, or
25   you're welcome to stay.
```

1          THE WITNESS:  Thank you.

2          THE COURT:  Who is your next witness?

3          MR. SECOR:  Special Agent Paul Pape.

4          THE COURT:  And what do you expect he will tell

5    us?

6          MR. CRAWFORD:  He's the agent that took

7    Mr. Cook's statement so we will hear a large amount about

8    that.

9                SPECIAL AGENT PAUL PAPE,

10   was herein, called as if upon examination, was first duly

11   sworn, as hereinafter certified, and said as follows:

12         THE COURT:  If you'll sit up to the microphone,

13   and will you tell the ladies and gentlemen who you are.

14   A.        My name is Paul Pape, P-A-P-E.

15         THE COURT:  And what is your occupation or

16   profession?

17   A.        I'm a special agent with the Federal Bureau of

18   Investigation.

19         THE COURT:  Give me one minute.  I'm just making

20   a note about something.

21         And how long have you been a special agent?

22   A.        I've been a special agent for 14 years.

23         THE COURT:  And before then did you have any law

24   enforcement training.

25   A.        I do.  Prior to that I spent seven years with the

```
 1    Ohio State Highway Patrol as a state trooper.

 2              THE COURT:  Okay.  And where are you presently

 3    assigned?

 4    A.        I'm currently assigned out of the Cleveland

 5    division, the Toledo resident agency.

 6              THE COURT:  Were you, at one time, assigned down

 7    at Lima?

 8    A.        I was.

 9              THE COURT:  And in the general -- what do you do,

10    sir?

11    A.        I'm a special agent assigned to investigative

12    procedures, and I mainly conduct interviews.

13              THE COURT:  Okay.

14                    DIRECT EXAMINATION

15    BY MR. SECOR:

16    Q.        Special Agent Pape, directing your attention to

17    September 15, 2010, did you have an occasion to be involved

18    with a search team in Lima, Ohio?

19    A.        Yes, sir.

20    Q.        And do you recall what you were searching for

21    when you went to that particular residence?

22    A.        Yes, sir.  We were executing a search warrant

23    that had been issued for child pornography images.

24    Q.        What did you observe once you arrived at that

25    particular residence?
```

1   A.        Once we arrived at the residence, we set up our

2   team that first knocked at the door and made contact with

3   the individuals at the scene or at the house.  I was closer

4   to the end of that.  Once I came to the door, my first

5   observations were of two individuals standing outside of

6   the door talking to other agents.

7   Q.        So you learned that there were two individuals

8   that were present in the residence when you arrived there?

9   A.        At that time that's what we knew because we were

10  talking to two, we weren't done, making sure there wasn't

11  other people at the scene.

12  Q.        Do you remember the names of the two individuals

13  that were present?

14  A.        I remember the name of Mr. Cook.  I don't

15  remember the name of his roommate, though.

16  Q.        If you know, was a search warrant executed?

17  A.        It was.

18            THE COURT:  If you were told that the roommate's

19  name was Ian Douglas, would you disagree with that?

20  A.        No, Ian, that's familiar now.  Thank you.

21            THE COURT:  Go ahead, Mr. Secor.

22  BY MR. SECOR:

23  Q.        Speaking of Mr. Douglas, do you know if whether

24  or not anyone conducted a search of his computer?

25  A.        I believe so, but I don't know for sure.

```
 1   Q.        Do you know, was any child pornography found on

 2   Mr. Douglas' computer?

 3   A.        No, not that I'm aware of.

 4   Q.        Now, as a result, did you have occasion to speak

 5   with Mr. Cook?

 6   A.        I did.

 7   Q.        And you have an occasion to be with Mr. Cook when

 8   you went to the Lima RA?

 9   A.        Yes.

10   Q.        And who went with you?

11   A.        Agent Schulte.

12   Q.        Describe how that transportation took place.

13   A.        I first spoke with Mr. Cook when he was standing

14   outside of the residence.  He was explained what the search

15   warrant was for, what we were there for.  He was in his

16   shorts and we were standing outside, so we had him come

17   inside because it was a little cold outside, told him what

18   we were there for and asked if he would come to the FBI

19   office in Lima where we could continue our investigation

20   and talk to him about why the child pornography was on his

21   computer.  He agreed to come down.  We went upstairs.  He

22   got dressed.  He and Agent Schulte and myself then left the

23   residence.  We walked out to my car, which was at the end

24   of the parking lot.  We didn't pat him down because we

25   didn't need to, we saw him get dressed.  He had a seat in
```

```
 1    the front seat of my car, Agent Schulte sat in the back,
 2    and we drove him to the Lima office of the FBI.
 3    Q.        Was he restrained in any fashion?
 4    A.        No, he wasn't.  He was told that it was voluntary
 5    to come down there.  We wanted just to continue to figure
 6    out what the circumstances of the case were, and it was a
 7    much more private setting there and just less disruptive
 8    than at his residence.
 9    Q.        So was he told by you or by Mr. Schulte that he
10    was free to leave at any time?
11    A.        Yes.  He was told he wasn't under arrest, this
12    was just -- if he would come to the Lima office of the FBI,
13    talk to him for a few hours, and when we were done we would
14    bring him back to his apartment.
15    Q.        And what was his demeanor?
16    A.        He was understanding.  I don't want to say
17    casual, but it was conversational.  He understood what we
18    were going to do, and he was willing to come down and
19    answer some questions.
20    Q.        Now, pursuant to your law enforcement duties,
21    have you ever dealt with people who are under the influence
22    of drugs or alcohol?
23    A.        Yes.
24    Q.        Did the defendant appear to be intoxicated by
25    alcohol or any type of drug?
```

```
 1   A.        Not at all.

 2   Q.        Did he appear to understand the procedures and

 3   what was going on?

 4   A.        Yes.

 5   Q.        Once you had arrived at the Lima RA, was the

 6   defendant Mirandized?

 7   A.        Yes, he was.

 8   Q.        How did that take place?

 9   A.        Once we came into the -- the office space, we

10   went into an interview room.  It's about a 10 by 10

11   interview room.  It has a desk and a few chairs, and it's

12   an interior room so there's no windows.  It's obviously

13   what we use for talking to people.  It's quiet.  And at

14   that point I have a computer that I use, and I opened that

15   computer and pulled up a Miranda warnings, advice of rights

16   form.  So he was shown that on my computer.  It's in

17   computer format.

18   Q.        What happened then?

19   A.        I told him what the form was for, I wanted him to

20   read that form.  I turned the computer screen to him so it

21   was in front of him, and I told him to read the form.  If

22   he had any questions about this or anything that he wasn't

23   sure of, to let me know.  If he understood what the form

24   said, then I would activate the signature box, which his

25   signature would indicate that he understood what that form
```

1  said.  And was willing to provide information to us.

2  Q.        What, if anything, did he do?

3  A.        He read over the form.  He said he understood

4  what the form said.  I said any questions, he didn't have

5  any questions.  At that point I activated the signature

6  pad, and he signed his name to indicate that he understood

7  what the form said.

8  Q.        So did it appear that the defendant understood

9  his rights?

10 A.        Yes.

11 Q.        What, if anything, was generated to establish

12 proof of this --

13 A.        Again, this form, once he reads it and signs it,

14 his electric signature is automatically transposed onto the

15 document itself, populates the screen where his signature

16 should go.  After his signature is there, my signature is

17 on there as a witness that he did sign it and understand

18 it, and also Agent Schulte's signature is there to indicate

19 that he was a witness to seeing him sign that form as well.

20 Q.        Now, I would ask you to direct your attention to

21 that screen and examine what's been marked as Government's

22 Exhibit 8.  Take a look at that and tell us whether or not

23 you've seen that before.

24 A.        Yes, sir, that's the advice of rights form we're

25 talking about.

```
 1   Q.        And you indicated someone else was present during

 2   this process; is that correct?

 3   A.        Yes, during this time Agent Schulte is also in

 4   the room.

 5   Q.        And he signed as a witness also?

 6   A.        Yes, he did.

 7   Q.        And that's the defendant's signature?

 8   A.        That is.

 9   Q.        You observed him place it there?

10   A.        I observed him sign the signature pad.  When

11   you're done signing the signature pad, I have to click an

12   accept button which populates it onto this form.

13   Q.        Now, thereafter did you interview the defendant?

14   A.        I did.

15   Q.        How was his demeanor during that interview, did

16   it change?

17   A.        No, he was cordial.  It was a polite interview.

18   It was a frank discussion of child pornography and why it

19   was on his computer.

20   Q.        What did he tell you?

21   A.        He told me that he had -- well, first he told me

22   he did have child pornography images on his computer.  He

23   told me the computer was in his bedroom at the apartment

24   and the search team would find that computer.  He said he

25   first started doing adult pornography when he was 17 years
```

1    old.  When he graduated high school and left home for work,

2    he started doing child pornography.  He gave me a reason

3    that he viewed child pornography.  He said it was first

4    viewed out of curiosity.  And he related a story to me that

5    when he was 11 years old he said that he was at a Boy Scout

6    camp, and walking to the lunch line in the woods and an

7    unknown male grabbed him and started to fondle him.  He was

8    able to scream and get away, and then went and told the

9    people at the Boy Scout camp that this had happened.  He

10   was very vague about the specifics about that, and he

11   didn't know who the guy was.  He didn't know if he ever got

12   caught.  He never even talked to the police, but he said

13   because of this situation, he wanted to experience what

14   that unknown male experienced at that point, so he thought

15   viewing child pornography would give him the understanding

16   of what that arousal was.

17   Q.       Did he indicate to you whether or not the child

18   pornography that he viewed on the computer gave him

19   arousal?

20   A.       He did.

21   Q.       What did he say about that?

22   A.       He said that he downloaded the child pornography

23   from Lime Wire, shared peer to peer network.  He said he

24   used the search category child porn to find pornography.

25   He said there was thousands of images he could look at

1    dealing with child pornography and that some of those

2    images did cause arousal to him.  He said that his main

3    arousal age group is low teens, which is 10 to 13 years

4    old.  He said he did have child pornography images of that

5    type on his computer that he downloaded.  He said he wasn't

6    interested, if you will, in children with adults in those

7    pictures, but he did find that naked children who are in

8    the low teen range is what he found most arousing.

9    Q.        Did he indicate to you approximately how often he

10   viewed this?

11   A.        Yes, he said at its peak he said he viewed it

12   once a week.  And again, that was since he left home after

13   graduating high school.  He said he hadn't viewed it for

14   the past month, and he said that he planned to rid himself

15   of viewing this type of material, and he was actually going

16   to take his computer to Best Buy following weekend to have

17   the hard drive erased.

18   Q.        Did you inquire as to whether or not he had

19   access to young children?

20   A.        He did.

21   Q.        Why did you do that?

22   A.        Part of our job and part of the reason we

23   investigate these cases is not only because people are

24   viewing this, but what we've found is that this type of

25   viewing could lead to hands-on offenses, and that's why we

```
 1   interview to make sure what type of people we're dealing
 2   with.
 3   Q.        What did he tell you in that regard?
 4   A.        He said he did have access to children in the low
 5   teen range.  He assisted with Sunday School teaching every
 6   other week in his home church where the age was 12 years
 7   old.  He's also a Scout leader, that he has 30 some kids
 8   from the ages of 11 to 18 that he has responsibility for.
 9   Q.        Did you inquire whether or not he fantasized
10   about children?
11   A.        I did.
12   Q.        What was his response?
13   A.        Question was did he relate images of child
14   pornography that he viewed to children that he had contact
15   with, that he knew.  He said he had been able to equate the
16   picture of or the comparison of child pornography images
17   and those people that -- those children that he is
18   associated with that have similar characteristics.  He was
19   able to do that.  He said he didn't fantasize in that way
20   towards the children that he knew, but he was able to put
21   that comparison together.
22   Q.        Now, during this interview, were there any breaks
23   taken?
24   A.        I think he had to use the bathroom one time.
25   Q.        Now, after -- I assume this interview took some
```

```
 1    period of time; is that correct?

 2    A.        It did.

 3    Q.        After the interview was concluded, was it reduced

 4    to writing?

 5    A.        Yes, it was.

 6    Q.        And how did that occur?

 7    A.        There was actually two interviews that take

 8    place.  The first is just orally sitting down and

 9    understanding how the child pornography got on his computer

10    and why it's there.  Once that is done, then I go back and

11    create a summary, if you will, of what we got done talking

12    about.  And in order to do that, I tell him that that's

13    what I want to do.  I want to make a summary of what we

14    talked about so there's no misunderstanding about what was

15    said here today.

16    Q.        What did you do?

17    A.        In order to do that, I have it computerized, so I

18    pull up a Word Perfect document and tell them this is what

19    we're going to do, I'm going to type this statement out.

20    When it's done, I'm going to have him read it over, see if

21    he understands it, see if he wants to change anything or

22    add anything or take anything out.  If the statement is a

23    true statement, summary of what we talked about, I'll have

24    him sign on the bottom, and I do the same thing to indicate

25    his approval.  In order to do that statement, basically I
```

```
 1   sit at my computer and type a sentence out, and he

 2   contributes to, yeah, that's correct, or, no, it's not

 3   correct.  I don't want to say I'm dictating, but he's very

 4   much engaged in the statement because I would ask the

 5   questions and say is this the way you said it, is this what

 6   we talked about, and he said, yes, that's correct.  So we

 7   would go that way back and forth until his statement is

 8   complete.

 9   Q.       That's what you did in this case?

10   A.       That's what I did.

11   Q.       Is the defendant given an opportunity to review

12   that statement?

13   A.       Absolutely.

14   Q.       So he's given an opportunity to review it as it

15   was made and then after it was concluded?

16   A.       Correct.

17   Q.       Did he agree with what you had set forth in the

18   statement?

19   A.       Yes.

20   Q.       How did you signify this agreement?

21   A.       Again, after he reads it and sees there's no need

22   for correction and agrees with what the contents are, I

23   click on the signature box, tell him, okay, I'm going to

24   have you sign on the bottom here to signify that this is a

25   true and accurate description of what we talked about, and
```

1   that's what I did.  I clicked on the box, he signed the

2   statement, and then I signed as well.

3   Q.        Directing your attention to the screen in front

4   of you, what's been marked as Government's Exhibit 9, ask

5   you to take a look at and ask if you can recognize?

6   A.        I do.

7   Q.        What is it?

8   A.        That is the typed statement that we prepared at

9   the end of that interview.

10  Q.        And is it signed?

11  A.        It's a two-page document, so on this first page

12  you'll see markings on the bottom of the page.  Of those

13  are initials.  And in having him reviewing the statement,

14  again, it's computerized, so as he got to the bottom of the

15  first page, to signify that he understood that particular

16  page, I had him initial that to say that was a true and

17  accurate copy of this page.

18  Q.        So those are Mr. Cook's initials --

19  A.        They are.

20  Q.        -- on the bottom of the first page?

21  A.        Yes, sir.

22  Q.        What did you do next?

23  A.        Once he initialed there, I went to the second

24  page again, had him finish reading the document that he

25  prepared.  At the end of this is where he signed to signify

1    that the authenticity of the entire document.

2    Q.        Is there another signature on the second page?

3    A.        There is.

4    Q.        And whose signature is that?

5    A.        That's my signature.

6    Q.        Was that Exhibit 9 voluntarily signed by

7    Mr. Cook?

8    A.        Yes.

9    Q.        How -- what was Mr. Cook's demeanor throughout

10   the giving of this statement?

11   A.        Again, it's -- I'm sure he'd rather be elsewhere,

12   but he's cordial to me, and we're having a direct, frank

13   conversation about matters that most people don't want to

14   talk about.  But he knows that this is something that --

15   why he's there, and we need to resolve the issues.

16   Q.        After the interview was completed, where did you

17   go?

18   A.        Once the interview was complete, I let Agent

19   Schulte know that we were done talking.  He was not in the

20   room during that time.  I let him know that we were done

21   talking and we were ready to give him a ride back to his

22   apartment.

23   Q.        So where did you go?

24   A.        We went out to my car and gave him a ride back to

25   the apartment.

```
1    Q.         And who did you go with?

2    A.         Mr. Cook and Mr. Schulte.

3    Q.         You went to Mr. Cook's apartment?

4    A.         That's correct.

5    Q.         Did you do anything when you were there?

6    A.         Not at the apartment.  He had a vehicle out there

7    that was -- he made mention that there may have been a

8    thumb drive or a disc, something inside that, just wanted

9    to be extra cautious that it was in there, that we knew

10   about it.  So when we went to the -- back to the house, he

11   gave us consent to go get those things, to look in his

12   vehicle to make sure that no other child pornography

13   material was in that vehicle.

14   Q.         Directing your attention to Government's Exhibit

15   13, can you tell us what that is?

16   A.         When we went to the scene, this is a form, it's a

17   consent to search form, it's a form that the FBI utilizes

18   when we ask people voluntarily if we can search things.  In

19   this particular case we wanted to search inside of his

20   pick-up truck to retrieve that material.  This was a form

21   that was presented to Mr. Cook and read over and signed.

22   Q.         Mr. Cook signed that in your presence?

23   A.         Yes, he did.

24   Q.         Does your signature appear on there?

25   A.         It does.
```

1          MR. SECOR:  Thank you.  I have nothing further,

2   Your Honor.

3          THE COURT:  Ms. Kelly?

4          MS. KELLEY:  Thank you, Your Honor.

5                    CROSS EXAMINATION

6   BY MS. KELLEY:

7   Q.      Good morning, sir.

8   A.      Good morning.

9   Q.      I'm Elizabeth Kelly, and I represent Mr. Cook.

10  A.      Nice to meet you.

11  Q.      Sir, I want to go directly to the statement, the

12  confession which Alex allegedly made.  Now, you say that

13  during the course of your interview with him, he revealed

14  that he had been inappropriately touched as an 11 year old,

15  correct?

16  A.      That's correct.

17  Q.      He was a Boy Scout then, correct?

18  A.      Yes.

19  Q.      He was at camp, correct?

20  A.      He was.

21  Q.      And how long did this -- this interview of Alex

22  take?

23  A.      Two hours.

24  Q.      Two hours?

25  A.      Two-and-a-half hours roughly.

1    Q.       And you had been with him for how long that
2    entire morning, including the search?
3    A.       Three hours.
4    Q.       Three hours, okay.  And you had never met Alex
5    before that morning, had you?
6    A.       No, I hadn't.
7    Q.       Okay.  So based on an acquaintanceship of three
8    hours, he revealed to you that he had been molested as an
9    11 year old boy, correct?
10   A.       That's what he alleged.
11   Q.       Okay.  He alleged?
12   A.       I had no proof that he didn't.
13   Q.       But at the same time, he didn't reveal to you,
14   did he, that he had a reading disability, did he?
15   A.       He said nothing about any reading disability.
16   Q.       Okay.  He said that he supposedly downloaded
17   these images from Lime Wire, correct?
18   A.       Correct.
19   Q.       Isn't it true that Lime Wire has been shut down
20   by the government?
21   A.       Since that time, yes.
22   Q.       Okay.  Now, Alex also supposedly revealed to you
23   that he taught Sunday School, correct?
24   A.       Correct.
25   Q.       Based on his alleged confession to you of his

```
1    interest in child pornography, did you ever contact the
2    authorities at church to suggest that they might want to
3    suspend this teacher?
4    A.        Me personally?
5    Q.        Or did anyone from your office?
6    A.        That was a consideration, I'm not sure if -- I
7    didn't personally, that's not what I was assigned to do.
8    Q.        Gotcha, okay.  Now, this supposed confession was
9    reduced to writing, correct?
10   A.        Correct.
11   Q.        Did you give Alex a copy of this -- did you print
12   it out for him?
13   A.        No, there is no printer with my equipment.
14   Q.        There's no printer?
15   A.        No.
16   Q.        You have all these fancy computers and people can
17   sign on the screen and the government can't buy you a
18   printer?
19   A.        Everything on this particular computer is
20   computerized.  There's no need for a printer.
21   Q.        But you can't print out a document?
22   A.        I didn't say I can't print it out.
23   Q.        But you didn't print it out?
24   A.        No.
25   Q.        Did you print out any of the other documents that
```

```
 1   Alex signed that morning?

 2   A.        At that morning?

 3   Q.        Uh-huh.

 4   A.        No, I didn't.

 5   Q.        So when consent to search documents were given to

 6   him at his apartment, were those presented to him on a

 7   computer screen, or were they given to him as a piece of

 8   paper?

 9   A.        No, the consent to search was from Agent Schulte,

10   and that is a hard copy that he had with him.  The copies

11   that I have, copies that I utilize are computerized.

12   Q.        And you don't print them out and give the person

13   a copy of those at the end, do you?

14   A.        No, and we wouldn't give him a copy if it wasn't

15   computerized.

16   Q.        So that person couldn't take -- strike that.

17             Would you agree that these are fairly important

18   documents that people are signing in your office on the

19   computer screen?

20   A.        These are documents for our investigation.

21   Q.        And they're important, aren't they?

22   A.        Yes.

23   Q.        But they're not important enough for you to give

24   the subject of the investigation a copy to take with him

25   and put in their records?
```

```
 1   A.          No.  The subject will get a copy when he obtains

 2   counsel.

 3   Q.          All right.  So those documents could be in your

 4   possession for a long period of time, correct?

 5   A.          In my possession?

 6   Q.          In -- in anyone but the subject's possession for

 7   a very long time, correct?

 8   A.          They go into the case file.

 9   Q.          Okay.  But -- but the subject doesn't have access

10   to them at that point?

11   A.          Not at this point.

12   Q.          Okay.  Now, that advice of rights form, the

13   Miranda form, that's -- that's basically a one-page

14   document, correct?

15   A.          Yes.

16   Q.          And it's very brief, isn't it?

17   A.          It is.

18   Q.          All right.  And it's double spaced for the most

19   part, isn't it?

20   A.          Yes.

21               MS. KELLEY:  Your Honor, could I approach the

22   witness?

23               THE COURT:  Sure.  Have you shown that to

24   counsel?

25               MR. SECOR:  I believe they have a copy.
```

1              MR. CRAWFORD:  It's Government's Exhibit 8.

2              MS. KELLEY:  Thank you.

3    BY MS. KELLEY:

4    Q.        Sir, I'm handing you what has previously been

5    marked as Government's Exhibit 8.  Will you please tell the

6    jury what that is again?

7    A.        That's the advice of rights form.

8    Q.        And will you please read that out loud.

9    A.        Advice of rights?

10   Q.        Yes.

11   A.        (Reading:) Your rights, before we ask you any

12   questions, you must understand your rights.  You have the

13   right to remain silent.  Anything you say can be used

14   against you in a court.  You have the right to talk to a

15   lawyer for advice before we ask you any questions.  You

16   have the right to have a lawyer with you during

17   questioning.  If you cannot afford a lawyer, one will be

18   appointed for you before any questioning if you wish.  If

19   you decide to answer questions now without a lawyer

20   present, you have the right to stop answering questions at

21   any time.  I have read this statement of my rights, and I

22   understand what my rights are.  At this time I am willing

23   to answer questions without a lawyer present.

24   Q.        All right.  Sir, if I told you that took

25   approximately 45 seconds for you to read out loud to the

```
 1    jury, would that seem accurate?
 2    A.        Yeah, it would.
 3              MS. KELLEY:  Okay.  May I approach again, Your
 4    Honor?
 5              THE COURT:  Certainly.
 6    BY MS. KELLEY:
 7    Q.        Sir, I'm handing you what's previously been
 8    marked as Government's Exhibit 9.  Will you please tell the
 9    jury what that is?
10    A.        This is a copy of the statement that was
11    provided --
12    Q.        All right.
13    A.        -- by Mr. Cook.
14    Q.        Again, I'm going to ask you to read that -- could
15    you tell the jury how many pages that document is?
16    A.        It's a little over two pages, there's a paragraph
17    on the second page.
18    Q.        And would it be fair to say that that's all
19    single spaced?
20    A.        Each paragraph is single spaced.
21    Q.        All right.  And it's all the same type set,
22    correct?
23    A.        Correct.
24    Q.        And nothing is in bold or in larger type?
25    A.        No.
```

1    Q.        All right.  Would you begin reading that for the

2    jury, please?

3    A.        Statement:  In regards to having child

4    pornography images on my computer, I do have child

5    pornography images on my personal laptop computer which was

6    in my bedroom of my apartment on 1268 Knollwood Drive in

7    Lima, Ohio.  I started viewing adult pornography about

8    three years ago when I was around 17 years old.  After

9    graduating high school and leaving home for my job,

10   traveling construction, I started viewing child pornography

11   after finding a desensitization to adult pornography.  My

12   viewing the child pornography was first out of curiosity

13   mainly.  When I was around 11 years old I was in the woods

14   walking through the Boy Scout camp going to the lunch hall,

15   a guy grabbed me and fondled me until I was able to scream

16   and break free.  He ran away and I reported this to the

17   adults in charge.  I don't know if he was ever apprehended

18   or not.  I tell this because this contributed to my

19   curiosity of child pornography.  I wanted to see what

20   aroused him about that situation.  I downloaded child

21   pornography from Lime Wire network.  I searched it using

22   child porn and -- searched it under child porn and found

23   thousands and thousands of images to choose from.  I found

24   that I did get aroused by some of the images that I saw

25   mainly because of the thought of it being dirty and wrong,

1   not the activities of the images.  I found one particular

2   girl that reminded me of my ex-fiancee, and that is why I

3   downloaded several pictures of her.  Most of these pictures

4   were clothed, and the images were basically a progression

5   as she grew older.  Although I had images of child

6   pornography sexual activities on my compute, I did not want

7   to see adults with children.  I was aroused most by views

8   of children naked and in the low teenage range.  At the

9   peak, I may have viewed child pornography once a week.  I

10  have not viewed child pornography for a month, and I'm

11  working to rid myself of not viewing at all, and that

12  includes all pornography.  In an effort to do that, I was

13  bringing my computer into Best Buy this weekend to have the

14  hard drive completely erased.  I have spoken several times

15  to my church leader about viewing pornography and have been

16  working to stop.  I do have access to younger children in

17  the Sunday School that I teach every other weekend in Knox

18  County, these are children approximately 12 years old.  I

19  am never alone with any of them and would never even

20  attempt to do anything inappropriate to them, not only

21  because it's wrong, but also out of fear of punishment and

22  reputation damage.  I am also an Eagle Scout and a Scout

23  leader leading about 36 scouts in the 11 to 18 age range.

24  Also with this responsibility I am never alone with any

25  child, nor would I ever think of doing anything

```
 1   inappropriate.  In viewing child pornography I have found
 2   that some children that I know can remind me of or resemble
 3   some images that I have viewed of child pornography.  I do
 4   not fantasize about the children in that way, but I have
 5   found that I notice a similarity to real children in the
 6   child pornography images.  I have never touched or had
 7   sexual contact with any person under the age of 18.
 8   Q.       All right.  And if I told you that took
 9   approximately three minutes and 15 seconds, would that seem
10   about reasonable?
11   A.       That would.
12   Q.       All right.  Thank you.
13            MS. KELLEY:  Can I approach the witness, Your
14   Honor?
15            THE COURT:  Of course.
16   BY MS. KELLEY:
17   Q.       Now, sir, I want to ask you a few questions about
18   this supposed confession.
19            First of all, when -- you were the one who
20   drafted this, correct?
21   A.       I typed it, yes.
22   Q.       Okay.  So in other words, Alex wasn't sitting
23   there and -- and saying in regards to having child
24   pornography while you were typing, correct?
25   A.       Correct.
```

1    Q.       Okay.  So you were just basically creating this

2    document based on your interview, correct?

3    A.       A summary of what we talked about, yes.

4    Q.       A summary, okay.  And you know, you have all

5    these computers in your room, why didn't you just give Alex

6    the keyboard and say, hey, type it up yourself?

7    A.       Well, a couple reasons.  One, I only have one

8    computer in the room, and it's a laptop.

9    Q.       But you could have stood up and let him use the

10   keyboard?

11            MR. SECOR:  Objection, Your Honor.  Let him

12   finish his answer.

13            MS. KELLEY:  I'm sorry.

14   A.       And second reason, my policy is not to let people

15   type on my laptop.  I find that it's more -- when I don't

16   know if he can type.  Two, it's easier.  The same way if I

17   was taking a written statement, I would write that out as

18   he was telling me.

19   Q.       Could you ask him if he could type?

20   A.       I could, but that wouldn't -- I don't let people

21   type on my laptop.

22   Q.       Could you give him a piece of paper and say why

23   don't you write down your statement and I'll retype it?

24   A.       There's different policies or procedures each

25   agent could use.  For us, again, my equipment is completely

```
 1    electronic.  If he writes out a statement now, I have a

 2    hard copy of his written statement that I can't put into my

 3    computer, so all my evidentiary information on my computer

 4    now has this loose sheet of paper that to try to log that

 5    in and store it and keep it with everything during the

 6    entire process, it's much safer to not -- you don't lose

 7    evidence if I type it out and everything's computerized.

 8    It goes under that file.

 9    Q.        How about giving him a tape recorder and asking

10    him to make a statement into the tape recorder and then you

11    can transcribe it?

12    A.        I don't have a tape recorder.

13    Q.        Okay.  I'm just consumed with this because I have

14    a really bad memory.  Now, your -- when you're writing this

15    summary, you're trying to sound like the subject of the

16    interview, correct?

17    A.        Not necessarily.  It's a summary --

18    Q.        I'm sorry.  Continue.

19    A.        It's a summary of what we talked about.  It's not

20    a verbatim transcript.

21    Q.        Okay.  But I notice that you use the first person

22    when you're doing this summary.  For instance, you use a

23    phrase like I started viewing adult pornography.  Do you

24    recall writing that?

25    A.        Yes.
```

```
1   Q.        And my viewing of child pornography, do you
2   recall writing that?
3   A.        I do.
4   Q.        Yet at the same time, sir, when you are reading
5   to -- to the jury, you stumbled on a word.  Do you remember
6   what that was?
7   A.        I do.
8   Q.        What was that?
9   A.        Desensitization.
10  Q.        How many 19 year olds do you know who use the
11  word desensitization?
12  A.        Again, it's not a transcription of what we talked
13  about.  That's my --
14  Q.        It's not a transcription of what you talked
15  about?
16  A.        It's not a verbatim transcript of what we talked
17  about.  It's a summary.  Desensitization is my word, if you
18  want me to explain.
19  Q.        No, that's fine.
20  A.        Okay.
21  Q.        Now, you also mentioned in here that supposedly
22  these images of little girls reminded Alex of his
23  ex-fiancee, do you recall writing that?
24  A.        I do.
25  Q.        You didn't use a name of this supposed
```

```
 1   ex-fiancee, did you?

 2   A.        No.

 3   Q.        Did you ever view this woman if she existed?

 4   A.        Did I --

 5   Q.        Did you ever interview the ex-fiancee?

 6   A.        No.

 7   Q.        Do you know if the ex-fiancee existed?

 8   A.        No.

 9             MS. KELLEY:  May I have a moment, Your Honor?

10   Thank you.  No more questions.

11                      REDIRECT EXAMINATION

12   BY MR. SECOR:

13   Q.        Explain dee -- your desensitization.

14   A.        During that portion of our interview, there are

15   reasons that we have found that people go from viewing

16   adult pornography to child pornography.  In this particular

17   case I was asking him, did you just get board with child

18   pornography, have you seen the same thing so many times

19   that you become desensitized to it, it doesn't get you

20   aroused anymore?  That's what we were talking about, thus

21   to switch to child pornography, it was dirty and wrong is

22   what he said.  My terminology was you became desensitized

23   to it.  Instead of putting a long drawn out explanation of,

24   well, I view child pornography, I became board with it,

25   that type of thing.  I used desensitized.  That's what it
```

1    means.  And that's why I put it in there.  That's my word,

2    but it's a succinct definition of what we're talking about

3    at that time.  It's a summary.

4              MR. SECOR:  Nothing further, Your Honor.

5                      RECROSS EXAMINATION

6    BY MS. KELLEY:

7    Q.       I want to talk again about the D word.  This

8    statement is purported to be Alex's confession, correct?

9    A.       That is a summary statement of what we talked

10   about.

11   Q.       It's a summary statement.  Then how much of this

12   statement is indeed a statement or a summary and how much

13   of this statement is your analysis?

14   A.       As I said, when we are -- when I am comprising or

15   composing that statement, every sentence Alex is providing

16   me input for the desensitization statement.  I asked him, I

17   typed that out and I said, so basically you became

18   desensitized to it, is that right?  Yes, it is.

19   Q.       So I'm confused.  Earlier in cross examination I

20   was under the impression that you and Alex chatted, and

21   then based on that chat, you typed up this summary.  Was

22   that correct or not correct?

23   A.       We talked about it verbally --

24   Q.       Yeah.

25   A.       -- in length.  When that was done, then I said we

```
1    want to get the summary of what we got done talking about.
2    Then we rehashed what we got done talking about.  It was
3    not me typing on the computer with him sitting in the
4    corner quietly.  He was providing input with every sentence
5    that I was writing to make sure that what I was putting
6    down was an accurate summary of what we talked about.
7    Q.        So in other words, he would talk, you would write
8    a sentence, he would talk, you would write a sentence?
9    A.        Basically, yes, or I would type a sentence and
10   say did you say you were desensitized to adult pornography,
11   is that why?  Yes, that's why.
12             MS. KELLEY:  Interesting.  Thank you.  No more
13   questions.
14             MR. SECOR:  Nothing further, Your Honor.
15             THE COURT:  You may step down, you're free to go,
16   or you're welcome to stay.  It's entirely up to you.
17             MR. SECOR:  Next witness will be John Jones,
18   Special Agent, porn execution.
19                    SPECIAL AGENT JOHN JONES,
20   was herein, called as if upon examination, was first duly
21   sworn, as hereinafter certified, and said as follows:
22             THE COURT:  Will you tell the ladies and
23   gentlemen who you are, please.
24   A.        My name is Jonathan PR Jones.  I am a special
25   agent with the FBI based out of the Lima, Ohio office.
```

```
1              THE COURT:  Okay.  And how long have you worked
2   for the FBI?
3   A.         I've worked for the FBI approximately five years.
4              THE COURT:  And before that, did you have any law
5   enforcement experience?
6   A.         No, I did not.
7              THE COURT:  Okay.  And what sort of work or
8   education did you have before joining the bureau?
9   A.         I have a bachelors degree in industrial
10  engineering, and I worked for the U.S. Navy as a civilian
11  employee for approximately four years as a cost analyst.
12             THE COURT:  Okay.  Mr. Secor.
13             MR. SECOR:  Thank you, Your Honor.
14                        DIRECT EXAMINATION,
15  BY MR. SECOR:
16  Q.         As part of your duties as a Special Agent
17  assigned to Lima, did you have an occasion to be part of a
18  search team on September 15th, 2010 in the execution of a
19  search warrant which took place 1268 Knollwood Drive in
20  Lima?
21  A.         Yes, I did.
22  Q.         And what was the search team authorized to cease,
23  if you recall?
24  A.         The search was part of a case involving child
25  pornography, and the search warrant authorized the seizure
```

```
 1   of any images or equipment, including computer equipment

 2   which may contain child pornography images.

 3   Q.        Did you enter the residence?

 4   A.        Yes, I did.

 5   Q.        What type of residence was it?

 6   A.        It was an apartment.

 7   Q.        Once you entered the residence, where did you go?

 8   A.        During the search, I believe I was throughout the

 9   entire part of the apartment.

10   Q.        Did you go to any bedrooms?

11   A.        Yes, I did.

12   Q.        Whose bedroom did you go to?

13   A.        I went to the front bedroom in the upstairs.

14   Q.        Did you cease anything from that bedroom?

15   A.        Yes, I did.

16   Q.        What did you cease?

17   A.        A laptop computer and a two pieces of paper, one

18   was a cable bill from Time Warner Cable, and the other was

19   a resume for Alex Cook.

20   Q.        Directing your attention to Government's Exhibit

21   7, I'd ask you to take a look at it.  Can you recognize it?

22   A.        I believe this is the laptop that was seized that

23   day.

24   Q.        And you indicated you took that from a particular

25   bedroom; is that right?
```

```
 1    A.        Yes, it was the bedroom upstairs at the front of
 2    the apartment.
 3    Q.        Directing your attention to the screen in front
 4    of you, what's been marked as Government's Exhibit 10, have
 5    you seen that scene before?
 6    A.        Yes, I have.
 7    Q.        Where have you seen it?
 8    A.        On the day of the search in that front bedroom.
 9    Q.        Is there anything in that photograph that you
10    recognize?
11    A.        On the night stand beside the light is the laptop
12    computer that was seized.
13    Q.        That's Government's Exhibit 7 you just
14    identified?
15    A.        Yes.
16    Q.        Does government's Exhibit 10 fairly and
17    accurately depict the scene as you saw it on the morning of
18    September 15th, 2010?
19    A.        Yes, it does.
20    Q.        Directing your attention to what's been marked as
21    Government's Exhibit 11, I'd ask you to take a look at it.
22    Can you recognize it?
23    A.        Yes.
24    Q.        If so, what is it?
25    A.        That is a cable bill from Time Warner Cable made
```

```
 1   out to Alex Cook.  I believe that is the document that I
 2   found on the dresser which would have been to the left of
 3   the night stand as we saw in the picture.
 4   Q.        Again, directing your attention to the screen in
 5   front of you and ask you to take a look at what's been
 6   marked as Government's Exhibit 12, and can you tell us what
 7   that is?
 8   A.        That is a copy of a resume that was found on the
 9   dresser in the front bedroom.
10   Q.        Found with the cable bill?
11   A.        Yes.  There was a few other documents there as
12   well.
13   Q.        You took possession of 7, 11, 12 and 10; is that
14   correct?
15   A.        Yes.
16   Q.        What did you do with them?
17   A.        Ultimately I transported the items down to
18   Special Agent Russ, but in respect to the laptop computer,
19   I requested the assistance of Special Agent Steve Smith to
20   help me collect that particular item.
21   Q.        And why did you ask for his assistance?
22   A.        Special Agent Smith is a cyber agent.  He's been
23   specifically trained -- specifically trained to investigate
24   cyber crimes.  And as such, he has more training and
25   experience with regard to ceasing computers and other types
```

```
 1    of electronic evidence.

 2    Q.        So simply what is it he asked you to do with

 3    regards to this computer?

 4    A.        I believe the laptop was on at the time we were

 5    in the room, and Special Agent Smith powered down the

 6    computer.  And at the time the -- we fill out a computer

 7    seizure worksheet.  Special Agent Smith read off the serial

 8    number and the condition of the computer at the time that

 9    he found it and turned it off.

10    Q.        Now, you indicated that you took these four items

11    to Special Agent Russ; is that correct?

12    A.        Yes.

13    Q.        Why did you take them to him?

14    A.        Special Agent Russ was preparing the

15    documentation which we conduct during a search.  It's a log

16    of all the items that are seized.

17              THE COURT:  Excuse me, is it Rust or Russ?

18              MR. SECOR:  Russ, R-U-S-S.

19    A.        Russ, R-U-S-S.

20              THE COURT:  Okay.  Thank you.  He was preparing

21    the inventory?

22    A.        Yes, sir.

23              THE COURT:  Mr. Secor, if you can take that one

24    document off the screen unless --

25              MR. SECOR:  Maybe Mr. Crawford can do that.
```

```
 1                 THE COURT:  Okay.  Don't look to me.  Go ahead.
 2                 MR. SECOR:  I have nothing further Your Honor.
 3                          CROSS EXAMINATION
 4   BY MS. KELLEY:
 5   Q.        Good morning, sir.  I'm Elizabeth Kelly, and I
 6   represent Alex Cook.  When you conducted your search, was
 7   that the only laptop that you found?
 8   A.        That was the only laptop that I personally found.
 9   Q.        Okay.  Was -- if you know, was there another
10   laptop in the apartment?
11   A.        I believe there may have been another laptop in
12   the apartment.
13   Q.        And do you know where that was found?
14   A.        I do not specifically recall where it was found.
15                 MS. KELLEY:  Thank you.  May I have a moment,
16   Your Honor.
17                 THE COURT:  Uh-huh.
18   BY MS. KELLEY:
19   Q.        If I told you that that other laptop was found
20   downstairs, would I be right?
21   A.        As I previously stated, I am not aware of where
22   that laptop was located at.
23                 MS. KELLEY:  Thank you.  No more questions.
24                 MR. SECOR:  No questions.
25                 THE COURT:  You may step down.  You're free to go
```

```
 1   or welcome to stay.

 2            MR. SECOR:  Brian Russ.

 3            THE COURT:  What's his first name?

 4            MR. SECOR:  Brian Russ.

 5                    SPECIAL AGENT BRIAN RUSS,

 6   was herein, called as if upon examination, was first duly

 7   sworn, as hereinafter certified, and said as follows:

 8            THE COURT:  Will you please tell the ladies and

 9   gentlemen your name.

10   A.       My name is Brian Russ.

11            THE COURT:  And what is your occupation?

12   A.       I'm a Special Agent with the FBI.

13            THE COURT:  And where are you assigned?

14   A.       To the Lima resident agency in Lima, Ohio.

15            THE COURT:  Okay.  And what are your duties in

16   general terms?

17   A.       I conduct investigations on a variety of crimes

18   that have federal interest.

19            THE COURT:  Okay.  Mr. Secor.

20                    DIRECT EXAMINATION

21   BY MR. SECOR:

22   Q.       Mr. Russ, were you present at 1268 Knollwood in

23   Lima, Ohio on September 15th, 2010?

24   A.       Yes, I was.

25   Q.       And what was the purpose for you going there?
```

```
 1    A.          To assist with the search of the residence.

 2    Q.          Do you know what the agents were looking for?

 3    A.          Yes.

 4    Q.          And what was that?

 5    A.          Various items to include electronic evidence, any

 6    paper evidence related to an investigation for child

 7    pornography.

 8    Q.          Now, were you assigned to any particular duties

 9    in conjunction with that search?

10    A.          Yes, I was.

11    Q.          And what -- what duties were you assigned?

12    A.          Initially to help secure the residence, and then

13    once the residence was secured, to fill out several logs,

14    including an evidence log.

15    Q.          So in layman's terms, you were an inventory

16    officer?

17    A.          Yes, basically.

18    Q.          And what does an inventory officer do?

19    A.          As different items of evidence are located, I

20    receive those items, I fill out an evidence log to document

21    what was -- what is being seized, and then place that item

22    into an evidence bag.

23    Q.          So you're not going around looking for evidence,

24    you're having people bring it to you?

25    A.          That's correct, that was my duty.
```

1   Q.        Did you set up any particular place in the

2   apartment?

3   A.        I did.

4   Q.        Where was that?

5   A.        On that day once the residence was secured, and

6   the searching commenced, we searched a small dining room

7   area first, and then cleaned off the table area, set up a

8   place where I could collect the evidence, log it, fill out

9   my paperwork and place the items in the bags.

10  Q.        Directing your attention to Government's Exhibit

11  7, which is in front of you, did you have an occasion to

12  inventory that item?

13  A.        Yes, I did.

14  Q.        How did you inventory that item?

15  A.        This item was brought to me by Special Agent John

16  Jones believing that this is the item from this evidence

17  bag.  I see my signature here.  It was brought to me, I

18  filled out the evidence log and placed it into this bag.

19  Q.        It was substantially the same condition as when

20  you saw it September 15th, 2010?

21  A.        Yes.

22  Q.        Next item directed to the screen in front of you,

23  ask you to examine what's been marked as Government's

24  Exhibit 11.  Have you seen that before?

25  A.        I believe so.

1   Q.        And where did you see it?

2   A.        I would have to look at the evidence log to be

3   certain of each individual item that we collected that day,

4   but this appears to be an item that was collected from the

5   home.  It's a Time Warner Cable bill for 1268 Knollwood

6   Drive.

7   Q.        Mr. Russ, I show you what's been marked as

8   Government's Exhibit 20 for identification purposes, ask

9   you to take a look at it.  Can you tell us what it is?

10  A.        This is an evidence recovery log that I completed

11  on September 15th of 2010.

12  Q.        And is Government's Exhibit 11 listed on there?

13  A.        Yeah, item number two is a cable bill for Alex

14  Cook, so yes, it is.

15            THE COURT:  And what you refer to as the log is

16  also something called an inventory; is that correct, or am

17  I wrong?

18  A.        Evidence recovery log could also be referred to

19  as an inventory, the list of items that we removed from the

20  home.

21  Q.        Directing your attention to the screen which now

22  exhibits Government's Exhibit 12.  Would you take a look at

23  that and tell me if you've seen that before?

24  A.        Yes, this is also an item on the evidence

25  recovery log that appears to be a resume for Alex Cook,

1    which is also listed as item number two on the evidence

2    recovery log.

3    Q.      The items that you examined appear in

4    substantially the same condition as when you last saw them?

5    A.      Yes.

6    Q.      Thank you.

7            MR. SECOR:  I have nothing further, Your Honor.

8            MS. KELLEY:  Can you keep that on the screen.

9                        CROSS EXAMINATION

10   BY MS. KELLEY:

11   Q.      Good morning, sir.  I'm Elizabeth Kelly, and I

12   represent Alex Cook.  I want to talk a little bit about

13   this resume.  This is a two-page document, isn't it,

14   there's a second page, isn't there?

15   A.      This is one -- appears to be two pages.

16   Q.      A two-page document, okay.  Now, I know Alex's

17   name is at the top of this document in boldface.  But is

18   there any language on here that says Alex Cook created this

19   resume?

20   A.      You'll have to blow it up because there's some

21   words at the top that I can't read.  Other than his appears

22   to be his address, his phone number and his e-mail address

23   with his name on it, I don't see any documents who say who

24   actually created it.  There aren't any words to say who

25   created it.

```
 1   Q.        Is it possible that someone in the career center

 2   at his school could have created that for him?

 3   A.        I don't know.

 4   Q.        Okay.  Thank you.

 5             MS. KELLEY:  May I have a moment, Your Honor?

 6             THE COURT:  Sure.

 7             MS. KELLEY:  No more questions.  Thank you.

 8   Mr. Secor?

 9             MR. SECOR:  No questions.  Thank you, Your Honor.

10             THE COURT:  You may step down.  You're free to go

11   or welcome to stay.  Your next witness?

12             MR. SECOR:  Next witness will be Special Agent

13   Steven Smith.  He will testify to -- he was part of the

14   chain of the computer as well as the search warrant

15   execution.

16             THE COURT:  Okay.

17                        STEVEN SMITH,

18   was herein, called as if upon examination, was first duly

19   sworn, as hereinafter certified, and said as follows:

20             THE COURT:  Will you tell the ladies and

21   gentlemen your name?

22   A.        Steven A. Smith, Jr.

23             THE COURT:  You'll have to sit a tad closer to

24   the microphone.  Is it with a V or P-H?

25   A.        It's with a V.
```

```
 1              THE COURT:  And you're a special agent with the
 2   FBI?
 3   A.         That's correct.
 4              THE COURT:  And how long have you been
 5   assigned -- have you been employed by the bureau?
 6   A.         Since November of 2007.
 7              THE COURT:  Before that did you have any law
 8   enforcement experience?
 9   A.         No.
10              THE COURT:  Okay.  And where are you presently
11   assigned?
12   A.         The Toledo resident agency.
13              THE COURT:  Mr. Secor?
14                      DIRECT EXAMINATION
15   BY MR. SECOR:
16   Q.         Do you have any special areas of expertise?
17   A.         I have a computer science degree and worked as an
18   IT manager prior to the bureau.
19   Q.         What types of cases do you work with the bureau?
20   A.         Anything involving computers, cyber intrusions,
21   instant images cases.
22   Q.         Now, were you present when a search warrant was
23   executed in Lima, Ohio on September 15th, 2010?
24   A.         I was.
25   Q.         And what was your involvement in that particular
```

1    execution?

2    A.      My involvement was to initially help secure the

3    scene.  And after that, I assisted Special Agent Shulte

4    with the interview of Ian Douglas, and which then followed

5    an on-scene preview of Ian Douglas' laptop computer.

6    Q.      So you spoke with Mr. Douglas?

7    A.      Yes.

8    Q.      And what was the subject of that conversation?

9    A.      We informed him of why we were there, executing

10   the search warrant, and inquired of his use of any

11   computers in the house, and if he had ever viewed child

12   pornography.

13   Q.      Pardon?

14   A.      If he had ever viewed child pornography.

15   Q.      And what did you do?

16   A.      We based off of his information he provided to

17   us, we previewed his computer on scene, which is typical

18   process.

19   Q.      You were attempting to confirm what he had told

20   you?

21   A.      Correct.

22   Q.      Did you search his computer?

23   A.      Yes.

24   Q.      What, if anything, did you find?

25   A.      There was no evidence of child pornography being

1    located on the computer.  No search history, no indication

2    at all of someone seeking out, searching or possessing

3    child pornography on the computer.

4    Q.        As a result, what did you do with his computer?

5    A.        We left it in his possession.

6    Q.        If there had been evidence of child pornography

7    on that computer, would you have left it in his possession?

8    A.        No.

9    Q.        Now, did you have an occasion to come into

10   contact with another computer at that residence?

11   A.        There was a second laptop in a bedroom upstairs,

12   which was Alex Cook's bedroom.

13   Q.        What, if anything, did you do with that

14   particular --

15   A.        Nothing on the scene.

16   Q.        Did you do anything as far as turning it on or

17   shutting it off?

18   A.        No.

19   Q.        Directing you to Government's Exhibit 7, have you

20   seen that before?

21   A.        It's a laptop, but I see a lot of laptops, I

22   couldn't say this particular laptop.

23   Q.        Did you ever come into possession of it?

24   A.        I did.  It was seized at the search and taken by

25   agents in the Lima resident agency, and then after they

1   inventoried everything, processed it into our evidence

2   system, they then shipped it via Fed Ex to me at the Toledo

3   resident agency, at which time I received it, opened the

4   box, based off the packaging, identified it as being the

5   evidence from the search, the labeling, the case number on

6   the packaging, I didn't open it or examine it much.  It was

7   sealed, and I then took it to the Toledo Police Department,

8   at which time they performed their exam on it.

9   Q.      So as far as you're involved, that computer was

10  basically taken from the FBI to Toledo Police Crime Lab in

11  order to have it examined?

12  A.      That's correct.

13  Q.      Does it appear today as it appeared when it came

14  into your possession?

15  A.      The bag looks the same, but I did not actually

16  open it up and examine the laptop.

17  Q.      Did you deliver personally to any particular

18  individual at Toledo Police?

19  A.      I delivered it to David Morford M-O-R-F-O-R-D.

20          MR. SECOR:  Nothing further, Your Honor.

21          THE COURT:  Okay.  Any questions?

22          MS. KELLEY:  Yes, I do.

23                      CROSS EXAMINATION

24  BY MS. KELLEY:

25  Q.      Good morning, sir.

1    A.         Good morning.

2    Q.         I'm Elizabeth Kelly, and I represent Alex Cook.

3    Where did you find Mr. Douglas' computer?

4    A.         When I examined it, it was on the coffee table in

5    the living room.

6    Q.         It was in the living room?

7    A.         I don't recall where it was prior to that.  I was

8    outside the house with Ian Douglas, and when we went in, I

9    remember it being on the coffee table.  I'm not sure where

10   it originated prior to that.

11   Q.         So it could have been in Ian's bedroom prior to

12   that?

13   A.         It could have been.

14   Q.         All right.

15              MS. KELLEY:  May I approach the witness, Your

16   Honor?

17              THE COURT:  Sure.

18   BY MS. KELLEY:

19   Q.         Sir I'm handing you a document, do you recognize

20   that document?

21   A.         I do.

22   Q.         Could you please tell the jury what it is?

23   A.         It's a FD-302, which is a document that we use to

24   memorialize investigative activities.

25   Q.         I have bracketed I think the third paragraph in

```
 1   there --
 2   A.        That's correct.
 3   Q.        -- about Ian Douglas.  Would you read that out
 4   loud to the jury, please?
 5   A.          It says:  (Reading:) Douglas owns a laptop
 6   computer which he keeps inside his room.  Douglas accesses
 7   the internet via wireless connection.
 8   Q.        Could you -- just a little bit more slowly,
 9   please.
10   A.        Douglas accesses the internet via wireless
11   connection to Cook's router.
12   Q.        Could you reread that?
13   A.        Douglas accesses the internet --
14   Q.        Slower please.  The jury has not heard this
15   before.
16   A.        Douglas accesses the internet via wireless
17   connection to Cook's router, which is located in Cook's
18   bedroom.
19   Q.        All right.  Please continue.
20   A.        Douglas and Cook do not share computers, and
21   Douglas has never used Cook's computer, and Cook has never
22   used Douglas' computer.  Cook keeps the wireless router
23   encrypted, and in order to access the internet, Douglas
24   must type in a password or encryption key to establish a
25   connection with the wireless router.
```

```
 1   Q.        All right.  May I take back that -- keep the
 2   document.
 3             THE COURT:  Has that been marked as an exhibit?
 4   Maybe I missed it.
 5             MS. KELLEY:  No, it was turned over to me by the
 6   government.  It has not been previously used as an exhibit.
 7             THE COURT:  I'd like to have it marked as an
 8   exhibit, I'm sorry.
 9             MS. KELLEY:  All right.
10             THE COURT:  What Defense Exhibit 1 would that be?
11             MS. KELLEY:  I think we're using letters, Your
12   Honor.
13             THE COURT:  Amy, would you just mark that,
14   please?  It's just my practice to mark them whether they
15   come in or not.
16   BY MS. KELLEY:
17   Q.        Okay, now there's --
18             THE COURT:  Excuse me, can we have it marked.
19   Can you get it back from the witness and give it to Amy.
20             MS. KELLEY:  Sure.
21             THE COURT:  No problem.
22             MS. KELLEY:  May I approach the witness again?
23             THE COURT:  Of course.
24   BY MS. KELLEY:
25   Q.        Sorry for the delay.  I'm handing you what's been
```

```
 1    marked as Defendant's Exhibit 116.  Could you reread or
 2    could you -- strike that.
 3              Could you tell the jury again what Mr. Douglas
 4    claims as to his use or non use of Alex's computer.
 5    A.        He claims he did not use Alex's computer.
 6    Q.        Okay.  He claims he did not use Alex's computer.
 7    And how many agents did he say that to?
 8    A.        Two.
 9    Q.        Okay.  And was he emphatic about that?
10    A.        I do not recall.
11    Q.        Okay.  And he also went on to say, as I recall
12    from that statement, that Alex never used his computer,
13    would that be correct?
14    A.        That's correct.
15    Q.        Okay.  And he just volunteered that information
16    to you both?
17    A.        We may have asked him if anyone else used his
18    computer.  I don't recall.
19    Q.        Okay.  And Mr. Douglas was aware of the fact that
20    you were all law enforcement, correct?
21    A.        Correct.
22    Q.        All right.  Did Mr. -- now, you testified that
23    when you did the scan of Mr. Douglas' computer, it came up
24    clean for child pornography, correct?
25    A.        That's correct.
```

```
 1   Q.        Did Mr. Douglas tell you that that computer was
 2   only two weeks old?
 3   A.        No.
 4   Q.        He didn't tell you that?
 5   A.        No.
 6   Q.        Did he tell you as well that he had already gone
 7   through three laptops that year?
 8   A.        No.
 9   Q.        Didn't volunteer that information?  But he did
10   volunteer that he'd never used Alex's computer, correct?
11   A.        Correct.
12   Q.        All right.
13             MS. KELLEY:  May I have a moment, Your Honor?
14             THE COURT:  Of course.
15             MS. KELLEY:  Thank you.  Nothing further.
16   Thanks.
17             THE COURT:  Mr. Secor?
18             MR. SECOR:  Nothing, Your Honor.
19             THE COURT:  You may step down.  You're free to
20   go, or you're welcome to stay.
21             MR. SECOR:  Our next will be quite lengthy so I
22   might suggest that we adjourn for lunch.
23             THE COURT:  Okay.  Okay.  How are we doing in
24   terms of time table overall?
25             MR. SECOR:  At the present we plan on calling one
```

1   more witness.

2        THE COURT:  Okay.  When you say quite lengthy,

3   how long do you anticipate?

4        MR. CRAWFORD:  I'll be doing this examination,

5   Judge, between 45 minutes and an hour.

6        THE COURT:  Okay.  And Ms. Kelly, you would like

7   to call a witness about 1:30; is that correct?

8        MS. KELLEY:  Yes, Dr. Graves is prepared to

9   appear then.

10       THE COURT:  And how long do you think his

11  testimony will be?

12       MS. KELLEY:  I would say maybe between 15 minutes

13  and a half hour, and then cross examination.

14       THE COURT:  Okay.  The only problem is I may not

15  be available until -- I should be available by 1:00, so why

16  don't we go ahead and adjourn, take a recess.

17       Ladies and gentlemen, we do seem to be moving

18  along with the anticipated schedule, or perhaps even a

19  little bit more quickly.  And because of scheduling issues,

20  Ms. Kelly has asked that she be permitted to present one of

21  the defense witnesses, even though the government has not

22  completed its case, and neither the government or I have a

23  problem with that.  That sometimes happens, so we will

24  start with that witness at 1:30.

25       MS. KELLEY:  Or if I could suggest for everyone's

```
 1   convenience, I think my witness is somewhat flexible, so if
 2   it would be helpful to start --
 3              THE COURT:  Why don't we go ahead and get started
 4   with your witness, that's okay.  Let's use the time.
 5              MR. SECOR:  I'd rather not break that witness up,
 6   Your Honor.  It's our final witness.
 7              THE COURT:  Okay.  That's fine.
 8              MS. KELLEY:  But I'm sorry, what we could do is
 9   get through the government's witness and then perhaps mine
10   could start at 2:00 or 230.
11              THE COURT:  Okay.  Well, okay.  We'll take a
12   rather long lunch.  We'll see you at 1:30.  If you can be
13   available by 1:15 if there's any chance your witness is
14   available early.
15              MS. KELLEY:  I will make a call.
16              THE COURT:  Thank you.  And even earlier, let Amy
17   know to tell the jurors.  Thank you.  Don't talk about the
18   case.  Keep an open mind.  See you at 1:30 or perhaps
19   sooner.
20
21
22
23
24
25
```

1                    C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    s:/Angela D. Nixon

7    --------------------------            -----------

8    Angela D. Nixon, RPR, CRR             Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25