```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION


 3


 4   UNITED STATES OF AMERICA,-    Docket No. 3:10-cr-522
                               -
 5       Plaintiff,            -    Toledo, Ohio
                               -    September 7, 2011
 6          v.                 -    Trial
                               -
 7   ALEX DAVID COOK,          -
                               -
 8       Defendant.            -
     -------------------------------

 9
                            VOLUME 3
10                     TRANSCRIPT OF TRIAL
               BEFORE THE HONORABLE JAMES G. CARR
11        UNITED STATES DISTRICT JUDGE, AND A JURY

12   APPEARANCES:

13   For the Plaintiffs:  United States Attorneys' Office
                          By:  Thomas O. Secor
14                             Gene Crawford
                          Four SeaGate, Suite 308
15                        Toledo, OH 43604
                          (419) 259-6376
16
     For the Defendant:   Elizabeth Kelley
17                        Suite 285
                          13938 A Cedar Road
18                        Cleveland, OH 44118-3204
                          (216) 410-6923
19
     Court Reporter:      Tracy L. Spore, RMR, CRR
20                        1716 Spielbusch Avenue
                          Toledo, Ohio 43624
21                        (419) 213-5520

22

23

     Proceedings recorded by mechanical stenography,
24   transcript produced by notereading.

25
```

|   |   |
|---|---|
|  | 1 |
|  | 2 |
| 00:00:01 | 3 |
| 00:00:03 | 4 |
| 00:00:04 | 5 |
| 00:00:12 | 6 |
| 00:00:14 | 7 |
| 00:00:16 | 8 |
| 00:00:18 | 9 |
| 00:00:24 | 10 |
| 00:00:28 | 11 |
| 00:00:33 | 12 |
| 00:00:38 | 13 |
| 00:00:56 | 14 |
| 00:01:10 | 15 |
| 00:01:12 | 16 |
| 00:01:14 | 17 |
| 00:01:20 | 18 |
| 00:01:21 | 19 |
| 00:01:22 | 20 |
| 00:01:24 | 21 |
| 00:01:26 | 22 |
| 00:01:27 | 23 |
| 00:01:29 | 24 |
| 00:01:30 | 25 |

1    (Reconvened at 1:38 p.m.)

2    (Jury enters the courtroom.)

3    THE COURT:  Ms. Kelley, who is your witness,

4    and what are we likely to hear?

5    Ms. Kelley, who is your witness?

6    MS. KELLEY:  I'm sorry.  I just heard

7    witness, and I went and got him.

8    We are calling Dr. Wayne Graves to the

9    stand.  And he is expected to testify as to whether

10   someone like Alex with his reading disability would

11   knowingly sign a statement without understanding it or

12   having adequate time to examine it.

13   THE COURT:  Sir, you may come forward.

14   (The witness was sworn by the clerk.)

15   THE COURT:  Will you tell the ladies and

16   gentlemen your name, please.

17   THE WITNESS:  My name is Wayne Graves, Ph.D.

18   THE COURT:  What is your community of

19   residence?

20   THE WITNESS:  I live in Swanton, Ohio.

21   THE COURT:  Okay.  And what is your

22   occupation or profession?

23   THE WITNESS:  I'm a clinical and forensic

24   psychologist.

25   THE COURT:  And what does that mean?

00:01:33  1          THE WITNESS:  Well, I'm a psychologist who

00:01:35  2  spends about half my time working with clinical problems

00:01:40  3  in people, and the other half working with clinical

00:01:45  4  problems as they apply to some legal question, something

00:01:50  5  to deal with a question before the courts or something

00:01:55  6  that has legal aspects to it.

00:01:58  7          THE COURT:  And how long have you been doing

00:02:02  8  that sort of work?

00:02:04  9          THE WITNESS:  Thirty-three years.

00:02:06  10          THE COURT:  And what was your training and

00:02:11  11  education and certifications and so forth?

00:02:14  12          THE WITNESS:  I received a bachelor with

00:02:18  13  honors in psychology from Indiana University, Ph.D. in

00:02:22  14  clinical psychology in 1976 from the University of

00:02:27  15  Toledo.  I did an internship in -- on the east coast in

00:02:31  16  Baltimore at Shepherd Pratt and Springfield Hospital

00:02:35  17  Center.  And I did a residency and my early training at

00:02:39  18  Court Diagnostic and Treatment Center, which is the

00:02:42  19  local forensic psychiatry center.  I ran that agency

00:02:47  20  until 1982.  And I've been in private practice since

00:02:54  21  then.

00:02:54  22          THE COURT:  And I apologize, but I -- if I

00:03:00  23  can get my computer to cooperate, will you tell me your

00:03:03  24  name again.

00:03:04  25          THE WITNESS:  Wayne Graves, G-r-a-v-e-s.

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 00:03:11 | 1  | THE COURT:  Ms. Kelley.                                       |
| 00:03:12 | 2  | MS. KELLEY:  Thank you.  Based on what Dr.                    |
| 00:03:14 | 3  | Graves just told us, I would ask that he be qualified as      |
| 00:03:17 | 4  | an expert.                                                    |
| 00:03:18 | 5  | THE COURT:  Any objection to his giving his                   |
| 00:03:21 | 6  | opinion?                                                      |
| 00:03:21 | 7  | MR. CRAWFORD: No, Your Honor.                                 |
| 00:03:21 | 8  | THE COURT:  Okay.  Ladies and gentlemen, let                 |
| 00:03:25 | 9  | me say, Ms. Kelley -- it's a personal idiosyncrasy, but      |
| 00:03:32 | 10 | we lawyers commonly refer to a witness who has some          |
| 00:03:35 | 11 | special skill or training, education, or experience as,      |
| 00:03:38 | 12 | quote, an expert.  And with that label, the law entitles     |
| 00:03:44 | 13 | them -- and actually it's with those qualifications,         |
| 00:03:48 | 14 | skill, and training -- label to one side -- the law          |
| 00:03:51 | 15 | entitles them to give opinions on various subject            |
| 00:03:54 | 16 | matters within their field of education, training, and       |
| 00:03:59 | 17 | experience.  So he's being called for that purpose.          |
| 00:04:03 | 18 | Okay.  Go ahead.                                             |
| 00:03:22 | 19 | - - -                                                         |
| 00:03:22 | 20 | WAYNE GRAVES, Ph.D., DIRECT EXAMINATION                       |
| 00:04:04 | 21 | BY MS. KELLEY:                                                |
| 00:04:04 | 22 | Q.  Good afternoon, Doctor.                                   |
| 00:04:06 | 23 | A.  Good afternoon.                                           |
| 00:04:08 | 24 | Q.  Do you know the defendant in this case, Alex             |
| 00:04:10 | 25 | Cook?                                                         |

00:04:10    1        A.    I do.

00:04:11    2        Q.    And please tell the jury how you know him.

00:04:13    3        A.    I performed an evaluation of Mr. Cook.  And I did

00:04:18    4    it for his -- for what was his public defender in June

00:04:26    5    of this year.  I met him on two -- well, May of this

00:04:31    6    year.  I met him on two occasions.

00:04:33    7        Q.    You met him on two occasions.  And how long did

00:04:36    8    you meet with him on both occasions?

00:04:38    9        A.    I had two hours of face-to-face time, plus I had

00:04:43   10    him in the office another two or three hours doing other

00:04:49   11    testing kinds of endeavors.

00:04:54   12        Q.    And tell the jury about the testing that you

00:04:56   13    performed.

00:04:57   14        A.    First I tested his ability to read and spell and

00:05:04   15    tested his mathematical calculation skills.  Then I

00:05:08   16    asked him to do two personality inventories, which were

00:05:13   17    computer -- one of them is computer administered, the

00:05:16   18    other one was paper and pencil administered because of

00:05:21   19    some issues that I don't remember now, but it was later

00:05:25   20    put into the computer.

00:05:27   21        Q.    Excuse me.  Was it an issue with the computer or

00:05:30   22    was it an issue with Alex?

00:05:33   23        A.    I believe that it was an issue with our computer

00:05:36   24    timing rather than with Alex.

00:05:42   25              These two instruments are pretty commonly used

| | | |
|---|---|---|
| 00:05:45 | 1 | personality inventories, one of them about current |
| 00:05:48 | 2 | issues and one about longer term personality problems or |
| 00:05:53 | 3 | types.  One of them is called the MMPI, Minnesota |
| 00:06:01 | 4 | Multiphasic Personality Inventory.  The other one is |
| 00:06:05 | 5 | called the Milan Personality Inventory III. |
| 00:06:12 | 6 | Q.  And did you perform any other types of tests? |
| 00:06:14 | 7 | A.  I asked him to complete the adult -- I'm sorry, |
| 00:06:20 | 8 | the psychosexual life history adult male form, which was |
| 00:06:24 | 9 | a take-home eight-page questionnaire that he brought |
| 00:06:28 | 10 | back with him the next time. |
| 00:06:30 | 11 | Q.  All right.  And did you review any documents |
| 00:06:37 | 12 | either in preparation for the interviews or for writing |
| 00:06:42 | 13 | your final report? |
| 00:06:44 | 14 | A.  I had available at the time that I did the |
| 00:06:47 | 15 | evaluation his educational records. |
| 00:06:50 | 16 | Q.  All right. |
| 00:06:50 | 17 | A.  And the records of his -- I'm going to refer to |
| 00:06:57 | 18 | my report. |
| 00:06:57 | 19 | Q.  Before you do that, Doctor -- |
| 00:07:00 | 20 | A.  I did have available records from the offense |
| 00:07:06 | 21 | itself including the statement that he had signed, the |
| 00:07:11 | 22 | descriptions of the websites that he was to have gone |
| 00:07:15 | 23 | to, the indictment, the description of the offenses. |
| 00:07:21 | 24 | Q.  And when you said earlier that you reviewed |
| 00:07:24 | 25 | educational records, what specifically do you mean? |

00:07:27  1      A.  Alex was in special education for his entire

00:07:35  2  grade school and high school career.  He had testing

00:07:40  3  called individualized education plans, IEPs, and some

00:07:47  4  specific additional testing that was multifactored

00:07:51  5  evaluations called -- that were available to me.  There

00:07:55  6  were two IEPs and one section of the multifactored

00:07:59  7  evaluation.

00:08:01  8      Q.  Now, a few moments ago, Doctor, you touched what

00:08:04  9  you called your report.  I'm handing you what's

00:08:06  10  previously been marked as Defendant's Exhibit 101.

00:08:11  11  Could you please tell the jury what that is.

00:08:18  12      A.  This is a marked up copy of an early edition of

00:08:37  13  my report.  It does not have my letterhead; it does not

00:08:43  14  have headers on it.

00:08:47  15      Q.  But it is your report?

00:08:53  16      A.  I haven't examined it entirely.  It's not signed.

00:08:57  17  It looks like it's very close to the final product.

00:09:11  18              MS. KELLEY:  I apologize, Your Honor.

00:09:19  19              Your Honor, could I retrieve that copy of

00:09:22  20  the report?

00:09:23  21              THE COURT:  Of course.

00:09:40  22              MR. CRAWFORD: Could we approach the side for

00:09:42  23  a second?

00:09:43  24              THE COURT:  Of course.

00:09:44  25              (Whereupon the following discussion was had

| 00:11:33 | 1 | at the bench outside the hearing of the jury:) |

00:11:33 1 at the bench outside the hearing of the jury:)

00:11:33 2 MR. CRAWFORD: Judge, we've seen one copy of

00:11:33 3 a report; no previous drafts, no marked up drafts.  I

00:11:33 4 have no idea --

00:11:33 5 MS. KELLEY:  This is the report that I was

00:11:33 6 given.  And his office, because I had a marked up copy,

00:11:33 7 I contacted his office and I said, please send me a

00:11:34 8 clean final copy, which he did.  And that, in turn, was

00:11:34 9 e-mailed to you and a copy to the Court.

00:11:34 10 MR. CRAWFORD: Judge, I've seen no prior

00:11:34 11 drafts that are marked up.

00:11:34 12 MS. KELLEY:  I'm not using them.  This is my

00:11:34 13 personal copy.  If not, I won't use it.  You have the

00:11:35 14 same copy that he has.

00:11:35 15 MR. SECOR:  I thought he said it was marked

00:11:35 16 up.

00:11:35 17 MS. KELLEY:  I would ask for two minutes to

00:11:35 18 go and download from Amy's computer that document.

00:11:35 19 MR. CRAWFORD: I think it's hearsay anyway.

00:11:35 20 It can be used for prior inconsistent statements, but to

00:11:35 21 admit an expert report --

00:11:35 22 THE COURT:  Why don't you ask him his

00:11:35 23 opinions.

00:11:35 24 MS. KELLEY:  But it is the same report.

00:11:35 25 It's computer ignorance on my part.

00:11:35  1          (End of sidebar discussion.)

00:11:42  2    BY MS. KELLEY:

00:11:45  3        Q.  Based on the review of the documents and your

00:11:47  4    interview with Alex, do you have an opinion based on a

00:11:54  5    reasonable degree of medical certainty as to why Alex

00:11:59  6    might sign a supposed confession?

00:12:05  7        A.  I have an opinion to a reasonable degree of

00:12:09  8    psychological certainty --

00:12:10  9        Q.  All right.

00:12:11  10       A.  -- about why Alex might do that, yes.

00:12:14  11       Q.  Please tell the jury that opinion.

00:12:15  12       A.  Well, it essentially is that because of Alex's

00:12:19  13   learning disabilities that he lived with his whole life

00:12:23  14   throughout school, he didn't really trust his own

00:12:27  15   ability to read and make sense of written information.

00:12:34  16   He also, because of that, was somewhat dependent on

00:12:38  17   authority figures and was inclined to give in to people

00:12:44  18   in authority and would not necessarily trust his own

00:12:52  19   reading of something that was in front of him.

00:12:55  20       Q.  Now, I want to clarify, Doctor, is Alex stupid or

00:13:02  21   unintelligent?

00:13:03  22       A.  Alex has somewhere between low average and

00:13:06  23   average intellectual functioning, tested at that level.

00:13:12  24   But he also has learning disabilities in reading,

00:13:17  25   expressive language, as in written language, and

00:13:20  1   calculation or math skills, and they've been identified

00:13:25  2   consistently throughout his school career.

00:13:30  3       Q.   Does that come from lack of trying or lack of

00:13:35  4   ability?

00:13:37  5       A.   It usually comes from some lack of ability from

00:13:42  6   some neurologic miswiring that takes place that

00:13:49  7   interferes with information coming in and being

00:13:52  8   translated appropriately.

00:13:55  9       Q.   And you stated earlier that you gave Alex a

00:13:58  10  number of tests, correct?

00:13:59  11      A.   Yes.

00:14:01  12      Q.   Do you think he was applying himself when he was

00:14:05  13  taking those tests?

00:14:07  14      A.   I think he was putting reasonably good effort

00:14:11  15  into those tests with one exception.

00:14:14  16      Q.   All right.  And tell the jury about that.

00:14:16  17      A.   There was one long computer test.  The MMPI II is

00:14:25  18  567 items.  Somewhere in the last 200 of those items

00:14:31  19  apparently Alex lost focus or interest, and it looks as

00:14:39  20  if he did not stay on task or answered potentially

00:14:43  21  random.  It's a long test for somebody with a reading

00:14:48  22  disability.

00:14:48  23      Q.   Would it be fair to say that Alex just doesn't do

00:14:51  24  well on long examinations?

00:14:54  25      A.   It would be fair.

00:14:58  1      Q.   Now, do you have any indication that maybe Alex

00:15:03  2  was malingering on your tests?

00:15:07  3      A.   Meaning that he was trying to look more

00:15:10  4  defective?

00:15:12  5      Q.   Yes.

00:15:13  6      A.   Actually I thought his effort was pretty good.  I

00:15:16  7  thought he wanted to appear competent.  I didn't --

00:15:22  8  there are indicators in the two personality testing

00:15:27  9  instruments that allow me to decide his approach to the

00:15:30  10  testing, and both of them were making it look as if he

00:15:35  11  was making good effort and was not trying to look

00:15:38  12  particularly dysfunctional.

00:15:42  13      Q.   Now you said, as I recall, that you spent

00:15:45  14  approximately two hours face to face with him.

00:15:48  15      A.   Yes.

00:15:48  16      Q.   That would be two one-hour sessions?

00:15:50  17      A.   Two one-hour sessions on two different days.

00:15:57  18      Q.   Did he feel comfortable with you, if you know, or

00:16:00  19  did he appear comfortable with you?

00:16:03  20      A.   He got more comfortable over time.  I don't think

00:16:06  21  Alex feels terribly comfortable with anybody, but he got

00:16:12  22  more comfortable by the second session.

00:16:16  23      Q.   Did you ever feel that Alex was in a position to

00:16:20  24  confide in you?

00:16:23  25      A.   Well, I was asking fairly intimate complicated

00:16:26  1  questions about him and about his family and about his

00:16:30  2  sex life and about his experiences that are typically

00:16:35  3  not easy to talk about, and he was relatively open.

00:16:39  4      Q.  Did he talk to you about being molested as an

00:16:44  5  11-year-old?

00:16:46  6      A.  I don't think so.

00:16:48  7      Q.  All right.  Did he talk to you about teaching

00:16:51  8  Sunday school?

00:17:06  9      A.  I have no memory of him bringing that up.

00:17:08  10      Q.  Did he ever talk to you about an ex-fiancee'?

00:17:11  11      A.  Yes.

00:17:14  12          THE COURT:  A what?  I didn't hear your

00:17:16  13  question.  Talk to you about a what?

00:17:18  14          MS. KELLEY:  Ex-fiancee'.

00:17:22  15      A.  He said he had a girlfriend with whom he was

00:17:25  16  sexually active which ended with this -- these charges.

00:17:30  17      Q.  So she was -- she was only an ex-girlfriend?

00:17:34  18      A.  He called her a girlfriend.

00:17:35  19      Q.  Not a fiancee'?

00:17:37  20      A.  He did not.

00:17:42  21      Q.  Now, I want to go back to the tests you performed

00:17:46  22  as to his, I guess, sexual development and education;

00:17:52  23  would that be correct?

00:17:53  24      A.  Yes.

00:17:55  25      Q.  Any indications of deviancy during the course of

00:18:00  1    that testing?

00:18:05  2    A.  Using the word "test," I'm pretty careful about

00:18:10  3    what I described as a test.  What I gave him was a life

00:18:13  4    history questionnaire about psychosexual issues, and it

00:18:17  5    asks a bunch of questions about psychosexual

00:18:21  6    development.  So it's not a test in the sense that it's

00:18:27  7    normed.  It's not a test in the sense that it allows any

00:18:31  8    kind of clear comparison against standards.  It's a

00:18:39  9    questionnaire.  So there's a lot of room about how he

00:18:42 10    answers it, and it's answered in essay form, some of it.

00:18:46 11    Q.  Okay.  Was there an opportunity for Alex to

00:18:50 12    discuss any supposed interest in child pornography?

00:18:56 13    A.  Yes.

00:18:56 14    Q.  There was an opportunity?

00:18:58 15    A.  Yes.

00:18:58 16    Q.  And did he, in fact, discuss any interest in

00:19:02 17    child pornography?

00:19:03 18    A.  He denied interest in child pornography.  And

00:19:07 19    there were a number of questions specifically addressing

00:19:13 20    interest in children as sex objects, interest in

00:19:16 21    children -- arousal around children, arousal around

00:19:19 22    pictures of children, arousal around forms of sexual --

00:19:26 23    of sexualized pictures with teenagers, young teenagers.

00:19:32 24    Q.  And he denied any interest in that?

00:19:35 25    A.  He generally denied an interest in anything other

00:19:40  1    than people within about three or four years of his age.

00:19:48  2        Q.   So I want to return to the statement which he

00:19:55  3    allegedly signed at police headquarters.  Do you recall

00:19:59  4    examining that statement?

00:20:01  5        A.   Yes.

00:20:03  6        Q.   And do you recall discussing it with Alex?

00:20:05  7        A.   Yes.

00:20:09  8        Q.   And based on your interview with Alex, why would

00:20:15  9    he sign such a statement?

00:20:19  10       A.   Alex indicated -- I don't know that I can say

00:20:26  11   with absolute certainty, but Alex indicated that it was

00:20:30  12   a three- or four-hour interrogation.  The officer was

00:20:37  13   angry, as Alex recalls it, and pushing hard.  And then

00:20:44  14   the officer stopped -- for three or four hours.   Then

00:20:48  15   the officer stopped and started typing something up

00:20:50  16   which Alex said seemed to be something which the officer

00:20:56  17   implied would stop the process, stop the interrogation

00:21:01  18   and stop the charges.  There was a specific -- as Alex

00:21:06  19   recalled it, the officer said to him, this letter is to

00:21:19  20   the prosecutor, and there's no reason to follow this

00:21:21  21   further.

00:21:23  22       Q.   And did Alex tell you if he believed him?

00:21:26  23       A.   Alex said that he believed him at the time.

00:21:32  24   Well, he said the guy lied.

00:21:40  25       Q.   Based on your interviews with Alex and your

00:21:44 1    review of the materials, what type of relationship does

00:21:47 2    Alex have with people in authority?

00:21:54 3       A.  At the time that this was going on -- Alex is

00:21:59 4    generally not very independent; he tended to rely on

00:22:07 5    people in authority.  He was somewhat emotionally

00:22:10 6    dependent and tended to be compliant for the most part.

00:22:14 7    He was not somebody particularly rebellious.  He went

00:22:21 8    along with those in authority because for the most part,

00:22:25 9    he assumed that they were more knowledgeable than him.

00:22:30 10      Q.  All right.  And did you discuss with him at all

00:22:33 11   his relationship with his father?

00:22:35 12      A.  Yes.

00:22:35 13      Q.  And will you tell the jury how he described that

00:22:39 14   relationship.

00:22:57 15      A.  He thought that his father was supportive;

00:22:59 16   friendly; loving; disciplined, as in following a

00:23:03 17   structure; had no difficulty in confiding with his

00:23:10 18   parents.  And he thought that they treated him in a fair

00:23:16 19   fashion that was similar to his brother and sister.

00:23:19 20      Q.  All right.  Thank you.  Now, a few final

00:23:25 21   questions.  Doctor, you've been in practice how many

00:23:31 22   years?

00:23:32 23      A.  I've been licensed for 33 years.

00:23:34 24      Q.  And how many years have you testified in court?

00:23:36 25      A.  Thirty-three years.

00:23:37   1      Q.   Thirty-three years.  And have you testified only

00:23:41   2   for the defense?

00:23:44   3      A.   Actually, for the most part I only perform

00:23:48   4   evaluations -- for the most part, 80 or 90 percent of

00:23:53   5   the time, I only perform evaluations when I am court

00:23:56   6   ordered, court appointed, so I enter neutral.  I have

00:23:59   7   testified for both prosecution and defense, depending on

00:24:03   8   what my opinion is after that.

00:24:06   9      Q.   And in the spirit of full disclosure, are you

00:24:11  10   being paid the today?

00:24:12  11      A.   Yes.  For my time here, yes.

00:24:14  12      Q.   And would that in any way influence your

00:24:18  13   opinions?

00:24:20  14      A.   No.

00:24:21  15      Q.   All right.  I'm sorry to jump around, but I

00:24:30  16   thought of one more thing.  You testified a bit earlier

00:24:34  17   that Alex appears to be a bit compliant.  Do you recall

00:24:40  18   saying that?

00:24:40  19      A.   Yes.

00:24:42  20      Q.   Would an extension of that be that Alex tends to

00:24:49  21   blame other people for his problems?

00:24:53  22      A.   Well, at this point he is less trusting and more

00:24:56  23   angry and more blaming.

00:25:01  24          MS. KELLEY:  All right.  Thank you.  No more

00:25:03  25   questions.

```
00:25:16    1                        - - -
00:25:16    2            WAYNE GRAVES, Ph.D., CROSS-EXAMINATION
00:25:17    3   BY MR. CRAWFORD:
00:25:17    4      Q.  Dr. Graves, you made a report of your evaluation
00:25:21    5   of Mr. Cook; is that correct?
00:25:22    6      A.  That's correct.
00:25:22    7      Q.  It's dated June 22, 2011?
00:25:25    8      A.  Yes.
00:25:25    9      Q.  Has your opinion changed at all today since you
00:25:29   10   wrote that report in June?
00:25:30   11      A.  No.
00:25:30   12      Q.  Okay.  And is it fair to say that the gist of
00:25:34   13   your analysis was that Mr. Cook may say untrue things to
00:25:38   14   end an interrogation or a lengthy interview?
00:25:40   15      A.  He may say compliant things.  He may say things
00:25:44   16   to get someone off his back.  He may say things that are
00:25:50   17   conceding just to end an interrogation, yes.
00:25:55   18      Q.  Untrue things?
00:25:57   19               THE COURT:  The last part of your answer?
00:25:58   20   I'm sorry.  I didn't hear the last part of your answer.
00:26:02   21               THE WITNESS:  Conceding things in order to
00:26:04   22   end an interrogation.
00:26:06   23      Q.  So your testimony is nonetheless he would be
00:26:08   24   truthful in that situation?
00:26:10   25      A.  No, I didn't say that.  He would say anything
```

00:26:12  1   that would end an interrogation if there was enough

00:26:16  2   pressure or intensity to it.

00:26:18  3       Q.  So it might be untrue things?

00:26:20  4       A.  It might be an untrue thing.

00:26:21  5       Q.  And you met with him on a couple of occasions?

00:26:24  6       A.  Yes.

00:26:25  7       Q.  Was your interview with him confrontational?

00:26:27  8       A.  It was about several subjects, yes.

00:26:29  9       Q.  And were you confident that he was telling you

00:26:34  10  the truth during those times?

00:26:35  11      A.  I was confident that he was truthful for the most

00:26:42  12  part in the testing that I did because there are some

00:26:46  13  ways for me to evaluate that.  I was -- I believe that

00:26:51  14  he was withholding some information and downplaying some

00:26:56  15  aspects of his sexual life because he was still

00:27:03  16  embarrassed somewhat about psychosexual issues;

00:27:07  17  masturbation, for instance.

00:27:09  18      Q.  At the beginning of the process you asked him to

00:27:12  19  sign a waiver of confidentiality, didn't you?

00:27:15  20      A.  I asked him to sign a waiver of confidentiality

00:27:18  21  to his attorney and a -- an explanation that this

00:27:23  22  information might end up in court, yes.

00:27:25  23      Q.  And he signed an acknowledgment that this had

00:27:29  24  been explained to him by you?

00:27:30  25      A.  Yes.

00:27:31  1      Q.   And that he knew his report would go to his

00:27:34  2   federal public defender?

00:27:36  3      A.   Yes.

00:27:36  4      Q.   And who may or may not use that material in the

00:27:38  5   report as part of his defense?

00:27:40  6      A.   Yes.

00:27:40  7      Q.   You explained that to him, correct?

00:27:43  8      A.   Several times.

00:27:44  9      Q.   Did you believe he understood you?

00:27:46  10     A.   I thought he understood that I was not going to

00:27:49  11  keep secrets and that the information was going to go to

00:27:53  12  his defender and might go to the Court.

00:27:55  13     Q.   And you continued your evaluation anyway,

00:27:58  14  correct?

00:27:58  15     A.   I did.

00:28:06  16     Q.   And you concluded in your report that you

00:28:11  17  determined Mr. Cook was capable of understanding any

00:28:14  18  potential consequences of trial in this case?

00:28:18  19     A.   I thought that he seemed to understand the basics

00:28:23  20  of trial and the consequences of generally having some

00:28:29  21  significant punishment attached to being found guilty.

00:28:39  22     Q.   And you determined his level of performance; you

00:28:42  23  judged it to be adequate to answer computer

00:28:44  24  administrative test protocols?

00:28:47  25     A.   Yes.

00:28:47  1      Q.  So that means you could set him down in front of

00:28:49  2  a computer and have him answer questions?

00:28:51  3      A.  His reading level was at the -- barely at the

00:28:55  4  minimum level required, fifth grade reading level, sixth

00:29:00  5  grade reading level.

00:29:01  6      Q.  Dr. Graves, you could sit him down in front of a

00:29:05  7  computer and ask him to answer questions; is that true?

00:29:07  8      A.  Well, I'm trying to answer that in terms of the

00:29:10  9  reading level required, which is fifth grade reading

00:29:14  10  level.  Yes.

00:29:15  11      Q.  You also sent paperwork home with him.  Is that

00:29:18  12  true?

00:29:18  13      A.  That's true.

00:29:19  14      Q.  And he returned that to you?

00:29:20  15      A.  He did.

00:29:21  16      Q.  And you used it in your report?

00:29:23  17      A.  I did.

00:29:29  18      Q.  All right.  You also discussed with Mr. Cook and

00:29:32  19  he provided you information concerning his computer

00:29:34  20  usage; is that true?

00:29:35  21      A.  Yes.

00:29:36  22      Q.  And he admitted to you that he used LimeWire; is

00:29:41  23  that correct?

00:29:41  24      A.  That's correct.

00:29:41  25      Q.  And he admitted to downloading music using

| | | |
|---|---|---|
| 00:29:46 | 1 | LimeWire? |
| 00:29:46 | 2 | A.  Yes. |
| 00:29:47 | 3 | Q.  And he admitted he viewed adult pornography? |
| 00:29:51 | 4 | A.  Yes. |
| 00:29:51 | 5 | Q.  And he admitted he used LimeWire to download |
| 00:29:54 | 6 | adult pornography; isn't that true? |
| 00:29:57 | 7 | A.  I'd have to go back and look, but I think so. |
| 00:30:12 | 8 | Yes, he did. |
| 00:30:12 | 9 | Q.  And he, in fact, admitted to you that he saw on |
| 00:30:15 | 10 | his computer child pornography; isn't that true? |
| 00:30:18 | 11 | MS. KELLEY:  Excuse me.  I couldn't hear |
| 00:30:20 | 12 | that last phrase. |
| 00:30:21 | 13 | Q.  He admitted to you that he saw child pornography |
| 00:30:24 | 14 | on his computer; is that correct? |
| 00:30:25 | 15 | A.  He said a couple images of child pornography |
| 00:30:27 | 16 | popped up when he first turned his computer on, yes. |
| 00:30:30 | 17 | Q.  And he indicated he deleted them; is that true? |
| 00:30:33 | 18 | A.  That's what he said. |
| 00:30:33 | 19 | Q.  And he provided a description of the girl who was |
| 00:30:37 | 20 | in the child pornography? |
| 00:30:37 | 21 | A.  He did. |
| 00:30:38 | 22 | Q.  That was 14 or 15 years old with breasts and no |
| 00:30:42 | 23 | body hair; is that true? |
| 00:30:43 | 24 | A.  Yes.  Small breasts, no body hair. |
| 00:30:51 | 25 | Q.  He gave you a description of his interview with |

00:30:53  1   FBI Agent Pape?

00:30:54  2      A.  He did.

00:30:54  3      Q.  And in that interview he told you that Special

00:30:58  4   Agent Pape sat there yelling at me calling me an idiot

00:31:01  5   for three or four hours?

00:31:03  6      A.  Yes.

00:31:04  7      Q.  And he also said to you he had no clue what it

00:31:07  8   was about?

00:31:08  9      A.  That's what he said.

00:31:08  10     Q.  And he told you that the statement that Special

00:31:11  11  Agent Pape prepared was a letter to the prosecutor that

00:31:14  12  there is no reason to follow this further?

00:31:16  13     A.  That's what he said.

00:31:18  14     Q.  All right.  And Mr. Cook also talked to you about

00:31:21  15  his roommate.  Is that true?

00:31:23  16     A.  Yes.

00:31:28  17     Q.  And he indicated that he mistrusts his roommate?

00:31:32  18     A.  He does now.

00:31:32  19     Q.  He indicated that his roommate wrecked his

00:31:35  20  four-wheeler and didn't repay him?

00:31:37  21     A.  Yes.

00:31:38  22     Q.  His roommate stuck him with a $350 cable bill for

00:31:42  23  the apartment?

00:31:42  24     A.  Yes.

00:31:43  25     Q.  The roommate never helped him pay for it?

00:31:46  1      A.  Yes.

00:31:46  2      Q.  He indicated, referring to himself, "I was

00:31:48  3   stupid.  He's a jerk"?   It's page 6 of the record, the

00:32:01  4   first full paragraph.

00:32:07  5      A.  Yes.

00:32:09  6      Q.  And you indicated apparently there were other

00:32:11  7   bills he was forced to pay because the roommate, quote,

00:32:15  8   swears he paid it?

00:32:17  9      A.  Yes.

00:32:17  10      Q.  And Mr. Cook described his roommate as having no

00:32:21  11   job, being lazy, yet he called Mr. Cook lazy.  Is that

00:32:25  12   true?

00:32:27  13      A.  Yes.

00:32:29  14      Q.  He also made statements about the FBI in this

00:32:31  15   case; isn't that true?

00:32:34  16      A.  Yes.

00:32:35  17      Q.  He said that he trusted the FBI?

00:32:39  18      A.  He did say that.

00:32:41  19      Q.  And he trusted the FBI not to mess me over, and

00:32:43  20   they all lied to me.  Isn't that true?

00:32:45  21      A.  That was his statement.

00:32:46  22      Q.  He said, I was helpful in any way I could be to

00:32:49  23   them because I had nothing to hide.  He said that,

00:32:52  24   didn't he?

00:32:53  25      A.  Yes.

00:32:53  1    Q.   And he said, "When I found out other things they

00:32:56  2    forgot to look at, I called them, asked them if they

00:32:59  3    wanted to come and get them."  He said that?

00:33:00  4    A.   That's what he said.

00:33:01  5    Q.   And he said, "I signed a waiver for them to

00:33:04  6    search my vehicle"?

00:33:05  7    A.   Yes.

00:33:05  8    Q.   "I was trying to be helpful, and they messed me

00:33:08  9    over."  Did he say that?

00:33:09  10   A.   He did say that.

00:33:10  11   Q.   Did he indicate that he's angry with this

00:33:13  12   process; called it ridiculous, unfair, uncalled for, and

00:33:17  13   one-sided"?   Page 7, Dr. Graves.  Second full

00:33:38  14   paragraph.

00:33:39  15   A.   Yes.

00:33:44  16   Q.   And he never indicated to you that he believed he

00:33:48  17   was a victim of identity theft?

00:33:51  18   A.   He did not.

00:33:51  19   Q.   And he never indicated to you that he thought his

00:33:53  20   roommate had downloaded child pornography on his

00:33:57  21   computer, did he?

00:33:59  22   A.   No.

00:34:16  23            MR. CRAWFORD: No further questions, Judge.

00:34:18  24            THE COURT:  Redirect?

00:34:19  25            MS. KELLEY:  Yes.  Thank you.

                              - - -

              WAYNE GRAVES, Ph.D., REDIRECT EXAMINATION

BY MS. KELLEY:

    Q.  Sir, you authored this report in May of this

year, correct?

    A.  June of this year.

    Q.  June of this year.  Three, four months ago,

correct?

    A.  Yes.

    Q.  And if you remember, who was the attorney on the

case at that point?

    A.  Attorney Donna Grill.

    Q.  All right.  Not Elizabeth Kelley?

    A.  No.

    Q.  Now, what grade reading level did Alex perform

at?

    A.  His reading level was at a seventh grade

equivalent, which is a 14th percentile.  His spelling

was at a fifth percentile, fifth grade level.

    Q.  All right.  And recalling your attention again to

the supposed confession which he signed, given the

circumstances at the FBI office that morning, would Alex

have been able to have fully comprehended what he was

reading if, in fact, he could read it?

                    MR. SECOR:  Objection, Your Honor.  There's

| | | |
|---|---|---|
| 00:35:38 | 1 | been no testimony that he knew what the circumstances |
| 00:35:40 | 2 | were that morning of the confession. |
| 00:35:45 | 3 | MS. KELLEY:  Well -- |
| 00:35:47 | 4 | THE COURT:  Why don't you lay those |
| 00:35:49 | 5 | circumstances out. |
| 00:35:50 | 6 | MS. KELLEY:  All right. |
| 00:35:51 | 7 | BY MS. KELLEY: |
| 00:35:51 | 8 | Q.  Describe for the jury then the circumstances |
| 00:35:54 | 9 | under which you understood Alex to have reviewed that |
| 00:36:00 | 10 | confession that morning? |
| 00:36:03 | 11 | A.  He was called in for an interview by the Special |
| 00:36:10 | 12 | Agent.  It was the first time that he had been in any |
| 00:36:13 | 13 | kind of serious trouble.  He said the interrogation -- |
| 00:36:21 | 14 | "interrogation" was his word -- went on for three or |
| 00:36:23 | 15 | four hours.  And the agent was yelling at him, calling |
| 00:36:27 | 16 | him stupid.  There were several derogatory statements |
| 00:36:37 | 17 | about it.  And that it went on for a significant period |
| 00:36:40 | 18 | of time.  And in that atmosphere when it suddenly seemed |
| 00:36:46 | 19 | to let up, and the agent was typing something, Alex felt |
| 00:36:51 | 20 | a sense of relief and wanting to get out of there. |
| 00:36:55 | 21 | Q.  Why did he feel a sense of relief? |
| 00:36:57 | 22 | A.  Well, that the intense, angry interrogation had |
| 00:37:02 | 23 | stopped. |
| 00:37:04 | 24 | Q.  All right. |
| 00:37:06 | 25 | MS. KELLEY:  Is that a sufficient |

| | | |
|---|---|---|
| 00:37:07 | 1 | foundation, Your Honor, to pursue -- |
| 00:37:10 | 2 | MR. CRAWFORD:  Your Honor, the objection |
| 00:37:11 | 3 | still stands.  This is all based upon -- |
| 00:37:14 | 4 | THE COURT:  Approach. |
| 00:37:16 | 5 | (Whereupon the following discussion was had |
| 00:38:30 | 6 | at the bench outside the hearing of the jury:) |
| 00:38:30 | 7 | THE COURT:  Your objection? |
| 00:38:30 | 8 | MR. SECOR:  My objection is all this is |
| 00:38:30 | 9 | based upon the defendant's self-reporting.  He's not |
| 00:38:30 | 10 | making an opinion based on what actually happened or |
| 00:38:30 | 11 | what the government contends happens.  On a self-report |
| 00:38:30 | 12 | here. |
| 00:38:30 | 13 | THE COURT:  I understand.  But I assume that |
| 00:38:32 | 14 | defendant will testify to that fact, and based upon his |
| 00:38:32 | 15 | understanding as communicated by the defendant, and you |
| 00:38:32 | 16 | can dispute that and you can ask on cross-examination, |
| 00:38:32 | 17 | well, what if these were the facts? |
| 00:38:32 | 18 | MR. SECOR:  All right. |
| 00:38:32 | 19 | MS. KELLEY:  I'm confused.  I thought this |
| 00:38:33 | 20 | was Mr. Crawford's witness. |
| 00:38:33 | 21 | MR. CRAWFORD:  We'll be mindful of that. |
| 00:38:33 | 22 | (End of sidebar discussion.) |
| 00:38:33 | 23 | THE COURT:  You may continue. |
| 00:38:35 | 24 | MS. KELLEY:  Thank you, Your Honor. |
| 00:38:37 | 25 | BY MS. KELLEY: |

00:38:38 1    Q.   Doctor, based on your interviews with Alex and

00:38:42 2    your reviews of the materials, do you have an opinion as

00:38:49 3    to why Alex would sign such a statement?

00:38:51 4    A.   Yes.

00:38:51 5    Q.   And please tell the jury that opinion?

00:38:55 6    A.   Because he doesn't trust his own ability to

00:39:00 7    understand documents very well, because he is passive

00:39:05 8    and somewhat conflict-avoidant with adults, and because

00:39:11 9    he wanted to escape from the interrogation situation and

00:39:14 10   thought that's what he was being offered if he signed.

00:39:20 11          MS. KELLEY:   All right.   Thank you.   No

00:39:22 12   further questions.

00:39:42 13                         - - -

00:39:42 14          WAYNE GRAVES, Ph.D., RECROSS-EXAMINATION

00:39:43 15   BY MR. CRAWFORD:

00:39:43 16   Q.   Dr. Graves, Mr. Cook's statement that he was

00:39:47 17   being interrogated for three or four hours while an

00:39:49 18   agent was yelling at him calling him an idiot, that

00:39:53 19   factored in your determination in your evaluation of Mr.

00:39:57 20   Cook, didn't it?

00:39:58 21   A.   Yes.

00:39:58 22   Q.   And had that circumstance about the interrogation

00:40:02 23   been untrue, that would have changed your opinion?

00:40:06 24   A.   It might have.

00:40:08 25   Q.   And had Mr. Cook voluntarily went down to the FBI

00:40:17 1    office, had not been detained, not been arrested, and

00:40:20 2    not been in an interrogation, could that have changed

00:40:24 3    your opinion and your evaluation of Mr. Cook?

00:40:30 4        A.  I guess it depends on -- again, this is -- Mr.

00:40:34 5    Cook's subjective view of his experience is more

00:40:39 6    important than the practical elements of it.  However,

00:40:44 7    if he -- if it was less than three or four hours by a

00:40:48 8    significant margin, if there wasn't as much yelling as

00:40:51 9    he proposes, those would have been important.

00:40:55 10       Q.  And his subjective evaluation as you understand

00:40:58 11   it is based entirely on his self-reporting to you?

00:41:00 12       A.  That's what I had available.

00:41:05 13            MR. CRAWFORD:  Thank you.

00:41:08 14                        - - -

00:41:08 15        WAYNE GRAVES, Ph.D., FURTHER REDIRECT EXAMINATION

00:41:12 16   BY MS. KELLEY:

00:41:12 17       Q.  Just one question.  Subjective often means

00:41:15 18   self-reporting, doesn't it?

00:41:17 19       A.  Yes.

00:41:18 20            MS. KELLEY:  Thank you.  No more questions.

00:41:20 21            THE COURT:  You may step down.  You're free

00:41:21 22   to go or welcome to stay; it's entirely up to you.

00:41:35 23            Are you ready to resume with the prosecution

00:41:37 24   case?

00:41:37 25            MR. CRAWFORD: We are, Your Honor.  We would

| | | |
|---|---|---|
| 00:41:39 | 1 | call Detective David Morford. |
| 00:41:42 | 2 | MS. KELLEY:  Excuse me, Your Honor.  Could |
| 00:41:44 | 3 | we have a brief recess? |
| 00:41:45 | 4 | THE COURT:  Sure.  About five minutes or so? |
| 00:41:51 | 5 | Ladies and gentlemen, if you want to step |
| 00:41:53 | 6 | out for a moment, that's fine. |
| 00:51:22 | 7 | (Recess taken.) |
| 00:51:25 | 8 | THE COURT:  Ready to resume? |
| 00:51:27 | 9 | MR. CRAWFORD: Our next witness IS Detective |
| 00:51:29 | 10 | David Morford of the Toledo Police Department. |
| 00:51:31 | 11 | THE COURT:  What are we going to hear? |
| 00:51:33 | 12 | MR. CRAWFORD:  Detective Morford conducted a |
| 00:51:37 | 13 | forensic analysis of the computer sized from the |
| 00:51:40 | 14 | Knollwood apartment. |
| 00:51:42 | 15 | (The witness was sworn by the clerk.) |
| 00:51:51 | 16 | THE COURT:  Good afternoon.  Have a seat. |
| 00:51:54 | 17 | Tell the ladies and gentlemen your name, please. |
| 00:51:55 | 18 | THE DEFENDANT:  David Morford, |
| 00:51:57 | 19 | M-o-r-f-o-r-d. |
| 00:52:00 | 20 | THE COURT:  Maybe a little closer.  Not too |
| 00:52:03 | 21 | much closer. |
| 00:52:14 | 22 | THE WITNESS: David Morford, M-o-r-f-o-r-d. |
| 00:52:17 | 23 | THE COURT:  Can you hear okay, ladies and |
| 00:52:19 | 24 | gentlemen? |
| 00:52:20 | 25 | And what is your occupation or profession? |

| | | |
|---|---|---|
| 00:52:24 | 1 | THE WITNESS:  I'm a detective with the |
| 00:52:25 | 2 | Toledo Police Department. |
| 00:52:26 | 3 | THE COURT:  How long have you been with the |
| 00:52:28 | 4 | TPD? |
| 00:52:29 | 5 | THE WITNESS:  Seventeen years. |
| 00:52:30 | 6 | THE COURT:  And how long have you held the |
| 00:52:32 | 7 | rank of detective? |
| 00:52:33 | 8 | THE WITNESS:  Six years. |
| 00:52:34 | 9 | THE COURT:  And what do you do presently? |
| 00:52:36 | 10 | THE WITNESS:  I'm in the computer crimes |
| 00:52:38 | 11 | unit, mainly computer forensics. |
| 00:52:41 | 12 | THE COURT:  How long have you been doing |
| 00:52:42 | 13 | that sort of work? |
| 00:52:43 | 14 | THE WITNESS:  Six years. |
| 00:52:44 | 15 | THE COURT:  What sort of training or |
| 00:52:45 | 16 | preparation did you have for it? |
| 00:52:46 | 17 | THE WITNESS:  I've been to several |
| 00:52:49 | 18 | trainings:  Basic data recovery and acquisition; network |
| 00:52:55 | 19 | intrusive response for the Secret Service; Access Data |
| 00:52:58 | 20 | boot camp, which is the software that we use for |
| 00:53:01 | 21 | forensics; practical examiner test for Access Data; |
| 00:53:05 | 22 | advanced forensics, basic computer recovery and evidence |
| 00:53:12 | 23 | response.  I'm an ICAC or InCAC instructor. |
| 00:53:19 | 24 | THE COURT:  What does that stand for? |
| 00:53:20 | 25 | THE WITNESS:  Internet Crimes Against |

00:53:21   1    Children.

00:53:22   2                    THE COURT:  Instructor where?

00:53:26   3                    THE WITNESS:  For their ICAC program,

00:53:28   4    conducting online investigations with things such as

00:53:32   5    Facebook and My Space.

00:53:33   6                    THE COURT:  Is that here in Toledo or

00:53:35   7    elsewhere?

00:53:36   8                    THE WITNESS:  It's nationwide.

00:53:38   9                    THE COURT:  I meant the instruction; where

00:53:39  10    do you do that?

00:53:40  11                    THE WITNESS:  We don't have enough people

00:53:42  12    here that can do it.

00:53:47  13                    THE COURT:  Mr. Crawford, continue.

00:53:50  14                            - - -

00:53:50  15                    DAVID MORFORD, DIRECT EXAMINATION

00:53:51  16    BY MR. CRAWFORD:

00:53:51  17       Q.  Mr. Morford, I'm handing you what's been

00:53:55  18    identified as Government's Exhibit 7.  Do you recognize

00:53:58  19    that item?

00:53:58  20       A.  I do.

00:53:59  21       Q.  How do you recognize that?

00:54:00  22       A.  It's just a bag that was brought to me, that was

00:54:04  23    brought to me along with the rest of the items in the

00:54:07  24    case.  It was sealed when I got it.

00:54:08  25       Q.  Can you describe the condition it was in the bag

00:54:11  1   when you?

00:54:11  2       A.   This was sealed, and I would have cut it to open

00:54:15  3   it so I could get to the laptop inside.

00:54:18  4       Q.   At the time you received it, did it appear to

00:54:21  5   have been opened and resealed several times or --

00:54:23  6       A.   No.

00:54:23  7       Q.   Just one seal?

00:54:25  8       A.   I think I broke the seal, the original seal.

00:54:28  9       Q.   And what did you find inside there?

00:54:30  10      A.   There's a laptop, an HP; the battery is out.

00:54:37  11  And a power cord.

00:54:38  12      Q.   Can you remove those items from the bag, please.

00:54:52  13           To your recollection are the items that are

00:54:54  14  before you today the items that were in that bag when

00:54:57  15  you first received it?

00:54:59  16      A.   Yes.

00:55:01  17      Q.   And at the time you first received that computer,

00:55:09  18  did you -- could you just generally describe what

00:55:11  19  condition it was in?

00:55:12  20      A.   Exactly this condition.  The battery was out,

00:55:15  21  power cable was separate, exactly like it is now.

00:55:19  22      Q.   Was there any indication that it had been

00:55:21  23  tampered with, damaged, that you could tell?

00:55:24  24      A.   No.  It's in pretty good shape.

00:55:28  25      Q.   Perhaps I asked you this, but does it appear

| | | |
|---|---|---|
| 00:55:31 | 1 | today as it did when you first opened the bag to examine |
| 00:55:35 | 2 | it? |
| 00:55:35 | 3 | A.  Yes, it does. |
| 00:55:38 | 4 | Q.  Could you please describe briefly for the jury |
| 00:55:41 | 5 | the capabilities of a computer.  Is a computer able to |
| 00:55:45 | 6 | store information? |
| 00:55:45 | 7 | A.  Absolutely. |
| 00:55:46 | 8 | Q.  How does it do that? |
| 00:55:47 | 9 | A.  Computers have hard drives inside of them.  It's |
| 00:55:52 | 10 | a piece of media that stores data, the operating system, |
| 00:55:54 | 11 | files, whatever you choose to put on there. |
| 00:55:56 | 12 | Q.  And what sort of files could these be? |
| 00:56:00 | 13 | A.  Anything; documents, pictures, movies, |
| 00:56:03 | 14 | spreadsheets, e-mail. |
| 00:56:05 | 15 | Q.  You said they're stored on a hard drive.  Could |
| 00:56:08 | 16 | you describe what physically a hard drive looks like? |
| 00:56:11 | 17 | A.  A hard drive is -- in this particular laptop it's |
| 00:56:15 | 18 | a small square, probably four inches by five and a half |
| 00:56:21 | 19 | inches, maybe three-quarters of an inch thick.  There's |
| 00:56:25 | 20 | platters inside that the media is stored on.  And those |
| 00:56:29 | 21 | platters spin, if it's a normal hard drive.  There are |
| 00:56:32 | 22 | SD drives that have no moving parts; it just stores data |
| 00:56:36 | 23 | in sectors on the drive. |
| 00:56:37 | 24 | Q.  The computer can store and retrieve data from |
| 00:56:40 | 25 | this hard drive? |

00:56:41  1    A.   Yes.

00:56:42  2    Q.   If you want to know what's contained on that hard

00:56:44  3    drive, what do you have to do?

00:56:47  4    A.   What we do is image the hard drive.  We pull the

00:56:50  5    original hard drive out of the machine; we log the drive

00:56:54  6    serial number and the type, and then we make a duplicate

00:56:57  7    sector by sector, bit by bit of the original, and then

00:57:02  8    we analyze the copy.  We put the original back in the

00:57:07  9    original machine, and we don't touch it again.

00:57:09  10   Q.   Why do you do that as opposed to just, say, turn

00:57:12  11   on the computer and look around to see what's there?

00:57:14  12   A.   For several reasons.  The first reason is if you

00:57:17  13   do your work off of an image, you don't have to worry

00:57:20  14   about disturbing the original media, changing anything

00:57:23  15   on it, even inadvertently.  We image through a write

00:57:28  16   blocker so there's no chance of us writing to that

00:57:31  17   drive.  So the image we make is as the drive was when we

00:57:34  18   pull it out.

00:57:35  19        The second reason that we work off an image is

00:57:38  20   because like any piece of equipment, it can break.  And

00:57:41  21   you want to touch the drive as little as possible so you

00:57:44  22   don't have a failure and have the drive then be

00:57:46  23   inoperable for whatever reason.

00:57:48  24   Q.   Did that computer have a hard drive in it?

00:57:50  25   A.   Yes.

00:57:50  1      Q.  And did you make an effort to make an image of

00:57:53  2  that part of it?

00:57:53  3      A.  I did.

00:57:54  4      Q.  Please describe that process.

00:57:55  5      A.  We plug the original drive into -- we have a

00:58:01  6  machine called a FRED, which in essence is a big

00:58:05  7  computer.

00:58:05  8      Q.  Could you step back even farther.  You have the

00:58:08  9  computer in front of you.  You want to make an image.

00:58:10  10  What do you do?

00:58:11  11      A.  The first thing I do is log the computer serial

00:58:14  12  number.  If there's any damage on the computer at that

00:58:16  13  time or anything that stands out, I would note that,

00:58:18  14  that the machine looks operable.

00:58:21  15          I then remove the hard drive.  It's usually on a

00:58:24  16  panel under the bottom of the laptop held by a couple

00:58:27  17  screws.  Remove the hard drive; I log the hard drive's

00:58:29  18  information for my supplemental.  Then I take the hard

00:58:33  19  drive, the original, and I plug it into a write blocker

00:58:37  20  on our FRED, which stands for Forensic Recovery of

00:58:44  21  Evidence Device.  It's just a big computer.  We plug it

00:58:49  22  into a write blocker so we can access the drive but we

00:58:51  23  cannot make changes to the drive; we can't write to it

00:58:55  24  in any way.  We then use some software called Access

00:58:58  25  Data Imager to make a duplicate of the drive.

00:59:06  1      Q.  And when you make this duplicate, what's the end

00:59:09  2  product?

00:59:10  3      A.  The end product is a series of image files that

00:59:13  4  are 1500 megs in size each until the entire drive from

00:59:18  5  beginning to end is written.  The image it writes from

00:59:22  6  the very first bit in the very first sector on the drive

00:59:25  7  to the very end of the drive, the very last bit, very

00:59:29  8  last sector, all of the deleted space, the free space,

00:59:33  9  every part of the drive is imaged.

00:59:36  10          Then it's hashed, which in essence is an

00:59:41  11  algorithm thrown against the original drive, is a

00:59:43  12  mathematical algorithm which spits back a result that's

00:59:47  13  called a hash value.  Then our image is hashed.  And the

00:59:51  14  image should be -- in this case it was identical.

00:59:54  15      Q.  Could you explain a little more what a hash value

00:59:57  16  is, how it's derived and what it tells you about a

01:00:00  17  particular computer file?

01:00:01  18      A.  It is a mathematical algorithm that is thrown at

01:00:05  19  the hard drive.

01:00:05  20      Q.  What do you mean, "thrown at"?

01:00:07  21      A.  It is applied to the drive as the data sits.  And

01:00:10  22  it gives a response, which is a string of -- a very long

01:00:15  23  string of numbers and letters.  It's unique to that

01:00:18  24  drive as the data on that drive sits.  If you were to

01:00:21  25  change any data on the drive at all, the algorithm, the

01:00:24  1   response will change.  That's the hash value.  It's

01:00:27  2   similar to a DNA strand for the -- that would be how I

01:00:31  3   would equate it.  And then the hash is also applied to

01:00:36  4   our image as it sits to make sure that it's identical.

01:00:40  5      Q.  Okay.  You indicated in this case the hash value

01:00:45  6   from the computer in front of you was the same as the

01:00:47  7   image.  What does that tell you about the image?

01:00:49  8      A.  When I was trained on hash values I was told that

01:00:53  9   the chances of two separate hard drives, two different

01:00:56  10  hard drives having identical hash values is less than

01:01:00  11  one in 490 quadrillion.  So it tells me it's an

01:01:06  12  identical copy I'm looking at (.

01:01:10  13     Q.  Once you made this image, were you able to

01:01:13  14  examine or view this image in a virtual environment?

01:01:17  15     A.  I was.

01:01:18  16     Q.  Could you just describe, please, how that process

01:01:21  17  works?

01:01:21  18     A.  I used a piece of software called Virtual Box.

01:01:26  19  It is a piece of software that runs within my computer,

01:01:30  20  like any other piece of software.  Within Virtual Box I

01:01:33  21  can take my image and I can mount it as if it were a

01:01:37  22  hard drive on my machine virtually.  I can then have

01:01:43  23  Virtual Box boot that image as if I were sitting in

01:01:46  24  front of the laptop myself, booting the machine up on

01:01:51  25  the actual machine.  Everything is virtualized; the

01:01:54    1   video card, everything within Virtual Box is a virtual

01:01:58    2   environment.  It doesn't touch my host.  It's just a

01:02:01    3   piece of software running on my machine.

01:02:05    4      Q.  So you're basically able to take the image and

01:02:07    5   view that computer as if you had turned the computer on

01:02:10    6   in front of you?

01:02:10    7      A.  Correct.

01:02:11    8      Q.  And when you took a look at this image, what sort

01:02:17    9   of steps did you have to take to eventually access the

01:02:20   10   computer?

01:02:20   11      A.  When I first booted the machine up, there were --

01:02:25   12   there's an account on the machine, a login account which

01:02:29   13   most newer windows machines have; it's password

01:02:32   14   protected.  The only other way onto the machine -- there

01:02:35   15   were two ways of access, the logon password, which I

01:02:39   16   didn't have; or biometric, which is fingerprint reader.

01:02:44   17   We used a piece of software called Paragon Rescue Disk,

01:02:48   18   which we can put between the boot process -- we can boot

01:02:52   19   from a CD to Paragon, access the registry and wipe the

01:02:57   20   password so that we can boot into the machine.  And

01:03:00   21   that's what happened.

01:03:01   22      Q.  Now, the fact that your image was password

01:03:03   23   protected, what does that tell you about the laptop in

01:03:06   24   front of you?

01:03:07   25      A.  There's a login password or a biometric reader to

01:03:10   1    get on to it.

01:03:11   2        Q.  So someone turning on that computer today would

01:03:13   3    need a password to access the computer?

01:03:15   4        A.  Correct.

01:03:16   5        Q.  Let me show you this, what's marked as

01:03:19   6    Government's Exhibit 15.  Do you recognize this image?

01:03:48   7        A.  Yes, I do.

01:03:49   8        Q.  What is it?

01:03:50   9        A.  That's the desktop within Virtual Box of the

01:03:54  10    image from this laptop.

01:03:56  11        Q.  Okay.  And up here in the top left corner, what

01:04:06  12    does that mean?

01:04:06  13        A.  That's showing that I'm running Virtual Box, I'm

01:04:10  14    running a piece of software within my host.  And when I

01:04:14  15    started up this virtual machine, I named it Cook so I

01:04:17  16    knew what I was looking at because that's the case I was

01:04:20  17    working on.

01:04:20  18        Q.  The computer in front of you, if you were to plug

01:04:23  19    that computer in and turn it on, enter the appropriate

01:04:26  20    password, what would be the computer screen that you

01:04:29  21    would see?

01:04:30  22        A.  You wouldn't see this blue outline.  You would

01:04:34  23    see the login screen, and once you got by it, you would

01:04:37  24    see this desktop.

01:04:38  25        Q.  What do you mean by this desktop?

01:04:40  1       A.  This is what you would see on the screen, all

01:04:42  2   these icons, this fire wallpaper, or whatever that

01:04:46  3   actually is.

01:04:47  4       Q.  And this photograph that's on the desktop here?

01:04:50  5       A.  That, yes, that's what you'd see.

01:04:53  6       Q.  And after putting this image in the Virtual Box,

01:04:59  7   what did you do?

01:05:00  8       A.  The first thing that I made note of was there

01:05:04  9   appeared to be file sharing software that's sitting on

01:05:08  10  the desktop, the LimeWire, the version of LimeWire.  I

01:05:12  11  then opened up the My Computer.

01:05:14  12      Q.  Is this what you're referring to?

01:05:16  13      A.  Correct.

01:05:17  14      Q.  What is this?

01:05:17  15      A.  That's a file sharing program.  It's very

01:05:21  16  popular.  It was shut down by the federal government, I

01:05:24  17  believe, in January.

01:05:25  18      Q.  And what does this icon on the desktop represent?

01:05:31  19      A.  That's a shortcut to run the program.

01:05:33  20      Q.  5.3.6; what is that?

01:05:36  21      A.  That's the version of the software that's on

01:05:39  22  there.

01:05:47  23      Q.  Okay.  What's this image?

01:05:49  24      A.  This is the documents folder under the account

01:05:52  25  name "Alex" on this machine.

01:05:57  1    Q.   What do you mean by account name "Alex"?

01:05:59  2    A.   The account name, when I originally booted the

01:06:02  3  machine in Virtual Box, was Alex.  So that's the name of

01:06:06  4  the account that you are logging into or accessing when

01:06:10  5  you go into the machine.

01:06:12  6    Q.   Okay.  Then over on the left-hand side here,

01:06:20  7  desktop, there's Alex, then what are these items

01:06:23  8  underneath?

01:06:23  9    A.   That's the file free under that account;

01:06:25  10  contacts; the desktop, which will show you the icons on

01:06:29  11  the desktop; the documents, which is what we were in.

01:06:32  12  There's a downloads folder, favorites links, music; your

01:06:37  13  iTunes can go in there.

01:06:42  14    Q.   Then on the right-hand side of the screen, what

01:06:47  15  are those items?

01:06:48  16    A.   That's going to be the contents of the documents

01:06:50  17  folder.

01:06:51  18    Q.   Are those user created files or system files?

01:06:57  19    A.   The bottom seven are going to be documents.  The

01:07:03  20  text documents were probably created with Word Pad, and

01:07:08  21  the Word documents obviously were created with Microsoft

01:07:12  22  Word.

01:07:12  23    Q.   Are those documents that are automatically

01:07:18  24  created by windows, or are those documents that a user

01:07:21  25  would have to create?

01:07:23  1      A.   Those are user-created files.

01:07:25  2      Q.   What are the two folders at the top, LimeWire and

01:07:28  3   webcam.

01:07:30  4      A.   LimeWire and webcam are files within this folder.

01:07:39  5      Q.   What's this screen?

01:07:41  6      A.   These are the contents of the LimeWire folder.

01:07:51  7      Q.   What is "incomplete"?

01:07:52  8      A.   Incomplete is a partial download.  With LimeWire

01:07:57  9   when you initiate a download your download is written to

01:08:01 10   the incomplete folder until it completes.  Once the

01:08:04 11   download is finished, it transfers to this saved folder

01:08:07 12   or whatever folder has been designated as -- by the

01:08:11 13   user.

01:08:11 14      Q.   And what is in the saved folder?

01:08:13 15      A.   The saved folder in this particular case is going

01:08:16 16   to be a file library, movies, documents, music.

01:08:21 17      Q.   And where does the saved information -- where

01:08:23 18   does the contents of the saved folder come from?

01:08:25 19      A.   In this case they can be downloaded from

01:08:32 20   LimeWire.  They can be copied into that folder by the

01:08:35 21   user.

01:08:36 22      Q.   What does "store purchased" mean?

01:08:39 23      A.   Store purchased.  LimeWire, they have an option

01:08:43 24   very similar to iTunes where you can actually go and buy

01:08:47 25   files.

01:09:12  1    Q.  All right.  And what is this screen?

01:09:17  2    A.  This is going to be the contents of the LimeWire

01:09:20  3  saved folder.

01:09:21  4    Q.  Okay.  Briefly before we go on, any passwords

01:09:32  5  required to use Windows Explorer and view these items

01:09:36  6  once a person gets past the initial password?

01:09:38  7    A.  No.

01:09:39  8    Q.  Any special training required to view these

01:09:41  9  files?

01:09:41  10    A.  Just double click.

01:09:43  11    Q.  Any special computer program required to uncover

01:09:47  12  some sort or hidden files in order to view these?

01:09:49  13    A.  No.

01:09:49  14    Q.  So here we have a blown up portion of the

01:09:55  15  left-hand side of this slide.  What does this represent

01:09:57  16  again?

01:09:57  17    A.  This is the file tree again showing where these

01:10:00  18  particular files, these particular folders lie within

01:10:04  19  the file path.

01:10:12  20    Q.  All right.  And on the left-hand side here -- on

01:10:16  21  the right hand side, I'm sorry, what is that

01:10:20  22  information?

01:10:20  23    A.  This is going to be the contents of the actual

01:10:23  24  LimeWire saved folder.

01:10:27  25    Q.  All right.  And just briefly describe what are

01:10:32  1   some of the contents in the LimeWire saved folder on

01:10:35  2   this computer?

01:10:36  3       A.  Well, the icons on the left side will tell you

01:10:38  4   what type of file it is.  I see JPEGs, which are still

01:10:43  5   photos; music or audio files of some kind; and one movie

01:10:49  6   of some kind.

01:10:52  7       Q.  And what is -- what are the music files?

01:10:55  8       A.  The Forrest Gump soundtrack, that looks like a

01:11:00  9   song; Shaggie --

01:11:04  10      Q.  And you mentioned some images and videos.  Are

01:11:07  11  there any file names here that are indicative to you of

01:11:10  12  potentially containing child pornography?

01:11:14  13      A.  Yes.

01:11:14  14      Q.  Could you just identify one please?

01:11:17  15      A.  Sure.  Youth jailbait private daughter pussy PEDO

01:11:25  16  Lolita PTHC.

01:11:28  17      Q.  Could you identify what PTHC means?

01:11:31  18      A.  Preteen hardcore.

01:11:32  19      Q.  In your investigations do you routinely come

01:11:35  20  across that term?

01:11:36  21      A.  Yes.  It's a common search term used to find

01:11:41  22  child pornography.

01:11:42  23      Q.  In using LimeWire, how does one find files using

01:11:49  24  LimeWire?

01:11:50  25      A.  With LimeWire you do a search by key words.  You

01:11:55  1   can -- you'll see that a lot of these files have really

01:12:00  2   long file names, and that's for a reason, so that you

01:12:02  3   can hit on them with one key word.  So you'd do a search

01:12:07  4   for whatever key word you're using, and for -- and I

01:12:10  5   can't tell you these files which key word was used, but,

01:12:14  6   for example, PTHC, and you will then go out on the

01:12:18  7   Gnutella network and look for files with PTHC in the

01:12:21  8   title.

01:12:21  9       Q.  Down here in the lower left-hand corner you see

01:12:25  10  870 items.  What does that mean?

01:12:28  11      A.  That's the total number of items within this

01:12:31  12  folder.

01:12:33  13      Q.  And within which folder?

01:12:35  14      A.  The LimeWire saved.

01:12:52  15      Q.  What is this screen?

01:12:53  16      A.  This is the same folder.  I scrolled down just a

01:12:56  17  little ways to take some random shots of it.  Also shows

01:13:01  18  the contents of the folder, just farther down.

01:13:04  19      Q.  You say this is the LimeWire saved folder?

01:13:06  20      A.  It is.

01:13:15  21      Q.  And what is this?

01:13:16  22      A.  The same, farther down on the same -- just a

01:13:20  23  random shot of the contents of the saved folder.

01:13:29  24      Q.  All right.  What are some of the files, types of

01:13:32  25  files that are located here?

01:13:33  1    A.   I see three audio files, and it looks like three

01:13:38  2    media files, movies.

01:13:40  3    Q.   What are the audio files?

01:13:41  4    A.   The top three, the Creed, Crossfade and Crystal

01:13:45  5    Shawanda.

01:13:49  6    Q.   Are any of the other files indicative of child

01:13:55  7    pornography?

01:13:55  8    A.   Cute 12 year old being taught by daddy, fisting,

01:14:00  9    incest, child.

01:14:14  10    Q.   What is this screen?  It looks different.  Please

01:14:18  11    explain the difference between this screen and the last

01:14:21  12    screen.

01:14:21  13    A.   This is the LimeWire library within the LimeWire

01:14:24  14    software.  So I started the LimeWire software and

01:14:27  15    actually viewed the library within the software.

01:14:32  16    Q.   Okay.  So we saw the LimeWire icon on the

01:14:34  17    desktop, one of the first slides.  So you ran that

01:14:38  18    program?

01:14:38  19    A.   Correct.

01:14:39  20    Q.   And you ran it from this Virtual Box?

01:14:41  21    A.   Correct.

01:14:41  22    Q.   And what happened when you ran the program?

01:14:46  23    A.   The software starts up.

01:14:49  24    Q.   What do you see on the computer screen?

01:14:51  25    A.   You'll see the LimeWire logo.  It's loading.

01:14:55  1   It's going to try to connect out when it first starts,

01:14:59  2   but it can't because we don't allow it network access.

01:15:02  3   And again, LimeWire is shut down.

01:15:05  4       Q.  Okay.  So is this a home screen for LimeWire?

01:15:09  5       A.  This is not the home screen.  This is the library

01:15:12  6   screen.  The home screen would connect and show you the

01:15:15  7   LimeWire logo.

01:15:16  8       Q.  What sort of information is contained in this

01:15:19  9   library screen?

01:15:20  10      A.  This is virtually the same -- actually the same

01:15:25  11  file list that was in the LimeWire saved.  This is

01:15:28  12  actually accessing that folder through the LimeWire

01:15:30  13  program.

01:15:31  14      Q.  Okay.  So up here in the top right-hand corner,

01:15:40  15  what do we have there?

01:15:40  16      A.  The number of files within this folder.

01:15:42  17      Q.  And is that number the same or different from the

01:15:45  18  number of files that were in the LimeWire saved folder

01:15:47  19  that we just looked at?

01:15:48  20      A.  It's the same.

01:15:57  21      Q.  Any special skills required to view or run

01:16:00  22  LimeWire on this computer?

01:16:01  23      A.  Double click.

01:16:03  24      Q.  Any password or anything required to get here

01:16:06  25  beyond the password to get get in initially?

01:16:09  1      A.  No.

01:16:09  2      Q.  Any special software training needed to see

01:16:12  3  what's in this library folder?

01:16:13  4      A.  No.

01:16:14  5      Q.  It is available just to the user of the program?

01:16:16  6      A.  Yes.

01:16:17  7      Q.  And here, what's displayed here?

01:16:27  8      A.  File contents of the folder, the same in the

01:16:31  9  LimeWire saved.  I see some still photos, a movie.

01:16:38  10     Q.  These names, where do these names come from?  Is

01:16:40  11  this something that LimeWire makes up, or where do these

01:16:43  12  names come from?

01:16:44  13     A.  These names are the file names.  The files are

01:16:47  14  named, and the user can change a file name.

01:16:49  15     Q.  Any file names here consistent with child

01:16:53  16  pornography?

01:16:53  17     A.  Absolutely.

01:16:54  18     Q.  Could you identify one?

01:16:55  19     A.  "Laurie, 10 YO," which means ten year old,

01:17:00  20  "daughter, skirt, panties, preteen, dog."

01:17:21  21     Q.  What's this screen?

01:17:25  22     A.  I can't see it well, but it looks like the

01:17:30  23  library.  Scroll down farther.  Another shot.

01:17:36  24     Q.  What are these items at the bottom?

01:17:39  25     A.  Those are incomplete downloads.  With LimeWire

01:17:42  1   you have the option of starting a download.  If for some

01:17:46  2   reason the host that you're downloading the file from

01:17:48  3   goes offline or you go offline, you have the option of

01:17:51  4   resuming that download when you come back online.  Those

01:17:55  5   are incomplete downloads.

01:18:07  6       Q.   This screen, please describe it.

01:18:10  7       A.   The same folder, farther down, farther down in

01:18:15  8   the files.

01:18:22  9       Q.   And what are some of these files?

01:18:25  10      A.   Stills and videos.

01:18:27  11      Q.   Anything there that would be indicative of child

01:18:31  12  pornography?

01:18:31  13      A.   The top file, "13 year old fucks her dad."

01:18:49  14      Q.   And this screen?

01:18:51  15      A.   This is the public shared folder within the

01:18:54  16  LimeWire software.

01:18:56  17      Q.   Hold on a second.  Previously which folder have

01:19:03  18  we been looking at?

01:19:03  19      A.   We were in the library.

01:19:05  20      Q.   Is the library folder on this zoom here?

01:19:08  21      A.   It's the top folder.

01:19:09  22      Q.   Now you've moved down to the one below?

01:19:12  23      A.   Correct.

01:19:13  24      Q.   What is a public shared folder?

01:19:15  25      A.   That is the folder on -- within LimeWire on your

01:19:18  1    computer that is shared when you're on LimeWire on the

01:19:22  2    Gnutella network that is shared for other users.  If

01:19:25  3    they have done a key word search and you have a file

01:19:28  4    that they want, they can download it from you.

01:19:33  5        Q.  On the left we have highlighted there public

01:19:37  6    shared; is that correct?

01:19:38  7        A.  I can't see that highlighted, but yes.

01:19:46  8        Q.  The shading is not the greatest.

01:19:54  9        A.  I can tell it is by the warning on the bottom.

01:19:57  10       Q.  We'll get to that in a second.  These items here,

01:20:03  11   what are those?

01:20:05  12       A.  Those are the contents of this folder.

01:20:11  13       Q.  And are any of those file names indicative of

01:20:16  14   child pornography?

01:20:18  15       A.  Most of them.  Youth, jail bait, private,

01:20:22  16   daughter, PEDO.

01:20:37  17       Q.  In the center here.

01:20:44  18           You mentioned LimeWire allows you to share that

01:20:49  19   files with others?

01:20:50  20       A.  Other users on the network.

01:20:52  21       Q.  Other LimeWire users?

01:20:53  22       A.  It could be other LimeWire users, FrostWire,

01:20:57  23   Shareaza.  LimeWire is a tool to get onto this world

01:21:01  24   network.

01:21:01  25       Q.  Do people pay to get onto the Gnutella network?

01:21:05  1      A.  No.

01:21:06  2      Q.  Is it limited to Ohio, midwest?

01:21:08  3      A.  All over the world.

01:21:09  4      Q.  And please, if you could read the sentence here

01:21:12  5  that's in the middle of the screen.

01:21:14  6      A.  "Files in this list are shared anonymously with

01:21:17  7  the world."

01:21:17  8      Q.  What does that mean?

01:21:19  9      A.  It's letting you know that anything that is

01:21:21  10  within this folder, when you are online on the network,

01:21:25  11  other users can download from you.

01:21:40  12      Q.  What do we have here?

01:21:43  13      A.  This is the same folder, just again farther down

01:21:46  14  into the file list.

01:21:47  15      Q.  So there is public shared.  It still has the same

01:21:49  16  warning in the middle about anonymous sharing?

01:21:53  17      A.  Yes.

01:21:58  18      Q.  Here?

01:21:58  19      A.  Same.  Same file list farther down.

01:22:06  20      Q.  And what sorts of images are these?

01:22:09  21      A.  Those are JPEGs or EMPs without the file

01:22:15  22  extension.  I can't tell you from here, but they're

01:22:17  23  still photos.

01:22:18  24      Q.  Any words there indicative of child pornography?

01:22:21  25      A.  Kiddie porn.

01:22:42  1       Q.  What's this screen?

01:22:43  2       A.  This is going to be the options menu from within

01:22:47  3   the LimeWire software.

01:22:49  4       Q.  What does the options menu tell you?

01:22:52  5       A.  It allows you to make some changes to how the

01:22:54  6   program works, what the program does, whether it loads

01:22:59  7   at startup.  And in this case it allows you to turn off

01:23:06  8   downloaded files going into your public shared if you

01:23:09  9   choose to do that.

01:23:18  10      Q.  This is a blown up portion of the screen.  It

01:23:22  11  says "sharing."  What does this indicate?

01:23:24  12      A.  It's just telling you how to modify what you are

01:23:28  13  sharing on the internet, where to find it, how to modify

01:23:31  14  it.

01:23:34  15      Q.  That last line, "Add files I download from P2P

01:23:39  16  users to my public shared list," what does that mean?

01:23:42  17      A.  What that's telling the software, when I'm

01:23:45  18  downloading from the Gnutella network from another user,

01:23:49  19  when the download completes, automatically put it into

01:23:53  20  my shared folder.

01:23:55  21      Q.  This is a checkmark by that line.  What does that

01:23:59  22  checkmark mean?

01:24:00  23      A.  You can turn it off.

01:24:01  24      Q.  In the case is it turned off or on?

01:24:04  25      A.  No.

01:24:05  1      Q.  Off or on?

01:24:06  2      A.  It's on.

01:24:17  3      Q.  One other set of slides, Detective Morford, if I

01:24:17  4  may.

01:24:42  5          What is this screen?

01:24:43  6      A.  This is actually the "about" screen off that

01:24:45  7  LimeWire software that I was running in the Virtual Box

01:24:48  8  just showing the software version is the reason I took a

01:24:53  9  shot of it.

01:24:53  10     Q.  What LimeWire version is it?

01:24:55  11     A.  5.3.6.

01:24:58  12     Q.  And that is the software version that you have at

01:25:02  13  TPD, or is that the software version that's on the

01:25:05  14  laptop in front of you?

01:25:06  15     A.  That is the software version that's on that

01:25:09  16  laptop.

01:25:13  17     Q.  What is this screen?

01:25:15  18     A.  That is the contents of a CD that we made with

01:25:20  19  the "install executable" for LimeWire 5.3.6.

01:25:24  20     Q.  What is this item that's been highlighted here?

01:25:26  21     A.  That's the install, the executable file to

01:25:29  22  install that software.

01:25:30  23     Q.  What do you mean "executable file"?

01:25:32  24     A.  When you double click on that file, you run this

01:25:35  25  program, which will start the install process to install

01:25:38   1    LimeWire on your computer.

01:25:53   2        Q.   What's this screen?

01:25:55   3        A.   This is the first notice that you get when you

01:25:59   4    run that.  It's asking you if you want to allow this

01:26:02   5    piece of software to make changes to your operating

01:26:05   6    system.

01:26:09   7        Q.   This screen?

01:26:10   8        A.   If you click "yes" you get the install beginning.

01:26:14   9    This is telling you what you're installing to start

01:26:17  10    going through the the install process.

01:26:22  11        Q.   What's this screen?

01:26:23  12        A.   File path, where the software is installed.  The

01:26:28  13    default file path where the software itself is

01:26:31  14    installed.

01:26:35  15        Q.   And what does this depict?

01:26:36  16        A.   This is the progress bar showing the installation

01:26:39  17    occurring.  We installed this on a virtual machine of

01:26:42  18    our own.

01:26:46  19        Q.   And what does this indicate?

01:26:47  20        A.   It's showing you the installation completed and

01:26:52  21    you can run the software.  Hit "finish" when that

01:27:01  22    install is done.

01:27:02  23                THE COURT:  How much longer?

01:27:04  24                MR. CRAWFORD: I would anticipate about 30

01:27:06  25    minutes.

01:27:07  1          THE COURT:  I have a brief conference, so it

01:27:11  2  will take me about ten minutes probably.

01:27:14  3          MR. CRAWFORD:  Right now, Judge?

01:27:15  4          THE COURT:  Why don't we take our recess.

01:34:11  5          (Recess taken.)

01:46:13  6          THE COURT:  You may resume.

01:46:17  7          You understand you remain under oath?

01:46:20  8          THE WITNESS:  Yes, sir.

01:46:22  9  BY MR. CRAWFORD:

01:46:22  10     Q.  Continuing with Exhibit 18, was LimeWire

01:46:29  11  installed on the computer in front of you there?

01:46:32  12     A.  Yes.

01:46:33  13     Q.  And do you recall what version of LimeWire was

01:46:37  14  installed?

01:46:38  15     A.  5.3.6.

01:46:40  16     Q.  In the images I showed you, Exhibit 18 here,

01:46:44  17  those are images that depict what?

01:46:47  18     A.  This is the desktop of our virtual machine.

01:46:50  19     Q.  And the previous slides that we looked at

01:46:53  20  depicted?

01:46:54  21     A.  LimeWire being installed on this machine.

01:46:57  22     Q.  Are these the same sort of steps that someone

01:47:00  23  installing LimeWire on that computer or any other

01:47:03  24  computer would have to go through in order to install

01:47:05  25  LimeWire?

01:47:06    1       A.   Yes.

01:47:07    2       Q.   So back to Exhibit 18 here.   What is this image?

01:47:11    3       A.   This is the desktop showing the shortcut to

01:47:14    4   LimeWire.

01:47:14    5       Q.   Is this the shortcut to LimeWire?

01:47:21    6       A.   Yes.

01:47:22    7       Q.   And is that the same shortcut as on Government's

01:47:26    8   Exhibit 7 in front of you there?

01:47:27    9       A.   Yes.

01:47:27   10       Q.   And 5.3.6 indicates what?

01:47:31   11       A.   The software version.

01:47:47   12       Q.   And what is this screen?

01:47:50   13       A.   This is LimeWire's legal terms of use and

01:47:54   14   copyright information the first time you run the

01:47:57   15   software.

01:48:00   16       Q.   In order to get to this screen, what did you do

01:48:04   17   in the virtual machine?

01:48:05   18       A.   I would have double clicked the LimeWire 5.3.6

01:48:10   19   icon.

01:48:10   20       Q.   To get to their software, what do you have to do?

01:48:11   21       A.   You have to agree to the terms of their use

01:48:17   22       A.   I take it you agreed?

01:48:18   23       A.   Correct.

01:48:19   24       Q.   What is this screen?

01:48:20   25       A.   Basic configurations settings.   Do you want

01:48:23  1    LimeWire to launch in your system tray when you start

01:48:26  2    your computer?  Do you want to take part in an anonymous

01:48:30  3    survey in order to make their product better?

01:48:32  4        Q.  And what do those boxes with the Xs on the left

01:48:36  5    indicate?

01:48:36  6        A.  You can turn those options off.

01:48:39  7        Q.  And since you're running this on a virtual

01:48:43  8    machine, are these Xs that you put in there, or are

01:48:45  9    these Xs that were automatically put in there?

01:48:48  10       A.  Everything on this install including these Xs are

01:48:52  11   default that come up when you run the software.

01:48:57  12       Q.  In the very top left-hand corner there, what does

01:49:04  13   that information indicate?

01:49:05  14       A.  This is step 2 of the set up the first time you

01:49:09  15   run LimeWire, and it's giving you some information about

01:49:11  16   file sharing.

01:49:15  17       Q.  And what does this screen say?

01:49:18  18       A.  This allows you to turn off the option that adds

01:49:24  19   files that you've downloaded from other users on the

01:49:27  20   Gnutella network to your public share list.

01:49:35  21       Q.  What does this indicate here?

01:49:36  22       A.  It's turned on by default.

01:49:38  23       Q.  What's turned on by default?

01:49:40  24       A.  The adding the files to your public shared by

01:49:44  25   default, that's where the file you download goes.

01:49:48  1       Q.   Someone setting up LimeWire, would they have the

01:49:52  2   option of un-"X"ing that box?

01:49:55  3       A.   Yes.

01:49:58  4       Q.   This public shared list, what files go into this

01:50:04  5   public shared list that are shared with the world?

01:50:06  6       A.   You can put files from there, from other places

01:50:09  7   in your computer if you would like.  By "there," any

01:50:12  8   files that you download from the Gnutella network will

01:50:15  9   automatically go there when the download completes.

01:50:18  10      Q.   When we were reviewing Exhibit 15, which was

01:50:21  11  Government's Exhibit 7 there in a virtual environment,

01:50:25  12  were some of those screen shots of the public shared

01:50:28  13  list?

01:50:29  14      A.   Yes.

01:50:45  15      Q.   Detective Morford, what is an FTK analysis?

01:50:48  16      A.    FTK is the software we use to run the analysis

01:50:52  17  on the image we created.  It stands for Forensic

01:50:56  18  Toolkit.  It is a software developed by Access Data.

01:50:59  19  It's an industry standard in law enforcement.  It's used

01:51:03  20  throughout the world for computer analysis, computer

01:51:06  21  forensics.

01:51:07  22      Q.   Generally what sorts of uses -- what can you do

01:51:09  23  with it, would you do with it in your day-to-day job

01:51:14  24  duties?

01:51:15  25      A.   We use it everyday.  FTK takes the contents of an

01:51:21  1  image or a hard drive directly, if that's what you

01:51:26  2  choose to do.  It examines the file system.  It indexes

01:51:30  3  all of the words on the computer; it categorizes all of

01:51:35  4  the files within the computer as to what type of file it

01:51:38  5  is; for example, a document or a graphic or multimedia.

01:51:44  6  And it allows me to go look when I do my analysis at

01:51:48  7  just the types of files I need without having to sift

01:51:53  8  through 300,00 or 400,000 other system files that are

01:51:56  9  not important.

01:51:57  10      Q.  Did you perform or did you use the FTK software

01:52:01  11  to analyze the image of Government's Exhibit 7 there?

01:52:04  12      A.  Yes, I did.

01:52:16  13      Q.  Let me show you Government's Exhibit 16.  What is

01:52:18  14  that item?

01:52:19  15      A.  That is a copy of the FTK report that I generated

01:52:23  16  at the conclusion of my exam.

01:52:24  17      Q.  How do you know that's a copy?

01:52:25  18      A.  I reviewed it, and it's my initials on the disk.

01:53:39  19      Q.  Is this your FTK report?

01:53:43  20      A.  Yes, it is.

01:53:45  21      Q.  I'll show you an item on the left here called

01:53:49  22  bookmarked files.  What does this screen indicate?

01:53:58  23      A.  I had this to the report -- or had the report

01:54:00  24  generate this to show any file I added as an evidence

01:54:04  25  file to my final case report to show the file path.  So

01:54:08  1   somebody looking at this could see where on the computer

01:54:11  2   that file would have resided if you were exploring the

01:54:14  3   computer yourself.  Everything in blue is an evidence

01:54:19  4   item.

01:54:25  5       Q.  Do you see that folder called documents?

01:54:27  6       A.  Yes.

01:54:28  7       Q.  What's there?

01:54:29  8       A.  That is the documents folder we looked at earlier

01:54:33  9   with the LimeWire folder and the LimeWire saved folder

01:54:36  10  within it, and then the evidence that I added to the

01:54:38  11  case within that.

01:54:43  12      Q.  And what are the -- is the blue writing here

01:54:47  13  underneath the LimeWire saved?

01:54:49  14      A.  Those are the file names.

01:55:00  15      Q.  And what is this screen?

01:55:02  16      A.  This is the file properties for each file, all of

01:55:06  17  the file properties I have available for each file that

01:55:09  18  I added to the case as an evidence item to include the

01:55:12  19  file path, the file name, what type of file it was, the

01:55:17  20  logical physical size, created, modified, and accessed

01:55:21  21  if it was available.  If you scroll down, the hash

01:55:27  22  values should be available as well and a link to the

01:55:30  23  file.

01:55:38  24      Q.  Here's one example you'll see file there.  What's

01:55:41  25  that file name?

01:55:42  1      A.   Nine year old or 9YO Jennie nude with legs spread

01:55:46  2   wide apart.

01:55:48  3      Q.   Beneath that it says full path.  What does full

01:55:51  4   path indicate?

01:55:51  5      A.   Full path is where the file was on the computer

01:55:56  6   that it came from.

01:56:02  7      Q.   Do you see extension JPG?  What does that mean?

01:56:07  8      A.   That means that it's a still photo.

01:56:13  9      Q.   And what is this link here?

01:56:16  10     A.   That's a link to the photo.

01:56:23  11     Q.   And is this an image of the photo that goes with

01:56:28  12   the other properties that you just described?

01:56:31  13     A.   Yes.

01:57:12  14     Q.   How about this file here.   The same information?

01:57:14  15     A.   The same information.

01:57:15  16     Q.   You have a file name.  And what's that file name

01:57:19  17   there?

01:57:19  18     A.   Kids teens women porno Lolitas preteens,

01:57:26  19   hussyfans, underage.

01:57:30  20     Q.   Are those terms associated with child

01:57:32  21   pornography?

01:57:32  22     A.   Most definitely.

01:57:34  23     Q.   It says extension here, jpg.  What does that

01:57:37  24   indicate?

01:57:37  25     A.   It's a photo.

01:57:41  1      Q.   And this link here, exported as?

01:57:43  2      A.   That will be the photo.

01:57:48  3      Q.   And is that the photo that is associated with

01:57:50  4   that file name?

01:57:51  5      A.   Yes.

01:58:22  6      Q.   Detective Morford, this is Government's Exhibit

01:58:24  7   17.   Do you recognize that item?

01:58:28  8      A.   Yes, I do.

01:58:29  9      Q.   What is that?

01:58:30  10     A.   A slide show of the exploited images from my FTK

01:58:36  11  report.

01:58:36  12     Q.   And the images on that disk, where did they come

01:58:39  13  from?

01:58:39  14     A.   They came from my FTK report.

01:58:43  15     Q.   Is that a summary of what's on your FTK report?

01:58:46  16     A.   Yes.

01:58:47  17     Q.   Have you had an opportunity to review the images

01:58:49  18  on that disk?

01:58:50  19     A.   Yes.

01:58:50  20     Q.   Are the images on that disk the same that you

01:58:53  21  found in your FTK analysis?

01:58:55  22     A.   Yes, they are.

01:59:35  23     Q.   What are we looking at here?

01:59:36  24     A.   This is the contents of the CD you just put in on

01:59:40  25  of the exported images as well as a Microsoft

01:59:43  1    PowerPoint.

01:59:44  2        Q.   What is that Microsoft PowerPoint?

01:59:46  3        A.   Untitled 1.

01:59:48  4        Q.   And what does it contain?

01:59:49  5        A.   That's going to be the slides above and below.

01:59:53  6        Q.   And at the bottom here it says movie clip.  What

01:59:55  7    are those?

01:59:56  8        A.   Three movies.

01:59:57  9        Q.   And you've seen these, and they're images that

02:00:01  10   came from your analysis of Government's Exhibit 7?

02:00:03  11       A.   Yes, they did.

02:00:04  12       Q.   I'll play the first movie and ask you to identify

02:00:07  13   it.

02:00:28  14              MR. CRAWFORD: Your Honor, two or three

02:00:29  15   movies we've seen before.  I was going to play them for

02:00:32  16   approximately ten seconds to give Detective Morford an

02:00:36  17   opportunity to identify.  The third one we have not

02:00:38  18   seen; I was going to play it in its entirety.

02:00:41  19              I'll play therefore approximately ten

02:00:44  20   seconds, Detective Morford, and you can acknowledge

02:00:46  21   whether you recognize it.

02:00:48  22              (Video played in open court.)

02:00:57  23       Q.   Detective Morford, is that one of the movies you

02:01:00  24   discovered during your FTK analysis?

02:01:04  25       A.   Yes.

02:01:07  1          (Video shown in open court.)

02:01:42  2     Q.   The same question, is this one of the movies

02:01:45  3  you've seen?

02:01:45  4     A.   Yes.

02:01:59  5          (Video shown in open court.)

02:03:39  6     Q.   Same question.  Is that a video you uncovered

02:03:42  7  during your FTK analysis?

02:03:44  8     A.   Yes.

02:03:45  9     Q.   These will be still images.

02:04:04  10         (Photographs shown in open court.)

02:05:47  11    Q.   Are those images that you recovered during your

02:05:51  12  FTK analysis?

02:05:52  13    A.   Yes.

02:05:56  14            MR. CRAWFORD: Just a moment, Your Honor.

02:06:36  15  BY MR. CRAWFORD:

02:06:36  16    Q.   Detective Morford, the last movie we saw, have

02:06:40  17  you seen that in other investigations before?

02:06:42  18    A.   Many times.

02:06:43  19    Q.   And is that a full version of that video?

02:06:45  20    A.   No.

02:06:47  21    Q.   And what have you seen, the full version of that

02:06:52  22  video, in other investigations?

02:06:54  23    A.   The full version is much longer; it's called the

02:06:57  24  Baby J video.  There are multiple men having sex with

02:07:00  25  that little girl.  She's probably around five years old.

| | | |
|---|---|---|
| 02:07:06 | 1 | MR. CRAWFORD:  Judge, if we could approach |
| 02:07:08 | 2 | at the side for a second. |
| 02:07:10 | 3 | (Whereupon the following discussion was had |
| 02:08:11 | 4 | at the bench outside the hearing of the jury:) |
| 02:08:11 | 5 | MR. CRAWFORD: Judge, that's our last |
| 02:08:11 | 6 | witness.  Do you want to do exhibits now? |
| 02:08:11 | 7 | THE COURT:  She has cross.  Wait for her to |
| 02:08:11 | 8 | finish the cross-examination. |
| 02:08:11 | 9 | How long do you think cross will be? |
| 02:08:11 | 10 | MS. KELLEY:  Very brief. |
| 02:08:11 | 11 | THE COURT:  Are there going to be |
| 02:08:11 | 12 | objections? |
| 02:08:11 | 13 | MS. KELLEY:  Not that I can think of at this |
| 02:08:12 | 14 | point. |
| 02:08:21 | 15 | (End of side-bar discussion.) |
| 02:08:28 | 16 | THE COURT:  You may examine. |
| 02:08:30 | 17 | MS. KELLEY:  Thank you, Your Honor. |
| 02:08:30 | 18 | - - - |
| 02:08:30 | 19 | DAVID MORFORD, CROSS-EXAMINATION |
| 02:08:32 | 20 | BY MS. KELLEY: |
| 02:08:32 | 21 | Q.  Good afternoon.  I'm Elizabeth Kelley.  I |
| 02:08:34 | 22 | represent Alex Cook. |
| 02:08:37 | 23 | Now, you examined a number of different items |
| 02:08:40 | 24 | which were seized in Alex's apartment, didn't you? |
| 02:08:44 | 25 | A.  That's correct. |

02:08:45   1       Q.   You examined a thumb drive?

02:08:48   2       A.   Yes.

02:08:48   3       Q.   And memory cards?

02:08:51   4       A.   Correct.

02:08:51   5       Q.   And an Xbox?

02:08:53   6       A.   Right.

02:08:53   7       Q.   And an iPod?

02:08:56   8       A.   Yes.

02:08:57   9       Q.   And you didn't find any evidence of child

02:09:01  10   pornography on any of those items, did you?

02:09:03  11       A.   No, ma'am.

02:09:04  12       Q.   Just found the hard drive?

02:09:05  13       A.   Yes, ma'am.

02:09:06  14       Q.   During the course of your examination, did you

02:09:10  15   discover when the LimeWire software was actually

02:09:14  16   downloaded on to the hard drive?

02:09:17  17       A.   No.

02:09:17  18       Q.   You didn't?   How long did you spend examining

02:09:22  19   the hard drive?

02:09:24  20       A.   Quite a while.

02:09:25  21       Q.   And you never discovered when it was downloaded?

02:09:31  22       A.   I didn't think it was relevant.

02:09:35  23       Q.   Now, in your FTK report, in virtually every

02:09:46  24   single entry the created time, the modified time, and

02:09:50  25   the access time was identical.   Why was that?

02:09:53  1      A.  Because the machine was running Windows Vista,

02:09:57  2  and Windows Vista by default does not update access

02:10:00  3  dates when you access a file.

02:10:02  4      Q.  All right.  So there's really, based on that,

02:10:05  5  there's no evidence that any of those files were

02:10:09  6  actually opened, is there?

02:10:10  7      A.  No.

02:10:11  8      Q.  And there's no evidence that they were actually

02:10:14  9  viewed, is there?

02:10:15  10      A.  Nope.

02:10:16  11      Q.  And there's no evidence that they were actually

02:10:19  12  categorized, is there?

02:10:21  13      A.  No.

02:10:24  14      Q.  Now, there's something called a biometric device

02:10:29  15  on Alex's computer, correct?

02:10:31  16      A.  Correct.

02:10:32  17      Q.  And tell the jury in a couple quick sentences

02:10:36  18  what a biometric device is?

02:10:38  19      A.  A fingerprint reader.

02:10:43  20      Q.  And Alex could, once Alex was logged in, he

02:10:48  21  didn't need to log in again in his computer, did he, on

02:10:51  22  his computer, did he --

02:10:53  23      A.  No.

02:10:54  24      Q.  -- if it had a biometric device?

02:10:56  25      A.  No.

02:10:57   1      Q.  And until the computer was unplugged and

02:11:00   2   disabled, that biometric device would still be in

02:11:05   3   effect, wouldn't it?

02:11:09   4      A.  It would depend on the settings on the machine.

02:11:12   5      Q.  Okay.  But, in other words, Alex could sign in

02:11:15   6   once, and that would be it, correct?

02:11:17   7      A.  It's possible, yes.

02:11:19   8      Q.  So, in other words, someone else could sit down

02:11:23   9   in front of Alex's keyboard, and it wouldn't know the

02:11:26  10   difference, would it?

02:11:27  11      A.  No.

02:11:32  12      Q.  Now, do you, in fact, know that Alex was the

02:11:38  13   person sitting in front of his keyboard every single

02:11:40  14   time?

02:11:41  15      A.  No.

02:11:43  16      Q.  Now, since only the IP address of the router was

02:11:52  17   the subject of the search warrant, could these files

02:11:57  18   have come from any other computer on the network behind

02:12:00  19   the router?

02:12:01  20      A.  I guess you're going to have to explain your

02:12:04  21   question.  Are you talking about the undercover

02:12:06  22   downloaded files?

02:12:07  23      Q.  Yes.

02:12:09  24      A.  They could have come from any computer on that

02:12:11  25   network.

02:12:13  1       Q.  Any computer on that network?

02:12:15  2       A.  Behind that router.

02:12:18  3       Q.  Did you examine any other computers from that

02:12:24  4  particular apartment?

02:12:31  5       A.  I don't believe so.

02:12:34  6       Q.  Do you know how long Alex had this computer?

02:12:38  7       A.  I have no idea.

02:12:45  8       Q.  How old, if you remember, were some of the oldest

02:12:50  9  files on that computer that weren't child pornography,

02:12:54  10  if you remember?

02:12:54  11      A.  I don't remember.  I wouldn't even have paid

02:12:57  12  attention to them.

02:12:58  13      Q.  Now, are you familiar with the term MAC address?

02:13:06  14      A.  Yes.

02:13:07  15      Q.  Tell the jury again in a couple quick sentences

02:13:10  16  what a MAC address is?

02:13:11  17      A.  It's an access control, a MAC address is -- it's

02:13:16  18  kind of like a serial number for a network device.  A

02:13:19  19  lot of places -- like, for instance, Buckeye Cable used

02:13:22  20  a MAC address to authenticate a router.  It's usually

02:13:26  21  unique to that network device.

02:13:29  22      Q.  What was the specific MAC address that the files

02:13:32  23  were downloaded from?

02:13:33  24      A.  I don't know.

02:14:04  25      Q.  You had -- there was a category labeled "Public

02:14:09  1    Share," on the computer.  Do you recall that?

02:14:14  2        A.  Yes.

02:14:15  3        Q.  Did files appear in that category automatically,

02:14:22  4    or did they have to be posted there?

02:14:26  5        A.  The Public Shared is populated automatically by

02:14:30  6    files downloaded from LimeWire.  But you can place files

02:14:34  7    in there.

02:14:35  8        Q.  And do you know who can place files there?

02:14:38  9        A.  Anybody sitting behind the keyboard.

02:14:41  10       Q.  Anyone in the world -- anyone in the network?

02:14:44  11       A.  Not necessarily.

02:14:46  12       Q.  Do you necessarily need to know the person

02:14:49  13   posting?

02:14:50  14       A.  Nobody on Gnutella can push a file up to your

02:14:54  15   computer.  Somebody in that local network could put

02:14:58  16   something behind that router if it was shared and opened

02:15:03  17   for them to do that.

02:15:04  18       Q.  But you needn't necessarily know that person,

02:15:06  19   would you?

02:15:09  20       A.  If they're accessing your network, I would think

02:15:11  21   you would know who's on your network.

02:15:14  22            MS. KELLEY:  Could I have a moment, Your

02:15:20  23   Honor?

02:15:20  24            (Discussion had off the record.)

02:15:21  25            MS. KELLEY:  No more questions.  Thank you.

02:15:28  1                       - - -

02:15:28  2              DAVID MORFORD, REDIRECT EXAMINATION

02:15:29  3  BY MR. CRAWFORD:

02:15:29  4      Q.  Detective Morford, you were asked about images

02:15:32  5  that were downloaded to Mr. Cook's computer from

02:15:35  6  LimeWire?

02:15:35  7      A.  Yes.

02:15:36  8      Q.  Are you a task force member with the Oklahoma

02:15:41  9  FBI?

02:15:41  10     A.  No.

02:15:41  11     Q.  Were you involved with that at all?

02:15:43  12     A.  No.

02:15:43  13     Q.  Were you asked to do any analysis on the files

02:15:46  14  that were downloaded from the Oklahoma FBI?

02:15:48  15     A.  No.

02:15:51  16              MR. CRAWFORD: Thank you.

02:15:52  17              MS. KELLEY:  Nothing further.

02:15:59  18              THE COURT:  Any further witnesses from the

02:16:01  19  government?

02:16:01  20              MR. CRAWFORD: No, Your Honor.

02:16:03  21              THE COURT:  Are you prepared to proceed for

02:16:05  22  a bit, or what's your pleasure?

02:16:07  23              MS. KELLEY:  We can begin with our first

02:16:09  24  witness, Your Honor.

02:16:11  25              THE COURT:  Why don't we do that.

02:16:16  1          MS. KELLEY:  Could we approach, though.

02:18:49  2          (Whereupon the following discussion was had

02:18:49  3  at the bench outside the hearing of the jury:)

02:18:49  4          THE COURT:  What's your timetable?  Can we

02:18:49  5  get all the evidence to the jury by 3:00 or 4:00

02:18:49  6  tomorrow, 3:30, 4:00?

02:18:49  7          MS. KELLEY:  I've got six witnesses

02:18:49  8  tomorrow.

02:18:49  9          THE COURT:  Were you planning to carry over

02:18:49  10  until Tuesday?

02:18:49  11          MR. SECOR:  Tomorrow's Thursday.

02:18:49  12          MS. KELLEY:  I think we, for purposes of the

02:18:50  13  record, I need to make a Rule 29 motion.

02:18:50  14          THE COURT:  Can we get all the evidence to

02:18:50  15  the jury -- can we get the whole case to the jury by

02:18:50  16  Friday afternoon?

02:18:50  17          MR. SECOR:  I think we can get the whole

02:18:50  18  case to the jury by tomorrow.

02:18:50  19          THE COURT:  Can you get all your witnesses

02:18:51  20  in by tomorrow?

02:18:51  21          MS. KELLEY:  They have been told to be here.

02:18:51  22  I don't know how quickly we'll plow through them.

02:18:51  23          THE COURT:  What will that leave, rebuttal?

02:18:51  24          MR. SECOR:  Very short rebuttal witnesses.

02:18:51  25          THE COURT:  We can at least get the jury

02:18:51  1    charged on Friday?

02:18:51  2                    MR. SECOR:  Absolutely.

02:18:52  3                    MS. KELLEY:  I know you're unavailable on

02:18:52  4    Friday -- or Monday, excuse me.

02:18:52  5                    THE COURT:  The jury can deliberate.  I'm

02:18:52  6    here.

02:18:52  7                    MS. KELLEY:  That's what I wondered.

02:18:52  8                    MR. SECOR:  Before we rest, we have to

02:18:52  9    discuss these, the exhibits.

02:18:53  10                    THE COURT:  I'll say that -- why don't you

02:18:53  11    say you rest subject to admission of exhibits.  I'll

02:18:53  12    adjourn, and we'll tidy up our business.

02:18:53  13                    MR. SECOR:  All right.

02:18:53  14                    THE COURT:  And is that what you're saying?

02:18:53  15                    MR. SECOR:  Normally we decide on admission

02:18:53  16    of the exhibits before we rest.

02:18:53  17                    THE COURT:  You don't have any objection?

02:18:53  18                    MS. KELLEY:  No.

02:18:53  19                    THE COURT:  You can rest subject to

02:18:53  20    admission.  If there's some problem with the exhibit --

02:18:53  21                    MR. SECOR:  I don't see any.

02:18:53  22                    (End of sidebar discussion.)

02:18:53  23                    THE COURT:  Does the government have any

02:18:54  24    further witnesses?

02:18:55  25                    MR. SECOR:  We do not, Your Honor.  Subject

02:18:59  1    to admission of exhibits, the government would rest.

02:19:02  2              THE COURT:  Okay.  Ladies and gentlemen, I

02:19:04  3    think we'll adjourn for the day, earlier than I thought.

02:19:08  4    Counsel are hopeful that we can actually get the entire

02:19:13  5    case into your hands before you go home on Friday.  I

02:19:17  6    don't think it will be possible for you to start

02:19:20  7    deliberations, although that will be entirely up to you.

02:19:29  8    So it's more likely than not that we'll get the case to

02:19:32  9    you, we'll complete everything by Friday afternoon, but

02:19:38  10   you'll have to come back on Monday to deliberate.  Let's

02:19:41  11   see how it goes.   But we're actually moving along at a

02:19:45  12   better pace than I and counsel had anticipated.  In any

02:19:51  13   event, we'll adjourn for the evening.  We'll start

02:19:54  14   tomorrow at 8:30 with defense witnesses.  Keep an open

02:20:01  15   mind.  We'll see you tomorrow morning.

02:20:48  16              (Jury exits the courtroom.)

02:23:12  17              THE COURT:  You have Exhibits 1 through 17?

02:23:15  18              MR. SECOR:  1 through 20.  1 was the lead

02:23:23  19   disk identified by Special Agent Whisman.

02:23:27  20              THE COURT:  Any objection?

02:23:28  21              MS. KELLEY:  No, Your Honor.

02:23:31  22              MR. SECOR:  Two was the lead disk summary

02:23:37  23   identified by Agent Whisman.

02:23:38  24              THE COURT:  Any objection?

02:23:39  25              MS. KELLEY:  None, Your Honor.

02:23:40  1               MR. SECOR:  Three was the Time Warner

02:23:42  2  subpoena identified by Special Agent Whisman.

02:23:45  3               MS. KELLEY:  No.

02:23:47  4               MR. SECOR:  Four was the Time Warner

02:23:49  5  subpoena response identified by Special Agent Whisman

02:23:53  6  and the Time Warner records custodian.

02:23:57  7               MS. KELLEY:  No objection.

02:24:00  8               THE COURT:  One through four will all be

02:24:02  9  admitted.

02:24:03  10              MR. SECOR:  Five was the, quote-unquote,

02:24:05  11 Jennie image identified by Amy Allen.

02:24:09  12              MS. KELLEY:  No, no objection.

02:24:11  13              THE COURT:  It will be admitted.

02:24:12  14              MR. SECOR:  Exhibit 6 was the quote-unquote

02:24:14  15 Vicki video identified by Roy Shepherd.

02:24:19  16              MS. KELLEY:  No objection.

02:24:20  17              THE COURT:  Admitted.

02:24:23  18              MR. SECOR:  Number 7 was the laptop computer

02:24:26  19 identified by Special Agents Schulte, Smith, Russ, Jones

02:24:32  20 and TPD Officer Morford.

02:24:39  21              MS. KELLEY:  No objection.

02:24:40  22              THE COURT:  It will be admitted.

02:24:41  23              MR. SECOR:  Eight is the Miranda waiver

02:24:43  24 identified by Special Agents Pape and Schulte.

02:24:47  25              MS. KELLEY:  No objection.

02:24:51  1              MR. SECOR:  Number 9 is the signed statement

02:24:53  2  identified by Special Agent Pape.

02:24:58  3              MS. KELLEY:  No objection.

02:24:59  4              THE COURT:  They will be admitted.

02:25:02  5              MR. SECOR:  Number 10 was the search warrant

02:25:04  6  photo identified by Special Agent Jones.

02:25:10  7              MS. KELLEY:  That was the photo of the

02:25:11  8  bedroom?  No objection.

02:25:13  9              THE COURT:  It will be admitted.

02:25:15  10             MR. SECOR:  Exhibit 11 was the cable bill

02:25:19  11  identified by Special Agent Jones.

02:25:23  12             MS. KELLEY:  No objection.

02:25:24  13             THE COURT:  It will be admitted.

02:25:26  14             MR. SECOR:  12 was the resumé identified by

02:25:31  15  Special Agent Jones.

02:25:32  16             MS. KELLEY:  Objection as to relevance.

02:25:37  17             THE COURT:  I think not.  I think it's

02:25:39  18  relevant.  Objection noted and overruled.  It shows a

02:25:43  19  degree of educational obtainment.  Whether it was

02:25:47  20  prepared by him or someone else, it was in his

02:25:50  21  possession, which would indicate constructive adoption.

02:25:57  22             MR. SECOR:  Exhibit number 13.

02:26:01  23             THE COURT:  If there's some reason to change

02:26:06  24  that ruling during the defense case, renew your request.

02:26:10  25             It will be admitted.

02:26:12  1           MR. SECOR:  Exhibit 13, consent to search

02:26:15  2  the truck identified by Special Agents Schulte and Pape.

02:26:20  3           MS. KELLEY:  No objection.

02:26:21  4           THE COURT:  It will be admitted.

02:26:23  5           MR. SECOR:  Four, consent to search the

02:26:24  6  apartment identified by Special Agents Schulte and Russ.

02:26:29  7           MS. KELLEY:  No objection.

02:26:30  8           THE COURT:  It will be admitted.

02:26:35  9           MR. SECOR:  Exhibit 15 was the laptop

02:26:37  10  computer screen shots that was identified by TPD officer

02:26:43  11  Morford.

02:26:44  12           MS. KELLEY:  No objection.

02:26:45  13           THE COURT:  It will be admitted.

02:26:46  14           MR. SECOR:  Exhibit 16 was the FTK report

02:26:49  15  disk, again identified by TPD Agent Morford.

02:26:54  16           MS. KELLEY:  No objection.

02:26:55  17           THE COURT:  It will be admitted.

02:26:57  18           MR. SECOR:  Exhibit 17 was the FTK report

02:26:59  19  summary disk again identified by TPD Officer Morford.

02:27:06  20           MS. KELLEY:  No objection.

02:27:07  21           THE COURT:  It will be admitted.

02:27:08  22           MR. SECOR:  Exhibit 18, LimeWire install

02:27:11  23  screen shots, those were identified by TPD Officer

02:27:16  24  Morford.

02:27:16  25           MS. KELLEY:  No objection.

| | | |
|---|---|---|
| 02:27:18 | 1 | THE COURT:  It will be admitted. |
| 02:27:19 | 2 | MR. SECOR:  19 was not offered.  And 20 is |
| 02:27:23 | 3 | the evidence log, which was identified and testified to |
| 02:27:26 | 4 | by Special Agent Russ. |
| 02:27:28 | 5 | MS. KELLEY:  No objection. |
| 02:27:29 | 6 | THE COURT:  It will be admitted. |
| 02:27:31 | 7 | Okay.  Government rests? |
| 02:27:33 | 8 | MR. SECOR:  We do. |
| 02:27:34 | 9 | MS. KELLEY:  Thank you, Your Honor.  We |
| 02:27:36 | 10 | would like to make a Rule 29 motion for acquittal at |
| 02:27:39 | 11 | this point.  The government has not put forth sufficient |
| 02:27:44 | 12 | evidence at this point to prove that it was Alex Cook |
| 02:27:48 | 13 | who put these objects on his computer.  They have not |
| 02:27:52 | 14 | proved that even if the objects were on his computer he |
| 02:27:57 | 15 | knowingly put them on his computer.  Beyond that, they |
| 02:28:02 | 16 | have not put forward sufficient evidence to show that |
| 02:28:05 | 17 | the alleged confession was knowing, intelligent, and |
| 02:28:09 | 18 | voluntary. |
| 02:28:14 | 19 | MR. SECOR:  Briefly, Your Honor, as the |
| 02:28:15 | 20 | Court, I'm sure, is well aware, at this stage of the |
| 02:28:17 | 21 | proceeding the Court looks at the evidence in the light |
| 02:28:19 | 22 | most favorable to the government.  As far as the |
| 02:28:22 | 23 | voluntariness of the confession or the statement, the |
| 02:28:27 | 24 | Court heard, the jury heard all sorts of testimony |
| 02:28:30 | 25 | relative to the defendant's demeanor, to his |

willingness, to his intelligence, to his soberness, all
of the indicia regarding the voluntariness of the
confession.

As far as the knowledge is concerned, that
can be imputed from the nature of the items seized on
the computer, and the nature of the files, and the
number of files, the period of time over which they had
been accumulated, which can be all viewed on Exhibits 14
through 18.

I have nothing further.

THE COURT:  I'm going to overrule the
motion.  I think that there's sufficient evidence for
the case to go to the jury and for a rational jury to
decide on the basis of what's before it now that the
defendant's guilty beyond a reasonable doubt.  It's not
to say that it will, but that's not the standard at this
point.

Anything further from the government?

MR. SECOR:  No, Your Honor.

THE COURT:  Ms. Kelley?

MS. KELLEY:  Nothing further.

THE COURT:  We'll see you in the morning.

(Adjourned at 4:08 p.m.)

- - -

1                    **C E R T I F I C A T E**

2

3      I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled

5   matter.

6

7   /s Tracy L. Spore_____            _____

8   Tracy L. Spore, RMR, CRR                   Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         I N D E X

2

3     Examinations                                    Page

4

5     WAYNE GRAVES, Ph.D., DIRECT EXAMINATION          186

6      BY MS. KELLEY:

7     WAYNE GRAVES, Ph.D., CROSS-EXAMINATION           199

8      BY MR. CRAWFORD:

9     WAYNE GRAVES, Ph.D., REDIRECT EXAMINATION        207

10     BY MS. KELLEY:

11    WAYNE GRAVES, Ph.D., RECROSS-EXAMINATION         210

12     BY MR. CRAWFORD:

13    WAYNE GRAVES, Ph.D., FURTHER REDIRECT EXAMINATION 211

14     BY MS. KELLEY:

15    DAVID MORFORD, DIRECT EXAMINATION                214

16     BY MR. CRAWFORD:

17    DAVID MORFORD, CROSS-EXAMINATION                 248

18     BY MS. KELLEY:

19    DAVID MORFORD, REDIRECT EXAMINATION              254

20     BY MR. CRAWFORD:

21

22

23

24

25
```