```
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF OHIO
 2                       WESTERN DIVISION

 3

 4   UNITED STATES OF AMERICA,-    Docket No. 3:10-cr-522
                                -
 5        Plaintiff,            -    Toledo, Ohio
                                -    September 8, 2011
 6          v.                  -    Trial
                                -
 7   ALEX DAVID COOK,           -
                                -
 8        Defendant.            -
     -------------------------------

 9
                             VOLUME 4
10                     TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE JAMES G. CARR
11        UNITED STATES DISTRICT JUDGE, AND A JURY

12   APPEARANCES:

13   For the Plaintiffs:  United States Attorneys' Office
                          By:   Thomas O. Secor
14                              Gene Crawford
                          Four SeaGate, Suite 308
15                        Toledo, OH 43604
                          (419) 259-6376
16
     For the Defendant:   Elizabeth Kelley
17                        Suite 285
                          13938 A Cedar Road
18                        Cleveland, OH 44118-3204
                          (216) 410-6923
19
     Court Reporter:      Tracy L. Spore, RMR, CRR
20                        1716 Spielbusch Avenue
                          Toledo, Ohio 43624
21                        (419) 213-5520

22

23
     Proceedings recorded by mechanical stenography,
24   transcript produced by notereading.

25
```

|   |   |
|---|---|
|  | 1 |
|  | 2 |
|  | 3 |
| 00:00:02 | 4 |
| 00:00:05 | 5 |
| 00:00:10 | 6 |
| 00:00:21 | 7 |
| 00:00:23 | 8 |
| 00:00:26 | 9 |
| 00:00:28 | 10 |
| 00:00:31 | 11 |
| 00:00:35 | 12 |
| 00:00:37 | 13 |
| 00:00:38 | 14 |
| 00:02:06 | 15 |
| 00:02:48 | 16 |
| 00:02:49 | 17 |
| 00:02:49 | 18 |
| 00:02:52 | 19 |
| 00:02:53 | 20 |
| 00:02:55 | 21 |
| 00:03:22 | 22 |
| 00:03:40 | 23 |
| 00:03:41 | 24 |
| 00:03:44 | 25 |

1          (Reconvened at 8:41 a.m.)

2          (The jury is not present.)

3          MS. KELLEY:  I have two witnesses here ready

4 to go; two more are coming from approximately three

5 hours away, that is to say Mark and Ann Vance; and then

6 my computer forensic expert cannot get here until 11:30.

7          THE COURT:  We'll do the best we can.

8          THE COURT:  Are the two who are travelling

9 three hours, are they on their way?

10          MS. KELLEY:  Yes.  Alex's father is calling

11 them right now.  I touched base with them last night.  I

12 imagine simply because of the weather they've had some

13 bad driving.

14          THE COURT:  Okay.

15          (Jury enters the courtroom.)

16          THE COURT:  Good morning.  You may be

17 seated.

18          Ms. Kelley, you may proceed.  Who is your

19 first witness?

20          MS. KELLEY:  Our first witness is Jerry

21 Cook, the defendant's father.

22          (The witness was sworn by the clerk.)

23          MS. KELLEY:  Your Honor, do you want me to

24 summarize briefly what this witness will say?

25          THE COURT:  Please.

00:03:45  1        MS. KELLEY:  Mr. Cook will testify that
00:03:47  2  numerous statements in the alleged confession are simply
00:03:50  3  wrong and that other individuals had access to his son's
00:03:54  4  computer and, in fact, he observed that.
00:03:57  5        THE COURT:  Okay.  Will you please tell the
00:04:01  6  ladies and gentlemen your name.
00:04:02  7        THE WITNESS:  Jerry Cook.
00:04:03  8        THE COURT:  What community do you live in?
00:04:05  9        THE WITNESS:  Fredericktown, Ohio.
00:04:07  10       THE COURT:  You're the defendant's father;
00:04:09  11  is that correct?
00:04:09  12       THE WITNESS:  Yes, I am.
00:04:12  13                      - - -
00:04:12  14       JERRY COOK, DIRECT EXAMINATION
00:04:13  15  BY MS. KELLEY:
00:04:13  16  Q.  Good morning, sir.
00:04:14  17  A.  Good morning.
00:04:14  18  Q.  Please tell the jury what you do for a living.
00:04:17  19  A.  I work for a company called North American
00:04:19  20  Communication Resources.  I design basically telephone
00:04:22  21  systems for large corporations.
00:04:25  22  Q.  How long have you worked for them?
00:04:26  23  A.  I've been with them for approximately two years,
00:04:28  24  but I've been in that field for over 26 years.
00:04:31  25  Q.  Are you married?

00:04:32  1      A.  Yes, I am.

00:04:33  2      Q.  How long have you been married?

00:04:34  3      A.  Let me get this right.  A little over 25 years

00:04:38  4  this last May.

00:04:39  5      Q.  And to state the obvious, you know the defendant

00:04:42  6  in this case, Alex Cook, correct?

00:04:44  7      A.  Yes, I do.

00:04:44  8      Q.  How old is Alex now?

00:04:47  9      A.  Alex is 20.  He turned 20 in December.

00:04:50  10      Q.  Now, how would you describe your relationship

00:04:52  11  with your son?

00:04:54  12      A.  I think it's very good.  We have a very close

00:04:56  13  relationship.  We talk.  We have our differences, most

00:05:00  14  fathers do, but a very good relationship.

00:05:03  15      Q.  Has he been forthcoming with you about rather

00:05:08  16  personal and intimate facts in his life?

00:05:10  17      A.  Yes.  We have a lot of time, a lot of camping

00:05:14  18  private time together.  We talk and do a lot of things.

00:05:17  19  He's always opened up when he needs anything, have

00:05:20  20  something concerning him, we talk about it, those type

00:05:22  21  of things.

00:05:23  22      Q.  You mentioned camping a moment ago.  When did you

00:05:26  23  camp with Alex?

00:05:27  24      A.  We've been doing that since he was probably about

00:05:30  25  eight years old.  I've been involved in Scouts, and he

00:05:33  1    would go with me on camp-outs actually before he became

00:05:37  2    a Boy Scout.  Then once he became is a Boy Scout we

00:05:40  3    camped at least once a month around the year, pretty

00:05:44  4    much with him all the time doing that.

00:05:47  5        Q.  There is a statement in Government's Exhibit 9,

00:05:52  6    Alex's supposed confession, that he was molested at Boy

00:05:57  7    Scout camp when he was 11.  Do you know anything about

00:06:00  8    that alleged incident?

00:06:01  9        A.  Alex never talked anything about that to me or

00:06:05  10   anybody else.  And in Scouts, if it happened in Scouts,

00:06:08  11   Scouting is very, very particular about those types of

00:06:12  12   things.  They have a youth protection clause that every

00:06:15  13   Scout leader, which I was a trained Scout leader, have

00:06:18  14   to go through, and they have to be recertified every

00:06:20  15   year.  If that was reported to any Scout leader, they

00:06:23  16   have to report that to the district Scout office for

00:06:27  17   investigation, even if they believe there might have

00:06:29  18   been something they have to report that --

00:06:30  19       Q.  But I want to get back to Alex's relationship

00:06:33  20   with you; that is to say, the father-son relationship.

00:06:37  21       A.  Yes.

00:06:37  22       Q.  Over the years have you felt there was any reason

00:06:39  23   to believe that this happened, that Alex was withholding

00:06:43  24   information from you?

00:06:44  25       A.  No.

00:06:45  1      Q.  All right.  There's also a statement or -- yes, a

00:06:51  2   statement in Alex's alleged confession that he had an

00:06:57  3   ex-fiancée'.  To the best of your knowledge, has Alex

00:06:59  4   ever been engaged?

00:07:00  5      A.  No, he has not.

00:07:02  6      Q.  Steady girlfriend?

00:07:04  7      A.  Not really, no.  Maybe six weeks at the most;

00:07:08  8   that was about it.

00:07:09  9      Q.  Never engaged?

00:07:09  10     A.  Never engaged.

00:07:11  11     Q.  All right.  There's also a statement in the

00:07:13  12  supposed confession --

00:07:15  13             MR. SECOR:  Objection to the

00:07:17  14  characterization, Your Honor.

00:07:18  15             THE COURT:  Overruled.

00:07:19  16             MS. KELLEY:  I'll rephrase.

00:07:21  17             THE COURT:  Overruled.

00:07:22  18  BY MS. KELLEY:

00:07:23  19     Q.  There's also a statement in the supposed

00:07:24  20  confession --

00:07:25  21             MR. SECOR:  Objection, Your Honor.

00:07:27  22  "Supposed confession;" it's a characterization.

00:07:30  23             THE COURT:  That's the contention.  The jury

00:07:32  24  can decide.

00:07:36  25  BY MS. KELLEY:

00:07:39 1      Q.   There's also a statement in the confession that

00:07:42 2  Alex teaches Sunday school.  Is this true?

00:07:44 3      A.   No, it is not.

00:07:45 4      Q.   Could he teach Sunday school without you knowing?

00:07:48 5      A.   We've been going to same church for 15 years.

00:07:51 6  And our church, it's a small country church about 75,

00:07:55 7  80, 85 people.  And we have maybe 20 youth.  We do not

00:08:00 8  allow young people to teach.  It's always -- usually the

00:08:04 9  younger kids it's always the women of the church that

00:08:07 10  teach those.   They may be assisted by a 20 or 25 year

00:08:11 11  old other teacher, but only women teach the children.

00:08:15 12  Some of the men teach the older classes.   Most of the

00:08:18 13  time Alex was never at Sunday school.  He would come to

00:08:21 14  church but never come to Sunday school services.

00:08:24 15      Q.   Now, did you ever visit Alex in his apartment at

00:08:28 16  1268 Knollwood in Lima?

00:08:30 17      A.   Yes, we did.

00:08:31 18      Q.   When you say "we," who do you mean?

00:08:33 19      A.   My wife and I went up there on several occasions.

00:08:36 20      Q.   Okay.  And when did Alex move in?

00:08:38 21      A.   He moved in the last week of April of 2010.

00:08:46 22      Q.   Did you help Alex move in or anything?

00:08:48 23      A.   Well, he took his stuff up initially.  We went up

00:08:52 24  that first weekend, I believe it was the 1st and 2nd of

00:08:56 25  May of 2010.

00:08:58  1      Q.  By "stuff" do you include a computer?

00:09:00  2      A.  Yes, he did.

00:09:01  3      Q.  All right.  And what kind of computer was it?

00:09:04  4      A.  It was an HP laptop computer.

00:09:08  5      Q.  To the best of your knowledge, how long did he

00:09:10  6  have that computer?

00:09:11  7      A.  He was given that as a graduation present when he

00:09:15  8  graduated high school in 2009.

00:09:18  9      Q.  And he moved in in 2010?

00:09:20  10     A.  May, 2010.

00:09:21  11     Q.  So he had had that computer for at least a year?

00:09:24  12     A.  Well, not quite.

00:09:25  13     Q.  Ten months?

00:09:26  14     A.  Yeah.  He got it probably the end of June, so

00:09:29  15  yeah, about 11 months.

00:09:30  16     Q.  Did Alex have a roommate?

00:09:32  17     A.  Yes, he did.

00:09:33  18     Q.  And what was the roommate's name?

00:09:35  19     A.  Ian Douglas.

00:09:39  20     Q.  Approximately how old was Ian?

00:09:41  21     A.  I believe Ian was about the same age as Alex.

00:09:45  22  He might have been a few months older or younger.  I'm

00:09:48  23  not sure of his birthday, but around the same age.

00:09:50  24     Q.  Do you know if Ian had a computer?

00:09:53  25     A.  At the time he moved in, he did not.  He said he

00:09:56 | 1  did; he'd be using Alex's for a while, and he would get

00:10:00 | 2  his later.

00:10:01 | 3      Q.  And how long did he use Alex's computer, if you

00:10:04 | 4  know?

00:10:04 | 5      A.  I'm not sure.

00:10:05 | 6      Q.  Did you ever observe him using Alex's computer?

00:10:08 | 7      A.  Yes, I did.

00:10:10 | 8      Q.  And you're sure that it was Alex's computer?

00:10:13 | 9      A.  Yes.

00:10:13 | 10      Q.  How do you know it was Alex's computer?

00:10:15 | 11      A.  Well, I saw him, and it kind of went through my

00:10:19 | 12  mind, I wish he wouldn't share his computer.  He was the

00:10:23 | 13  only one there.  But I did see him on it, yes.

00:10:26 | 14      Q.  Did he use any of Alex's other things?

00:10:29 | 15      A.  They shared pretty much everything; coats, you

00:10:33 | 16  know, everything but ball caps; that was their precious

00:10:35 | 17  things.  Coats, shirts, food.  We actually went out that

00:10:37 | 18  weekend and basically stocked their apartment with food.

00:10:40 | 19  We were getting food for Ian, food for Alex, stuff they

00:10:43 | 20  liked.

00:10:43 | 21      Q.  What weekend was that?

00:10:44 | 22      A.  That was the first weekend of May, 1st and 2nd of

00:10:47 | 23  May.

00:10:48 | 24      Q.  And was that one of the occasions when you saw

00:10:51 | 25  Ian use Alex's computer?

00:10:52  1     A.  Yes, it is.

00:10:53  2     Q.  Ever see him use it any other time?

00:10:55  3     A.  Not after that, no.

00:10:57  4     Q.  All right.  Sir, would it be fair to say that you

00:11:01  5  love your son?

00:11:02  6     A.  Yes, I do.

00:11:03  7     Q.  Would you be willing to lie under oath for him?

00:11:06  8     A.  No, I would not.

00:11:07  9        MS. KELLEY:  All right.  Thank you.  No more

00:11:09  10  questions.

00:11:13  11        THE COURT:  Mr. Crawford or Mr. Secor?

00:11:17  12        MR. SECOR:  No questions.

00:11:22  13        THE COURT:  You may step down.

00:11:23  14        Your next witness, and what will we be

00:11:27  15  hearing?

00:11:27  16        MS. KELLEY:  Yes, the next one is here.

00:12:01  17        (The witness was sworn by the clerk.)

00:12:12  18        THE COURT:  What do you expect this witness

00:12:14  19  to be talking about?

00:12:15  20        MS. KELLEY:  Thank you, Your Honor.  We

00:12:16  21  expect the pastor to address the issue as to whether or

00:12:21  22  not Alex indeed teaches Sunday school, and also another

00:12:24  23  statement in the confession that Alex has discussed his

00:12:28  24  addiction to child pornography with him.

00:12:33  25        THE COURT:  Sir, you have to slide a little

00:12:36    1    bit closer to the microphone.

00:12:42    2              Your name is?

00:12:42    3              THE WITNESS:  My name is Gary Kochhaiser.

00:12:46    4              THE COURT:  Maybe a little closer.

00:12:49    5              THE WITNESS:  My name is Gary Kochhaiser.

00:12:51    6              THE COURT:  How to do you spell your name?

00:12:53    7              THE WITNESS: K-o-c-h-h-a-i-s-e-r.

00:13:00    8              THE COURT:  What is your community of

00:13:01    9    residence?

00:13:02    10             THE WITNESS: Mansfield, Ohio.

00:13:06    11             THE COURT:  What is your occupation?

00:13:07    12             THE WITNESS:  I'm the pastor of the

00:13:09    13   Akneytown Grace Baptist Church.

00:13:12    14             THE COURT:  Which town?

00:13:14    15             THE WITNESS:  It's called Akneytown.  Like

00:13:18    16   Akney, Iowa.

00:13:20    17             THE COURT:  And how long have you held that

00:13:22    18   position?

00:13:22    19             THE WITNESS:  Since January 1, 2011.

00:13:31    20             THE COURT:  And how long have you been

00:13:32    21   engaged in the religious occupation?

00:13:34    22             THE WITNESS:  Thirty-five years.

00:13:36    23             THE COURT:  What sort of education did you

00:13:38    24   have?

00:13:38    25             THE WITNESS:  I have a bachelor's, two

00:13:41   1   masters, and my doctorate.

00:13:42   2           THE COURT:  In what fields?

00:13:44   3           THE WITNESS:  Grace College, Grace

00:13:48   4   Theological Seminary and Anderson Theological University

00:13:54   5   and Trinity Evangelical Divinity School.  My college was

00:13:59   6   in psychology and political studies, and both the

00:14:02   7   masters and doctorate is in Biblical ministries and the

00:14:06   8   Old Testament.

00:14:09   9           THE COURT:  You may continue.

00:14:12  10                       - - -

00:14:12  11           GARY KOCHHAISER, DIRECT EXAMINATION

00:14:13  12   BY MS. KELLEY:

00:14:13  13     Q.  Good morning, sir.  Do you know the defendant,

00:14:16  14   Alex Cook?

00:14:17  15     A.  Yes, I do.

00:14:18  16     Q.  Please tell the jury how you know Alex.

00:14:20  17     A.  Alex is a member of our church.  I have met him;

00:14:24  18   I've seen him in church, know the family; they're a part

00:14:27  19   of our church, been involved in leadership ministry.

00:14:30  20     Q.  And over the past couple of years has Alex been a

00:14:37  21   regular church attendee?

00:14:39  22     A.  I would say no because of the fact that when I

00:14:43  23   first came to this job, he was on the road a lot with

00:14:47  24   doing -- I can't even remember exactly who it was with.

00:14:50  25   When he was home, he was there.  And then when he was

00:14:53  1   at college, again, it was depending upon the week.

00:14:56  2       Q.  So to clarify, he graduated from -- he graduated

00:15:01  3   from high school, correct?

00:15:01  4       A.  Yes.

00:15:02  5       Q.  And then after that he worked on the road for

00:15:04  6   about a year?

00:15:05  7       A.  Yes.  I can't remember exactly.  It was with a

00:15:08  8   company that --

00:15:10  9       Q.  That's fine.   Then he enrolled in college?

00:15:12  10      A.  Yes.

00:15:13  11      Q.  And since then his attendance has been sporadic?

00:15:17  12      A.  Yes.

00:15:19  13      Q.  To the best of your knowledge does he teach

00:15:22  14  Sunday school?

00:15:23  15      A.  No, ma'am.

00:15:26  16      Q.  Did you ever receive a call from law enforcement

00:15:34  17  in the Fredericktown or Lima area that Alex might be in

00:15:43  18  a dangerous position in regards to young children?

00:15:46  19      A.  No, ma'am.

00:15:47  20      Q.  Never did?

00:15:48  21      A.  No, ma'am.

00:15:52  22      Q.  Now, there is a statement in the supposed

00:15:57  23  confession that Alex has spoken to his church leader

00:16:06  24  about various issues including a preoccupation with

00:16:12  25  pornography.  First of all, are you typically referred

```
00:16:16   1   to as a, quote-unquote, a church leader?
00:16:18   2       A.  No, ma'am.
00:16:18   3       Q.  What are you typically referred to?
00:16:20   4       A.  Pastor.  Our church is congregational.  Other
00:16:24   5   than the pastor, I'm like everybody else in the church.
00:16:27   6       Q.  All right.  So would it -- would Alex be likely
00:16:32   7   to refer to you as a church leader?
00:16:37   8               MR. SECOR:  Objection, Your Honor.
00:16:39   9               THE COURT:  I think that's --
00:16:42  10               MS. KELLEY:  I'll withdraw it.  Thank you.
00:16:45  11   BY MS. KELLEY:
00:16:45  12       Q.  Has Alex discussed with you a preoccupation with
00:16:49  13   pornography?
00:16:50  14       A.  We talked about it.  I wouldn't say we discussed
00:16:55  15   it.
00:16:55  16       Q.  All right.  Could you please tell the jury the
00:16:58  17   difference between "talk" and "discuss."
00:17:00  18       A.  I guess I'm the one that brought it up because
00:17:03  19   most of us as males struggle.  Let's be honest.  And I
00:17:06  20   brought it up just as a conversation between him and I
00:17:09  21   as a young man and his pastor.
00:17:12  22       Q.  Did Alex ever mention to you any preoccupation
00:17:16  23   with child pornography?
00:17:20  24               MR. SECOR:  Objection, Your Honor.
00:17:21  25               THE COURT:  Basis?
```

00:17:24  1            MR. SECOR:  Hearsay.

00:17:25  2            THE COURT:  It's not for the truth of the

00:17:27  3  matter asserted, whether such statement was made; is

00:17:31  4  that correct?

00:17:31  5            MS. KELLEY:  You can continue.

00:17:33  6       A.  Never child pornography, no, ma'am.

00:17:39  7         (Discussion had off the record.)

00:17:39  8            MS. KELLEY:  Nothing further.

00:17:41  9            MR. SECOR:  No questions.

00:17:42  10            THE COURT:  Pastor, you may step down.

00:17:44  11  You're welcome to stay or go; it's up to you.  Thank you

00:17:47  12  for coming.

00:17:50  13            MS. KELLEY:  Your Honor, I'll have to check

00:17:53  14  and see if my next two witnesses are here.

00:18:31  15            (Discussion had off the record.)

00:18:31  16            MS. KELLEY:  Your Honor, the next two

00:18:33  17  witnesses are approximately five minutes away.  For

00:18:37  18  everyone's convenience, if you like, we can put Mr. Cook

00:18:40  19  on the stand next.

00:18:42  20            THE COURT:  Why don't we sort of get

00:18:44  21  started, and we can interrupt.

00:18:46  22            MS. KELLEY:  I would prefer to go straight

00:18:49  23  through Alex's testimony.

00:18:50  24            THE COURT:  Are they here in Toledo?  Do you

00:18:53  25  know?

00:18:54   1          MS. KELLEY:  Yes.  Before Mr. Cook got on

00:18:55   2   the stand, he called them.  At that point in time they

00:18:58   3   said they were ten minutes away.

00:19:02   4          THE COURT:  Did you wish them good luck at

00:19:06   5   finding a parking spot?  Why don't we take a break.

00:19:11   6          Ladies and gentlemen, apparently the next

00:19:13   7   couple witnesses should be here shortly.  Once they're

00:19:16   8   here, we'll get back to business.

00:38:36   9          (Recess taken.)

00:38:45  10          THE COURT:  Ms. Kelley, who is your next

00:40:04  11   witness, and what are we going to hear?

00:40:06  12          MS. KELLEY:  Mark Vance, who has been Alex's

00:40:10  13   Scout leader.  And he will testify that he and Alex

00:40:13  14   never had discussions as to the alleged molestation that

00:40:16  15   Alex suffered as a child.

00:40:44  16          (The witness was sworn by the clerk.)

00:41:01  17          THE COURT:  The sound of your voice, you may

00:41:06  18   be one witness who doesn't have to be told to get closer

00:41:10  19   to the microphone.

00:41:12  20          Will you tell the ladies and gentlemen your

00:41:13  21   name, please.

00:41:14  22          THE WITNESS: Mark Wayne Vance, R.N.

00:41:18  23          THE COURT:  And you said R.N.  Is that

00:41:20  24   registered nurse?

00:41:21  25          THE WITNESS:  Registered nurse.

00:41:22  1                    THE COURT:  How long have you been a

00:41:24  2   registered nurse?

00:41:25  3                    THE WITNESS:  I graduated in '76.  35 years.

00:41:33  4                    THE COURT:  What is your community of

00:41:34  5   residence?

00:41:35  6                    THE WITNESS:  Fredericktown, Ohio.

00:41:36  7                    THE COURT:  Where do you work?

00:41:37  8                    THE WITNESS:  In Crestland, Ohio at

00:41:40  9   Pittsburgh Glassworks.

00:41:41  10                   THE COURT:  In a nursing capacity?

00:41:43  11                   THE WITNESS:  Yes.  I work for Med Central

00:41:46  12  Health System in their occupational health department,

00:41:48  13  and they have me stationed at the factory as the plant

00:41:52  14  nurse.

00:41:53  15                   THE COURT:  Okay.  And you're acquainted

00:41:57  16  with Mr. Alex Cook?

00:41:58  17                   THE WITNESS:  Yes.

00:41:59  18                   THE COURT:  How long have you known him?

00:42:00  19                   THE WITNESS:  Probably 14 years when I try

00:42:04  20  to figure it up.

00:42:05  21                   THE COURT:  You're affiliated with Boy

00:42:07  22  Scouts of America?

00:42:08  23                   THE WITNESS:  Yes.

00:42:08  24                   THE COURT:  How long have you been with that

00:42:10  25  affiliation?

```
00:42:11   1              THE WITNESS:  Fifteen years.

00:42:15   2                         - - -

00:42:15   3              MARK VANCE, DIRECT EXAMINATION

00:42:15   4    BY MS. KELLEY:

00:42:15   5       Q.  Good morning, Mr. Vance.

00:42:17   6       A.  Good morning.

00:42:17   7       Q.  In what capacity have you known Alex during these

00:42:21   8    14 years?

00:42:23   9       A.  I first knew him as the son of our treasurer.

00:42:26  10       Q.  Who was that?

00:42:26  11       A.  Jerry Cook.

00:42:28  12       Q.  All right.

00:42:29  13       A.  He's one of the Eagle Scouts of Troop 342.  When

00:42:33  14    he moved back home, he came in to help out because our

00:42:37  15    finances were in disarray.  And with his organization he

00:42:40  16    was able to bring us back into financial responsibility.

00:42:43  17       Q.  Beautiful.

00:42:44  18       A.  Alex was the tagalong.  He always wanted to come

00:42:47  19    to Boy Scout meetings.

00:42:49  20       Q.  So Alex was what, about four or five at that

00:42:51  21    point in time?

00:42:53  22       A.  Probably.

00:42:53  23       Q.  And were you ever Alex's scoutmaster?

00:42:56  24       A.  Assistant scoutmaster.

00:42:58  25       Q.  All right.
```

00:42:59  1    A.  I've never been privileged to have the position

00:43:02  2  of scoutmaster.

00:43:03  3    Q.  Okay.

00:43:04  4    A.  But my wife says I'm a better indian than I am a

00:43:08  5  chief, so I respect her wisdom in that.

00:43:13  6    Q.  Now, do you remember the summer when Alex was

00:43:17  7  about 11 years old?

00:43:19  8    A.  Yeah.

00:43:21  9    Q.  Did he go to Boy Scout camp, if you know?

00:43:24  10    A.  I don't think he ever missed Boy Scout camp from

00:43:27  11  when he joined.

00:43:29  12    Q.  And were you relatively close to Alex?

00:43:32  13    A.  Yes.  He was one of the -- one of the scouts that

00:43:37  14  was always looking to do more and be more.  And so he

00:43:42  15  wanted to accomplish more.  He wanted to move -- in

00:43:46  16  scouting you move up by ranks, and he didn't want to

00:43:51  17  stay in the same rank.  He was headed for the top.

00:43:53  18    Q.  All right.  And did Alex ever confide in you that

00:43:57  19  he was molested when he was 11 years old at Boy Scout

00:44:03  20  camp?

00:44:03  21    A.  Never.

00:44:04  22    Q.  Did you ever hear -- did anyone else make a

00:44:07  23  report to you that Alex was molested?

00:44:11  24    A.  Not youth or adults.  And that would be

00:44:16  25  information that would be shared.

00:44:17  1    Q.   Because?

00:44:18  2    A.   It's the policy of Boy Scouts of America.  Boy

00:44:22  3    Scouts is very, very proactive on child protection.  To

00:44:26  4    join Scouts in the front of the handbook is a handbook

00:44:31  5    for the parents and the Scout, and they actually have to

00:44:35  6    go over that together and sign off that they understand

00:44:37  7    it.  And it lays out the importance -- we call them the

00:44:41  8    three Rs:  recognize, resist, and report.  Those are the

00:44:48  9    three Rs of youth protection.  And this is drilled into

00:44:51  10   the boys every year.  We do that with them.  And also

00:44:56  11   all adults have to have youth protection training in

00:45:01  12   order to participate with youth.

00:45:05  13   Q.   Do the Boy Scouts take an oath?

00:45:08  14   A.   Absolutely.  Every meeting.

00:45:10  15   Q.   Will you recite that oath for the jury.

00:45:12  16   A.   On my honor I will do my best to do my duty to

00:45:20  17   guide my country, to obey the Scout law, to help other

00:45:23  18   people at all times, to keep myself physically strong,

00:45:26  19   mentally awake, and morally straight.

00:45:31  20   Q.   And is that a goal that Eagle Scouts take as

00:45:34  21   well?

00:45:34  22   A.   Absolutely.

00:45:36  23   Q.   And that is a lifelong goal that Scouts endeavor

00:45:41  24   to keep?

00:45:41  25   A.   During their Eagle ceremony, they are given what

00:45:45  1    is called the Eagle Charge by an elder Eagle.  And in

00:45:52  2    that they have to swear renewed allegiance on their

00:46:00  3    honor to uphold the Scout oath and the law.

00:46:04  4        Q.  And that includes all aspects of the Scout oath?

00:46:09  5        A.  All aspects of the Scout oath and the law.

00:46:12  6        Q.  Including to be morally straight?

00:46:14  7        A.  Morally straight.

00:46:15  8            MS. KELLEY:  Thank you.  No more questions.

00:46:18  9            THE COURT:  Mr. Secor.

00:46:20  10                        - - -

00:46:20  11           MARK VANCE, CROSS-EXAMINATION

00:46:21  12   BY MR. SECOR:

00:46:21  13       Q.  Mr. Vance, you testified that Mr. Cook is an

00:46:25  14   Eagle Scout; is that correct?

00:46:27  15       A.  Yes.  Alex.

00:46:30  16       Q.  And that's the highest level, isn't it?

00:46:33  17       A.  Yes.

00:46:34  18       Q.  And the way to achieve or one of the ways to

00:46:37  19   achieve that level is to earn merit badges; is that

00:46:42  20   correct?

00:46:42  21       A.  There are required merit badges and there are

00:46:44  22   optional merit badges.  And there's 21, I believe, that

00:46:48  23   have to be earned in order to achieve that rank.

00:46:51  24       Q.  There's 21 that are must be, then how many

00:46:55  25   additional ones may you earn in order to attain the

00:46:58  1  rank?

00:46:59  2     A.  I think right now the number's about 108 that are

00:47:05  3  available.  Most kids earn 25, 26; exceptional ones earn

00:47:15  4  30.

00:47:17  5     Q.  Now, to earn a merit badge there are magazines

00:47:23  6  and reading material that go with each badge, are there

00:47:27  7  not?

00:47:27  8     A.  There's the merit badge pamphlet that has all of

00:47:32  9  the requirements, and then it has a short explanation of

00:47:39  10  what the merit badge constitutes, the information that

00:47:42  11  you need.

00:47:42  12     Q.  They're instructional?

00:47:44  13     A.  Right.

00:47:45  14     Q.  And, in fact, some of them, at least from my

00:47:50  15  recollection of 40 years ago, get rather complicated,

00:47:56  16  don't they?

00:47:57  17     A.  Extremely.

00:48:01  18     Q.  So one needs to be able to read and comprehend

00:48:05  19  these, as you say, pamphlets in order to succeed and

00:48:12  20  earn the merit badge; is that correct?

00:48:15  21     A.  And they also need to be guided by their

00:48:17  22  counselor.  So it's the pamphlet, the counselor, the

00:48:23  23  Scout; it all comes together.  When it's accomplished,

00:48:28  24  it's awarded.

00:48:34  25          MR. SECOR:  I have nothing further.

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
| 00:48:39 | 1  |                        - - -                           |
| 00:48:39 | 2  |           MARK VANCE, REDIRECT EXAMINATION             |
| 00:48:40 | 3  | BY MS. KELLEY:                                         |
| 00:48:40 | 4  |     Q.   The U.S. Attorney referred to a number of     |
| 00:48:44 | 5  | pamphlets.  Did Alex have any assistance with reading  |
| 00:48:49 | 6  | those pamphlets?                                       |
| 00:48:54 | 7  |     A.   A lot of times it would be the counselor's job -- |
| 00:49:01 | 8  |           MR. SECOR:  Objection, Your Honor.  The      |
| 00:49:02 | 9  | question should be --                                  |
| 00:49:03 | 10 |           THE COURT:  I understand.  The question is   |
| 00:49:08 | 11 | specifically related to Mr. Cook and what you may have |
| 00:49:11 | 12 | observed in that regard individually, not what you might |
| 00:49:13 | 13 | have heard from somebody.                              |
| 00:49:15 | 14 |     A.   What I individually did when he was in my family |
| 00:49:18 | 15 | life was basically I walked him -- I told him the      |
| 00:49:22 | 16 | requirements.  I listened to his input of what he wanted |
| 00:49:26 | 17 | to do, what he wanted to do accomplish, and then I     |
| 00:49:29 | 18 | specifically instructed him on the different aspects of |
| 00:49:33 | 19 | what is in the manual.  I don't know for a fact that   |
| 00:49:39 | 20 | Alex actually read the manual because it's difficult for |
| 00:49:45 | 21 | him.                                                   |
| 00:49:47 | 22 |     Q.   Okay.                                         |
| 00:49:47 | 23 |     A.   But as counselor I would make sure that he knew |
| 00:49:50 | 24 | the information.                                       |
| 00:49:51 | 25 |     Q.   Wonderful.  And isn't it true that most of the |

| | | |
|---|---|---|
| 00:49:56 | 1 | merit badges he earned were at camp? |
| 00:49:58 | 2 | A.  Yes. |
| 00:49:58 | 3 | Q.  They were sort of skill related? |
| 00:50:00 | 4 | A.  Right. |
| 00:50:03 | 5 | MS. KELLEY:  Thank you.  No more questions. |
| 00:50:03 | 6 | MR. SECOR:  Nothing further. |
| 00:50:05 | 7 | THE COURT:  Mr. Vance, you may step down. |
| 00:50:07 | 8 | You're free to stay or welcome to go.  Thank you very |
| 00:50:12 | 9 | much. |
| 00:50:29 | 10 | Ms. Kelley, who is your next witness and |
| 00:50:32 | 11 | what will they tell us? |
| 00:50:34 | 12 | MS. KELLEY:  This is Ann Vance, and she is a |
| 00:50:36 | 13 | teacher at Fredericktown High School, and she has been |
| 00:50:44 | 14 | in charge of Alex's IEPs, individualized education |
| 00:50:51 | 15 | plans, for a number of years and has observed Alex in |
| 00:50:56 | 16 | the act of reading and otherwise being educated. |
| 00:51:04 | 17 | (The witness was sworn by the clerk.) |
| 00:51:14 | 18 | THE COURT:  You may be seated.  And if you |
| 00:51:17 | 19 | can -- it's a little cumbersome, but if you can slide |
| 00:51:22 | 20 | your chair forward.  Will you please tell the ladies and |
| 00:51:30 | 21 | gentlemen of the jury your name. |
| 00:51:31 | 22 | THE WITNESS:  Ann Vance. |
| 00:51:37 | 23 | THE COURT:  Where do you live?  What town? |
| 00:51:39 | 24 | THE WITNESS:  Fredericktown, Ohio. |
| 00:51:41 | 25 | THE COURT:  Ms. Kelley indicated you're a |

00:51:44  1   teacher, correct?

00:51:45  2                   THE WITNESS:  Yes.

00:51:45  3                   THE COURT:  How long have you been a

00:51:46  4   teacher?

00:51:47  5                   THE WITNESS:  Since about '87.

00:51:51  6                   THE COURT:  And where do you teach?

00:51:53  7                   THE WITNESS:  At Fredericktown High School.

00:51:54  8                   THE COURT:  How long have you been there?

00:51:56  9                   THE WITNESS:  Since the fall of 1990.

00:51:58  10                  THE COURT:  And what subjects do you teach?

00:52:00  11                  THE WITNESS:  I teach special ed and chorale

00:52:05  12  music.

00:52:07  13                  THE COURT:  What generally is special ed?

00:52:10  14  What's that all about?

00:52:11  15                  THE WITNESS:  Working with students that

00:52:13  16  have learning disabilities.

00:52:15  17                  THE COURT:  And do you know Mr. Alex Cook?

00:52:18  18                  THE WITNESS:  Yes.

00:52:18  19                  THE COURT:  Okay.  Ms. Kelley.

00:52:20  20                  MS. KELLEY:  Thank you.

00:52:21  21                          - - -

00:52:21  22                  ANN VANCE, DIRECT EXAMINATION

00:52:22  23  BY MS. KELLEY:

00:52:22  24     Q.  Good morning, Ann.

00:52:23  25     A.  Good morning.

00:52:24  1      Q.  How long have you known Alex?

00:52:26  2      A.  Probably since he was in junior high.

00:52:28  3      Q.  All right.  And he was a special ed student,

00:52:32  4   correct?

00:52:33  5      A.  Yes.

00:52:34  6      Q.  All right.  Describe for the jury the reason why

00:52:37  7   Alex needed special ed?

00:52:39  8      A.  Because he was getting behind in his work,

00:52:46  9   teachers noticed that he wasn't achieving as he should

00:52:49  10  have been for his grade level, and so he was tested by

00:52:53  11  the school psychologist.

00:52:54  12     Q.  And about what time was this?

00:52:56  13     A.  I know he had an IEP from third grade on.

00:53:02  14             THE COURT:  Excuse me.  What is an IEP?

00:53:05  15             THE WITNESS:  An individualized education

00:53:07  16  plan.

00:53:07  17             THE COURT:  And if I may, just again, what

00:53:09  18  all does that involve, and how is that formulated, and

00:53:14  19  so forth?

00:53:15  20             THE WITNESS:  Okay.  It is formed after the

00:53:20  21  school psychologist puts the student through many tests

00:53:24  22  and gets input from the teachers as to their performance

00:53:28  23  in the classroom and so forth, and then uses the results

00:53:33  24  to determine if they have a learning disability.  If

00:53:36  25  they are not performing academically up to the level

00:53:41  1   that they should be for their intelligence level, if

00:53:46  2   their performance is not the same as what it should be,

00:53:50  3   then they -- we draw up an IEP, an individual plan for

00:53:57  4   them for the year.  Each year they get a new one.  And

00:54:00  5   it's just putting down goals and objectives that we're

00:54:04  6   going to work on that year to help them deal with their

00:54:09  7   disability and do better in the classroom.

00:54:14  8             MS. KELLEY:  Can I continue, Your Honor?

00:54:15  9             THE COURT:  Of course.  By all means.

00:54:18  10  BY MS. KELLEY:

00:54:18  11     Q.  Could you describe the specific nature of Alex's

00:54:22  12  learning disability?  What did he have problems with?

00:54:25  13     A.  Alex had problems with three areas:  basic

00:54:28  14  reading was one; math calculations was one; and written

00:54:33  15  expression, writing, putting together a good paragraph.

00:54:36  16     Q.  So I want to focus on the reading aspect.  When

00:54:43  17  Alex graduated from high school, did you know him?

00:54:47  18     A.  Yes.

00:54:49  19     Q.  And when he graduated from high school, at

00:54:52  20  approximately what reading level did he perform at?

00:54:56  21     A.  The last two years, his junior and senior year,

00:55:01  22  he was at the career center, so I did not write that

00:55:06  23  IEP.  I wrote it for his ninth and tenth grade year.

00:55:10  24  But basically as he was going through he was about two

00:55:13  25  to two and a half years behind grade level in his

00:55:17 1 reading ability.

00:55:18 2     Q. Okay. And was that under circumstances with

00:55:25 3 accommodations or without accommodations?

00:55:27 4     A. That would be without accommodations. Yes.

00:55:32 5     Q. And tell the jury what type of accommodations

00:55:40 6 Fredericktown High School recommended for Alex.

00:55:42 7     A. He could have tests read to him if he opted for

00:55:46 8 it. He could be pulled out into a smaller -- if the

00:55:50 9 class was having a test, then he could be pulled out

00:55:54 10 into a smaller setting, taken off one-on-one; or if

00:55:57 11 there were other special ed kids in the same group, a

00:56:02 12 smaller setting so it was less stress and he could be

00:56:05 13 read to. He could use highlighters, things like that.

00:56:09 14     Q. Was he given extra time?

00:56:10 15     A. Yes. Definitely. He could have extra time on

00:56:13 16 tests, yes.

00:56:14 17     Q. And if you remember, how did Alex perform under

00:56:19 18 stress?

00:56:24 19     A. I didn't see -- well, when we would have, like,

00:56:27 20 the OGT, the Ohio graduation test, there again, he was

00:56:32 21 allowed -- we tried to take away some of the stress, and

00:56:36 22 allowed him to be in a smaller setting and so forth and

00:56:40 23 have the same availability of having tests read to him

00:56:44 24 and so forth. Other than that, I didn't really see him

00:56:48 25 in a stressful situation. When he would come to my

```
00:56:51   1   room it was supposed to be less stressful.
00:56:55   2       Q.  Now you mentioned the OGTs a moment ago.  Did
00:57:00   3   Alex eventually pass?
00:57:01   4       A.  He did.  He did.
00:57:02   5       Q.  But that -- again, that was with special
00:57:04   6   accommodations?
00:57:04   7       A.  That was -- right.
00:57:06   8       Q.  And do you remember how he did on the reading
00:57:13   9   portion at all?
00:57:16  10       A.  No, I don't.  I'm sorry.
00:57:19  11               MS. KELLEY:  If I can have a moment, Your
00:57:21  12   Honor.
00:57:21  13               THE COURT:  Of course.
00:57:22  14               (Discussion had off the record.)
00:57:24  15   BY MS. KELLEY:
00:57:25  16       Q.  Final set of questions, ma'am.  You mentioned
00:57:28  17   earlier on that Alex could have special accommodations
00:57:32  18   if he wanted to.
00:57:34  19       A.  Uh-huh.
00:57:34  20       Q.  Was Alex open about the fact that he had
00:57:38  21   difficulty reading?
00:57:40  22       A.  Alex was more -- he did things more on his own.
00:57:45  23   He did not ask for a lot of help.  A lot of students are
00:57:50  24   embarrassed because they have a disability.  He was one
00:57:53  25   that tried to do things more on his own.  He had the
```

00:57:56  1   accommodations, but he was --

00:57:59  2       Q.  He wanted to be normal?

00:58:01  3       A.  He wanted to be normal.  Yes.

00:58:04  4       Q.  And did you ever get the sense that Alex was

00:58:11  5   trying to get into learning -- special ed so he could

00:58:16  6   get special treatment or not have to work as hard as the

00:58:19  7   other kids?

00:58:20  8       A.  No.  Not at all.  No.

00:58:21  9       Q.  And did you -- what did you feel about the effort

00:58:26  10  he put into his work?

00:58:29  11      A.  He made an effort.  Part of his problem some of

00:58:33  12  the time was that he wouldn't turn in homework as much

00:58:37  13  as he should.  He'd get a little bit behind on that.

00:58:40  14  But no, Alex made an effort.  He did.  He tried.  It was

00:58:45  15  just more difficult for him.

00:58:47  16              MS. KELLEY:  Thank you.  No more questions.

00:58:52  17              MR. SECOR:  No questions, Your Honor.

00:58:54  18              THE COURT:  You may step down.  You're free

00:58:56  19  to go or welcome to stay.  Thank you for coming.

00:59:24  20              MS. KELLEY:  We're prepared to call our next

00:59:26  21  witness, Your Honor.

00:59:27  22              THE COURT:  That is?

00:59:28  23              MS. KELLEY:  That is Alex Cook.

00:59:44  24              (The witness was sworn by the clerk.)

00:59:55  25              THE COURT:  Mr. Cook, if you'll slide so we

01:00:02  1   can hear you but not so close that we get a lot of

01:00:05  2   feedback.

01:00:06  3            Tell the ladies and gentlemen your name.

01:00:08  4            THE WITNESS:  My name is Alex Cook.

01:00:13  5            THE COURT:  And what's your community of

01:00:14  6   residence?

01:00:15  7            THE WITNESS:  As of right now,

01:00:16  8   Fredericktown, Ohio.

01:00:19  9            THE COURT:  Ms. Kelley.

01:00:20  10                   - - -

01:00:20  11           ALEX COOK, DIRECT EXAMINATION

01:00:20  12  BY MS. KELLEY:

01:00:20  13    Q.  Good morning, Alex.

01:00:22  14    A.  Good morning.

01:00:23  15    Q.  Alex, I want to start first with some major

01:00:27  16  topics and then delve into some more minor topics.

01:00:33  17       First of all, let's talk about your apartment at

01:00:39  18  1268 Knollwood.  How long had you lived there?

01:00:45  19    A.  From when?  Like, the whole period of time?

01:00:48  20    Q.  Yes.

01:00:49  21    A.  About seven months, eight months.

01:00:51  22    Q.  When did you move in?

01:00:53  23    A.  End of April.

01:00:54  24    Q.  Of what year?

01:00:54  25    A.  Of 2011 -- or 2010, sorry.

01:00:58  1       Q.   2010?

01:00:59  2       A.   Yeah.

01:01:00  3       Q.   And when did you move out?

01:01:02  4       A.   That same year; September, I do believe.

01:01:08  5       Q.   Shortly after the search warrant was executed?

01:01:11  6       A.   Yes, ma'am.

01:01:12  7       Q.   And did you have a roommate during this time?

01:01:15  8       A.   Yes, ma'am.

01:01:16  9       Q.   And what was his name?

01:01:17  10      A.   Ian Douglas.

01:01:19  11      Q.   Have you talked to Ian since the search warrant

01:01:22  12  happened?

01:01:22  13      A.   No.

01:01:23  14      Q.   What happened to Ian?

01:01:25  15      A.   The day of -- the search was done, Ian tried to

01:01:29  16  leave the house.  He tried to move out.  He -- I told

01:01:34  17  him he needed to stay for reason being that I couldn't

01:01:37  18  afford the bills; otherwise, the apartment complex was

01:01:40  19  going to charge.

01:01:44  20      Q.   Would you speak a little more slowly and loudly.

01:01:48  21      A.   He tried to leave the apartment the day the

01:01:51  22  search warrant was executed after the FBI agents had

01:01:53  23  left.  Then I let him know that the apartment was going

01:01:57  24  to charge me $2,500 if he was going to try to get out of

01:02:02  25  the contract early and that he was going to owe me his

01:02:04  1   portion of the bills that he agreed to pay when he

01:02:08  2   signed the contract to the apartment.

01:02:10  3       Q.   Okay.  Did he end up paying the bills?

01:02:14  4       A.   He missed two payments on bills that he promised

01:02:19  5   me that he would make.  I was trying to make

01:02:22  6   accommodations to him because I was the one that footed

01:02:26  7   the down payment on the apartment.  And what our

01:02:29  8   agreement was is that he would pay one time winter cable

01:02:33  9   bill.  That's all he needed to do.

01:02:34  10      Q.   When I hear that Ian owed you money, I could jump

01:02:39  11  to the conclusion that you're mad at him because he

01:02:44  12  stiffed you and you're trying to pin this on him.  Are

01:02:47  13  you?

01:02:47  14      A.   No.  I didn't mind that he had -- didn't have any

01:02:50  15  money.  I knew he didn't have a job at the time.

01:02:52  16      Q.   Didn't have a job at what time?

01:02:54  17      A.   The whole time we lived at the apartment.

01:02:56  18      Q.   So what did he do during the day?

01:02:58  19      A.   He was at the apartment all day.  Some days he'd

01:03:02  20  go out and hang out with the neighbors across the

01:03:04  21  street.  That was about it.

01:03:05  22      Q.   Did he go to class at all?

01:03:06  23      A.   Yes, he went to class in the morning, the same

01:03:09  24  time I did.

01:03:09  25      Q.   But he came home in the afternoon?

| | | |
|---|---|---|
| 01:03:11 | 1 | A.   Came home right after class. |
| 01:03:12 | 2 | Q.   How was he supporting himself? |
| 01:03:14 | 3 | A.   His parents were paying for everything. |
| 01:03:17 | 4 | Q.   How long had you known Ian? |
| 01:03:18 | 5 | A.   Since my freshman year in high school. |
| 01:03:21 | 6 | Q.   Okay.  Why did you choose him as a roommate? |
| 01:03:24 | 7 | A.   Him and I, we went to the career center.  We hung |
| 01:03:28 | 8 | out quite a bit outside school and during school.  He |
| 01:03:32 | 9 | was also in the IEP program with me; that's how we first |
| 01:03:35 | 10 | met.  And then once we got out of school, him and I |
| 01:03:38 | 11 | worked together at Whiteford Rental and Sales in Mt. |
| 01:03:41 | 12 | Vernon,  Ohio; we were yard hands there. |
| 01:03:45 | 13 | Q.   Did you have a computer during this time? |
| 01:03:47 | 14 | A.   Yes, ma'am. |
| 01:03:48 | 15 | Q.   Tell the jury what kind of computer? |
| 01:03:50 | 16 | A.   An HP laptop. |
| 01:03:52 | 17 | Q.   And how long did you have that? |
| 01:03:53 | 18 | A.   Since my graduation party in 2009. |
| 01:03:57 | 19 | Q.   So that would be spring of '09? |
| 01:03:59 | 20 | A.   Yes, ma'am. |
| 01:04:00 | 21 | Q.   Ever have any other computers during that time? |
| 01:04:02 | 22 | A.   No, ma'am. |
| 01:04:03 | 23 | Q.   Did Ian have a computer when he moved in? |
| 01:04:06 | 24 | A.   Originally when he first moved in, no, he did |
| 01:04:10 | 25 | not. |

01:04:10   1      Q.   When did he get one?

01:04:11   2      A.   About a month after he lived there.

01:04:14   3      Q.   And what kind of computer was that?

01:04:17   4      A.   It was an older Dell laptop.

01:04:19   5      Q.   And during the time that Ian was living with you,

01:04:24   6   did he have any other computers?

01:04:27   7      A.   Two more after that.

01:04:28   8      Q.   Two more?

01:04:29   9      A.   Yes, ma'am.

01:04:30  10      Q.   And this is in how many months?

01:04:31  11      A.   Eight months.

01:04:33  12      Q.   What kind of computers were they?

01:04:35  13      A.   The second one was a Verizon notebook; he had

01:04:40  14   that for about a month or two, then I lost it.

01:04:46  15      Q.   He did what with it?

01:04:47  16      A.   I lost track of it.  I never saw it.

01:04:49  17           Then he came up with -- I do believe it was a

01:04:51  18   Toshiba.  It was the final one the FBI searched at the

01:04:55  19   house.

01:04:56  20      Q.   Do you know what he did with that Toshiba when he

01:04:59  21   left?

01:04:59  22      A.   I have no idea.

01:05:10  23      Q.   Did you guys ever share things?

01:05:12  24      A.   We shared everything; sweatshirts, T-shirts,

01:05:15  25   things like that.   The only thing we didn't really

01:05:18    1    share was our hats.  It was kind of our thing.  But

01:05:21    2    other than that, he drove my truck, I drove his truck.

01:05:24    3    Things like that.   We shared tools, everything.

01:05:26    4        Q.   Did you share computers?

01:05:27    5        A.   Yes.

01:05:37    6        Q.   I want to talk about this computer.  Was it

01:05:39    7    password protected?

01:05:41    8        A.   Yes, ma'am.

01:05:41    9        Q.   So if you sat down to use it, could only you use

01:05:46   10    it?

01:05:47   11        A.   No, ma'am.  Ian also had the password to my

01:05:52   12    laptop.

01:05:53   13        Q.   Ian had your password?

01:05:54   14        A.   Yes, ma'am.

01:05:55   15        Q.   And there was also testimony earlier on that

01:05:58   16    there was some sort of fingerprint identity device.

01:06:01   17        A.   There is a fingerprint scanner when you flip the

01:06:05   18    laptop up; it's on the right side on the middle of the

01:06:09   19    edge of the screen.

01:06:10   20        Q.   Would that prevent someone else from getting in?

01:06:12   21        A.   No, because you could also just type in the

01:06:15   22    password and the password would bypass that.

01:06:23   23        Q.   Now, I want to talk about this supposed

01:06:27   24    confession you made to the police marked as Government's

01:06:34   25    Exhibit 9.  There were some allegations -- strike that.

01:06:43   1          Dr. Graves testified yesterday.  Do you recall
01:06:46   2   that?
01:06:46   3       A.  Yes, ma'am.
01:06:47   4       Q.  And he recalls that you told him that there was
01:06:51   5   yelling in the interrogation room.
01:06:54   6       A.  Yes, ma'am.
01:06:54   7       Q.  That is to say that Agent Pape from the FBI was
01:06:58   8   yelling at you?
01:06:59   9       A.  Yes, ma'am.
01:07:00  10       Q.  Did you believe it was yelling?
01:07:02  11       A.  Yes, ma'am.
01:07:03  12       Q.  Why?
01:07:04  13       A.  It was just -- he was getting in my face.  At
01:07:07  14   first -- at first when we first got there he was very --
01:07:11  15   it was very relaxed.  He was being nice.  And it
01:07:15  16   gradually  started getting worse and worse and worse.
01:07:18  17   And I kept telling him that I had no idea what he was
01:07:21  18   talking about.
01:07:22  19       Q.  The $64,000 question is:  Why did you go with
01:07:26  20   these guys?   I mean, ten law enforcement agents come
01:07:30  21   into your apartment.  Why did you just go with them?
01:07:33  22       A.  I had nothing to hide.  There was nothing I knew
01:07:35  23   of anything going on or anything like that.  I had no
01:07:38  24   reason not to go with them, to comply.
01:07:40  25       Q.  And we learned through Dr. Graves and through

01:07:45  1  your father's testimony that you and your father are

01:07:48  2  very close.  Why didn't you take out your cell phone and

01:07:51  3  call your dad that morning?

01:07:52  4      A.  I attempted to.

01:07:53  5      Q.  But what happened?

01:07:55  6      A.  Agent Pape told me to put it away.

01:07:58  7      Q.  Now, I anticipate that you will be asked that you

01:08:07  8  supposedly confessed when you were standing outside the

01:08:10  9  apartment to having child pornography on your computer.

01:08:15 10  Did you make such a confession?

01:08:17 11      A.  I did not.

01:08:19 12      Q.  What, if anything, did you tell law enforcement

01:08:22 13  while you were waiting outside your apartment and they

01:08:25 14  were searching?

01:08:26 15      A.  When they first got there, they pulled us out the

01:08:31 16  front door.  Agent Schulte was right at the front door.

01:08:35 17  He's the one that pulled me out the front door.  Ian was

01:08:38 18  right behind me.  When they first went in, they searched

01:08:44 19  the house to make sure there were no dangers or anything

01:08:48 20  like that that we were going to harm them.  We went

01:08:50 21  upstairs, changed clothes, then I was interviewed inside

01:08:54 22  the living room by Agent Pape.

01:08:56 23      Q.  So you and Ian were interviewed separately?

01:08:59 24      A.  Yes.  Ian was outside.  I was inside.

01:09:02 25      Q.  Continue.  I interrupted you.

01:09:04  1       A.   Agent Pape first started asking me an e-mail

01:09:11  2   address, and I had no idea what he was talking about.   I

01:09:15  3   never heard of the e-mail address before.   I never used

01:09:18  4   the e-mail address.

01:09:19  5       Q.   What e-mail address?

01:09:20  6       A.   Evidently later on I came to find out it was the

01:09:24  7   e-mail address given to me by Time Warner Cable.   I had

01:09:28  8   no idea I had that e-mail address.   He was sitting there

01:09:31  9   accusing me of lying to him about that.   And I honestly

01:09:34  10  had no idea that they'd given me an e-mail address.

01:09:38  11       Then he asked me why I thought they were there.

01:09:42  12       I told him I have no idea why you would even come

01:09:46  13  to my apartment.   He went on to say that it was for

01:09:50  14  investigation into child pornography.   And he started

01:09:52  15  asking me about it.   And I told him I had no idea what

01:09:55  16  he was talking about or anything of that nature.   I told

01:09:59  17  him that there were two images that could be considered

01:10:05  18  child pornography, but I wasn't sure.

01:10:07  19       Q.   Two images where?

01:10:08  20       A.   In the deleted on my computer.

01:10:11  21       Q.   Two images in the deleted file that could be --

01:10:12  22       A.   On my computer.   That's all the further we

01:10:15  23  discussed.

01:10:16  24       Q.   Let's talk about those two images.   How did they

01:10:20  25  pop up?   When did they pop up?

01:10:22  1      A.  I got home from work one night.

01:10:24  2      Q.  When approximately was that?

01:10:25  3      A.  10:00, 11:00 at night is usually about the time I

01:10:29  4  got home.

01:10:30  5      Q.  Okay.

01:10:30  6      A.  I walked in.  I went upstairs to finish typing up

01:10:34  7  a document that I had to do the next day for my -- I do

01:10:39  8  believe it was for my communications class.

01:10:41  9      Q.  Let's hold it right there.  You're typing up a

01:10:44  10  document.  We've heard lots of testimony that you have a

01:10:47  11  learning disability, you have problems with spelling and

01:10:51  12  writing.  How were you able to draft a document?

01:10:53  13      A.  At the school I would type it up and I would

01:10:58  14  e-mail it to my teachers.  They would do finalizations

01:11:04  15  for me, things like that, do a lot of corrections.  It

01:11:07  16  usually took me about four or five times to send it to

01:11:10  17  them.  They'd send it back with corrections I needed to

01:11:13  18  make, things like that before I actually got the

01:11:15  19  document correct.

01:11:16  20      Q.  Okay.  Okay.  Then please continue.

01:11:19  21      A.  I opened -- I went upstairs.  I opened up my

01:11:22  22  computer.  And as soon as it came out of sleep mode they

01:11:27  23  were just up on the computer.

01:11:29  24      Q.  So you just got it out of sleep mode and these

01:11:32  25  images appeared?

01:11:34  1      A.   Yes, ma'am.

01:11:34  2      Q.   When was the last time you used that computer?

01:11:37  3      A.   It was probably a day or two before that.

01:11:42  4      Q.   Okay.  And had you been conducting any searches

01:11:48  5  that would lead to those images coming up?

01:11:51  6      A.   At that time, no.

01:11:54  7      Q.   So what did you do?

01:11:55  8      A.   I just deleted them, didn't think anything of it.

01:11:58  9  I was kind of hesitant to try to figure out how they got

01:12:02  10  on there, but I didn't look into it.

01:12:04  11     Q.   Okay.  Now, there have been allegations that

01:12:09  12  there's adult pornography on your computer.  Is that

01:12:13  13  true?

01:12:13  14     A.   Yes, ma'am.

01:12:16  15     Q.   And there was also a comment by Dr. Graves

01:12:20  16  yesterday that you had an interest in individuals around

01:12:32  17  your age, give or take three or four years.  Would that

01:12:37  18  be correct?

01:12:38  19     A.   Not exactly, no.

01:12:40  20     Q.   What do you mean?  If you're comfortable, tell

01:12:45  21  us what your object of fascination is.

01:12:48  22     A.   Typically the same age or older.

01:12:51  23     Q.   Same age or older.  So 19 and above?

01:12:58  24     A.   Yes, ma'am.

01:13:00  25     Q.   Now, after you told the agent that nothing was on

01:13:04  1    your computer other than these two images that you

01:13:08  2    deleted, what happened?

01:13:09  3        A.  He told me that if I would come with them to the

01:13:13  4    field office that we could just get this all cleared up

01:13:16  5    today and move on.

01:13:18  6        Q.  Okay.

01:13:19  7        A.  So that's one of the reasons why I went with

01:13:22  8    them.  I went with them -- I went out to get my truck.

01:13:26  9    He said we could just take his car; it was closer.  So

01:13:29  10   we walked down to the end of the parking lot to his car.

01:13:32  11       Q.  Stop for a minute.  Tell us a bit about this

01:13:36  12   parking lot.  What kind of cars were typically in the

01:13:41  13   parking lot?

01:13:41  14       A.  Mainly trucks.

01:13:42  15       Q.  Trucks?

01:13:43  16       A.  Yes, ma'am.

01:13:44  17       Q.  Okay.  Who all lived in this apartment complex?

01:13:47  18       A.  This apartment complex mainly consisted of

01:13:50  19   college students that did not want to live on campus.

01:13:55  20       Q.  Now, there was testimony by Agent Schulte that

01:13:59  21   the FBI had surveyed your apartment five times during

01:14:06  22   the month of September.  Did you, yourself, notice an

01:14:10  23   undercover car?

01:14:12  24       A.  We noticed a suspicious vehicle moving around the

01:14:16  25   area, yes.

01:14:17  1       Q.   Who is "we"?

01:14:18  2       A.   Ian, my roommate; my neighbors.

01:14:22  3       Q.   How many times did you notice the suspicious

01:14:25  4  vehicle?

01:14:26  5       A.   Two or three times.

01:14:27  6       Q.   Okay.  So you're in transit to the FBI office.

01:14:34  7  Then what happened?

01:14:35  8       A.   We get to the FBI office.  We go upstairs.  Agent

01:14:41  9  Schulte opens the door.  We go upstairs.   We go inside

01:14:44  10  his office.   And as soon as you get inside the door

01:14:47  11  there's a metal detector then there's a door off to your

01:14:50  12  immediate left.  And then we went into to door off to

01:14:53  13  the immediate left, and Schulte and Agent Pape both

01:14:57  14  accompanied me in there.

01:14:58  15       Q.   Okay.  There's been testimony that you were given

01:15:03  16  a couple of consent forms and waiver forms to sign.  Do

01:15:09  17  you remember that?

01:15:09  18       A.   Yes, ma'am.

01:15:10  19       Q.   Okay.  Let's talk first about the consent to

01:15:14  20  search forms.  Did you actually read those?

01:15:19  21       A.   No.  The one he said was just the advice of

01:15:23  22  rights.

01:15:23  23       Q.   No, the consent.  The consent to search.  Did you

01:15:27  24  actually read it?

01:15:28  25       A.   No.

| | | |
|---|---|---|
| 01:15:29 | 1 | Q.  Why did you sign it? |
| 01:15:30 | 2 | A.  Because I had nothing in the car to hide. |
| 01:15:34 | 3 | Q.  Did they tell you what it was? |
| 01:15:36 | 4 | A.  Basically, yes. |
| 01:15:37 | 5 | Q.  So they sort of summarized? |
| 01:15:38 | 6 | A.  Yes. |
| 01:15:39 | 7 | Q.  Now about the advice.  Did you read that? |
| 01:15:42 | 8 | A.  No. |
| 01:15:43 | 9 | Q.  Why not? |
| 01:15:44 | 10 | A.  I just -- he explained to me it was like as you |
| 01:15:48 | 11 | see on TV. |
| 01:15:49 | 12 | THE COURT:  I couldn't hear the last part of |
| 01:15:51 | 13 | your answer. |
| 01:15:51 | 14 | THE WITNESS:  He explained to me it's just |
| 01:15:54 | 15 | like you see on TV. |
| 01:15:58 | 16 | BY MS. KELLEY: |
| 01:15:59 | 17 | Q.  Then let's talk about the circumstances of the |
| 01:16:02 | 18 | actual confession.  Are you alleging that these guys |
| 01:16:06 | 19 | beat a confession out of you? |
| 01:16:08 | 20 | A.  No, ma'am. |
| 01:16:08 | 21 | Q.  Okay.  I want to read to you this supposed |
| 01:16:13 | 22 | confession line by line, and I want to ask you some |
| 01:16:16 | 23 | questions. |
| 01:16:18 | 24 | The first line is in regards to having child |
| 01:16:22 | 25 | pornography images on computer. |

01:16:24   1        "I do have child pornography images on my

01:16:28   2  personal laptop computer which was in my bedroom of my

01:16:32   3  apartment on 1268 Knollwood in Lima, Ohio?"

01:16:38   4        Did you say anything like that?

01:16:41   5   A.  No.

01:16:41   6   Q.  Is any portion of that true?

01:16:44   7   A.  The laptop was in my room, yes.

01:16:46   8   Q.  But what about child pornography on it?

01:16:48   9   A.  No.

01:16:50  10   Q.  Now, the next sentence is, "I started viewing

01:16:53  11  adult pornography about three years ago when I was

01:16:57  12  around 17 years old." Is that true?

01:17:00  13   A.  Yes.

01:17:02  14   Q.  Next sentence. "After graduating high school and

01:17:05  15  leaving home for my job travelling construction, I

01:17:09  16  started viewing child pornography after finding a

01:17:18  17  desensitization to adult pornography."

01:17:26  18        By my calculation, that means you started

01:17:30  19  looking -- well, strike that.

01:17:33  20        When were you travelling construction?

01:17:35  21   A.  Back in '09.

01:17:36  22   Q.  So that was right after you graduated from high

01:17:38  23  school?

01:17:38  24   A.  Yes, ma'am.

01:17:43  25   Q.  So you worked in construction for about how long?

01:17:45  1      A.  Six months.

01:17:47  2      Q.  During that time were you indeed looking at child

01:17:53  3  pornography?

01:17:53  4      A.  If you look at the records, no.

01:17:55  5      Q.  But I don't care about the records.  Were you

01:17:57  6  looking at child pornography?

01:17:58  7      A.  No.  No, ma'am.

01:18:00  8      Q.  Were you looking at adult pornography?

01:18:02  9      A.  Yes, ma'am.

01:18:05  10     Q.  Then the next sentence reads -- strike that.

01:18:10  11  Have you ever used the word desensitization?

01:18:12  12     A.  I don't even know what that means, ma'am.

01:18:16  13     Q.  The next sentence reads, "My viewing of child

01:18:21  14  pornography was at first out of curiosity mainly."

01:18:25  15     A.  No, ma'am.

01:18:26  16     Q.  No, what?

01:18:27  17     A.  No, I did not say that.

01:18:29  18     Q.  Didn't view child pornography?

01:18:32  19     A.  No, ma'am.

01:18:33  20     Q.  Okay.  "When I was around 11 years old I was in

01:18:37  21  the woods walking to the Boy Scout camp lunch hall."

01:18:43  22  Would that be true?

01:18:44  23     A.  I did walk through the woods, yes.

01:18:47  24     Q.  "A guide grabbed me and fondled me until I was

01:18:51  25  able to scream and break free."

01:18:53    1          A.   No, ma'am.

01:18:54    2          Q.   That didn't happen?

01:18:55    3          A.   No.

01:18:57    4          Q.   "He ran away, and I reported this to adults in

01:19:02    5     charge."

01:19:03    6          A.   No, ma'am.  I didn't say any of that.

01:19:06    7          Q.   You didn't report it or it didn't happen?

01:19:09    8          A.   It didn't happen.

01:19:09    9          Q.   And who would adults in charge have been?

01:19:12   10          A.   Mark Vance; Reverend Tim Lehman, he was the camp

01:19:20   11     director; and my father was also there; and at that time

01:19:27   12     Dick Clapperoff [phonetically].

01:19:31   13          Q.   "I don't know if he was ever apprehended or not."

01:19:34   14          A.   I never said any of that.

01:19:36   15          Q.   Okay.  "I tell this because this contributed to

01:19:40   16     my curiosity with child pornography."

01:19:44   17               Did you, in fact, reveal this as the root cause

01:19:47   18     of your alleged fascination with child pornography?

01:19:50   19          A.   No, ma'am.

01:19:52   20          Q.   "I wanted to see what aroused him about that

01:19:55   21     situation"?

01:19:56   22          A.   No, ma'am.

01:19:59   23          Q.   "I downloaded child pornography from LimeWire

01:20:05   24     network"?

01:20:05   25          A.   No, ma'am.

01:20:06  1      Q.   Did you download adult pornography from LimeWire?

01:20:10  2      A.   Yes, ma'am.

01:20:11  3      Q.   Did you download anything else from LimeWire?

01:20:13  4      A.   Music.

01:20:16  5      Q.   And for our information, when did you first

01:20:19  6  download the LimeWire on your computer?

01:20:23  7      A.   I believe it was back in '09, but I'm not

01:20:27  8  positive on when exactly it was.

01:20:29  9      Q.   After you got your computer?

01:20:31  10     A.   Yes, ma'am.

01:20:33  11     Q.   "I searched it under," quote, "'child porn' and

01:20:38  12  found thousands upon thousands of files to choose from"?

01:20:41  13     A.   No, ma'am.

01:20:42  14     Q.   Ever type in the search terms child porn?

01:20:46  15     A.   No, ma'am.

01:20:46  16     Q.   Even on the internet?

01:20:48  17     A.   No, ma'am.

01:20:50  18     Q.   "I found that I did get aroused by some of the

01:20:52  19  images I saw, mainly because of the thought of it being

01:20:56  20  dirty and wrong, not the activities of the images"?

01:21:00  21     A.   No, ma'am.

01:21:01  22     Q.   No, what?

01:21:02  23     A.   No, I did not say any of that.

01:21:06  24     Q.   "I found one particular girl that reminded me of

01:21:09  25  my ex-fiancée, and that was why I downloaded several

01:21:13  1   pictures of her."

01:21:15  2          Who was your ex-fiancée?

01:21:17  3      A.   I never had one, ma'am.

01:21:18  4      Q.   Never had a fiancée?

01:21:20  5      A.   No.

01:21:20  6      Q.   Steady girlfriend?

01:21:21  7      A.   The longest relationship was two months.

01:21:25  8      Q.   "Most of the pictures were clothed and the images

01:21:31  9   were basically a progression as she grew older"?

01:21:35  10     A.   No, ma'am.

01:21:36  11     Q.   "Although I had images of child pornography

01:21:41  12   sexual activities on my computer, I did not want to see

01:21:44  13   adults with children"?

01:21:45  14     A.   No, ma'am.

01:21:48  15     Q.   "I was aroused most by views of children naked

01:21:51  16   and in the low teen range"?

01:21:54  17     A.   No, ma'am.

01:21:55  18     Q.   Kids?  Do kids arouse you?

01:21:57  19     A.   No.

01:21:58  20     Q.   Do teenagers arouse you?

01:22:00  21     A.   No, ma'am.

01:22:00  22     Q.   Do preteens arouse you?

01:22:03  23     A.   No, ma'am.

01:22:04  24     Q.   Adult women arouse you?

01:22:05  25     A.   Yes, ma'am.

01:22:06  1    Q.  "At the peak I may have viewed child pornography

01:22:08  2  once a week"?

01:22:09  3    A.  No, ma'am.

01:22:10  4    Q.  No, what?

01:22:11  5    A.  Did not say that.

01:22:12  6    Q.  Ever view child pornography once a week at your

01:22:15  7  peak?

01:22:15  8    A.  No, ma'am.

01:22:16  9    Q.  Ever have a peak?

01:22:17  10    A.  No, ma'am.

01:22:21  11    Q.  "I have not viewed child pornography for a month

01:22:23  12  and am working to rid myself of viewing it at all, and

01:22:27  13  that includes all pornography"?

01:22:31  14    A.  No, ma'am.

01:22:34  15    Q.  Are you trying to get rid of your addiction to

01:22:37  16  adult pornography?

01:22:37  17    A.  Yes, ma'am.

01:22:38  18    Q.  Good.

01:22:39  19      "In an effort to do that I was bringing my

01:22:41  20  computer into Best Buy this next weekend to have the

01:22:45  21  hard drive completely erased"?

01:22:47  22    A.  That is not what I said.

01:22:48  23    Q.  What did you say?

01:22:49  24    A.  What I said was I was taking my computer to Best

01:22:52  25  Buy because I was having troubles with it.

01:22:55  1    Q.   What kind of troubles?

01:22:57  2    A.   It wouldn't hook up to my printer wirelessly like

01:23:01  3    it was supposed to.  It was going incredibly slow.  It

01:23:05  4    wasn't like it when I got it, if that makes sense.   It

01:23:08  5    wasn't as fast as it was.   It would take five, ten

01:23:11  6    minutes for a document to load.  For the internet to do

01:23:16  7    anything it was taking forever.  So that's the reason

01:23:19  8    why I was going to take it to Best Buy to get it fixed.

01:23:23  9    Q.   "I have spoken several times to my church leader

01:23:26  10   about viewing pornography and have been working to

01:23:29  11   stop"?

01:23:30  12   A.   I never spoke with him about it until after I got

01:23:34  13   arrested and I came home.  He actually came over and

01:23:37  14   confronted me about it and asked me if we could talk

01:23:40  15   about it.

01:23:40  16   Q.   So you didn't talk to Pastor Gary until after you

01:23:44  17   had been arrested?

01:23:45  18   A.   Yes, ma'am.

01:23:48  19   Q.   "I do have access to younger children in the

01:23:51  20   Sunday school that I teach every other weekend in Knox

01:23:55  21   County"?

01:23:56  22   A.   No, ma'am.

01:23:56  23   Q.   Do you teach Sunday school?

01:23:58  24   A.   No, ma'am.

01:24:00  25   Q.   "These are children approximately 12 years old"?

01:24:03  1      A.   I don't know.  I never taught Sunday school.

01:24:08  2      Q.   Don't know how old the kids are?

01:24:09  3      A.   No.

01:24:10  4      Q.   "I am never alone with any of them and would

01:24:13  5   never even attempt to do anything inappropriate to them,

01:24:17  6   not only because it is wrong, but also out of fear and

01:24:21  7   reputation damage"?

01:24:22  8      A.   Did not say that.

01:24:24  9      Q.   "I am also an Eagle Scout and a Scout leader

01:24:29  10  leading about 36 scouts in the 11 to 12 age range."

01:24:36  11          Are you an Eagle Scout?

01:24:37  12     A.   Yes, ma'am.

01:24:37  13     Q.   Are you a scout leader?

01:24:39  14     A.   Not really.  I haven't been active in it for --

01:24:42  15  since '09 because I've been on the road working in

01:24:45  16  the -- and in school.

01:24:47  17     Q.   "Also with this responsibility I am never alone

01:24:50  18  with any child, nor would I ever think of doing anything

01:24:54  19  inappropriate"?

01:24:56  20     A.   Can you repeat that one more time.

01:24:57  21     Q.   Sure.  "Also with this responsibility I am never

01:25:02  22  alone with any child, nor would I ever think of doing

01:25:08  23  anything inappropriate"?

01:25:11  24     A.   I don't remember ever saying that.

01:25:13  25     Q.   Let's bounce back to being an Eagle Scout.  There

01:25:18  1   were questions by Mr. Secor about the manuals?

01:25:22  2      A.  Yes, ma'am.

01:25:22  3      Q.  I presume Mr. Secor was an Eagle Scout.  How did

01:25:26  4   you get through the manuals?

01:25:27  5      A.  Most of my merit badges were done at camp.  Every

01:25:32  6   time at camp -- I actually went back to be an instructor

01:25:36  7   at camp.  What we would do and what I would do is I

01:25:40  8   would go through the outline of what the merit badge

01:25:45  9   requires and the requirements of the merit badge.

01:25:48  10     Q.  How did you get the outline?

01:25:49  11     A.  When I started working there, the director of my

01:25:54  12  department, I was handicraft, he explained to me what I

01:26:00  13  needed to tell him.  He went through everything with me.

01:26:04  14  And he pretty much gave me the rules to teach -- what I

01:26:11  15  taught in handicraft was woodworking.  We made wooden

01:26:15  16  benches, like collapsable chairs, I guess you could say,

01:26:20  17  out of two-by-12s.

01:26:22  18     Q.  So that's how you got through the manuals?

01:26:24  19     A.  Yes, they would explain it to me, show me what to

01:26:27  20  do.

01:26:27  21     Q.  Did you ever try and pretends that you, yourself,

01:26:30  22  were reading the manual?

01:26:31  23     A.  No, ma'am.

01:26:32  24     Q.  It was open knowledge that folks were helping you

01:26:35  25  get through the manual?

01:26:36  1      A.   Yes, ma'am.

01:26:38  2      Q.   Final paragraph.  "In viewing child pornography,

01:26:43  3  I have found that some children that I know can remind

01:26:46  4  me of or resemble some images that I have viewed of

01:26:51  5  child pornography"?

01:26:52  6      A.   No, ma'am.

01:26:53  7      Q.   No, what?

01:26:54  8      A.   I never said that.

01:26:56  9      Q.   "I do not fantasize about any children in that

01:27:00  10  way, but I have found that I notice the similarity to

01:27:06  11  real children and child pornography images"?

01:27:11  12     A.   No, ma'am.

01:27:13  13     Q.   Okay.  "I have never touched or had any sexual

01:27:16  14  contact with any person under the age of 18"?

01:27:20  15     A.   No, ma'am.

01:27:22  16     Q.   No, what?

01:27:23  17     A.   I have never said that, nor have I done it.

01:27:27  18     Q.   So you've never had sexual contact with anyone

01:27:30  19  under 18?

01:27:30  20     A.   No, ma'am.

01:27:31  21     Q.   Just for the record, you never said this?

01:27:34  22     A.   No, ma'am.

01:27:36  23     Q.   Now, when you were -- after you signed this

01:27:44  24  alleged confession, were you given a hard copy when you

01:27:52  25  walked out the door?

01:27:53  1      A.   No, ma'am.

01:27:53  2      Q.   Were you given a hard copy of any of the forms

01:27:58  3  you signed that morning?

01:28:00  4      A.   The only one that I got was -- copies of the

01:28:04  5  forms I got was the receipt of what the FBI agents took,

01:28:09  6  and that was it.

01:28:10  7      Q.   The inventory search?

01:28:12  8      A.   Yes, ma'am.

01:28:13  9      Q.   You got a copy of that for your records?

01:28:15  10     A.   Yes, ma'am.

01:28:16  11     Q.   Now, I want to go back to the setup of the room

01:28:20  12  where the alleged confession took place.  Describe the

01:28:28  13  circumstances in which you were allowed to review your

01:28:36  14  supposed statement.  Were you given a chance to read

01:28:40  15  this?

01:28:41  16     A.   Not completely, no.

01:28:42  17     Q.   What do you mean by "not completely"?

01:28:44  18     A.   He scrolled through it really fast and I --

01:28:46  19     Q.   Who's "he"?

01:28:47  20     A.   Agent Pape.

01:28:48  21     Q.   And what do you mean by "scrolled through it"?

01:28:51  22     A.   Scrolled through it, meaning it was on the

01:28:53  23  computer screen, so he'd slide it down through the

01:28:57  24  computer screen relatively fast.

01:28:59  25     Q.   What do you mean by fast?

01:29:01  1      A.   A lot faster than I could read anything.

01:29:04  2      Q.   Okay.  So he went through the -- what did you do

01:29:10  3  when he scrolled to the end?

01:29:12  4      A.   I didn't see any reason not to believe what he

01:29:17  5  told me that it was about, so I just signed it so I

01:29:22  6  could get out of there.

01:29:23  7      Q.   Now, I can't but wonder, why didn't you just say,

01:29:29  8  hey, I can't read that fast; go back to the top again?

01:29:33  9  Why didn't you say that?

01:29:34  10     A.   Because I wanted to get out of there.  I just --

01:29:37  11  I was tired of getting yelled at.  I was scared.   I

01:29:40  12  just wanted to leave.

01:29:41  13     Q.   Okay.  But you knew this was important, correct?

01:29:44  14     A.   Yes.

01:29:45  15     Q.   You knew you could go to prison, didn't you?

01:29:48  16     A.   Yes, ma'am.

01:29:49  17     Q.   But you trusted him?

01:29:51  18     A.   Yes, ma'am.

01:29:52  19     Q.   Now, you've had special accommodations in school

01:29:57  20  for years and years and years?

01:29:59  21     A.   Yes, ma'am.

01:30:00  22     Q.   Why didn't you tell the officer, hey, I've got a

01:30:05  23  reading disability; you've got to go slower?

01:30:08  24     A.   It's not something I talk about with everybody.

01:30:11  25     Q.   But he says you were willing to confide in him

01:30:14  1  that you were molested when you were 11 years old.

01:30:18  2     A.  He never gave me a reason not to trust him.  I

01:30:22  3  didn't see any reason not to trust him.  He's an FBI

01:30:24  4  agent.  I didn't see a problem with it.

01:30:26  5     Q.  Okay.  Was there a printer in the room?

01:30:31  6     A.  Yes, ma'am.

01:30:33  7     Q.  Why didn't you point to the printer and say, hey,

01:30:37  8  print it out for me?

01:30:38  9     A.  I didn't think anything of it at the time, to be

01:30:42  10  honest with you.  I figured he would do what he needed

01:30:46  11  to do and give me a copy or whatnot.  I didn't see any

01:30:49  12  importance in it, nothing.

01:30:51  13     Q.  But when he didn't give you a copy, why didn't

01:30:55  14  you ask him for one?

01:30:56  15     A.  I really just wanted to get out of there.

01:30:59  16     Q.  I think what we're all trying to figure out is,

01:31:02  17  you're an Eagle Scout.  You're a relatively smart guy.

01:31:06  18  Why did you sign something that you never said?

01:31:09  19     A.  I never read it.  He told me it was a letter to

01:31:13  20  the prosecutor so there's no reason to go further with

01:31:17  21  this.

01:31:18  22     Q.  And you believed him?

01:31:19  23     A.  Yes, ma'am.

01:31:20  24     Q.  Okay.  Now, your resumé has been introduced into

01:31:32  25  evidence?

01:31:32   1   A.   Yes, ma'am.

01:31:33   2   Q.   Did you, yourself, prepare that?

01:31:37   3   A.   I did, in fact, type it up.  But what we did as a

01:31:42   4   class, the senior year at the career center, we got

01:31:46   5   what's called a passport.  It has our diploma in it, all

01:31:51   6   of our certifications as we passed our class we went

01:31:55   7   there for.  And it has a resumé in it and letter of

01:31:58   8   recommendation from -- usually it was from our

01:32:02   9   supervisor of the school itself.

01:32:04  10   Q.   Okay.  Is the content on that resumé accurate?

01:32:10  11   A.   Not entirely.

01:32:11  12   Q.   Okay.  What's not accurate?

01:32:13  13   A.   It's outdated.

01:32:15  14   Q.   It's outdated?

01:32:16  15   A.   Yeah.

01:32:16  16   Q.   But it was accurate at the time?

01:32:18  17   A.   Yes, ma'am.

01:32:19  18   Q.   Now, describe for the jury the drafting of that

01:32:24  19   resumé and the review of that resumé and the ultimate

01:32:28  20   production of that resumé?

01:32:30  21   A.   The whole class went into what's called a

01:32:34  22   computer lab.  It's just a bunch of computers that are

01:32:38  23   set up as kids go in and type up school work for class,

01:32:42  24   or if a class needs to be done on the computer, they can

01:32:46  25   do it in there.  We all went down to the computer lab,

01:32:50    1    and we sat down in front of the computer.  She had us

01:32:53    2    pull up this web page that we went to that creates

01:32:56    3    resumés for us.  The only thing that you need to do is

01:32:59    4    just type in your personal information and things like

01:33:01    5    that.  She told us she -- she specifically told us

01:33:06    6    bullet points that we had to have in there or that we

01:33:08    7    needed to have in there to make it a good resumé.

01:33:13    8        Q.  And how many drafts did this resumé go through?

01:33:16    9        A.  This one went through about seven.

01:33:18   10        Q.  Seven?

01:33:18   11        A.  Yes, ma'am.

01:33:20   12        Q.  So you read it and showed it to other people or

01:33:23   13    other adults?

01:33:24   14        A.  I printed it out.  After each class we printed it

01:33:28   15    out and handed it to our English teacher, and then she

01:33:32   16    went through and did any corrections to it or anything

01:33:34   17    like that.

01:33:35   18        Q.  And was she a special ed teacher?

01:33:38   19        A.  No.

01:33:38   20        Q.  She was just a normal English teacher?

01:33:40   21        A.  Just a normal English teacher.

01:33:42   22        Q.  Now, you worked construction for about a year?

01:33:46   23        A.  Yes, ma'am.

01:33:49   24        Q.  What, if any, reading did that entail?

01:33:52   25        A.  None whatsoever.

01:33:56  1     Q.   Now, a good deal has been made of the fact that
01:33:59  2  you are in college right now.  What kind of classes do
01:34:03  3  you take in college?
01:34:05  4     A.   The class that I was going for was to be an
01:34:08  5  agricultural diesel technician.
01:34:10  6     Q.   What does an agricultural diesel technician do?
01:34:14  7     A.   The class that I was taking was going to give me
01:34:17  8  a bachelor's degree in diesel mechanics.
01:34:21  9     Q.   How much reading do you have to do?
01:34:24 10     A.   Barely any, if any at all.  Most of our stuff is
01:34:30 11  hands on.
01:34:30 12     Q.   And when do you need to read things like
01:34:33 13  directions, what do you do?
01:34:35 14     A.   The teacher -- like, we got a booklet for each
01:34:42 15  class for our tech classes, and the teacher literally
01:34:44 16  went over it word for word with us.  We went through
01:34:47 17  the slide shows is mainly what they did, and they read
01:34:49 18  the slide shows to us.
01:34:53 19     Q.   And when you were on the job, if you had written
01:34:57 20  directions, what would do you?
01:35:00 21     A.   I would sit down probably for about a half hour
01:35:03 22  and read them, depending on the length of the
01:35:05 23  directions.  And if I didn't understand them, I would
01:35:08 24  definitely take them to somebody to have them explain it
01:35:11 25  to me.

01:35:15  1    Q.   What classes are you taking in college right now?

01:35:19  2    A.   None.

01:35:20  3    Q.   What were you taking?

01:35:22  4    A.   When I left I just got through with a -- with a

01:35:28  5    psychology course that I failed miserably.

01:35:31  6    Q.   Why did you fail?

01:35:33  7    A.   This happened.  I was very stressed.  It involved

01:35:38  8    quite a bit of reading, and I just couldn't handle it.

01:35:41  9    Q.   Why did you enroll in it in the first place?

01:35:44  10   A.   I didn't realize I had to take the class.   I

01:35:47  11   thought we'd be doing hands on entirely.

01:35:52  12        THE COURT:  I couldn't hear your answer.

01:35:54  13   A.   I didn't realize we had to take the course.  So I

01:35:57  14   thought it was going to be all hands on entirely.  I

01:35:59  15   didn't realize it was going to be a course for that.

01:36:03  16   Q.   So your guidance counselor enrolled you?

01:36:06  17   A.   Yes, he enrolled me.   We did it over the phone.

01:36:08  18   At the time I do believe I was out in -- I was in the

01:36:11  19   southern part of Ohio, I do believe, when I called him.

01:36:14  20   I was in Mississippi.   And we discussed it.

01:36:17  21   Q.   Were you taking any other classes?

01:36:20  22   A.   I took an Excel class for management.

01:36:25  23   Q.   Any English classes, any other classes?

01:36:28  24   A.   Basic English class.

01:36:31  25   Q.   How did you do in that?

01:36:33  1     A.  I failed it.

01:36:33  2     Q.  Why?

01:36:34  3     A.  I didn't have the accommodations that I needed,

01:36:39  4  and I didn't understand it.

01:36:40  5     Q.  Isn't the institution required -- if you know,

01:36:43  6  isn't the institution required by law to provide special

01:36:46  7  accommodations for you?

01:36:48  8     A.  Yes, ma'am.

01:36:49  9     Q.  Did you ask for them?

01:36:50  10     A.  At the time I didn't realize, like, how to go

01:36:53  11  about getting them.  By the time I realized that I had

01:36:56  12  them, it was my -- only my second session there, and

01:36:59  13  then I took it, I didn't realize they had them until

01:37:02  14  after the class was half over, and my grades were too

01:37:06  15  far behind to get back up.

01:37:17  16     Q.  Final set of questions.  I want to talk about

01:37:19  17  these 30 or so images and four videos that were found on

01:37:26  18  your computer.  Other than the two deleted images that

01:37:37  19  you told the special agent about, when did you learn

01:37:41  20  that these images were on your computer?

01:37:44  21     A.  Not until they arrested me.

01:37:50  22     Q.  And what was your initial reaction?

01:37:52  23     A.  I -- when they arrested me, I freaked out.  I

01:37:56  24  didn't know what was going on.  I had no idea, nothing.

01:37:59  25     Q.  Did you ever open any of these images?

| | | |
|---|---|---|
| 01:38:02 | 1 | A.   No, ma'am. |
| 01:38:02 | 2 | Q.   Did you ever double click them? |
| 01:38:04 | 3 | A.   No, ma'am. |
| 01:38:05 | 4 | Q.   Did you ever file them? |
| 01:38:06 | 5 | A.   No, ma'am. |
| 01:38:06 | 6 | Q.   Did you ever categorize them? |
| 01:38:08 | 7 | A.   No, ma'am. |
| 01:38:09 | 8 | Q.   Did you ever give them to anyone? |
| 01:38:11 | 9 | A.   Not that I know of. |
| 01:38:12 | 10 | Q.   All right.  Now, when again did you move into |
| 01:38:17 | 11 | your apartment? |
| 01:38:18 | 12 | A.   At the end of April. |
| 01:38:21 | 13 | Q.   And so you were there from -- you were there all |
| 01:38:29 | 14 | during the month of May? |
| 01:38:30 | 15 | A.   Yes, ma'am. |
| 01:38:31 | 16 | Q.   And all during the month of June? |
| 01:38:33 | 17 | A.   Yes, ma'am. |
| 01:38:34 | 18 | Q.   All right.  Were you working at all at that time? |
| 01:38:39 | 19 | A.   During May -- during May I was not.  But at the |
| 01:38:44 | 20 | middle of June I started working. |
| 01:38:47 | 21 | Q.   And you were going to school? |
| 01:38:49 | 22 | A.   Yes, ma'am. |
| 01:38:49 | 23 | Q.   And were you going home? |
| 01:38:51 | 24 | A.   On the weekends, yes, ma'am. |
| 01:38:54 | 25 | Q.   And where, if you know, was Ian during this time? |

01:38:58  1    A.  At home.  He worked also at the apartment, I

01:39:02  2  mean.  But he went to school also.  He went home also on

01:39:05  3  the weekends.

01:39:07  4         MS. KELLEY:  All right.  Thank you.  No

01:39:08  5  further questions.

01:39:11  6         Mr. Secor, would you like a moment or like

01:39:14  7  to take a break -- Mr. Crawford?

01:39:27  8                   - - -

01:39:27  9         ALEX COOK, CROSS-EXAMINATION

01:39:28  10  BY MR. CRAWFORD:

01:39:28  11    Q.  Mr. Cook, you indicated that you moved into your

01:39:30  12  Knollwood apartment at the end of April, 2010?

01:39:35  13    A.  Yes, sir.

01:39:37  14    Q.  And you had a roommate, Mr. Douglas?

01:39:40  15    A.  Yes, sir.

01:39:40  16    Q.  And when did he move in with you?

01:39:42  17    A.  At the same time.

01:39:44  18    Q.  End of April of 2010 -- yes, 2010?

01:39:48  19    A.  Yes, sir.

01:39:49  20    Q.  Any other roommates?

01:39:51  21    A.  No, sir.

01:39:53  22    Q.  Okay.  And you indicated that you used LimeWire

01:39:57  23  on your computer?

01:39:58  24    A.  Yes, sir.

01:39:58  25    Q.  You used it to download music?

01:40:01  1    A.  Yes, sir.

01:40:02  2    Q.  Adult pornography?

01:40:03  3    A.  Yes, sir.

01:40:04  4    Q.  And did you use it to download child pornography?

01:40:06  5    A.  No, sir.

01:40:08  6    Q.  And how often would you download music using

01:40:11  7  LimeWire?

01:40:12  8    A.  Once, twice a week.

01:40:14  9    Q.  And when you downloaded that music, would you

01:40:17  10  then listen to it on occasion after you downloaded it?

01:40:20  11    A.  Yes, sir.

01:40:21  12    Q.  And one of the ways that you can -- at least one

01:40:24  13  of the ways you can listen to music on LimeWire is

01:40:27  14  select  -- click on LimeWire, select the music file, and

01:40:31  15  play?

01:40:31  16    A.  I don't know.   I always copied it from there

01:40:33  17  into my music folder, just drag and drop is what I

01:40:37  18  always did.

01:40:38  19    Q.  You searched for music on LimeWire once or twice

01:40:42  20  a week?

01:40:43  21    A.  Yes, sir.

01:40:43  22    Q.  And to do that you would open the LimeWire

01:40:45  23  program, true?

01:40:46  24    A.  Yes, sir.

01:40:47  25    Q.  Now, when agents came to your apartment to serve

01:40:51  1  a search warrant, it's true that you told Special Agent

01:40:54  2  Pape that there had been child pornography on your

01:40:56  3  computer?

01:40:57  4      A.  No, sir.  I told him there were two images that

01:41:00  5  may be; I was not sure.

01:41:02  6      Q.  But you had seen two images that you thought

01:41:05  7  might be child pornography on your computer?

01:41:06  8      A.  Yes, sir.

01:41:12  9      Q.  And you accompanied Agent Pape and Schulte to the

01:41:16  10  FBI Lima office?

01:41:17  11      A.  Yes, sir.

01:41:17  12      Q.  And you made a statement there?

01:41:19  13      A.  Yes, sir.

01:41:22  14      Q.  And that statement was reduced to writing at some

01:41:26  15  point?

01:41:26  16      A.  I didn't actually make a statement, but yes, sir.

01:41:31  17      Q.  But Special Agent Pape interviewed you?

01:41:33  18      A.  Yes.

01:41:34  19      Q.  And you admitted having child pornography on your

01:41:37  20  computer in that statement?

01:41:38  21      A.  No, sir.

01:41:40  22      Q.  But you indicated that you started viewing child

01:41:43  23  pornography about three years prior to that?

01:41:44  24      A.  No, sir.

01:41:51  25      Q.  On direct examination did you indicate that you

01:41:53  1  did view adult pornography at some point in time prior

01:41:56  2  to the search warrant?

01:41:58  3      A.   Yes, sir.

01:41:59  4      Q.   And approximately how old were you when that

01:42:02  5  happened?

01:42:02  6      A.   Adult pornography was around 17.

01:42:05  7      Q.   You indicated that after you left home and

01:42:07  8  graduated from high school you started viewing child

01:42:10  9  pornography?

01:42:10  10      A.   No, sir.

01:42:12  11      Q.   Did you indicate that you -- first viewed child

01:42:17  12  pornography out of curiosity?

01:42:19  13      A.   No, sir.

01:42:19  14      Q.   You relayed a story to Special Agent Pape about

01:42:23  15  being fondled at Boy Scout camp?

01:42:26  16      A.   No, sir.

01:42:31  17      Q.   You indicated to Special Agent Pape that you

01:42:35  18  downloaded child pornography from LimeWire?

01:42:37  19      A.   No, sir.

01:42:38  20      Q.   Did you tell him that you used the search term

01:42:41  21  "child porn" to search for images?

01:42:44  22      A.   No, sir.

01:42:48  23      Q.   Did you tell him that you found one particular

01:42:50  24  girl that reminded you of your ex-fiancée?

01:42:53  25      A.   No, sir.

01:43:01 1      Q.  Did you indicate to him that you had downloaded

01:43:03 2  pictures that showed someone resembling your ex-fiancée

01:43:08 3  that was clothed and showed the age progression as she

01:43:14 4  grew older?

01:43:14 5      A.  No, sir.

01:43:15 6      Q.  Did you indicate you were aroused most by views

01:43:17 7  of children naked in the low teen range?

01:43:20 8      A.  No, sir.

01:43:21 9      Q.  Did you indicate that you had viewed child

01:43:24 10 pornography approximately once per week?

01:43:26 11     A.  No, sir.

01:43:26 12     Q.  Did you indicate that you spoke to your church

01:43:35 13 leader about viewing pornography?

01:43:37 14     A.  Viewing what?

01:43:38 15     Q.  Pornography?

01:43:39 16     A.  After I got arrested, I said.

01:43:43 17     Q.  Let me ask the question again.  Did you indicate

01:43:45 18 to Special Agent Pape that you had discussed with your

01:43:48 19 church leader that you had been viewing pornography?

01:43:51 20     A.  No.  I'm sorry.

01:43:56 21     Q.  Now, you have attended church in the past in Knox

01:44:00 22 County; is that true?

01:44:01 23     A.  Yes, sir.

01:44:03 24     Q.  You indicated to Special Agent Pape that you had

01:44:06 25 taught Sunday school?

01:44:07   1       A.   No, sir.

01:44:08   2       Q.   You indicated to Special Agent Pape you were a

01:44:12   3   scout leader?

01:44:13   4       A.   No, sir.

01:44:25   5       Q.   Now, approximately eight months after the search

01:44:30   6   warrant you met with Dr. Graves; is that true?

01:44:32   7       A.   Yes, sir.

01:44:33   8       Q.   And you told Dr. Graves that you saw child

01:44:35   9   pornography on your computer; is that true?

01:44:37   10      A.   I saw two images that I thought might be.

01:44:40   11      Q.   Well, you've described these images to him as a

01:44:44   12   girl that's 14 or 15 years old with small breasts and no

01:44:49   13   body hair.  Is that true?

01:44:49   14      A.   No, sir.

01:44:50   15      Q.   You did not tell Dr. Graves that?

01:44:53   16      A.   I didn't tell him ages because I didn't know

01:44:55   17   ages.

01:44:55   18      Q.   But you made the statement to him that this image

01:44:58   19   was of a girl that appeared 14 to 15 years old with

01:45:01   20   small breasts and no body hair?

01:45:04   21      A.   Yes, sir.

01:45:06   22      Q.   You told Dr. Graves that you downloaded adult

01:45:10   23   pornography on LimeWire?

01:45:10   24      A.   Yes, sir.

01:45:11   25      Q.   You told Dr. Graves that you watched X rated

01:45:15   1   videos on the internet; is that true?

01:45:17   2       A.   Yes, sir.

01:45:18   3       Q.   You spoke to Dr. Graves about your roommate; is

01:45:20   4   that correct?

01:45:20   5       A.   Yes, sir.

01:45:21   6       Q.   And your roommate was Ian Douglas?

01:45:23   7       A.   Yes, sir.

01:45:24   8       Q.   You told Dr. Graves that Ian Douglas was a jerk,

01:45:28   9   didn't you?

01:45:28  10       A.   Yes, sir.

01:45:29  11       Q.   You said that he stuck with you with a $350 cable

01:45:33  12   bill?

01:45:33  13       A.   Yes, sir.

01:45:38  14       Q.   You told him that there were other bills that you

01:45:41  15   were forced to pay because Mr. Douglas swore that he

01:45:44  16   paid them?

01:45:44  17       A.   Yes, sir.

01:45:45  18       Q.   You said that he had no job -- that Mr. Douglas

01:45:48  19   had no job, that he was lazy, yet Mr. Douglas called you

01:45:53  20   lazy?

01:45:53  21       A.   Yes, sir.

01:46:02  22       Q.   You also told Mr. Graves that you were upset with

01:46:04  23   the FBI; is that true?

01:46:06  24       A.   Yes, sir.

01:46:07  25       Q.   You told Mr. Graves that the FBI agents lied to

01:46:10  1   you?

01:46:10  2       A.  Yes, sir.

01:46:10  3       Q.  You told Dr. Graves that this whole situation was

01:46:15  4   ridiculous, uncalled for, unfair, and one-sided; is that

01:46:19  5   true?

01:46:19  6       A.  Yes, sir.

01:46:20  7       Q.  You told Dr. Graves that the FBI -- you trusted

01:46:24  8   the FBI not to mess me over and they all lied to me.  Is

01:46:26  9   that true?

01:46:27  10      A.  Yes, sir.

01:46:27  11      Q.  You said you were helpful in any way you could

01:46:30  12  be; is that true?

01:46:31  13      A.  Yes, sir.

01:46:31  14      Q.  Because you had nothing to hide?

01:46:33  15      A.  Yes, sir.

01:46:34  16      Q.  You said you called them back to your apartment

01:46:37  17  and signed the consent form for them to search your

01:46:41  18  vehicle?

01:46:41  19      A.  Yes, sir.

01:46:42  20      Q.  Because you were trying to be helpful.  Is that

01:46:45  21  true?

01:46:45  22      A.  Yes, sir.

01:46:46  23      Q.  You told Dr. Graves that there was an FBI agent

01:46:51  24  that yelled at you for three or four hours calling you

01:46:53  25  an idiot; is that true?

01:46:55  1    A.  Yes, sir.

01:46:55  2    Q.  And that you were signing a letter to the

01:46:58  3  prosecutors telling them not to go forward with the

01:47:01  4  case.  Is that true?

01:47:02  5    A.  Yes, sir.

01:47:05  6        MR. CRAWFORD: Just one moment, Your Honor.

01:47:26  7  BY MR. CRAWFORD:

01:47:26  8    Q.  Mr. Cook, you indicated that you'd first learned

01:47:29  9  about images on your computer at the time you'd been

01:47:31  10  arrested?

01:47:32  11    A.  Yes, sir.

01:47:33  12    Q.  Were you aware that there were 30-plus images of

01:47:35  13  child pornography on your computer prior to being

01:47:37  14  arrested?

01:47:38  15    A.  No, sir.

01:47:38  16    Q.  Were you aware of any movies depicting child

01:47:41  17  pornography on your computer prior to being arrested?

01:47:43  18    A.  No, sir.

01:47:43  19    Q.  You were arrested sometime in December of 2010?

01:47:47  20    A.  I don't believe it was December.

01:47:48  21    Q.  Do you recall when it was?

01:47:50  22    A.  October, November, I think, or September.  I

01:47:55  23  can't remember exactly when it was.  It was roughly ten

01:47:59  24  months from -- prior to this.  Ten months.  I don't

01:48:04  25  know.  I'm not good with dates.

01:48:06  1          MR. CRAWFORD: No further questions.

01:48:09  2          THE COURT:  Okay.

01:48:10  3          MS. KELLEY:  Very briefly.

01:48:11  4                    - - -

01:48:11  5          ALEX COOK, REDIRECT EXAMINATION

01:48:12  6  BY MS. KELLEY:

01:48:12  7      Q.  Those two images that you told the Special Agent

01:48:21  8  about, what did you do with those two images?

01:48:25  9      A.  Put them in the recycling bin on my computer.

01:48:30  10     Q.  What is the recycle bin?

01:48:31  11     A.  To get rid of unwanted documents.

01:48:33  12     Q.  Slowly.

01:48:35  13     A.  Sorry.  To get rid of unwanted documents.

01:48:38  14     Q.  To get rid of unwanted documents.  You didn't

01:48:40  15  want them?

01:48:41  16     A.  No, ma'am.

01:48:41  17     Q.  Do you know how they got on your computer?

01:48:44  18     A.  I have no idea.

01:48:45  19     Q.  And to the best of your knowledge, those were the

01:48:47  20  only images of child pornography on your computer?

01:48:53  21     A.  Yes, ma'am.

01:48:54  22     Q.  All right.  And are you mad at Ian because he

01:49:02  23  stiffed you with those bills?

01:49:04  24     A.  No, ma'am.

01:49:05  25     Q.  Is that the reason why we've been discussing him

01:49:08   1   at this trial?

01:49:09   2       A.  No, ma'am.

01:49:10   3               MS. KELLEY:  No further questions.  Thank

01:49:12   4   you.

01:49:12   5               MR. CRAWFORD: No questions.

01:49:13   6               THE COURT:  You may step down.  Why don't we

01:49:21   7   take a break.

01:49:22   8               All right.  Thank you.

01:49:27   9               Counsel, why don't you come up for a moment.

01:49:33  10               (Recess taken.)

02:50:07  11               (The following discussion was had in

02:50:08  12   chambers; the jury is not present.)

02:50:13  13               THE COURT:  In the instruction on

02:50:15  14   credibility of witnesses, I intend to instruct the

02:50:18  15   following: You may also consider the failure of the FBI

02:50:23  16   to have recorded its interview with the defendant in

02:50:26  17   assessing the credibility of the testimony about that

02:50:28  18   interview and the defendant's statements against the

02:50:31  19   agent's.

02:50:32  20               Twice in my career I'm faced with the fact

02:50:35  21   that had the Bureau recorded the conversation, we

02:50:38  22   wouldn't be here.

02:50:41  23               I spoke to Mike Rolf at the time when Fred

02:50:44  24   Henning was convicted.  I've said to agents otherwise.

02:50:47  25   I find it a shabby and unjustified practice.   Recording

| | |
|---|---|
| 02:50:50 | 1 |
| 02:50:55 | 2 |
| 02:50:57 | 3 |
| 02:51:00 | 4 |
| 02:51:02 | 5 |

is ubiquitous.  They videotape with TPD.

MR. SECOR:  You're preaching to the choir.
But, that having been said, this is a procedural thing
that the government -- when I say "the government," I
mean my office -- has no control over.

THE COURT:  I understand that.  Somebody has
to tell the Bureau, enough is enough.  This kid is
looking at 15 years, if I understand correctly.  A 20
year old Eagle Scout.  I don't know whether he's telling
the truth.  But I think this matters.  And I think she
should be able to argue it.  If you want to ask the
agent on the stand, why don't you do it, go right ahead.
It's outside the scope of the defense case in chief.
I'm dropping this bombshell on you.  But I'm sitting
here listening to that kid and wondering, you know,
maybe he's telling the truth.  Implausible as it seems,
incredible as it is; nonetheless, we wouldn't be here.
And a highly respected lawyer in this community would
not have ever been convicted, or he may well have been
convicted; the case would never have gone to trial.
It's not necessary for us and the jurors and everybody
else to take the time and money when the Bureau, as far
as I'm concerned, has absolutely no reason not to do it.
It gives the Bureau an edge.  These guys come in here
with their badge, their experience, their professional

02:52:12  1  demeanor in testifying, and it's impossible not to

02:52:15  2  believe them.  It's impossible.  It really is.

02:52:18  3              MR. SECOR:  So you're doing this in order to

02:52:20  4  get them to change their policies?

02:52:22  5              THE COURT:  No, I'm doing it because it's

02:52:24  6  fundamentally unfair.  It is fundamentally unfair.  They

02:52:27  7  do it deliberately because they know it gives them an

02:52:30  8  edge.  And that's not right.  It's not the way the

02:52:33  9  government should function.  It recorded thousands of

02:52:36  10  hours, hundreds of hours of that Darren Griffin, the

02:52:41  11  undercover agent, the plant in the terrorism case.

02:52:44  12  Hundreds of hours.  Peep hole cameras, gym bags; they

02:52:49  13  can do it.  There's no excuse not to.  Highway patrol

02:52:53  14  does it.  I'd be willing to bet every major police

02:52:57  15  department in this state does it.  There's no excuse.

02:53:00  16              I'm yelling at you, Tom; I'm sorry, but I'm

02:53:04  17  really upset.  This is 15 years of the kid's life.  He

02:53:07  18  may deserve it.  The stuff we saw yesterday is

02:53:10  19  appalling.  He deserves a stiff sentence if he did it.

02:53:14  20  And we could know one way or another what the truth was

02:53:16  21  about what happened in that closed interrogation room.

02:53:18  22  I don't like thinking that an FBI agent might lie, but

02:53:24  23  there's a sure and certain way I would know whether

02:53:28  24  that's true or not.  This case wouldn't be here if they

02:53:30  25  had a recording; she would have pled, or you wouldn't

02:53:32  1    have indicted.  End of discussion.

02:53:36  2          MR. SECOR:  Well, what we would have done is

02:53:38  3    not material to our discussion right now because we

02:53:41  4    would have, without his statement, we would have gone

02:53:45  5    forward with this case.  But, you know, at this point of

02:53:51  6    the proceeding --

02:53:54  7          THE COURT:  I understand.  It just occurred

02:53:55  8    to me right now after I saw his testimony, when I heard

02:53:58  9    what he said.  I agree that it is very difficult to

02:54:02  10   credit; no doubt about that at all.  On the other hand,

02:54:07  11   as she's pointed out, a kid that does apparently have

02:54:11  12   some bona fide reading disability; he said, I didn't

02:54:15  13   read it.  This is what the agent told me.  Okay.  I

02:54:20  14   wanted to get out of there.  And we all know and the

02:54:24  15   last five years have shown us there are plenty of false

02:54:28  16   confessions.  People who are totally innocent.  Has it

02:54:32  17   happened in this case?  Who knows.  That's for the jury

02:54:35  18   to decide.  But I am sick and tired of the Bureau coming

02:54:38  19   in here and taking that edge.  It's a violation of

02:54:42  20   fundamental due process as far as I'm concerned.

02:54:44  21          It's not the government's fault.  It's not

02:54:47  22   your fault.  Your hands are tied.  But maybe somehow

02:54:50  23   sometime if they lose this case, and if they realize

02:54:54  24   they could have won it if they recorded, maybe next time

02:54:57  25   sometime down the road somebody will say, bring me the

| | |
|---|---|
| 02:55:00 | 1 |
| 02:55:05 | 2 |
| 02:55:08 | 3 |
| 02:55:10 | 4 |
| 02:55:14 | 5 |
| 02:55:17 | 6 |
| 02:55:22 | 7 |
| 02:55:26 | 8 |
| 02:55:32 | 9 |
| 02:55:37 | 10 |
| 02:55:41 | 11 |
| 02:55:45 | 12 |
| 02:55:50 | 13 |
| 02:55:55 | 14 |
| 02:55:58 | 15 |
| 02:56:01 | 16 |
| 02:56:02 | 17 |
| 02:56:04 | 18 |
| 02:56:06 | 19 |
| 02:56:08 | 20 |
| 02:56:11 | 21 |
| 02:56:15 | 22 |
| 02:56:20 | 23 |
| 02:56:26 | 24 |
| 02:56:29 | 25 |

recording.  I may not change the policy.  I may be the first judge ever to say this.  I don't really care.

MR. SECOR:  Well, the policy has recently been modified, not that that matters in this case.

THE COURT:  No, it doesn't.  I'm telling you now so that at least you can get ready for the -- I know it's short notice, but, Tom, it occurred to me when I came back to my office.  I mean, I'm sorry; it just did. It grated me.  I was tempted, quite candidly, to ask, but then when Elizabeth didn't say anything about it, I figured, no, keep my thumb off the scales, and basically get into it in front of the jury with the agent.  I didn't.  Okay.  That's how strongly I feel about this. It just is not fair.  I have too great a respect for the Bureau and the work that it does day in and day out to accept it.

MR. SECOR:  Getting into it with the agent solves nothing either.

THE COURT:  Tom, I understand.  That's why I didn't do it.  I paused for a moment and said, you may step down.  At that moment I thought about saying, well, agent, you didn't record it, did you?  No.  Why not? Bureau policy.  Does the Lima PD record?  Does the Allen County sheriff?  Do you know whether the Toledo Police Department records?  The Ohio State Patrol when they

| | | |
|---|---|---|
| 02:56:31 | 1 | have a traffic stop?  I said, nope, that's not fair. |
| 02:56:40 | 2 | So anyway, I wanted to let you know.  And I |
| 02:56:44 | 3 | note your objection. |
| 02:56:47 | 4 | I assume you want that instruction.  I |
| 02:56:49 | 5 | should ask you that. |
| 02:56:51 | 6 | MS. KELLEY:  Yes.  No objection.  Thank you. |
| 02:56:55 | 7 | THE COURT:  I would assume not.  If the |
| 02:57:01 | 8 | Bureau is mad at me, they're mad at me.  I'm mad at them |
| 02:57:06 | 9 | about their policy. |
| 02:57:09 | 10 | Your witness is here? |
| 02:57:10 | 11 | MS. KELLEY:  Yes, he is. |
| 02:57:11 | 12 | THE COURT:  How long is he likely to be, an |
| 02:57:13 | 13 | hour? |
| 02:57:14 | 14 | MS. KELLEY:  I'm pretty short.  You've |
| 02:57:16 | 15 | probably discovered by now. |
| 03:28:54 | 16 | (Lunch recess taken.) |
| 03:31:47 | 17 | (The jury enters the courtroom.) |
| 03:33:14 | 18 | THE COURT:  Ms. Kelley, who is your next |
| 03:33:16 | 19 | witness, and what will we learn from them? |
| 03:33:19 | 20 | MS. KELLEY:  Our next witness is Mark |
| 03:33:21 | 21 | Vassel, who is a computer forensics expert.  He |
| 03:33:24 | 22 | conducted a thorough examination of Alex's computer.  He |
| 03:33:27 | 23 | is expected to address the subject of the two deleted |
| 03:33:31 | 24 | files on the computer as well as to whether the 30 |
| 03:33:37 | 25 | images and four videos were actually opened, viewed, |

03:33:42  1  categorized, or filed by the defendant.

03:34:17  2              (The witness was sworn by the clerk.)

03:34:26  3              THE COURT:  Have a seat, sir.  Sit about

03:34:31  4  this distance from the microphone.  It's easier for you

03:34:36  5  to move rather than it.

03:34:44  6              Please tell the ladies and gentlemen your

03:34:46  7  name.

03:34:46  8              THE WITNESS:  My name is Mark Vassel.

03:34:49  9              THE COURT:  M-a-r-c or K?

03:34:51  10             THE WITNESS:  It's with a K, Judge.

03:34:53  11             THE COURT:  The last name?

03:34:54  12             THE WITNESS: Vassel, V-a-s-s-e-l.

03:34:58  13             THE COURT:  Maybe sit back an inch or so.

03:35:01  14  What is your community of residence?  What town do you

03:35:04  15  live in?

03:35:04  16             THE WITNESS:  I live in Olmstead Falls,

03:35:06  17  Ohio.

03:35:07  18             THE COURT:  Do you have an occupation or

03:35:08  19  profession?

03:35:09  20             THE WITNESS:  I do.

03:35:09  21             THE COURT:  What is that?

03:35:10  22             THE WITNESS:  I'm a computer forensic

03:35:12  23  examiner.

03:35:13  24             THE COURT:  And what is a computer forensic

03:35:15  25  examiner?

03:35:16    1              THE WITNESS:  Basically what a computer
03:35:18    2    forensic examiner is, the geek without the pocket
03:35:22    3    protector.  We look at computer hard drives and process
03:35:27    4    them and pull potential evidence off them.
03:35:31    5              THE COURT:  Do you work for a company or are
03:35:33    6    you self-employed?  Who's your employer?
03:35:36    7              THE WITNESS:  Actually I was a police
03:35:37    8    officer for 13 years and then got a little tired of
03:35:42    9    working weekends and holidays, so I started my own
03:35:44   10    company.
03:35:46   11              THE COURT:  And if you have your own
03:35:47   12    company, you're probably still working weekends and
03:35:50   13    holidays.
03:35:51   14              THE WITNESS:  Unfortunately I didn't know
03:35:52   15    that at the time, Judge.
03:35:55   16              THE COURT:  What police department were you
03:35:56   17    with?
03:35:57   18              THE WITNESS:  I was with the Olmstead
03:35:58   19    Township Police Department.
03:36:01   20              THE COURT:  And what sort of training or how
03:36:04   21    did you become able to do what you do now?
03:36:07   22              THE WITNESS:  Sure.  What I -- I started as
03:36:10   23    a police officer.  In the State of Ohio there's a
03:36:13   24    training academy called OPOTA, Ohio Peace Officer's
03:36:18   25    Training Academy.  Went to my chief of police one day

03:36:21   1   and said, you know what, this is going to be the future

03:36:24   2   of crimes.  So I started --

03:36:28   3                  THE COURT:  I don't mind if you're turned

03:36:31   4   away.

03:36:31   5                  THE WITNESS:  -- the future of crimes.  So

03:36:33   6   the chief sent me to the basic computer forensic classes

03:36:36   7   they hold.  I'm like, you know what, this is kind of

03:36:39   8   cool.  I went, took the intermediate and advanced

03:36:43   9   computer crimes investigations, then went through the

03:36:49  10   National White Collar Crime Center for advanced computer

03:36:52  11   forensic examinations through Guidant Software.  The

03:37:00  12   program that we use, it's called EnCase, E-N-C-A-S-E.

03:37:05  13   What that is, it's a program that we use that allows --

03:37:09  14                  THE COURT:  I'm sorry?

03:37:11  15                  THE WITNESS:  It's going to be E-N-C-A-S-E.

03:37:17  16                  THE COURT:  EnCase?

03:37:19  17                  THE WITNESS:  That's manufactured by a

03:37:21  18   company called Guidant Software.  So I went through

03:37:24  19   training through the company, the manufacturers of the

03:37:27  20   software that we used, looked through the computer hard

03:37:30  21   drive and gathering the data and gathering the potential

03:37:34  22   evidence in the case.  So I went through that, taught

03:37:40  23   some computer forensic classes, gave some speeches.

03:37:46  24                  THE COURT:  Okay.

03:37:46  25                  MS. KELLEY:  Your Honor, based on the

foregoing we would ask permission to qualify Mr. Vassel as an expert.

THE COURT:  Any objection?

MR. SECOR:  No, Your Honor.

THE COURT:  Ladies and gentlemen, as previously indicated, the "expert" is sort of a shorthand term under the Rules of Evidence which permit somebody to give opinion testimony, which normally is not permitted.  Normally I can't hear somebody say, well, in my opinion X, Y, Z.  People usually have to testify just to the facts and so forth.  But when a person is qualified, as this witness is, or as earlier witnesses have been, to talk about something that ordinary people like ourselves would have difficulty comprehending, and also to tell us in greater detail about such matters, then the law permits what we in a shorthand way call expert testimony.  And you should consider the credibility and weight to be given to his testimony just like you will all the other witnesses, as I told you initially and as I will tell you again when I give you the charge.

Go ahead, Ms. Kelley.

MS. KELLEY:  Thank you, Your Honor.

- - -

MARK VASSEL, DIRECT EXAMINATION

```
03:38:58   1   BY MS. KELLEY:
03:38:58   2       Q.  Good afternoon, Mark.
03:38:59   3       A.  Good afternoon.
03:39:00   4       Q.  You told the jury earlier that you founded your
03:39:04   5   own company, correct?
03:39:06   6       A.  That's correct.
03:39:06   7       Q.  And as the principal in your own company, do you
03:39:12   8   testify only for the defense?
03:39:14   9       A.  No.  In fact, actually a couple weeks ago I got a
03:39:18  10   subpoena from an Ottawa County prosecutor.
03:39:21  11       Q.  Okay.  So you testify for both the prosecution
03:39:24  12   and the defense?
03:39:25  13       A.  Right.
03:39:27  14       Q.  And to clarify, are you being compensated for
03:39:30  15   your time today?
03:39:31  16       A.  Yes, I am.
03:39:33  17       Q.  All right.  And does your fee in any way
03:39:37  18   influence the direction of your testimony?
03:39:41  19       A.  No, it doesn't.
03:39:44  20       Q.  Now, have you had occasion to examine a hard
03:39:50  21   drive from Alex Cook's computer?
03:39:53  22       A.  Yes, I did.
03:39:54  23       Q.  And how long did you spend examining that hard
03:39:58  24   drive?
03:39:59  25       A.  I spent a good solid day there looking at that
```

03:40:03  1    hard drive, gathering some reports and taking the

03:40:07  2    reports back.

03:40:08  3        Q.  All right.  And based upon that approximately

03:40:13  4    eight-hour examination, have you reached some

03:40:16  5    conclusions as to that hard drive?

03:40:20  6        A.  Yes, I have.

03:40:21  7        Q.  And the objects on it?

03:40:23  8        A.  Yes.

03:40:23  9        Q.  All right.  The first issue I want to discuss

03:40:28  10   with you is LimeWire.  Were you able to tell during the

03:40:34  11   course of your examination when the LimeWire was

03:40:38  12   installed?

03:40:38  13       A.  Yes, I was.

03:40:40  14       Q.  And what was the date of the LimeWire's

03:40:42  15   installation?

03:40:44  16       A.  I believe it was July 31st.

03:40:49  17       Q.  Of what year?

03:40:51  18       A.  Of 2010.

03:40:54  19       Q.  Would that be 2009?

03:40:56  20       A.  I'm sorry, that would be 2009.

03:40:59  21       Q.  July of 2009.  And is LimeWire still in

03:41:02  22   existence?

03:41:03  23       A.  Actually, recently it was shut down.

03:41:06  24       Q.  All right.  Now, do you recall the dates in

03:41:12  25   question when these 34 images and videos appeared on

03:41:21  1   Alex's hard drive?

03:41:22  2       A.  I know I created a report.  Off the top of my

03:41:27  3   head, I can't remember.

03:41:28  4       Q.  All right.  Would it be correct to say that they

03:41:32  5   were created between May -- the first week of May and

03:41:37  6   June 22 of 2011?

03:41:40  7       A.  I believe that those would be the dates, yes.

03:41:45  8       Q.  And the LimeWire itself was installed July of

03:41:47  9   '09?

03:41:48  10      A.  That's correct.

03:41:49  11      Q.  All right.  Now, there has been a good deal of

03:41:54  12  discussion during the course of this trial about two

03:41:59  13  deleted child pornography files on Alex's hard drive.

03:42:05  14  Do you recall finding the titles of those two images?

03:42:12  15      A.  Yes, I did.

03:42:13  16      Q.  And what did you discover about those two images?

03:42:18  17      A.  The images themselves, when you delete a file,

03:42:22  18  it's like --

03:42:23  19      Q.  I'm going to interrupt you.  Were those files

03:42:26  20  deleted?

03:42:27  21      A.  They were in the recycle bin, yes.

03:42:30  22      Q.  They were in the recycle bin, which means delete?

03:42:33  23      A.  You'd have to empty the recycle and restore it,

03:42:37  24  then it would no longer be in the recycle bin.

03:42:40  25      Q.  If a person doesn't want to see something, they

03:42:43  1   put it in the recycle bin?

03:42:44  2       A.  Yes.

03:42:46  3       Q.  Continue.

03:42:47  4       A.  Recycle is like your waste paper basket at home.

03:42:50  5   You read the morning newspaper; you're done with it.

03:42:54  6   Crumple it up and throw it in the -- the recycle bin, I

03:42:58  7   guess, or regular garbage can.

03:43:01  8       Q.  For approximately how many years have you been

03:43:03  9   doing computer forensic analysis as it pertains to child

03:43:08  10  pornography?

03:43:08  11      A.  About 15 now, 15 years.

03:43:11  12      Q.  Has it been your experience that people

03:43:14  13  interested in child pornography typically put files in

03:43:18  14  the recycle bin?

03:43:20  15      A.  No.  Quite the contrary.

03:43:22  16      Q.  What do they usually do with them?

03:43:24  17      A.  Based on my experience and what I've seen in

03:43:28  18  doing these type of cases is they like to have instant

03:43:31  19  access to these files.  A pedophile wants to create

03:43:36  20  folders; one folder may say boys, another folder girls,

03:43:40  21  and they put it either on their desktop or My Documents.

03:43:44  22  So what they do is they create folders, categorize the

03:43:47  23  images, organize the images.

03:43:49  24      Q.  And you did not see that with these two deleted

03:43:52  25  files?

03:43:52  1      A.   No.

03:43:55  2      Q.   During the course of your examination, did you

03:44:00  3  learn if any search terms had been put into the computer

03:44:05  4  which would generate child pornography?

03:44:08  5      A.   The search terms that I did find on the computer

03:44:11  6  related to music.  I saw nothing indicative of someone

03:44:17  7  actively searching child pornography.  When I say

03:44:20  8  indicative, as far as the key words, it's like typing in

03:44:24  9  Lolita, PTHC, and having the screen populate.

03:44:28  10     Q.   So you're talking about an internet search right

03:44:30  11 now, correct?

03:44:31  12     A.   Both the internet and I did an examination for

03:44:33  13 LimeWire, looking for fragments.

03:44:36  14     Q.   So we have internet searches and we have LimeWire

03:44:38  15 searches.  Let's first clarify the internet searches.

03:44:42  16 Did you find any search terms indicative of a hunt for

03:44:47  17 child pornography?

03:44:49  18     A.   On the internet searches, no.

03:44:52  19     Q.   How about LimeWire?

03:44:53  20     A.   LimeWire I had to look for fragments, and I saw

03:44:56  21 nothing, no key words in LimeWire that would be

03:44:59  22 indicative of child porn.

03:45:03  23     Q.   Let's zero in on the 34 images which were the

03:45:09  24 subject of this trial.  Do you recall finding the

03:45:17  25 headings for those 34 images?

353

03:45:21    1        A.   I found the file names, yes.

03:45:28    2        Q.   And did you -- strike that.

03:45:31    3             How did you go about finding those file names?

03:45:34    4        A.   As I mentioned earlier, I used this program

03:45:36    5   EnCase.   In going through the government's 302 and the

03:45:44    6   computer, I made a comparison.

03:45:48    7        Q.   Now, yesterday when the government's expert,

03:45:52    8   Detective Morford, testified, he showed us a screen of

03:45:57    9   those 34 titles.

03:45:58   10        A.   Okay.

03:45:59   11        Q.   And the accessed time was virtually the same time

03:46:06   12   as the created time.   What, in your expert opinion, does

03:46:11   13   that mean, if anything?

03:46:13   14        A.   Well, let's talk about the created time and the

03:46:17   15   last accessed time.   The created time on the computer is

03:46:20   16   when that file comes from the internet.   When it's being

03:46:24   17   downloaded from the internet it's a series --

03:46:27   18        Q.   I'm going to interrupt you.   How does this stuff

03:46:31   19   just come from the internet without you asking for it?

03:46:33   20        A.   Well, it can be either pop-ups, there's numerous

03:46:37   21   amounts of ways that these can come from the internet.

03:46:40   22   You can do downloads from LimeWire or peer-to-peer

03:46:46   23   programs.

03:46:46   24        Q.   The bottom line is, it's coming?

03:46:48   25        A.   It's coming.   And it's coming in as literally

03:46:51  1    ones and zeros.  The information is being downloaded to

03:46:54  2    the computer.  The computer then populates and creates a

03:46:58  3    file name from these ones and zeros.  It becomes stored

03:47:03  4    on your computer.

03:47:04  5         When it's first stored on your computer, it's

03:47:07  6    called the created date.  So that's the date it's

03:47:10  7    created on your computer hard drive.  So that's the date

03:47:15  8    in which it was first stored.

03:47:17  9    Q.   So that gets a time that's indicated on the

03:47:19  10   screen?

03:47:20  11   A.   Right.  That's time stamped.

03:47:23  12   Q.   That's basically the inbox?

03:47:25  13   A.   Exactly.

03:47:26  14   Q.   Then why is the accessed time on virtually all of

03:47:31  15   those documents' last access -- that is to say, why is

03:47:36  16   that virtually the same?

03:47:37  17   A.   Let's talk about last access, and then make a

03:47:40  18   comparison.  Last access is when you take that mouse and

03:47:44  19   you move the pointer on the screen, and you double click

03:47:47  20   on that file.  It's when you open up that file

03:47:52  21   physically.  It's going to take you maybe four, five,

03:47:57  22   six, seven seconds to open that file.  So you're going

03:48:00  23   to see a date and time stamp of when it first came on

03:48:03  24   your computer, and a date and time stamp of when the

03:48:06  25   user last opened it, viewed it, accessed it.  If they're

03:48:10  1  identical, the file created date and time and the last

03:48:13  2  access date and time, down to the second, that's showing

03:48:18  3  me the file hasn't been double clicked on and opened and

03:48:21  4  viewed.

03:48:22  5      Q.  So yesterday when we saw that laundry list of 34

03:48:26  6  names with the created times and the last access times

03:48:35  7  all being the same, that is to say the created is the

03:48:41  8  same time as the last access, for virtually each of

03:48:46  9  those 34 entries, what does that mean?

03:48:48  10     A.  Well, that means it was on the computer but was

03:48:52  11  never opened, never viewed, never displayed.

03:48:54  12     Q.  Was it ever filed?

03:48:56  13     A.  I'm sorry?

03:48:57  14     Q.  Ever filed?

03:48:58  15     A.  No.

03:48:58  16     Q.  Ever downloaded?

03:49:00  17     A.  It was on the computer because that's your

03:49:02  18  created date.  But when it became on your computer, it

03:49:06  19  wasn't opened.

03:49:07  20     Q.  In laymen's terms, does that mean that anyone

03:49:12  21  opened it and watched that video?

03:49:14  22     A.  No.

03:49:14  23     Q.  Or looked at that image?

03:49:16  24     A.  Not with the times being identical, no.

03:49:19  25     Q.  All right.  Now, we also had a discussion

03:49:23   1    yesterday about IP addresses and MAC addresses.  Did you

03:49:35   2    review the discovery documents in this case?

03:49:37   3       A.  Yes, I have.

03:49:38   4       Q.  All right.  And what --

03:49:42   5           THE COURT:  If I can interrupt.  Ladies and

03:49:44   6    gentlemen, as Ms. Kelley used the term "discovery

03:49:47   7    documents," and what that means is documents that were

03:49:50   8    provided to her in the course of preparing for the

03:49:54   9    defense.  The, quote, "discovery" is kind of a legal

03:49:58  10    term of art.

03:49:59  11           Go ahead.  I apologize for interrupting.

03:50:01  12           MS. KELLEY:  No, that's fine.  Thank you.

03:50:03  13    BY MS. KELLEY:

03:50:04  14       Q.  Now, was this child pornography traced to an IP

03:50:13  15    address or to a MAC address?

03:50:15  16       A.  The CP in this matter was traced to an IP

03:50:22  17    address.

03:50:22  18       Q.  And CP is?

03:50:23  19       A.  Child pornography.

03:50:25  20       Q.  So the child pornography was traced to the router

03:50:28  21    address?

03:50:29  22       A.  It was traced back to the router.

03:50:34  23       Q.  What would have happened if the child pornography

03:50:38  24    had been traced to -- strike that.

03:50:42  25           What would have happened if law enforcement would

03:50:44  1   have looked for the MAC address?

03:50:46  2       A.  Well, the MAC address is an acronym.  What that

03:50:51  3   is, it's unique to that particular computer.  Every

03:50:56  4   computer in this courtroom that connects to the internet

03:51:01  5   has a separate different MAC address.  So it's like a

03:51:04  6   finger print of that particular computer.

03:51:06  7       Q.  So in other words, through the IP address you can

03:51:10  8   determine what router, what building things are coming

03:51:17  9   from, correct?

03:51:18  10      A.  That's correct.

03:51:19  11      Q.  But through the MAC address you can actually

03:51:22  12  determine the actual physical computer?

03:51:24  13      A.  Right.  You can determine the -- kind of an

03:51:26  14  analogy here is you can determine the actual computer

03:51:30  15  and what room it's in in the house.  To give an analogy

03:51:34  16  of -- you can trace it back to a house, and this will

03:51:37  17  actually tell you what computer, where to go.

03:51:42  18      Q.  And there can be lots of individual MAC addresses

03:51:46  19  within an IP address, correct?

03:51:49  20      A.  Right.  Nowadays in homes people have more than

03:51:54  21  one computer; you have iPads that with a MAC address,

03:51:59  22  multiple laptops.  My four-year-old now has his own

03:52:03  23  iPad, and that has a separate MAC address.

03:52:08  24      Q.  So the IP address in this case was traced to Alex

03:52:14  25  Cook, correct?

03:52:15   1     A.   It was traced to the residence.

03:52:17   2     Q.   To the residence of Alex Cook?

03:52:19   3     A.   That's correct.

03:52:20   4     Q.   And simply because an IP address is issued to an

03:52:26   5   individual, does that indicate identity?

03:52:30   6     A.   What is it does is it indicates a location.

03:52:36   7     Q.   A location.   It doesn't necessarily indicate a

03:52:38   8   specific user?

03:52:39   9     A.   No.   Absolutely not.

03:52:41   10     Q.   Now, is there any way of determining who was

03:52:47   11   actually sitting at the keyboard of the IP address in

03:52:53   12   question in this case?

03:52:54   13     A.   Not in this case.   The way I try to do it in

03:53:00   14   other cases is laptops now all have kind of a webcam

03:53:07   15   attached to the top of it.   Certain computers now, when

03:53:11   16   you hit the power button and turn it on, it actually

03:53:14   17   will take a picture of the person behind the keyboard.

03:53:17   18     Q.   But was there a web cam like this in this case?

03:53:21   19     A.   No.   Not in this case.

03:53:22   20     Q.   So we have no picture of actually who was sitting

03:53:25   21   at the computer during these 34 incidents in question?

03:53:29   22     A.   No, not in this case, no.

03:53:32   23     Q.   Now, you mentioned a password a couple moments

03:53:36   24   ago.   When you examined Alex's hard drive, were you able

03:53:44   25   to determine if anyone could just get on the computer?

03:53:49   1       A.   When I was looking over the hard drive, there was

03:53:54   2   a device on the computer that -- a biometric thing.  All

03:53:58   3   you have to do is swipe your finger once and the

03:54:01   4   computer is open.  So you don't have -- the screen

03:54:06   5   saver's not coming on and asking for the password.

03:54:10   6       Q.   So if you were to swipe your finger once on the

03:54:13   7   biometric device then get up and go to the fridge, could

03:54:17   8   I climb into your seat and get on the computer?

03:54:20   9       A.   Oh, sure.

03:54:22  10            MS. KELLEY:  May I have a moment, Your

03:54:26  11   Honor?

03:54:27  12            THE COURT:  Sure.

03:54:27  13            (Discussion had off the record.)

03:54:34  14   BY MS. KELLEY:

03:54:35  15       Q.   Were there any default settings on the LimeWire?

03:54:38  16       A.   They're all default.

03:54:39  17       Q.   What do you mean by that?

03:54:40  18       A.   When you download LimeWire from the internet, it

03:54:45  19   comes in and a screen pops up; it says -- it will give

03:54:50  20   you some configurations after LimeWire's been

03:54:54  21   downloaded.  You hit that "next" button.  Another screen

03:54:58  22   comes up, gives you some settings, go ahead and hit that

03:55:01  23   "next" button.  Really based on what I've seen everyone

03:55:06  24   generally uses the default because it's too complicated

03:55:10  25   to reconfigure LimeWire.  All they do is hit "next," and

03:55:13   1    it's installed.

03:55:14   2              MS. KELLEY:  Thank you, Your Honor.  I have

03:55:15   3    no more questions.

03:55:16   4              THE COURT:  Mr. Crawford or Mr. Secor?

03:55:19   5              MR. SECOR:  Mr. Crawford will be

03:55:21   6    questioning.

03:55:41   7              THE COURT:  Counsel, do you want to approach

03:55:43   8    for one second?

03:55:43   9              (The following discussion was had at the

03:56:44  10    bench outside the hearing of the jury:)

03:56:44  11              THE COURT:  Do you want her to read back

03:56:44  12    whatever you missed?

03:56:44  13              MR. CRAWFORD:  No, Judge, that's fine.  I

03:56:44  14    can just ask him briefly.

03:56:44  15              THE COURT:  I'm glad to let you do it.

03:56:46  16              (End of sidebar discussion).

03:57:11  17                        - - -

03:57:11  18          MARK VASSEL, CROSS-EXAMINATION

03:57:12  19    BY MR. CRAWFORD:

03:57:12  20      Q.  Mr. Vassel, you examined Mr. Cook's computer; is

03:57:15  21    that true?

03:57:15  22      A.  Yes, I did, sir.

03:57:16  23      Q.  You also examined a mirror image of the laptop?

03:57:19  24      A.  I examined the mirror image of the laptop.

03:57:22  25      Q.  You found that mirror image to be identical to

03:57:25  1  the actual laptop hard drive itself?

03:57:28  2      A.  That's correct.

03:57:28  3      Q.  You produced your report in this case; is that

03:57:31  4  true?

03:57:31  5      A.  Yes, I did.

03:57:32  6      Q.  It was dated August 24, 2011?

03:57:36  7      A.  Yes.

03:57:37  8      Q.  You made a number of conclusions in that report?

03:57:39  9      A.  Yes, I did.

03:57:39  10     Q.  Have any of your conclusions you made in that

03:57:42  11  report changed since you issued it?

03:57:44  12     A.  No.

03:57:45  13     Q.  Page 5 of your report you indicated that there

03:57:48  14  were file names which, if opened, contained images of

03:57:50  15  movies that a jury could find to depict minors engaged

03:57:54  16  in various forms of undress.  Where were those file

03:57:57  17  names?

03:57:57  18     A.  I'm sorry?

03:57:58  19     Q.  Where were those file names that you indicated

03:58:00  20  that you found that contained images and movies that a

03:58:04  21  jury could find minors in various forms of undress?

03:58:09  22     A.  Those were in the shareholder.

03:58:11  23         THE COURT:  Excuse me.  You're too young to

03:58:18  24  perhaps understand 45 and 78.  Will you go a little

03:58:22  25  slower.

03:58:22  1            MR. CRAWFORD:  I will.

03:58:23  2   BY MR. CRAWFORD:

03:58:24  3      Q.  Let me start again.  You indicated in your report

03:58:27  4   that you located file names which, if opened, contained

03:58:30  5   images and movies that a jury could find to depict

03:58:33  6   minors engaged in various forms of undress.  Is that

03:58:37  7   true?

03:58:37  8      A.  That's true.

03:58:42  9      Q.  And those files were located in the LimeWire

03:58:46  10  saved folder?

03:58:47  11     A.  I believe some of them, yes.

03:58:49  12     Q.  And when you're reviewing, why did you choose

03:58:52  13  some file names over others to check to see if they

03:58:56  14  contained child pornography?

03:58:57  15     A.  What I did is I focused on the 302 that was

03:59:00  16  provided, the undercover session.  When I say the

03:59:04  17  undercover session, the FBI did their peer-to-peer

03:59:08  18  investigation, gave me a report, when I say a 302, of

03:59:13  19  the files that they found.

03:59:14  20     Q.  And the file names that were listed in the 302,

03:59:17  21  you found those to be consistent with names that depict

03:59:22  22  child pornography; is that true?

03:59:23  23     A.  Yes.

03:59:24  24     Q.  And you indicated that you found LimeWire 5.3.6,

03:59:28  25  that's the version number, you found that installed on

03:59:30  1  the laptop?

03:59:31  2      A.  Yes, I did.

03:59:32  3      Q.  It was installed July 31, 2009?

03:59:34  4      A.  That's correct.

03:59:40  5      Q.  You further indicated that you conducted a review

03:59:43  6  of the saved file folder and located file names which,

03:59:48  7  if opened, would display images, music, or movies that

03:59:54  8  could be viewed by the computer system?

03:59:55  9      A.  That's correct.

04:00:17  10     Q.  Let me show you a page from Government's Exhibit

04:00:19  11  15, if I could.

04:00:26  12             MR. CRAWFORD:  We're working on it.

04:00:34  13             THE COURT:  It looks like a Persian rug.

04:00:36  14             MR. CRAWFORD:  The original looks a lot

04:00:39  15  better.

04:01:20  16             THE COURT:  Seriously, can you tell what the

04:01:24  17  problem is?

04:01:25  18             THE WITNESS:  The resolution on the laptop?

04:01:52  19  BY MR. CRAWFORD:

04:01:53  20     Q.  All right.  Well, we'll just talk about it.  So

04:01:55  21  you opened Windows Explorer.  You were able to do that

04:01:58  22  with the image?

04:01:59  23     A.  What I used was EnCase.  I'm not -- you have to

04:02:06  24  use forensically sound software, just because you don't

04:02:11  25  want to go changing -- altering the dates and times.

04:02:20   1            MR. CRAWFORD: We're back in business.

04:02:28   2    BY MR. CRAWFORD:

04:02:28   3       Q.   Okay.  Do you see an image there?  It's a page

04:02:31   4    from Government's Exhibit 15.

04:02:34   5       A.   My monitor is still --

04:02:36   6            MS. KELLEY:  Excuse me.  My monitor is

04:02:39   7    blurry as well.

04:02:46   8    BY MR. CRAWFORD:

04:02:47   9       Q.   The images you looked at in "LimeWire saved,"

04:02:51  10    where in the file structure of the computer were they

04:02:54  11    located, if you could explain that?

04:02:55  12       A.   As far as the file structure they're within the

04:02:58  13    LimeWire program.  When you saw LimeWire you have

04:03:01  14    incomplete -- a folder called the "incomplete

04:03:04  15    installed," "shared installed" or "saved," depending on

04:03:07  16    the version of LimeWire and stored purchased.

04:03:11  17       Q.   And the LimeWire "saved" folder is populated by

04:03:16  18    LimeWire saved folders?

04:03:19  19       A.   That's true.

04:03:20  20       Q.   In that LimeWire saved folder on the laptop you

04:03:26  21    identified and were able to find all of the files that

04:03:29  22    were downloaded in the undercover session; is that true?

04:03:32  23       A.   That's true.

04:03:33  24       Q.   The undercover session you understand to be an

04:03:36  25    FBI agent in Oklahoma who downloaded child pornography

04:03:40  1   sessions over the internet?

04:03:41  2       A.   That's correct.

04:03:42  3       Q.   You found that the images from the undercover

04:03:55  4   session from the FBI agent in Oklahoma came from an IP

04:03:58  5   address that was linked to Mr. Cook's internet service

04:04:01  6   account?

04:04:02  7       A.   Right.   I did find the images.

04:04:03  8       Q.   You found evidence that LimeWire's file sharing

04:04:08  9   was turned on?

04:04:09  10      A.   That's correct.

04:04:09  11      Q.   And you conducted a review of the most recently

04:04:12  12  used items for Windows?

04:04:14  13      A.   Yes, I did.

04:04:15  14      Q.   And there were numerous adult pornographic links

04:04:19  15  that were found there?

04:04:20  16      A.   That's true.

04:04:21  17      Q.   You also conducted a review of the incomplete

04:04:23  18  folder?

04:04:24  19      A.   Yes, I did.

04:04:25  20      Q.   And the incomplete folder is a folder that

04:04:28  21  contains information about LimeWire files that are to be

04:04:33  22  downloaded but have to not been downloaded?

04:04:36  23      A.   That's true.

04:04:37  24      Q.   You said there are file names in the incomplete

04:04:40  25  folder consistent with possible pornography involving a

04:04:43  1  minor?

04:04:44  2      A.  That's true.

04:04:46  3      Q.  And the reason you concluded that is because some

04:04:50  4  of those file names contained terms that are commonly

04:04:55  5  associated with child pornography; is that true?

04:04:57  6      A.  Yes.

04:05:07  7      Q.  And some of those file names, Lolita for one, is

04:05:13  8  that one consistent with child pornography?

04:05:15  9      A.  I've seen it in other cases, yes.

04:05:19  10      Q.  And do you recall the date -- and the incomplete

04:05:28  11  file, that that was created?

04:05:30  12      A.  Not off the top of my head.

04:05:31  13      Q.  Could I show you a copy of your report.  Would

04:05:34  14  that refresh your recollection?

04:05:35  15      A.  Yes.

04:05:37  16          THE COURT:  Before we do, for purpose of

04:05:40  17  identification can we have it marked, whether it goes

04:05:43  18  back to the jury or not, just so the record shows what

04:05:46  19  we're talking about.

04:05:58  20          MS. KELLEY:  Gene --

04:05:59  21          MR. CRAWFORD:  It's appendix F to his

04:06:06  22  report.

04:06:10  23  BY MR. CRAWFORD:

04:06:10  24      Q.  Let me hand you what's been marked as

04:06:12  25  Government's Exhibit 21.  And what is that document?

04:06:17   1      A.   The exhibit here, 21, is the files contained

04:06:23   2   within the incomplete folder.

04:06:24   3      Q.   And is that a list of the incomplete file and

04:06:28   4   incomplete folder for LimeWire; is that true?

04:06:31   5      A.   True.

04:06:31   6      Q.   Could you locate a file name there, I believe the

04:06:34   7   first word is "German."

04:06:41   8      A.   Okay.  I found it.

04:06:42   9      Q.   Could you read that file name, please.

04:06:44  10      A.   File name German school girls in pretty orgy

04:06:51  11   Devon C XXX porno sexy girl Lolita Russian dick fuck

04:07:00  12   suck child PEDO lesbian animal sister brother

04:07:04  13   masturbating humping.

04:07:06  14      Q.   That is a file to be downloaded from LimeWire?

04:07:09  15      A.   That's correct.

04:07:09  16      Q.   What's the file created date under there?

04:07:13  17      A.   The file created date would be 4/2, 2010 at

04:07:17  18   1:30 -- 2:30 a.m.

04:07:27  19      Q.   And there were other files in the incomplete

04:07:31  20   consistent with child pornography?

04:07:33  21      A.   There were.

04:07:34  22      Q.   Virgin teen gets raped in her own house.  Is that

04:07:38  23   consistent with child pornography?

04:07:39  24      A.   It can --

04:07:40  25      Q.   Illegal preteen underage Lolita?

04:07:44  1      A.  Preteen, yes.

04:07:45  2      Q.  You never actually saw these files?

04:07:48  3      A.  No.  They're incomplete.

04:07:49  4      Q.  But you saw the file names, and that indicated to

04:07:52  5  you possible child pornography?

04:07:53  6      A.  Right.  I'm able to identify the file names after

04:07:57  7  doing this for a while.

04:08:02  8      Q.  And isn't it true when you're surfing for child

04:08:05  9  pornography you look at the file names as a good

04:08:07  10  indicator of whether a file might, in fact, depict

04:08:10  11  children engaged in sexually explicit conduct?

04:08:13  12      A.  It's an okay indicator.  I've had it where you

04:08:16  13  double click on a file and it's renamed, a renamed file.

04:08:21  14      Q.  The converse is true?

04:08:22  15      A.  Exactly.

04:08:24  16      Q.  You also indicated in your testimony that of the

04:08:28  17  files you reviewed in the LimeWire saved folder, the

04:08:31  18  created time and the last accessed time matched?

04:08:36  19      A.  That's correct.

04:08:36  20      Q.  And the testimony, as I understand it, was once a

04:08:41  21  file is created, it has a created date, then each time

04:08:43  22  it's viewed the accessed date is updated?

04:08:45  23      A.  That's correct.

04:08:46  24      Q.  So if a file was created last year, viewed this

04:08:49  25  morning, the created time would be last year, the

04:08:51  1  accessed date would be sometime today?

04:08:53  2     A.  It could also be an antivirus running.

04:08:57  3     Q.  What version of Microsoft windows was Mr. Cook

04:09:00  4  running?

04:09:01  5     A.  I know I created an exhibit on it.  I want to say

04:09:09  6  it was either 7 or Vista.

04:09:33  7     Q.  Mr. Vassel, handing you what's been marked

04:09:35  8  Government's Exhibit 22.  What's that document?

04:09:37  9     A.  This document here, Government's Exhibit 22, is

04:09:42  10  information about the Windows on the system.

04:09:45  11     Q.  Okay.  And do you have recorded there what

04:09:48  12  version of windows Mr. Cook was running?

04:09:52  13     A.  It says Windows 2009.  Okay, Windows Vista

04:10:14  14  Ultimate.

04:10:15  15     Q.  Does Windows Vista Ultimate have a feature that

04:10:25  16  would update last accessed?

04:10:27  17     A.  Yes, it does.

04:10:28  18     Q.  Okay.  And isn't it true that Windows Vista

04:10:32  19  Ultimate when it's sold off the shelf, it comes from the

04:10:35  20  factory with that last accessed time updating feature

04:10:39  21  turned off?

04:10:39  22     A.  It depends on the installation.  In this case it

04:10:43  23  was actually turned on.

04:10:45  24     Q.  It was turned on?

04:11:16  25         Mr. Vassel, I'm handing you what's been marked

| | | |
|---|---|---|
| 04:11:18 | 1 | Government's Exhibit 23.  What is that document? |
| 04:11:22 | 2 | A.  This is the saved document I created. |
| 04:11:29 | 3 | Q.  What sort of information is listed there? |
| 04:11:30 | 4 | A.  You have the file created, last accessed, and |
| 04:11:35 | 5 | full file path. |
| 04:11:36 | 6 | Q.  And about how many files are in that folder? |
| 04:11:45 | 7 | A.  I thought there was over 800. |
| 04:11:48 | 8 | Q.  Okay.  And that is a printout of information |
| 04:11:50 | 9 | including last accessed times and created times for the |
| 04:11:55 | 10 | files that were in Mr. Cook's LimeWire saved folder? |
| 04:11:58 | 11 | A.  That's correct. |
| 04:11:59 | 12 | Q.  Out of all of those files, those 100 pages, can |
| 04:12:03 | 13 | you identify a single file that does not have a matching |
| 04:12:05 | 14 | created and accessed time? |
| 04:12:09 | 15 | A.  It might take a little bit here. |
| 04:12:11 | 16 | Q.  Sure. |
| 04:12:14 | 17 | THE COURT:  Can you represent to him whether |
| 04:12:15 | 18 | that is so or not? |
| 04:12:15 | 19 | BY MR. CRAWFORD: |
| 04:12:19 | 20 | Q.  Mr. Vassel, there isn't a single file that has a |
| 04:12:22 | 21 | different created time from its accessed time? |
| 04:12:24 | 22 | THE COURT:  Can you dispute that? |
| 04:12:26 | 23 | THE WITNESS:  No. |
| 04:12:26 | 24 | Q.  So it's your opinion of the 800 files, Mr. Cook |
| 04:12:31 | 25 | never viewed a single one? |

04:12:33  1      A.   He would have to go to the saved folder and

04:12:35  2  double click on the Keri Hilson, Knock You Down, Kanye

04:12:40  3  West, and change that.

04:12:41  4      Q.   And he never did that for a single one of the

04:12:43  5  files in LimeWire?

04:12:44  6      A.   Nothing in there, no.

04:12:48  7      Q.   And if, in fact, the last accessed updating

04:12:52  8  feature had been turned off, then the fact that -- the

04:12:55  9  saved times and the accessed times would tell us nothing

04:12:58  10  about how many times a given file was viewed; isn't that

04:13:01  11  true?

04:13:01  12      A.   Even if it was turned on or off, you can't make

04:13:04  13  that determination.

04:13:06  14      Q.   Okay.  Evidence of key word searches.

04:13:08  15      A.   Yes.

04:13:09  16      Q.   It's true that LimeWire runs by key words; is

04:13:11  17  that correct?

04:13:12  18      A.   That's correct.

04:13:13  19      Q.   All right.  And it's true that a LimeWire user,

04:13:25  20  when they enter key words into LimeWire, LimeWire

04:13:28  21  searchs the Gnutella network for other LimeWire users

04:13:32  22  that would have file names that match those search

04:13:34  23  terms?

04:13:34  24      A.   That is true.

04:13:35  25      Q.   So, for example, if someone typed in the word

04:13:37  1   Jimmy Hendrix, they would get songs back with the word

04:13:41  2   Jimmy Hendrix in the file name?

04:13:43  3       A.   Right.

04:13:43  4       Q.   If someone typed in Lolita, they would get file

04:13:47  5   names back, maybe a copy of the book Lolita, maybe child

04:13:51  6   pornography?

04:13:51  7       A.   That's correct.

04:13:52  8       Q.   So it's true that if somebody typed in illegal

04:13:57  9   preteen underage Lolitas, they would get back file names

04:14:01  10  that contained illegal underage Lolitas?

04:14:04  11      A.   That's true.

04:14:05  12      Q.   And if they select those files to view them, a

04:14:09  13  copy of that file goes into the saved folder?

04:14:12  14      A.   Yes.

04:14:12  15      Q.   And a copy of that file contains the same name as

04:14:15  16  what was produced in the search result, true?

04:14:21  17      A.   Generally LimeWire file names are long.  There

04:14:23  18  could be 26 different letters or words in it.  But it

04:14:29  19  would have to contain at least a portion of that, yes.

04:14:32  20      Q.   You said you indicated that you did some review

04:14:35  21  of key word searching in LimeWire?

04:14:37  22      A.   Some of the fragments.  LimeWire doesn't maintain

04:14:41  23  the entire list of key words, but it does go through

04:14:45  24  page fragments or virtual memory of the machine.

04:14:48  25      Q.   By "fragments" you mean incomplete information?

04:14:51  1    A.  By "fragments," whatever file search term is

04:14:55  2    recoverable.

04:14:56  3    Q.  So there may be some that are unrecoverable?

04:14:59  4    A.  That's true.

04:15:05  5              MR. CRAWFORD: I have no further questions,

04:15:07  6    Judge.

04:15:07  7              THE COURT:  Redirect?

04:15:13  8                        - - -

04:15:13  9              MARK VASSEL, REDIRECT EXAMINATION

04:15:15  10   BY MS. KELLEY:

04:15:15  11   Q.  Mark, I'm going to try to put what happened in

04:15:24  12   English.  First of all, let's go to that exhibit marked

04:15:33  13   incomplete.

04:15:34  14   A.  Okay.

04:15:40  15             MS. KELLEY:  Could I approach the witness?

04:15:50  16             THE COURT:  Of course.  I'm sorry.  It's

04:15:55  17   not necessary for you to ask.  No problem.  I know it's

04:15:58  18   a matter of protocol that's drilled into you in law

04:16:01  19   school.

04:16:02  20             MS. KELLEY:  Thank you.

04:16:02  21             THE COURT:  But it's quite all right.

04:16:04  22   BY MS. KELLEY:

04:16:04  23   Q.  Mark, I'm handing you a document you previously

04:16:07  24   looked at.  Could you tell the jury what it is.

04:16:09  25   A.  It's the incomplete file folder.

04:16:11  1          THE COURT:  What exhibit number is it,

04:16:13  2  please, for the record?

04:16:14  3          MR. CRAWFORD: Judge, it's 21.  I took it

04:16:16  4  back.  You're certainly welcome to use it.

04:16:21  5  BY MS. KELLEY:

04:16:21  6      Q.  And this is a two-page document, correct?

04:16:23  7      A.  That's correct.

04:16:24  8      Q.  Now, the undercover session that we're talking

04:16:31  9  about, that is to say the session that was run by the

04:16:36  10  fellow in Oklahoma, that was from approximately June

04:16:41  11  through September, correct?

04:16:42  12      A.  That's correct.

04:16:44  13      Q.  All right.  And this document has a few dates

04:16:47  14  that predate that, correct?

04:16:49  15      A.  Yes.

04:16:50  16      Q.  Okay.  Starting at the very top, would you give

04:16:59  17  the date the file was created and the name of that file.

04:17:06  18      A.  Yes.  In fact, looking at the incomplete,

04:17:11  19  Government's Exhibit 1.

04:17:14  20      Q.  21.

04:17:15  21      A.  One of the questions was:  Show me a date or

04:17:17  22  something in LimeWire where -- out of the 800 files

04:17:22  23  where they don't match.  Number one is actually an

04:17:26  24  example, a file folder --

04:17:29  25      Q.  Mark, I'm going to interrupt you.  Can you just

04:17:31   1   go through this list and give us the dates that these --

04:17:37   2   these dozen or so files have?

04:17:42   3       A.   Well, the first one here is going to be the

04:17:44   4   LimeWire incomplete folder.   It was created July 31,

04:17:48   5   2009.

04:17:49   6       Q.   The next?

04:17:49   7       A.   The last accessed --

04:17:52   8       Q.   No, just give the date of the next one.

04:17:54   9       A.   The next one is 4/19, 2010.

04:17:58   10       Q.   And the next?

04:17:58   11       A.   2/17, 2010.

04:18:00   12       Q.   Uh-huh.

04:18:01   13       A.   4 -- 04/02, 2010.

04:18:05   14       Q.   Uh-huh?

04:18:06   15       A.   5/13/2010, 9/3/2010, 6/23/2010, 9/3/2010,

04:18:28   16   9/14/2010.

04:18:30   17       Q.   All right.   So by my calculation, three of these

04:18:35   18   files predated the undercover session, correct?

04:18:39   19       A.   That's correct.

04:18:40   20       Q.   That is to say the one -- two in April and one in

04:18:45   21   February?

04:18:46   22       A.   That's correct.

04:18:47   23       Q.   And these three files have names that are

04:18:53   24   suggestive of child pornography, correct?

04:18:55   25       A.   Yes.

04:18:57  1     Q.   Notwithstanding the fact that all of these files

04:19:04  2  are sitting in the incomplete folder or file or whatever

04:19:11  3  you call it, is there any indication whatsoever that any

04:19:16  4  of those files, whether they fall within the undercover

04:19:22  5  session or predate the undercover session, were actually

04:19:28  6  viewed?

04:19:28  7     A.   No.  In fact --

04:19:30  8     Q.   How about downloaded?

04:19:32  9     A.   They're in the process or maybe partially, but

04:19:36  10 they haven't been completely downloaded.  You can't view

04:19:40  11 files normally through the incomplete.  Double click on

04:19:45  12 it, it's not going to --

04:19:47  13    Q.   So the bottom line is this holds no significance

04:19:49  14 whatsoever?

04:19:50  15    A.   No.  None.

04:19:51  16    Q.   Then moving on --

04:19:56  17            THE COURT:  Let me ask -- can you approach

04:19:59  18 one second?

04:19:59  19            (Whereupon the following discussion was had

04:21:17  20 at the bench outside the hearing of the jury:)

04:21:17  21            THE COURT:  I'm confused by that answer, no

04:21:17  22 significance whatsoever.  It's dangling.  It's your

04:21:17  23 case.  I'm saying when I heard it, I didn't understand

04:21:17  24 it.  It was a dangling participle.

04:21:17  25            And, Gene, slow down a little bit.

04:21:18  1   Seriously.  I had a case, Brendan Sullivan's case.  He

04:21:18  2   once actually held up a sign to Barry Simon telling him

04:21:18  3   to slow down.

04:21:18  4                 (End of sidebar discussion.)

04:21:19  5                 THE COURT:  Thank you.  I apologize for the

04:21:21  6   interruption.  You may continue.

04:21:23  7   BY MS. KELLEY:

04:21:24  8       Q.  Mark, I'm going to have you complete or explain

04:21:30  9   the last point you raised in regard to the files posted

04:21:36  10  on the incomplete setting.  Is there any significance at

04:21:45  11  all to the fact that these title names appear in the

04:21:52  12  incomplete file?

04:21:53  13      A.  I guess the significance is you can't open it.

04:22:00  14  The -- there's -- it's impossible.  I can open it as --

04:22:08  15      Q.  And you can conclude that these files were never

04:22:11  16  opened, correct?

04:22:12  17      A.  That's correct.

04:22:13  18      Q.  Never downloaded?

04:22:15  19      A.  Never viewed.

04:22:16  20      Q.  Never viewed, organized?

04:22:17  21      A.  That's correct.

04:22:18  22      Q.  They were just there?

04:22:20  23      A.  That's correct.

04:22:25  24      Q.  Thank you.  Now, I want to go to that huge

04:22:28  25  attachment called -- the 100-page attachment.  What,

04:22:35  1    again, was that called?

04:22:36  2        A.  It's the saved folder.

04:22:39  3        Q.  The saved folder.  Now, as Mr. Crawford pointed

04:22:45  4    out, virtually every one of those files has the same

04:22:51  5    time of creation as the time of accessed.

04:22:55  6        A.  That's correct.

04:22:57  7        Q.  Now, should we then conclude that -- well, strike

04:23:02  8    that.  Not all of the titles that appear on there are

04:23:08  9    child pornography, are they?

04:23:09  10       A.  No.  There's quite a few music, MP3, music files.

04:23:14  11       Q.  And there's a little adult porn thrown in there

04:23:17  12   too, isn't there?

04:23:18  13       A.  Yes.

04:23:18  14       Q.  Are we to conclude that there were just 800 files

04:23:22  15   sitting on this computer that had never been listened to

04:23:27  16   or viewed or anything?

04:23:28  17       A.  In this attachment you can conclude they haven't

04:23:34  18   been opened or viewed or displayed.

04:23:36  19       Q.  Why on earth would someone have a bunch of music

04:23:39  20   on a computer and not listen to it?

04:23:41  21       A.  They don't know where it is, they haven't turned

04:23:47  22   their computer on, or they may not even know how to

04:23:51  23   navigate to it.

04:23:51  24       Q.  ^  sometimes when people get on LimeWire and give

04:23:55  25   a request, it's kind of a bulk request, isn't it?

04:23:58  1    A.  You can select.  It's kind of a misnomer with

04:24:00  2  users where -- in other cases that I've heard about

04:24:04  3  where everyone thinks you double click on one file and

04:24:08  4  you randomly select.  The truth of the matter is when

04:24:10  5  they use LimeWire they click on the first file, and they

04:24:15  6  take that cursor and they highlight a bunch of other

04:24:19  7  files and download those files.

04:24:22  8    Q.  So when you make a request, you get a lot of junk

04:24:25  9  mail as well?

04:24:25  10    A.  You get whatever has been highlighted.

04:24:29  11          MS. KELLEY:  May I have a moment, Your

04:24:30  12  Honor?

04:24:30  13          THE COURT:  Of course.

04:24:33  14          (Discussion had off the record.)

04:24:34  15          MS. KELLEY:  Nothing further.  Thank you.

04:24:35  16          THE COURT:  Cross.

04:24:38  17                  - - -

04:24:38  18          MARK VASSEL, RECROSS-EXAMINATION

04:24:39  19  BY MR. CRAWFORD:

04:24:39  20    Q.  Mr. Vassel, let me show you Government's Exhibit

04:24:45  21  21 again.  This is the incomplete folder.

04:24:54  22    A.  Okay.

04:24:55  23    Q.  This is a list of files selected for download on

04:25:00  24  LimeWire but had not been completed?

04:25:02  25    A.  That's correct.

04:25:03  1      Q.  So, for example, on April 19, 2010, someone using

04:25:06  2  this computer using LimeWire selected a file from

04:25:29  3  LimeWire to download entitled virgin teen gets raped in

04:25:33  4  her own house rape fantasy illegal preteen underage

04:25:38  5  Lolitas kiddie child incest triple-X porno gay fuck.

04:25:45  6  MPG.

04:25:46  7      A.  Yes.

04:25:47  8      Q.  It's also true on April 2, 2010, someone using

04:25:50  9  LimeWire selected a file entitled German school girls in

04:25:54  10  pre orgy Devon C triple-X porno sexy girl Lolita Russian

04:26:01  11  doing cock suck child PEDO animal brother sister

04:26:06  12  masturbating.  They selected that file for download; is

04:26:09  13  that correct?

04:26:09  14      A.  That's correct.

04:26:11  15            MR. CRAWFORD:  No further questions, Judge.

04:26:15  16            THE COURT:  Ms. Kelley?

04:26:17  17                    - - -

04:26:17  18        MARK VASSEL, FURTHER REDIRECT EXAMINATION

04:26:18  19  BY MS. KELLEY:

04:26:18  20      Q.  In terms of those last titles, any evidence that

04:26:21  21  that person actually viewed those files?

04:26:23  22      A.  No.

04:26:24  23      Q.  Saw them?

04:26:24  24      A.  No.

04:26:25  25      Q.  Opened them?

| | | |
|---|---|---|
| 04:26:26 | 1 | A.  No. |
| 04:26:26 | 2 | Q.  Categorized them? |
| 04:26:27 | 3 | A.  No. |
| 04:26:28 | 4 | Q.  Filed them? |
| 04:26:29 | 5 | A.  No. |
| 04:26:29 | 6 | Q.  Experienced them? |
| 04:26:31 | 7 | A.  No. |
| 04:26:32 | 8 | Q.  Did anything with them? |
| 04:26:34 | 9 | A.  No. |
| 04:26:36 | 10 | Q.  Any idea who was sitting at the keyboard? |
| 04:26:38 | 11 | A.  None. |
| 04:26:40 | 12 | MS. KELLEY:  No more questions.  Thank you, |
| 04:26:41 | 13 | Your Honor. |
| 04:26:42 | 14 | THE COURT:  Mr. Crawford? |
| 04:26:44 | 15 | MR. CRAWFORD: No questions, Judge. |
| 04:26:45 | 16 | THE COURT:  Mr. Vassel, you may step down. |
| 04:26:50 | 17 | THE WITNESS:  Thank you, Judge. |
| 04:26:51 | 18 | THE COURT:  You're welcome to stay or free |
| 04:26:56 | 19 | to go.  It's entirely up to you. |
| 04:27:16 | 20 | Ms. Kelley? |
| 04:27:18 | 21 | MS. KELLEY:  Thank you, Your Honor.  At this |
| 04:27:19 | 22 | point the defense will rest. |
| 04:27:21 | 23 | THE COURT:  Both sides have rested? |
| 04:27:24 | 24 | MS. KELLEY:  Yes. |
| 04:27:25 | 25 | THE COURT:  Subject to admission of |

```
04:27:26   1    exhibits?
04:27:27   2              MS. KELLEY:  Correct.
04:27:27   3              THE COURT:  Mr. Secor, do you have rebuttal?
04:27:30   4              MR. SECOR:  We do.
04:27:32   5              THE COURT:  Ladies and gentlemen, the
04:27:32   6    government is entitled to present what is called
04:27:35   7    rebuttal evidence.  And in general that evidence is
04:27:40   8    confined to topics covered during the course of the
04:27:45   9    defense presentation in this case.  Mr. Secor, who is
04:27:48  10    your first rebuttal witness?
04:27:49  11              MS. KELLEY:  Excuse me, Your Honor.  Could
04:27:51  12    we have a five-minute break or less?
04:27:53  13              THE COURT:  Sure.  Come on up for one
04:27:55  14    second.
04:28:44  15              (Discussion had off the record.)
04:28:48  16              MR. CRAWFORD: We would call Detective David
04:28:53  17    Morford.
04:29:18  18              THE COURT:  Detective, you have previously
04:29:21  19    been sworn, and you remain under oath.
04:29:32  20                           - - -
04:29:32  21              DAVID MORFORD, DIRECT EXAMINATION
04:29:33  22    BY MR. CRAWFORD:
04:29:33  23       Q.  Detective Morford, you previously testified you
04:29:50  24    conducted an examination on an image of Government's
04:29:54  25    Exhibit 7, which is Mr. Cook's computer.  Is that true?
```

04:29:56  1      A.   That's correct.

04:29:57  2      Q.   You did an FTK report on that computer?

04:30:00  3      A.   Yes, I did.

04:30:01  4      Q.   Were you able to determine what version of

04:30:07  5   Windows he was using at the time -- what version of

04:30:12  6   Windows Mr. Cook's computer had on it?

04:30:15  7      A.   Vista Ultimate.

04:30:17  8      Q.   When Windows Vista Ultimate is sold off the

04:30:23  9   shelf, does have it a last accessed updating feature on

04:30:27  10   the file on it?

04:30:28  11      A.   No.  Windows Vista Ultimate, the default is to

04:30:32  12   not update the last accessed date and times.

04:30:34  13      Q.   What is the practical effect of that?

04:30:36  14      A.   Microsoft built that into Vista to be a

04:30:39  15   performance enhancer.

04:30:41  16      Q.   And how could it be a performance enhancer?

04:30:44  17      A.   The operating system, it's one thing the

04:30:48  18   operating system does not have to do when you access a

04:30:50  19   file.

04:30:50  20      Q.   And is the end result the created time and

04:30:53  21   accessed time are always the same?

04:30:54  22      A.   Not always.  If you modify a file, the accessed

04:30:57  23   time would change.  But just by opening it would not

04:31:01  24   change.

04:31:01  25      Q.   So if someone never modifies a file, they just

| | | |
|---|---|---|
| 04:31:04 | 1 | open it, the accessed and created dates will always be |
| 04:31:07 | 2 | the same? |
| 04:31:07 | 3 | A.  Correct. |
| 04:31:10 | 4 | Q.  Did you make any determination in your |
| 04:31:14 | 5 | examination of the computer about whether or not this |
| 04:31:17 | 6 | last accessed updating feature had been turned off on |
| 04:31:20 | 7 | Mr. Cook's computer? |
| 04:31:21 | 8 | A.  We tested that image in virtual box.  I opened up |
| 04:31:26 | 9 | the first file on the list in the LimeWire saved.  I |
| 04:31:30 | 10 | went to the properties of the file, looked at the |
| 04:31:33 | 11 | accessed date and time.  I then opened the image, closed |
| 04:31:40 | 12 | the image, looked at the properties again.  It had not |
| 04:31:44 | 13 | changed. |
| 04:31:45 | 14 | Q.  So using the virtual box you opened an image of |
| 04:31:48 | 15 | child pornography from Mr. Cook's computer.  You closed |
| 04:31:51 | 16 | the image? |
| 04:31:51 | 17 | A.  Correct. |
| 04:31:52 | 18 | Q.  And what did that do to the last accessed time |
| 04:31:54 | 19 | for that? |
| 04:31:57 | 20 | A.  Nothing. |
| 04:32:01 | 21 | Q.  All right.  Let me show you what's previously |
| 04:32:05 | 22 | been marked as Government's Exhibit 16.  Is this a copy |
| 04:33:12 | 23 | of your FTK report? |
| 04:33:14 | 24 | A.  Yes. |
| 04:33:15 | 25 | Q.  Let me show you an item called "list files by |

04:33:21  1    properties."  You testified yesterday, for example, we

04:33:28  2    looked at one image.  It's an image right here.  Do you

04:33:37  3    see that file, 9YO Jennie?

04:33:40  4         A.  Yes.

04:33:40  5         Q.  You'll see a created date at the bottom.  What's

04:33:44  6    that created date?

04:33:45  7         A.  5/19/2010.

04:33:48  8         Q.  It's got a modified date.  What is that time?

04:33:51  9         A.  5/19/2010.

04:33:53  10        Q.  Accessed date?

04:33:54  11        A.  The same, 5/19/2010.

04:34:25  12        Q.  You also located a file on here 2/2, 13 year old

04:34:29  13   little girls get come in face?

04:34:31  14        A.  Yes.

04:34:31  15        Q.  Is that a file you located off Mr. Cook's

04:34:34  16   computer?

04:34:35  17        A.  Yes.

04:34:35  18        Q.  What's the created date there?

04:34:37  19        A.  4/19/2010.

04:34:38  20        Q.  Accessed date?

04:34:39  21        A.  4/10/2010.

04:34:41  22        Q.  Let me play this video for 15 or 20 seconds so

04:34:46  23   you can identify it.

04:35:07  24             (Video shown in open court.)

04:35:33  25   BY MR. CRAWFORD:

04:35:33  1      Q.   All right.   Is that one of the files that you

04:35:35  2   downloaded from the HP laptop?

04:35:38  3      A.   Yes.

04:35:47  4      Q.   Here's another one entitled Lucifer's PEDOs

04:35:52  5   collection 3, 4?

04:35:54  6      A.   Yes.

04:35:54  7      Q.   What's the date created?

04:35:56  8      A.   5/20/2010.

04:35:58  9      Q.   And the accessed date?

04:35:59  10     A.   5/20/2010.

04:36:03  11           MR. CRAWFORD: No further questions, Judge.

04:36:22  12                     - - -

04:36:22  13           DAVID MORFORD, CROSS-EXAMINATION

04:36:23  14   BY MS. KELLEY:

04:36:23  15     Q.   Good afternoon.

04:36:24  16     A.   Hello.

04:36:24  17     Q.   You can disable the updating device, can't you?

04:36:27  18     A.   One more time?

04:36:28  19     Q.   You can disable the updating device, can't you?

04:36:31  20     A.   The accessed dates and time?

04:36:32  21     Q.   No, the disabling -- the updating device.

04:36:35  22     A.   On?

04:36:37  23     Q.   On Windows.

04:36:39  24     A.   I guess I don't understand your question.

04:36:42  25     Q.   Never mind.   Then I noticed on a number of those

04:36:46  1  various files that the modification date was different.

04:36:51  2  Why is that?

04:36:52  3     A.  It could have been from the file being moved

04:36:55  4  before it was touched.

04:36:58  5     Q.  Okay.  And did we discuss Windows at all

04:37:01  6  yesterday?

04:37:02  7     A.  You and I did not.

04:37:05  8     Q.  And how about with the government?

04:37:07  9     A.  We mentioned Windows Vista.

04:37:09  10     Q.  All right.  But you never talked about updating

04:37:12  11  yesterday, did you?

04:37:13  12     A.  Date and times?

04:37:15  13     Q.  Correct.

04:37:15  14     A.  I believe I was asked that question, and I

04:37:17  15  believe I answered it yesterday.

04:37:19  16           MS. KELLEY:  All right.  Thank you.

04:37:21  17           MR. CRAWFORD:  No questions, Judge.

04:37:23  18           THE COURT:  Detective, you may step down.

04:37:27  19           Ladies and gentlemen, I have to take about a

04:37:29  20  half hour break.  I'm sorry.  I'm quite confident that

04:37:34  21  we'll complete with another half hour or so of

04:37:37  22  testimony.  And once we do, I will excuse you for the

04:37:40  23  day.  And tomorrow morning we'll start with my reading

04:37:44  24  to you the final charge, and the closing arguments of

04:37:49  25  counsel, and the case will be in your hands I imagine by

04:37:52  1    around 11:00, 11:30 in the morning or so.  At that point

04:37:57  2    you can begin your deliberations or not; it's up to you.

04:38:01  3    In any event the schedule will be entirely in your own

04:38:04  4    hands, when you want to convene to deliberate, when you

04:38:07  5    want to adjourn, when you want to have lunch, whether

04:38:11  6    you want to remain in the courthouse or outside.  All of

04:38:14  7    that is entirely up to you.  But we'll try to resume

04:38:17  8    about quarter of or so.

04:38:19  9             In the meantime don't talk about the case.

04:38:21  10   Keep an open mind.  We will be finishing shortly

04:38:25  11   thereafter.

05:17:49  12             (Recess taken.)

05:17:49  13             THE COURT:  Mr. Secor.

05:17:52  14             MR. SECOR:  Ian Douglas.

05:17:53  15             MS. KELLEY:  May we approach?

05:17:55  16             THE COURT:  Sure.

05:17:56  17             (Whereupon the following discussion was had

05:18:51  18   at the bench outside the hearing of the jury:)

05:18:51  19             MS. KELLEY:  Your Honor, insofar as Mr.

05:18:51  20   Douglas' name was never read to the jury in voir dire

05:18:51  21   for them to have an opportunity to say whether or not

05:18:51  22   they know him, could the government do it now?

05:18:51  23             THE COURT:  What?

05:18:51  24             MS. KELLEY:  Could Mr. Secor read Ian's name

05:18:51  25   to the jury just to make sure that no one knows him?

| | | |
|---|---|---|
| 05:18:52 | 1 | THE COURT:  That's fair. |
| 05:18:52 | 2 | (End of side-bar discussion.) |
| 05:18:55 | 3 | THE COURT:  Ladies and gentlemen, the |
| 05:18:56 | 4 | parties had read the list of witnesses to you for voir |
| 05:19:02 | 5 | dire.  Do any of you recognize Mr. Douglas or know him |
| 05:19:05 | 6 | at all? |
| 05:19:07 | 7 | Okay. |
| 05:19:09 | 8 | (The witness was sworn by the clerk.) |
| 05:19:30 | 9 | THE COURT:  Will you tell the ladies and |
| 05:19:31 | 10 | gentlemen your name, please. |
| 05:19:32 | 11 | THE WITNESS:  I'm Ian Douglas. |
| 05:19:34 | 12 | THE COURT:  What is your community of |
| 05:19:36 | 13 | residence? |
| 05:19:36 | 14 | THE WITNESS:  Fredericktown, Ohio. |
| 05:19:38 | 15 | THE COURT:  Are you living there now? |
| 05:19:39 | 16 | THE WITNESS:  Yes. |
| 05:19:42 | 17 | THE COURT:  Mr. Secor. |
| 05:19:43 | 18 | - - - |
| 05:19:43 | 19 | IAN DOUGLAS, DIRECT EXAMINATION |
| 05:19:44 | 20 | BY MR. SECOR: |
| 05:19:44 | 21 | Q.  Mr. Douglas, are you presently employed? |
| 05:19:47 | 22 | A.  Yes. |
| 05:19:48 | 23 | Q.  How are you employed? |
| 05:19:50 | 24 | A.  I'm a pipeliner, Pennsylvania. |
| 05:19:55 | 25 | THE COURT:  A pipeliner? |

05:19:58    1              THE WITNESS:  Yeah.  I work for a pipeline

05:20:01    2   company out of Bellevue, Ohio.  We're currently working

05:20:04    3   in Pennsylvania.

05:20:05    4        Q.   What do you do?

05:20:06    5        A.   I'm a laborer.

05:20:07    6        Q.   How long have you been employed in that capacity?

05:20:09    7        A.   About three months.

05:20:14    8        Q.   Do you know the defendant in this case, Alex

05:20:17    9   Cook?

05:20:17   10        A.   Yes.

05:20:17   11        Q.   How long have you been acquainted with him?

05:20:20   12        A.   Since sophomore year of high school.

05:20:24   13        Q.   Were you friends?

05:20:25   14        A.   Yes.

05:20:26   15        Q.   Did you have an occasion to rent an apartment

05:20:31   16   with him in Lima, Ohio?

05:20:32   17        A.   Yes.

05:20:34   18        Q.   Do you recall approximately when you began that

05:20:36   19   relationship?

05:20:39   20        A.   It was about May.

05:20:41   21        Q.   May of?

05:20:42   22        A.   2010.

05:20:47   23        Q.   How did you and Mr. Cook meet?

05:20:49   24        A.   Became friends in high school.  We were in the

05:20:54   25   same classes together.

05:20:58  1           THE COURT:  Can you perhaps move a little
05:20:59  2   closer to the microphone, please?
05:21:02  3       A.  I met him -- we went to school together at the
05:21:06  4   Knox County Career Center, had the same class, building
05:21:10  5   trades.  We just started hanging out from there.
05:21:13  6       Q.  That's why you decided to room together; is that
05:21:17  7   right?
05:21:17  8       A.  We decided to -- we both went to college up in
05:21:21  9   Lima and then decided -- I was driving back and forth at
05:21:24  10  the time.  When he just chose to go there, we decided to
05:21:29  11  room together.
05:21:29  12      Q.  Describe your apartment there.
05:21:31  13      A.  It was a two-story townhouse.  It wasn't the
05:21:36  14  best, but it was pretty good for a college student.
05:21:41  15  Downstairs was living room, kitchen, bathroom; and
05:21:45  16  upstairs was two bedrooms and a bathroom upstairs.
05:21:48  17      Q.  So you each had your separate bedroom?
05:21:50  18      A.  Yes.
05:21:51  19      Q.  Now, did you each have a computer?
05:21:56  20      A.  Yes.
05:21:57  21      Q.  And how were they wired?
05:21:59  22      A.  Wireless.
05:22:04  23      Q.  Was your computer password protected?
05:22:07  24      A.  Yes.
05:22:07  25      Q.  How about Mr. Cook's?

| 05:22:08 | 1 | A.   I'm not sure. |
| 05:22:13 | 2 | Q.   Did Mr. Cook ever give you his password? |
| 05:22:16 | 3 | A.   No. |
| 05:22:18 | 4 | Q.   Have you ever used his computer? |
| 05:22:20 | 5 | A.   No. |
| 05:22:23 | 6 | Q.   Now, directing your attention to September 15, |
| 05:22:27 | 7 | 2010, do you remember that day? |
| 05:22:30 | 8 | A.   Yes. |
| 05:22:31 | 9 | Q.   Anything unusual happen that day? |
| 05:22:33 | 10 | A.   The FBI came to our apartment about 6:30 in the |
| 05:22:36 | 11 | morning. |
| 05:22:37 | 12 | Q.   And what happened? |
| 05:22:38 | 13 | A.   They searched the place from top to bottom.  We |
| 05:22:49 | 14 | got pulled outside, hands above our heads.  From there |
| 05:22:55 | 15 | they just started searching. |
| 05:23:00 | 16 | Q.   What was asked of you by any of the agents? |
| 05:23:03 | 17 | A.   Can you repeat that, please? |
| 05:23:04 | 18 | Q.   What did any of the agents ask you? |
| 05:23:07 | 19 | A.   If I knew of anything about child pornography |
| 05:23:11 | 20 | online in the apartment. |
| 05:23:12 | 21 | Q.   And what -- did you respond? |
| 05:23:14 | 22 | A.   I asked them what they were talking about, and I |
| 05:23:17 | 23 | didn't know. |
| 05:23:21 | 24 | Q.   Did anyone examine your computer? |
| 05:23:23 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 05:23:27 | 1 | Q.  Did the FBI take your computer thereafter? |
| 05:23:29 | 2 | A.  No.  They examined it there at the apartment. |
| 05:23:33 | 3 | Q.  Then what happened with your computer? |
| 05:23:34 | 4 | A.  They cleared it and it got left at the apartment. |
| 05:23:38 | 5 | Q.  They left it with you? |
| 05:23:39 | 6 | A.  Yes. |
| 05:23:42 | 7 | Q.  Now, did Mr. Cook leave that day? |
| 05:23:46 | 8 | A.  Yes. |
| 05:23:47 | 9 | Q.  With whom did he leave? |
| 05:23:48 | 10 | A.  I think two FBI agents.  I don't recall, but I |
| 05:23:53 | 11 | know it was with FBI agents. |
| 05:23:55 | 12 | Q.  Did you see him conversing with those agents? |
| 05:23:58 | 13 | A.  Yes. |
| 05:23:59 | 14 | Q.  Did they appear angry at Mr. Cook? |
| 05:24:01 | 15 | A.  No. |
| 05:24:10 | 16 | Q.  Do you know where they took Mr. Cook? |
| 05:24:12 | 17 | A.  No, I don't. |
| 05:24:13 | 18 | Q.  About how long was Mr. Cook gone? |
| 05:24:17 | 19 | A.  Most of the morning.  I went to class after they |
| 05:24:23 | 20 | released me to leave the premises, then when I got back |
| 05:24:26 | 21 | about 10:30, 11:00, they had just got back with Mr. |
| 05:24:31 | 22 | Cook. |
| 05:24:35 | 23 | Q.  Did you ask him what was going on? |
| 05:24:37 | 24 | A.  Yes. |
| 05:24:40 | 25 | Q.  What did Mr. Cook tell you? |

| | | |
|---|---|---|
| 05:24:43 | 1 | A.  He said it had to do something -- |
| 05:24:48 | 2 | THE COURT:  I'm sorry.  Can you lean a |
| 05:24:50 | 3 | little closer to the microphone and speak up. |
| 05:24:52 | 4 | A.  He said it had something to do with identity |
| 05:24:55 | 5 | theft, and that was the last he told me. |
| 05:25:00 | 6 | Q.  Did you believe him? |
| 05:25:01 | 7 | A.  I was pretty shook up about it anyway. |
| 05:25:07 | 8 | Q.  Why were you shook up? |
| 05:25:09 | 9 | A.  It was awkward.  I kind of felt violated. |
| 05:25:13 | 10 | Q.  Why? |
| 05:25:13 | 11 | A.  Because having my privacy taken, pretty much. |
| 05:25:16 | 12 | Q.  Were you angry? |
| 05:25:17 | 13 | A.  No.  I was just confused, lost. |
| 05:25:25 | 14 | Q.  Now, did your relationship with Mr. Cook change |
| 05:25:28 | 15 | after that date? |
| 05:25:29 | 16 | A.  Yes. |
| 05:25:30 | 17 | Q.  It did? |
| 05:25:31 | 18 | A.  Yes. |
| 05:25:32 | 19 | Q.  How so and why? |
| 05:25:34 | 20 | A.  It was just very distant between both of us.  We |
| 05:25:39 | 21 | didn't communicate like we used to.  That's about it. |
| 05:25:47 | 22 | We didn't hang out as much.  That's about it. |
| 05:25:56 | 23 | Q.  Did you -- have you ever downloaded child |
| 05:26:00 | 24 | pornography? |
| 05:26:00 | 25 | A.  No. |

05:26:05  1    Q.  Do you see Mr. Cook in court today?

05:26:07  2    A.  Yes, I do.

05:26:08  3    Q.  Can you indicate where he's seated and what he's

05:26:11  4  wearing for the record?

05:26:12  5    A.  Can you repeat that, please.

05:26:13  6    Q.  Can you indicate where he's seated and what he's

05:26:16  7  wearing for the record?

05:26:17  8    A.  He's seated to the right side of the room --

05:26:20  9  well, it would be the left side.  He's wearing a black

05:26:25  10  shirt and a gray suit.

05:26:28  11          MR. SECOR:  Your Honor, may the record

05:26:32  12  reflect --

05:26:32  13          THE COURT:  It does.

05:26:33  14          MR. SECOR:  Thank you.

05:26:34  15  BY MR. SECOR:

05:26:37  16    Q.  Have you had an occasion to speak with Mr. Cook

05:26:41  17  since you left the apartment?

05:26:43  18    A.  No.

05:26:54  19    Q.  When did you leave the apartment?

05:26:57  20    A.  Sometime in December I moved out.

05:27:02  21    Q.  And what was the reason?

05:27:04  22    A.  I was just -- I was by myself at that point in

05:27:08  23  the apartment.  He had been arrested and charged.  I was

05:27:16  24  by myself.

05:27:19  25    Q.  Did you talk to him about that?

```
05:27:21   1      A.  No, I didn't.

05:27:24   2      Q.  Didn't ask him about it?

05:27:25   3      A.  No.

05:27:31   4           MR. SECOR:  Thank you.  I have nothing

05:27:32   5  further, Your Honor.

05:27:35   6           MS. KELLEY:  Thank you, Your Honor.

05:27:37   7                   - - -

05:27:37   8           IAN DOUGLAS, CROSS-EXAMINATION

05:27:37   9  BY MS. KELLEY:

05:27:37  10      Q.  Hello, Ian.  It's nice to meet you.  I'm

05:27:44  11  Elizabeth Kelley.  I represent Alex.

05:27:47  12           Isn't it true that you had three computers

05:27:50  13  between May and September of 2010?

05:27:53  14      A.  Yes.

05:27:54  15      Q.  You had a Dell, didn't you?

05:27:56  16      A.  Yes.

05:27:57  17      Q.  And you had a Verizon notebook?

05:28:02  18      A.  Yes.

05:28:03  19      Q.  Then you acquired a new one?

05:28:04  20      A.  Yes.

05:28:05  21      Q.  And when you moved into Alex's apartment with

05:28:10  22  him, you didn't have a computer initially, did you?

05:28:13  23      A.  I had the Verizon netbook.

05:28:15  24      Q.  But you used to use Alex's computer, didn't you?

05:28:19  25      A.  No.
```

05:28:19  1     Q.  You were the one who gave Alex his password,
05:28:23  2  isn't that correct?
05:28:24  3     A.  No.
05:28:25  4     Q.  And your password is GMC boy 1990, isn't it?
05:28:30  5     A.  No.
05:28:31  6     Q.  And you gave that password to Alex so he could
05:28:34  7  use your computer, didn't you?
05:28:36  8     A.  No.
05:28:36  9     Q.  You guys used to share everything in that
05:28:38  10  apartment, didn't you?
05:28:40  11     A.  No.
05:28:40  12     Q.  In fact, when you first moved into the apartment
05:28:43  13  it was Alex's parents, Jerry and Eva, who furnished it,
05:28:47  14  wasn't it?
05:28:48  15     A.  No.
05:28:48  16     Q.  They bought you guys food, didn't they?
05:28:51  17     A.  Yes.
05:28:51  18     Q.  That first weekend when they were home they
05:28:54  19  filled up your refrigerator, didn't they?
05:28:56  20     A.  Yes.
05:28:57  21     Q.  And they filled up your cupboards?
05:28:59  22     A.  Yes.
05:28:59  23     Q.  And you used to eat that food, didn't you?
05:29:02  24     A.  Yes.
05:29:02  25     Q.  And you used to wear Alex's clothing, right?

| | | |
|---|---|---|
| 05:29:05 | 1 | A.  No. |
| 05:29:05 | 2 | Q.  And he used to wear your clothing, didn't he? |
| 05:29:08 | 3 | A.  No. |
| 05:29:08 | 4 | Q.  You guys shared everything? |
| 05:29:10 | 5 | A.  No. |
| 05:29:10 | 6 | Q.  All right.  Now, when you left the house or when |
| 05:29:17 | 7 | you left the apartment in September, you left Alex with |
| 05:29:22 | 8 | a stack of bills, didn't you? |
| 05:29:23 | 9 | A.  I didn't leave in September. |
| 05:29:25 | 10 | Q.  And you've never repaid those bills, have you? |
| 05:29:27 | 11 | A.  I never left in September. |
| 05:29:30 | 12 | Q.  You left, didn't you? |
| 05:29:32 | 13 | A.  In December. |
| 05:29:34 | 14 | Q.  When are you planning on paying Alex back for |
| 05:29:37 | 15 | that back rent? |
| 05:29:39 | 16 | A.  What back rent?  My rent was paid up. |
| 05:29:43 | 17 | Q.  Now, you've had a number of different cell phones |
| 05:29:45 | 18 | during the past few months, haven't you? |
| 05:29:47 | 19 | A.  Just two. |
| 05:29:48 | 20 | Q.  It's been difficult to get a hold of you by cell |
| 05:29:51 | 21 | phone, hasn't it? |
| 05:29:52 | 22 | A.  No. |
| 05:29:52 | 23 | Q.  Because you've changed cell phone numbers so many |
| 05:29:55 | 24 | times? |
| 05:29:55 | 25 | A.  I've only changed my cell phone twice. |

05:29:58  1    Q.  Are you here willingly today?

05:30:00  2    A.  Yes.

05:30:01  3    Q.  But didn't you receive a subpoena?

05:30:03  4    A.  Yes.

05:30:05  5    Q.  Now, when we heard testimony a couple of days ago

05:30:13  6    from Special Agent Schulte -- do you know him?

05:30:17  7    A.  Yes.

05:30:18  8    Q.  He told us that he had performed surveillance on

05:30:26  9    your apartment complex five times during the month of

05:30:31  10   September.  Would that seem accurate?

05:30:35  11   A.  Yes.

05:30:37  12   Q.  Okay.  And your apartment at 1268 Knollwood, that

05:30:41  13   was primarily -- well, some college students lived

05:30:46  14   there, didn't they?

05:30:47  15   A.  Yes.

05:30:48  16   Q.  And primarily trucks park there, correct?

05:30:50  17   A.  Yes.

05:30:51  18   Q.  So an undercover vehicle would stick out,

05:30:54  19   wouldn't it?

05:30:54  20   A.  There was cars coming in all the time.  So, I

05:30:58  21   mean, but probably, yes.

05:31:03  22   Q.  Now, in September you didn't have a job, did you?

05:31:06  23   A.  I just started working at my neighbor's gas

05:31:10  24   station back home.

05:31:11  25   Q.  In September?

| | | |
|---|---|---|
| 05:31:12 | 1 | A.  Yes. |
| 05:31:12 | 2 | Q.  And you were going to school half time, correct? |
| 05:31:14 | 3 | A.  Yes. |
| 05:31:16 | 4 | Q.  So you were at home during the day? |
| 05:31:19 | 5 | A.  Yes. |
| 05:31:20 | 6 | Q.  And you were home at night? |
| 05:31:21 | 7 | A.  Yes. |
| 05:31:22 | 8 | Q.  And you were there most of the weekends, weren't |
| 05:31:24 | 9 | you? |
| 05:31:24 | 10 | A.  No. |
| 05:31:25 | 11 | Q.  You weren't? |
| 05:31:25 | 12 | A.  No. |
| 05:31:26 | 13 | Q.  Okay.  Do you know Jerry Cook, Alex's father? |
| 05:31:31 | 14 | A.  Yes. |
| 05:31:32 | 15 | Q.  And do you find him to be an honorable man? |
| 05:31:39 | 16 | A.  Yes. |
| 05:31:40 | 17 | Q.  He testified today that he saw you using Alex's |
| 05:31:44 | 18 | computer.  Would he be lying if he said that? |
| 05:31:49 | 19 | A.  Yes. |
| 05:31:58 | 20 |             MS. KELLEY:  Could I have a moment, Your |
| 05:32:00 | 21 | Honor? |
| 05:32:00 | 22 |             THE COURT:  Of course. |
| 05:32:04 | 23 |             (Discussion had off the record.) |
| 05:32:07 | 24 | BY MS. KELLEY: |
| 05:32:09 | 25 | Q.  Have you been offered anything for your testimony |

05:32:11   1   today?

05:32:11   2      A.   No.

05:32:11   3      Q.   Have you been threatened in any way?

05:32:13   4      A.   No.

05:32:13   5      Q.   And you're here willingly?

05:32:15   6      A.   Yes.

05:32:16   7              MS. KELLEY:  All right.  Thank you.

05:32:18   8              THE COURT:  Mr. Secor?

05:32:22   9              MR. SECOR:  No questions, Your Honor.

05:32:23  10              THE COURT:  You may step down.  You're free

05:32:25  11   to go or welcome to stay; it's entirely up to you.

05:32:45  12              Any further witnesses?

05:32:48  13              MR. SECOR:  Yes, Your Honor.  Special Agent

05:32:49  14   Paul Pape.

05:33:05  15              THE COURT:  You've previously been sworn and

05:33:08  16   remain under oath.

05:33:10  17                        -  -  -

05:33:10  18              PAUL PAPE, DIRECT EXAMINATION

05:33:11  19   BY MR. SECOR:

05:33:11  20      Q.   Special Agent Pape, there was some testimony in

05:33:20  21   court today that when you took the statement from Mr.

05:33:31  22   Cook and reduced it to a summary writing and asked Mr.

05:33:39  23   Cook to sign it, that you told him it was nothing more

05:33:44  24   than a letter to the prosecutor not to follow up on this

05:33:51  25   case.  Did you ever do that?

05:33:53 1    A.  No.

05:33:56 2    Q.  In fact, how long have you been a police officer?

05:33:59 3    A.  I've been with the FBI 14 years, and seven years

05:34:02 4 prior to that with the State Highway Patrol.

05:34:03 5    Q.  How many times have you written a prosecutor on

05:34:08 6 any case and told them they should not pursue that case?

05:34:11 7    A.  Never.

05:34:17 8    Q.  We further heard testimony today and yesterday

05:34:23 9 that for three to four hours at the Lima RA with Mr.

05:34:30 10 Cook you used a raised voice and called him numerous

05:34:37 11 names such as idiot in order to convince him to speak to

05:34:44 12 you.  Is that true?

05:34:46 13    A.  Not at all.

05:34:48 14    Q.  Have you ever done such a thing?

05:34:50 15    A.  No.  Not at all.  My mannerism in conducting

05:34:54 16 interviews is the mannerism you see in here; matter of

05:35:00 17 fact and to the point.

05:35:03 18    Q.  Now, you also testified that you were at the

05:35:07 19 apartment when the search began; is that correct?

05:35:11 20    A.  That's correct.

05:35:12 21    Q.  In fact you had an occasion to come into contact

05:35:15 22 with Mr. Cook; isn't that correct?

05:35:17 23    A.  It is.

05:35:18 24    Q.  You had an occasion to have a conversation with

05:35:21 25 Mr. Cook; isn't that correct?

05:35:22   1      A.   That is.

05:35:23   2      Q.   And what was the essence of that conversation?

05:35:26   3      A.   I told Mr. Cook why we were there, that the FBI

05:35:30   4   was conducting a search warrant for child pornography

05:35:34   5   possession, that the FBI doesn't come to your house on a

05:35:37   6   hunch.  We have very good information that there is

05:35:39   7   child pornography on his computer.  I told him that we

05:35:44   8   were going to seize his computer and analyze it to find

05:35:50   9   child pornography.  I asked him -- at that point we had

05:35:52  10   come in the house from the outside.  We were in his

05:35:55  11   living room.  And I asked him if he had child

05:35:58  12   pornography on his computer.  And he said he did.  I

05:36:00  13   asked him where his computer was.  He said it was

05:36:03  14   upstairs in his room.  At that time we went upstairs to

05:36:05  15   his room.  As I testified yesterday, he put on clothing

05:36:12  16   because he only had his shorts on.  The computer was in

05:36:15  17   the room.  And the people collecting that computer

05:36:18  18   collected it.

05:36:21  19      Q.   Did Mr. Cook during that conversation or at any

05:36:26  20   later conversation ever indicate to you that Ian Douglas

05:36:32  21   had access to his computer?

05:36:34  22      A.   No, he did not.

05:36:42  23      Q.   Now, you testified yesterday that one of the

05:36:49  24   reasons that you did not tape this conversation which

05:36:53  25   you had with Mr. Cook was because you didn't have a tape

05:36:57  1    recorder.  Do you recall that?

05:36:59  2        A.  I do.

05:37:00  3        Q.  Was there any other reason besides that that you

05:37:05  4    did not tape this conversation?

05:37:08  5        A.  There is.

05:37:09  6        Q.  What is that reason?

05:37:10  7        A.  That reason is the FBI policy and procedure says

05:37:15  8    that we don't audio or videotape our interviews.  I

05:37:18  9    follow FBI policy and procedure by conducting the

05:37:23  10   interview, then reducing that to writing in a summary

05:37:26  11   form to identify what the interview was about.  That's

05:37:29  12   FBI policy.

05:37:30  13       Q.  There is an exception to that policy; is there

05:37:33  14   not?

05:37:34  15               THE COURT:  Was that exception in place at

05:37:35  16   the time of this interview, if there is an exception?

05:37:41  17               MR. SECOR:  I'll get there.

05:37:43  18               THE COURT:  Well, was there an exception in

05:37:45  19   place at the time?

05:37:46  20   BY MR. SECOR:

05:37:46  21       Q.  Was there an exception in place at the time of

05:37:49  22   this interview in order to tape an interviewee?

05:37:53  23       A.  In FBI policy, yes, there is an exception.

05:37:57  24       Q.  What is that exception?

05:37:58  25       A.  On very rare occasions we can get authorization

05:38:02  1   prior to the interview from our Special Agent in Charge.

05:38:06  2     Q.  Now, who was the Special Agent in Charge?

05:38:11  3     A.  At that time Special Agent in Charge would have

05:38:14  4   been SAC Figliuzzi.  He's out of Cleveland.

05:38:19  5     Q.  So your -- you affectionately refer to your

05:38:23  6   supervisor in charge as what?

05:38:25  7     A.  The SAC.

05:38:27  8     Q.  The SAC.  Where is he on the totem pole as far as

05:38:34  9   rank, so to speak, in the Cleveland office?

05:38:37 10     A.  The SAC is the top of the Cleveland office.  He

05:38:41 11   is in charge of the entire division of the FBI for the

05:38:45 12   Cleveland Division, which is half of the State of Ohio.

05:38:48 13     Q.  Now, what would the procedure have been in order

05:38:51 14   to get his approval?

05:38:53 15     A.  Prior to the interview we would have had to write

05:38:57 16   a communication to him requesting authorization to audio

05:39:01 17   or videotape the interview, and we would have had to

05:39:04 18   justify why we would need to get an exception to FBI

05:39:08 19   policy to do that.

05:39:11 20     Q.  Now, would that communication go directly from

05:39:14 21   you to your SAC, or would it have to go through your

05:39:19 22   supervisor?

05:39:20 23     A.  It would first go through our supervisor.  Then

05:39:23 24   it would go through the Assistant Special Agent in

05:39:26 25   Charge.  Then it would go to the Special Agent.

05:39:29  1    Q.  How long would that take?

05:39:31  2    A.  Depending on if the SAC was available, if he was

05:39:37  3    in the division, it could take anywhere from a couple

05:39:40  4    days to a week.

05:39:43  5    Q.  In the meantime you've got an individual you're

05:39:48  6    investigating.  Are you supposed to just let him go then

05:39:53  7    and then come back several days later?

05:39:55  8    A.  No.  Again, that's a very rare exception to the

05:39:58  9    FBI policy.

05:39:59  10   Q.  How often do you use that exception?

05:40:01  11   A.  I've never used that exception.  And I've

05:40:04  12   interviewed serial killers, bank robbers, kidnap

05:40:09  13   suspects, all high profile matters that I've

05:40:12  14   investigated.  I've never sought SAC approval to conduct

05:40:17  15   audio/videotaped interviews.

05:40:23  16   Q.  But a lot of police agencies do conduct video and

05:40:29  17   audio surveillance of their interviews, don't they?

05:40:34  18   A.  They do.  It's an individual department policy.

05:40:41  19   Q.  If you know, does the Highway Patrol do it?

05:40:45  20   A.  At the time I was a trooper, they did not.  But I

05:40:47  21   don't know as to current day if they do or not.

05:40:55  22   Q.  If you know, is the policy undergoing review?

05:41:05  23   A.  The policy is constantly being reviewed, just as

05:41:10  24   other policies with the FBI are.  Those that are at a

05:41:13  25   very -- bigger pay raise than I am make those decisions,

```
05:41:18   1    and they constantly review policy and procedure,
05:41:21   2    everything to make sure they are where they need to be
05:41:24   3    for the betterment of the mission.  This policy is no
05:41:27   4    exception.
05:41:37   5             MR. SECOR:  Nothing further, Your Honor.
05:41:42   6                       - - -
05:41:42   7             PAUL PAPE, CROSS-EXAMINATION
05:41:42   8    BY MS. KELLEY:
05:41:42   9        Q.  Thank you.  Good afternoon, sir.
05:42:02  10        A.  Good afternoon.
05:42:03  11        Q.  Let's talk about this confession, supposed
05:42:05  12    confession.  I understand that you do not set FBI
05:42:07  13    policy.  But did I understand you correctly when you
05:42:13  14    told Mr. Secor that it would take a couple of days to a
05:42:17  15    week in order to get approval to record an
05:42:22  16    interrogation?
05:42:24  17        A.  Depending on factors of availability, yes, ma'am.
05:42:28  18        Q.  Isn't it true that your first correspondence from
05:42:32  19    Special Agent Whisman, the gentleman in Oklahoma
05:42:36  20    conducting the undercover operation, was on June 23 of
05:42:42  21    2010?
05:42:44  22        A.  I didn't have contact with him.
05:42:47  23        Q.  Isn't it true he produced his first 302 in the
05:42:50  24    case in June of 2010?
05:42:55  25        A.  I don't have that document.
```

05:42:57  1              THE COURT:  If you were told that that was

05:42:59  2      the case, would you dispute that?

05:43:04  3              THE WITNESS:  If you told me that was the

05:43:06  4      case, I wouldn't disagree with you.

05:43:08  5              THE COURT:  Well, if you were told.

05:43:13  6      BY MS. KELLEY:

05:43:13  7      Q.  Would you be surprised to know that Special Agent

05:43:15  8      Whisman completed his 302 in regards to the initial

05:43:22  9      investigation of this alleged crime on June 23 of 2010?

05:43:30  10     A.  I don't believe that would be out of the ordinary

05:43:33  11     for time issues.

05:43:34  12     Q.  Okay.  That was in June.  Fast forward.  You and

05:43:42  13     your office -- strike that.

05:43:44  14         Your office participated in five undercover

05:43:48  15     surveillances of Alex and Ian's apartment, correct?

05:43:55  16     A.  I don't know that information either.

05:43:57  17     Q.  If Agent Schulte testified to that the other day,

05:44:00  18     would he be correct or incorrect?

05:44:03  19     A.  If that was his testimony.

05:44:10  20     Q.  Would it be correct -- would Agent Schulte be

05:44:12  21     correct to say that he began that undercover

05:44:15  22     surveillance the first part of September?

05:44:20  23     A.  If that was --

05:44:21  24             MR. SECOR:  Objection, Your Honor, unless

05:44:22  25     she shows a basis for his knowledge of what Special

| | | |
|---|---|---|
| 05:44:25 | 1 | Agent Schulte was doing. |
| 05:44:26 | 2 | THE COURT:  I think that's fair. |
| 05:44:27 | 3 | MS. KELLEY:  All right. |
| 05:44:28 | 4 | Q.  Did you participate in any of these undercover |
| 05:44:31 | 5 | surveillances in the parking lot? |
| 05:44:32 | 6 | A.  I did not. |
| 05:44:33 | 7 | Q.  And the search was executed on a morning in late |
| 05:44:41 | 8 | September, correct? |
| 05:44:42 | 9 | A.  Correct. |
| 05:44:43 | 10 | Q.  September 15, in fact, wasn't it? |
| 05:44:45 | 11 | A.  That is. |
| 05:44:47 | 12 | Q.  So between June and September, we have |
| 05:44:51 | 13 | approximately three months, correct? |
| 05:44:54 | 14 | A.  Yes. |
| 05:44:57 | 15 | Q.  Now, during that three-month time period, could |
| 05:45:04 | 16 | you have made the effort to get permission to record |
| 05:45:09 | 17 | this interrogation? |
| 05:45:13 | 18 | A.  It's not the effort. |
| 05:45:15 | 19 | Q.  That's not what I'm asking. |
| 05:45:16 | 20 | A.  Yes, you did. |
| 05:45:18 | 21 | Q.  Could you -- could you have tried to ask for |
| 05:45:23 | 22 | special permission? |
| 05:45:23 | 23 | A.  We could have. |
| 05:45:24 | 24 | Q.  All right.  But you didn't, did you? |
| 05:45:26 | 25 | A.  No. |

05:45:27  1    Q.  All right.  So the fact remains, the only record

05:45:34  2   we have of what supposedly transpired in that

05:45:39  3   interrogation room is your written statement, which Alex

05:45:44  4   signed, correct?

05:45:45  5    A.  That's correct.

05:45:46  6    Q.  And you stand by that statement?

05:45:49  7    A.  100 percent.

05:45:50  8    Q.  You stand by the statement that Alex told you he

05:45:54  9   was molested as an 11 year old Boy Scout?

05:45:57  10    A.  That's what he told me.

05:45:58  11    Q.  You stand by the statement that Alex teaches

05:46:02  12   Sunday school?

05:46:04  13    A.  Yes.

05:46:05  14    Q.  You stand by the statement that Alex told you he

05:46:09  15   has a fiancée?

05:46:11  16    A.  I believe it's an ex-fiancée.

05:46:15  17    Q.  An ex-fiancée.

05:46:23  18        And you stand by his statement that he began

05:46:25  19   viewing child pornography, an illegal subject, when he

05:46:33  20   was on the road doing construction?

05:46:36  21    A.  Correct.

05:46:37  22    Q.  And that predates the initial undercover

05:46:41  23   operation of Special Agent Whisman in Oklahoma, doesn't

05:46:46  24   it?

05:46:48  25    A.  Yes, it was before that date.

05:46:51  1    Q.  And prior to this time law enforcement had had no

05:46:56  2  contact whatsoever with Alex but for a couple of traffic

05:47:01  3  tickets, correct?

05:47:03  4    A.  Not to my knowledge.

05:47:04  5    Q.  So even though he's supposedly looking at child

05:47:09  6  pornography someplace out on the road doing

05:47:11  7  construction, the federal government with all its

05:47:13  8  resources has no record of it?

05:47:19  9    A.  Not to my knowledge.

05:47:21  10    Q.  And he'd been on the road doing construction for

05:47:25  11  about ten months, and you didn't have any record of it?

05:47:31  12    A.  Not to my knowledge.

05:47:34  13    Q.  So Agent Whisman sitting in Oklahoma in June

05:47:40  14  finds out that there is child pornography related

05:47:47  15  activity going on in an apartment in Fredericktown?

05:47:53  16        MR. SECOR:  Objection, Your Honor.  He

05:47:55  17  didn't find out that information then.

05:47:58  18        MS. KELLEY:  Could I approach the witness,

05:47:59  19  Your Honor?

05:47:59  20        THE COURT:  Sure.  In any event, I think it

05:48:02  21  was Lima rather than Fredericktown, I believe.

05:48:04  22        MS. KELLEY:  You're correct.  Thank you.

05:48:07  23        THE COURT:  But there is an objection to the

05:48:09  24  question.  And the objection again, Mr. Secor, was?

05:48:13  25        MR. SECOR:  The question had --

05:48:16   1            THE COURT:  Let's come up here.

05:48:18   2            (Whereupon the following discussion was had

05:50:01   3   at the bench outside the hearing of the jury:)

05:50:01   4            MR. SECOR:  The question had incorrect facts

05:50:01   5   in it that have not been adduced in the trial.  If you'd

05:50:01   6   like to read it back.

05:50:01   7            MS. KELLEY:  Agent Whisman testified that he

05:50:01   8   began and concluded his undercover operation on June 22

05:50:01   9   of 2010.

05:50:01   10            MR. SECOR:  That's not so.

05:50:01   11            MS. KELLEY:  We have a 302.

05:50:03   12            MR. SECOR:  That's when he started it.  But

05:50:03   13   then he issued a subpoena to get the IP address, and

05:50:03   14   eventually he got the IP address.  All this took a

05:50:03   15   period of time.  So if she wants to do it that way,

05:50:03   16   that's fine, but don't make it sound like he started and

05:50:03   17   concluded.

05:50:03   18            THE COURT:  I'm not sure that he would know

05:50:03   19   these facts anyway.

05:50:03   20            MR. SECOR:  Well, she's making it sound like

05:50:03   21   he did his whole investigation on that day.

05:50:03   22            MS. KELLEY:  I can rephrase.

05:50:03   23            THE COURT:  Well, but he's not the case

05:50:03   24   agent.

05:50:03   25            MR. SECOR:  That's true.

05:50:04  1          THE COURT: I assume he was called in Lima as

05:50:04  2  part of the search team and to conduct the

05:50:04  3  interrogation.

05:50:04  4          MR. SECOR:  Exactly.

05:50:04  5          MS. KELLEY:  I can rephrase.  It's not a big

05:50:04  6  deal.

05:50:04  7          (End of sidebar discussion.)

05:50:04  8          THE COURT:  You may continue.  Rephrase the

05:50:04  9  question.

05:50:04  10          MS. KELLEY:  I forgot where I was.

05:50:05  11  BY MS. KELLEY:

05:50:05  12     Q.  If you know, when did this investigation begin?

05:50:08  13     A.  I don't know.

05:50:09  14     Q.  All right.  And I want to go back to the

05:50:17  15  interrogation room.  So the only record we have of this

05:50:24  16  is that statement which you drafted on behalf of Alex,

05:50:28  17  correct?

05:50:30  18     A.  Yes.

05:50:36  19     Q.  And you stand by that statement still 100

05:50:39  20  percent?

05:50:39  21     A.  I do.

05:50:44  22     Q.  Now, Mr. Secor asked you if Alex had made any

05:50:56  23  statements to you outside the apartment while the search

05:51:01  24  was being conducted.  Do you recall that question?

05:51:09  25     A.  Today?

05:51:10  1      Q.   Today.

05:51:10  2      A.   I don't think he said outside the apartment.  At

05:51:13  3  the apartment.

05:51:14  4      Q.   Okay.  Did Alex make any statements to you at the

05:51:17  5  apartment?

05:51:17  6      A.   Yes.

05:51:18  7      Q.   About viewing child pornography?

05:51:19  8      A.   Yes.

05:51:20  9      Q.   Did you record those in any fashion?

05:51:22  10     A.   No.

05:51:24  11     Q.   You completed a 302 in regards to the initial

05:51:31  12  search, didn't you?

05:51:32  13     A.   No, I did not.

05:51:33  14     Q.   You didn't?  Could I approach the witness?

05:51:36  15          THE COURT:  You may.  If you want to show

05:51:41  16  him something, have it marked as an exhibit, please,

05:51:45  17  unless it has been marked already.

05:51:48  18          MS. KELLEY:  I don't think it's been marked.

05:51:52  19          (Discussion had off the record.)

05:51:58  20          THE COURT:  While we're doing that, what is

05:52:00  21  a, quote, "302," close quote.

05:52:03  22          THE WITNESS:  A 302 is a document that we

05:52:08  23  document things on.  It's just a -- 302 is the number

05:52:14  24  system that we have.  It says this is a paper that's

05:52:18  25  documented information on.

05:52:19  1          THE COURT:  It's basically the form that you

05:52:21  2    use to record various activities; is that correct?

05:52:27  3          THE WITNESS:  That is, yeah.

05:52:28  4          THE COURT:  And as far as I'm aware, no one

05:52:31  5    knows how come it's a 302 rather than 121.

05:52:37  6          THE WITNESS:  That is correct.

05:52:38  7          THE COURT:  Anyway, you've heard 302, ladies

05:52:40  8    and gentlemen.  That's lawyers' and so forth's shorthand

05:52:43  9    for simply the name of the piece of paper on which the

05:52:47  10   FBI agents record activities and investigations and

05:52:51  11   otherwise.

05:52:51  12          So go ahead.

05:52:52  13          MS. KELLEY:  Thank you.  May I approach the

05:52:55  14   witness, Your Honor?

05:52:55  15          THE COURT:  Certainly.

05:52:56  16   BY MS. KELLEY:

05:52:57  17      Q.  Sir, I'm handing you what's been marked as

05:52:59  18   Defendant's Exhibit 117.  Do you recognize that

05:53:02  19   document?

05:53:18  20      A.  I do.

05:53:20  21      Q.  Could you tell the jury what that is?

05:53:23  22      A.  It's a 302 of the -- of Alex Cook, and it appears

05:53:34  23   to be talking about the silver thumb drive.

05:53:39  24      Q.  Is your name at the bottom of that document?

05:53:41  25      A.  It is.

05:53:41  1    Q.  And is anyone else's name at the bottom of that

05:53:45  2  document?

05:53:45  3    A.  Agent Schulte.

05:53:48  4    Q.  Is there any mention in that entire 302 of Alex

05:53:56  5  Cook telling you that he has child pornography on his

05:54:00  6  computer?

05:54:03  7    A.  No, but I didn't write this document.

05:54:07  8    Q.  You didn't write that document?

05:54:08  9    A.  No.  Agent Schulte --

05:54:10  10   Q.  But you signed on to it?

05:54:11  11   A.  Yes.

05:54:11  12   Q.  But nonetheless, there is no mention of Alex

05:54:16  13  telling you that there is child pornography on his

05:54:20  14  computer, is there?

05:54:21  15   A.  Not on this document, no.

05:54:22  16   Q.  Not on that document.  Did you put it in any

05:54:27  17  other documents other than the confession?

05:54:30  18   A.  I did.

05:54:31  19   Q.  Really.  Which one?

05:54:32  20   A.  The 498.

05:54:34  21   Q.  And what is that?

05:54:42  22            MR. SECOR:  Go ahead.

05:54:44  23            THE WITNESS:  What's a 498?

05:54:46  24            MS. KELLEY:  Yeah.

05:54:48  25            MR. SECOR:  Sidebar.

05:54:50  1              (Whereupon the following discussion was had

05:55:53  2  at the bench outside the hearing of the jury:)

05:55:53  3              MR. SECOR:  Well, Judge, I've done

05:55:53  4  everything with these people to instruct them not to get

05:55:53  5  into the polygraph.

05:55:53  6              THE COURT:  What is it?

05:55:53  7              MR. SECOR:  The 498 is the polygraph.  It's

05:55:53  8  opened.

05:55:53  9              MS. KELLEY:  I did not know what it was.

05:55:53  10             MR. SECOR:  You had a copy of it.

05:55:53  11             MS. KELLEY:  I don't memorize numbers.

05:55:54  12             MR. SECOR:  Judge the question is in front

05:55:54  13  of the jury now.

05:55:54  14             THE COURT:  If she wants to withdraw, I'm

05:55:54  15  going to let her withdraw it.

05:55:54  16             MS. KELLEY:  If I don't know what a 498 is,

05:55:54  17  they don't know what a 498 is.

05:55:56  18             (End of side-bar discussion.)

05:56:01  19             MR. SECOR:  Is that question withdrawn?

05:56:02  20             MS. KELLEY:  It's withdrawn.  Thank you.

05:56:05  21  BY MS. KELLEY:

05:56:06  22     Q.  Now, Mr. Secor asked you if you told Mr. Cook

05:56:17  23  that this was a letter to the prosecutor.  Do you recall

05:56:20  24  that question?

05:56:21  25     A.  Yes.

05:56:23  1    Q.  And you testified that you didn't say that,

05:56:27  2  correct?

05:56:27  3    A.  That's correct.

05:56:30  4    Q.  And you also testified that you never lied to

05:56:33  5  Alex, correct?

05:56:36  6    A.  Did I lie to Alex?

05:56:39  7    Q.  You testified that you never lied to Alex?

05:56:41  8    A.  That I never lied to Alex, correct.  I don't know

05:56:44  9  if I testified to that, but to --

05:56:46  10    Q.  Did you ever lie to Alex?

05:56:47  11    A.  No.

05:56:48  12    Q.  Just out of curiosity, isn't law enforcement

05:56:51  13  allowed to lie to suspects?

05:56:53  14    A.  Yes.

05:57:02  15    Q.  Now, final question for you, and this goes back

05:57:05  16  to the recording or the non-recording of the confession.

05:57:11  17  You stated that the non-recording policy is under

05:57:18  18  review.  Would that be accurate?

05:57:21  19    A.  All policies are constantly under review.

05:57:24  20    Q.  Okay.  And given the date of Alex's

05:57:31  21  interrogation, he might not be able to be subject to a

05:57:41  22  tape recorded interrogation, correct?

05:57:44  23    A.  I don't understand your question on that.

05:57:46  24    Q.  So given the Bureau's policy at this point,

05:57:53  25  Alex's confession was not recorded, correct?

| | | |
|---|---|---|
| 05:57:57 | 1 | A.   It was recorded. |
| 05:57:59 | 2 | Q.   It was recorded? |
| 05:58:00 | 3 | A.   It was recorded on my statement form. |
| 05:58:02 | 4 | Q.   But was it audio recorded? |
| 05:58:04 | 5 | A.   It's not audio recorded. |
| 05:58:06 | 6 | Q.   Was it video recorded? |
| 05:58:07 | 7 | A.   No, it's not. |
| 05:58:08 | 8 | Q.   But fast forward.  Given the evolving standards |
| 05:58:14 | 9 | of decency within the FBI, or the evolving standards, |
| 05:58:19 | 10 | strike that, within the FBI, an interrogation like |
| 05:58:22 | 11 | Alex's might one day be audio recorded, correct? |
| 05:58:26 | 12 | MR. SECOR:  Objection, Your Honor.  It's |
| 05:58:28 | 13 | entirely speculative. |
| 05:58:30 | 14 | THE COURT:  I would agree. |
| 05:58:31 | 15 | MS. KELLEY:  Thank you.  No more questions. |
| 05:58:41 | 16 | MR. SECOR:  No questions, Your Honor. |
| 05:58:47 | 17 | THE COURT:  You may step down. |
| 05:58:58 | 18 | MR. CRAWFORD: Special Agent Schulte. |
| 05:59:05 | 19 | THE COURT:  Agent, you've been previously |
| 05:59:08 | 20 | sworn.  You remain under oath. |
| 05:59:10 | 21 | THE WITNESS:  Yes, Your Honor. |
| 05:59:12 | 22 | - - - |
| 05:59:12 | 23 | CRAIG SCHULTE, DIRECT EXAMINATION |
| 05:59:13 | 24 | BY MR. CRAWFORD: |
| 05:59:13 | 25 | Q.  Agent Schulte, you were part of the search |

05:59:17  1    warrant team that conducted a search at Knollwood in

05:59:22  2    September of 2010?

05:59:23  3        A.   That's correct.

05:59:24  4        Q.   Was one of your jobs, one of your assignments

05:59:27  5    that day to speak with Ian Douglas?

05:59:29  6        A.   It was.

05:59:29  7        Q.   And you were -- what were you trying to do in

05:59:35  8    terms of investigating Mr. Douglas?

05:59:37  9        A.   It was my intention to try to quickly assess

05:59:42  10   which direction the investigation should go, try to

05:59:48  11   identify a likely suspect.

05:59:50  12       Q.   And what steps did you or did the team take to

05:59:54  13   either confirm or dispel the notion that Mr. Douglas may

06:00:00  14   have been involved in possessing child pornography?

06:00:02  15       A.   I spoke with Mr. Douglas and asked him various

06:00:05  16   questions about his computer usage, if he had any

06:00:10  17   knowledge of child pornography, whether it be on his

06:00:16  18   computer or anybody else's electronic devices inside the

06:00:19  19   apartment.  Special Agent Steven Smith was with me when

06:00:23  20   I was asking Mr. Douglas those questions, and Special

06:00:29  21   Agent Smith conveyed to me that he could do an on-site

06:00:33  22   scan of Mr. Douglas' computer to verify if his statement

06:00:37  23   was correct.

06:00:38  24       Q.   First, what did you learn from your questioning

06:00:40  25   of Mr. Douglas that assisted you in making your

06:00:43  1    evaluation of him?

06:00:44  2        A.   Mr. Douglas told me that he was not aware of any

06:00:48  3    child pornography inside the apartment at all.  He

06:00:51  4    seemed very surprised.  He -- in fact, I did not

06:00:54  5    initially offer the fact that we were there for child

06:00:58  6    pornography.  I offered him the opportunity to volunteer

06:01:01  7    anything that he thought would be in the interest of the

06:01:04  8    FBI and why we would be there.  Mr. Douglas was at a

06:01:07  9    loss.  Mr. Douglas added that once I told him that we

06:01:10 10    were looking for child pornography --

06:01:12 11             THE COURT:  I assume this testimony is

06:01:15 12    offered only as proof that the statements were made by

06:01:18 13    Mr. Douglas and not for their truth; is that correct?

06:01:21 14             MR. CRAWFORD: Your Honor, the purpose of the

06:01:22 15    testimony is on cross-examination during our case in

06:01:25 16    chief, Agent Schulte was asked a number of questions

06:01:27 17    about why he took certain steps.

06:01:29 18             THE COURT:  I understand.  But I'm asking

06:01:31 19    about the weight the jury can give to the statements

06:01:35 20    attributed to Mr. Douglas.

06:01:37 21             MR. CRAWFORD: Through this witness, yes,

06:01:39 22    Your Honor.

06:01:39 23             THE COURT:  I don't believe they're

06:01:40 24    admissible for the truth of what he was saying, simply

06:01:44 25    for the fact that he made those statements; is that

06:01:49  1    correct?

06:01:49  2            MR. CRAWFORD: He made those statements, and

06:01:52  3    its effect on Mr. Schulte and his actions.

06:01:55  4            THE COURT:  They're not proof or whether or

06:01:57  5    not Mr. Douglas had child pornography on his computer or

06:02:00  6    knew of it on the defendant's computer.

06:02:02  7            MR. CRAWFORD: Not admissible for that

06:02:03  8    purpose.

06:02:04  9            THE COURT:  You're just testifying what he

06:02:06  10   said rather than whether it's true or not.  So the jury

06:02:09  11   will consider this testimony just for that aspect and

06:02:13  12   not for the truth of the matter asserted.

06:02:16  13           Go ahead, Mr. Crawford.

06:02:17  14   BY MR. CRAWFORD:

06:02:18  15       Q.  Agent Schulte, did Agent Smith conduct a scan of

06:02:22  16   Mr. Douglas' computer?

06:02:23  17       A.  Yes, he did.

06:02:24  18       Q.  Did you learn the results of that scan?

06:02:26  19       A.  I did.

06:02:27  20       Q.  And what were those results?

06:02:28  21       A.  Those results were that Special Agent Smith could

06:02:31  22   not find any evidence of child pornography on Ian

06:02:34  23   Douglas' computer to include the search terms, still

06:02:38  24   images, or movie files.

06:02:41  25       Q.  At the time you were speaking with Mr. Douglas,

06:02:44  1  was somebody else speaking with Mr. Cook?

06:02:46  2      A.  Yes, I believe Special Agent Pape was.

06:02:49  3      Q.  Okay.  At some point in time did Special Agent

06:02:52  4  Pape relay what he had learned from Mr. Cook to you?

06:02:55  5      A.  He did.  Special Agent Pape later told me that at

06:02:58  6  the residence Mr. Alex Cook told him that he knew why we

06:03:03  7  were there and that he had child pornography on his

06:03:05  8  computer.

06:03:05  9      Q.  And what role did that information from Mr. --

06:03:08  10  from Agent Pape, what role did that information play in

06:03:11  11  your evaluation of Mr. Douglas?

06:03:12  12      A.  It changed my focus of the investigation to be

06:03:16  13  nearly completely on Mr. Cook.

06:03:20  14      Q.  Had you found child pornography on Mr. Douglas'

06:03:22  15  computer, how would that have changed your

06:03:26  16  investigation?

06:03:28  17      A.  Well, at that point if I found it on Ian Douglas'

06:03:32  18  computer, in addition to the information we knew about

06:03:36  19  Mr. Cook, I would have treated them both as subjects of

06:03:39  20  the investigation.

06:03:40  21      Q.  Had you found child pornography on Mr. Douglas'

06:03:44  22  computer, would you have ignored Mr. Cook at that point?

06:03:47  23      A.  No, I would not have.

06:03:50  24      Q.  Subsequent to completing the search did you

06:03:53  25  receive any phone calls from Mr. Cook?

06:03:55  1      A.   I did.

06:03:56  2      Q.   Could you describe those phone calls?

06:04:00  3               MR. SECOR:  May we approach the bench?

06:04:02  4               THE COURT:  Sure.

06:04:03  5               (Whereupon the following discussion was had

06:07:05  6      at the bench outside the hearing of the jury:)

06:07:05  7               MR. CRAWFORD: I just want to proffer what

06:07:05  8      the phone calls are about.  One of the phone calls --

06:07:05  9      well, the gist of the phone calls is he was calling

06:07:05  10     Agent Schulte to ask him the status of his case.  He

06:07:05  11     called Agent Schulte; he wanted to get his X-Box back

06:07:06  12     because it belonged to Ian Douglas, and he also

06:07:06  13     requested on at least one occasion the name of the

06:07:06  14     U.S. -- Assistant U.S. Attorney who was handling this

06:07:06  15     case so he could call the U.S. Attorney and work

06:07:06  16     something out.

06:07:06  17              MS. KELLEY:  Why are we doing this?

06:07:07  18              THE COURT:  I'm not going to let him say

06:07:07  19     that.

06:07:07  20              MR. SECOR:  That's why I wanted to come to

06:07:07  21     the bench.

06:07:07  22              THE COURT:  An offer of settlement or

06:07:07  23     compromise, I don't think that's admissible.  So that's

06:07:07  24     that part of the question.

06:07:07  25              MS. KELLEY:  Then my objection would be

06:07:08  1    moot.

06:07:08  2              THE COURT:  Okay.  Why don't you ask the

06:07:08  3    agent -- and I'll say this calls for a yes or no

06:07:08  4    answer -- Agent, did Mr. Cook call you on one occasion

06:07:08  5    to ask you about -- whatever the first thing was.

06:07:08  6    And --

06:07:08  7              MS. KELLEY:  The X-Box I think.

06:07:08  8              THE COURT:  There were three things.

06:07:08  9              MR. CRAWFORD: Well, several things.  One was

06:07:08  10   the status of his case, another was this X-Box, and then

06:07:08  11   he wanted the name of the U.S. Attorney.

06:07:08  12             THE COURT:  I'm going to keep that out.

06:07:08  13             MR. CRAWFORD: Cut it off there?

06:07:08  14             THE COURT:  My point is he called to ask

06:07:08  15   about the status of his case, and at another point did

06:07:09  16   he call about getting his X-Box back?  I'll say just yes

06:07:09  17   or no so it can kind of guide the agent so he doesn't

06:07:09  18   say, Yes, and da-da-da.  I think it's a little risky.

06:07:09  19             MR. CRAWFORD: Judge, I intended to ask him

06:07:10  20   why he called about the X-Box.

06:07:10  21             THE COURT:  Why don't you say, He called to

06:07:10  22   ask about this and about that.  Because I don't want him

06:07:10  23   to talk about contacting the U.S. Attorney.  If you want

06:07:10  24   to ask him when were these calls made, on day one and

06:07:10  25   day two?

06:07:10  1            (End of side-bar discussion.)

06:07:10  2            THE COURT:  You may rephrase the question.

06:07:10  3   BY MR. CRAWFORD:

06:07:10  4   Q.  Special Agent Schulte, Mr. Cook made phone calls

06:07:15  5   to you after he'd been served the search warrant; is

06:07:18  6   that true?

06:07:18  7   A.  That is true.

06:07:20  8   Q.  And in one call he asked you the status of his

06:07:23  9   case; is that true?

06:07:24  10  A.  That is true.

06:07:25  11  Q.  And in another call he asked you about the return

06:07:28  12  of an X-Box; is that true?

06:07:30  13  A.  It may have been the same call, or it could have

06:07:33  14  been a separate call.  I don't recall how many times we

06:07:37  15  spoke.  But yes, I do recall Mr. Cook inquiring about an

06:07:41  16  X-Box.

06:07:41  17  Q.  During your career as a law enforcement officer,

06:07:44  18  have you ever sent a letter to a prosecutor telling him

06:07:47  19  not to go further with a case?

06:07:48  20  A.  No.

06:07:49  21  Q.  Have you ever sent a letter from a -- someone

06:07:53  22  under investigation to the prosecutor indicating the

06:07:56  23  prosecutor should not go forward with the case?

06:07:59  24  A.  No.

06:07:59  25  Q.  And you were present in the FBI Lima office

06:08:03   1   during the time Agent Pape was questioning Mr. Cook; is

06:08:07   2   that true?

06:08:07   3       A.  Yes.

06:08:08   4       Q.  And where -- where was your physical location to

06:08:12   5   the interrogation room?

06:08:13   6       A.  I was just outside the interrogation room in the

06:08:17   7   general office area of the FBI, perhaps 20 feet from --

06:08:22   8               MS. KELLEY:  Objection, Your Honor.  This

06:08:23   9   was already covered during direct.

06:08:25  10               THE COURT:  I think so.

06:08:27  11               MR. CRAWFORD: Okay, Your Honor.  That's

06:08:28  12   fine.

06:08:28  13               THE COURT:  I think so.

06:08:29  14               MR. CRAWFORD: All right.  No further

06:08:31  15   questions, Judge.

06:08:31  16               THE COURT:  Ms. Kelley.

06:08:33  17               MS. KELLEY:  Very briefly.  Thank you.

06:08:36  18                       -  -  -

06:08:36  19           CRAIG SCHULTE, CROSS-EXAMINATION

06:08:36  20   BY MS. KELLEY:

06:08:36  21       Q.  Under cross-examination during rebuttal testimony

06:08:42  22   Agent Pape testified that in certain circumstances law

06:08:48  23   enforcement is allowed to lie to subjects.  Would he be

06:08:52  24   correct or incorrect?

06:08:54  25       A.  I believe that to be correct.

06:08:57  1      Q.  And the child pornography material was traced to

06:09:08  2  an IP address, correct?

06:09:10  3      A.  That is correct.

06:09:11  4      Q.  It was not traced to a MAC address, was it?

06:09:15  5      A.  That's correct.

06:09:16  6              MS. KELLEY:  Thank you.  No more questions.

06:09:19  7              MR. CRAWFORD: No questions, Judge.

06:09:21  8              THE COURT:  I just have one question --

06:09:24  9  forget it.  That's okay.  Never mind.

06:09:41  10             MR. CRAWFORD: Judge, that concludes our

06:09:43  11 rebuttal witnesses.

06:09:44  12             THE COURT:  Pardon me?

06:09:45  13             MR. CRAWFORD: That concludes our rebuttal

06:09:47  14 witnesses.

06:09:48  15             THE COURT:  Any surrebuttal?

06:09:49  16             MS. KELLEY:  No, Your Honor.

06:09:51  17             THE COURT:  Both parties rest.  Okay.

06:09:53  18             Ladies and gentlemen, you've heard all the

06:09:54  19 evidence that you're going to hear to decide this case,

06:10:00  20 but keep an open mind.  I mean, I can understand that

06:10:04  21 that's very difficult.  It's human nature to start

06:10:09  22 weighing things and thinking about things along the way,

06:10:12  23 but as I explained to you at the outset of the trial,

06:10:17  24 that's why it's so important you ask do everything you

06:10:21  25 can to keep an open mind.

06:10:22  1          I certainly hope you followed my instruction

06:10:24  2   not to talk about the case yet.  Again, when you go home

06:10:27  3   this evening, if they ask you what's going on and so

06:10:30  4   forth, you say, well, once the case is all over I can

06:10:34  5   talk to you as much as you want to or you may want me to

06:10:37  6   talk about, but until then I can't say anything.  Let's

06:10:41  7   talk about how we go from August to November in

06:10:47  8   basically 24 hours around here or anything else, but not

06:10:50  9   about the case.

06:10:51  10          As I indicated, I'm going to adjourn now,

06:10:54  11  and we'll start tomorrow at 8:30 with my charge.  There

06:10:58  12  are some changes in the charge from the one that I gave

06:11:02  13  you.  They're primarily stylistic and reflect the fact

06:11:07  14  that you've heard the evidence rather than the

06:11:10  15  anticipation that you're about to hear the evidence.

06:11:13  16  But in sum and substance they are substantially the

06:11:17  17  same.  But it is that charge which will guide your

06:11:19  18  deliberations.  As I will probably mention tomorrow as

06:11:22  19  well, you'll each have your own copy.  You can make

06:11:25  20  whatever notes on it you want.  And you'll take those

06:11:31  21  back with you.  However, I will write the final charge

06:11:35  22  on the one that I read from in case of any change or

06:11:38  23  whatever.  If there's any question about the charge, it

06:11:41  24  will be that final charge that is to guide your

06:11:44  25  deliberations.

06:11:46  1          As I mentioned, I would expect that we will

06:11:49  2   have closing arguments done around 11:00.  I don't keep

06:11:54  3   a stopwatch on the lawyers; they both have a lot to talk

06:11:58  4   about, of course.  It's an important case.  I'll give

06:12:01  5   them the time they think they need.  So certainly I

06:12:04  6   think before noon the case will be in your hands for

06:12:09  7   deliberation.  As I mentioned earlier, the timetable is

06:12:12  8   entirely yours to set.  So thank you for your

06:12:14  9   attentiveness, patience for the occasion of delays and

06:12:19  10  sidebars.  I should have mentioned that while we're

06:12:23  11  over here at sidebar don't ponder about what it is we're

06:12:27  12  talking about or what's going on.  That's not evidence,

06:12:30  13  of course.  The evidence is only what you heard from the

06:12:33  14  witness stand and the exhibits that you'll have with you

06:12:35  15  in the jury room.

06:12:36  16          So safe travels home and back, and we'll see

06:12:40  17  you tomorrow morning about 8:30.  Thank you.

06:13:22  18              (The jury is excused.)

06:13:26  19          THE COURT:  I'll have Amy get you the charge

06:13:28  20  by e-mail.  One change I made, I've already discussed

06:13:33  21  with you, but I did place it elsewhere in the charge.

06:13:39  22  Let me just read it to you.  I think it's really the

06:13:42  23  only one that there's any significant change.  I

06:13:46  24  inserted my own closing charge about their duties and

06:13:56  25  selection of the foreperson, all of that.

06:14:00  1          The charge captioned "Statement by the

06:14:04  2     defendant" will read as follows, subject to further

06:14:07  3     objection and discussion, if any.  If you do, the

06:14:15  4     objection's been preserved, the government's objection.

06:14:18  5     But in terms of phraseology or whatever, as to this or

06:14:22  6     anything else, send me an e-mail sometime this evening

06:14:26  7     and I'll -- actually, if you can look at it now and let

06:14:32  8     me now.

06:14:33  9          MS. KELLEY:  Could you just read it quickly?

06:14:35  10         THE COURT:  I meant the whole charge.

06:14:37  11         Statement by the defendant:  You heard

06:14:38  12    testimony that the defendant on September 8, 2001, made

06:14:50  13    a statement in which the government -- the government

06:14:56  14    claims he acknowledged -- admitted certain facts.  The

06:15:04  15    defendant disputes the government's version typed by

06:15:06  16    Agent Pape of the statement.  It is for you to determine

06:15:10  17    what it was that defendant said to the agent and what

06:15:13  18    weight to give to what he told him.  In determining what

06:15:17  19    the defendant told the agent, you should consider all of

06:15:20  20    the evidence about the statement including the

06:15:22  21    circumstances under which the defendant spoke to the

06:15:25  22    agent, and the agent in turn created his typewritten

06:15:30  23    version of the statement.  In determining what the

06:15:33  24    defendant told the agent, you may also consider the

06:15:36  25    failure of the agent to have recorded the interview and

06:15:40  1   the oral statement made by the defendant to the agent.

06:15:45  2              I thought it would fit there.

06:15:46  3              MS. KELLEY:  The only point is purely

06:15:48  4   technical.  The statement was dated 9/15, not 9/8.

06:15:54  5              THE COURT:  I don't know how that snuck in

06:15:57  6   there.

06:15:57  7              MS. KELLEY:  Otherwise it's fine, Your

06:15:59  8   Honor.

06:15:59  9              MR. SECOR:  Judge, in our original

06:16:02  10  submission of jury instructions I had a pattern

06:16:04  11  instruction of 7.20, statement by the defendant.  Under

06:16:12  12  United States versus Adams, it's a required instruction.

06:16:16  13  It must be given.

06:16:19  14             MS. KELLEY:  No objection.

06:16:23  15             THE COURT:  Well, I'm not sure I can find

06:16:27  16  your -- can you bring that up to me?  Did I take that

06:17:30  17  out?  Corroboration; is that the part?   That makes

06:17:34  18  sense.  It seems superfluous to me, but I appreciate

06:17:46  19  your calling it to my attention.

06:17:51  20             Was that the only portion that -- I didn't

06:18:00  21  read that.  I'm sorry.

06:18:02  22             Number four.  You may convict the defendant

06:18:05  23  solely on his own -- you may not convict the

06:18:09  24  defendant -- that's the same language.  I just hadn't

06:18:13  25  read further.  Thank you.

06:18:19   1          I'm going to be very candid.  Agent Schulte,
06:18:22   2    I know it's not your job to change policy.  But as Mr.
06:18:26   3    Secor and Mr. Crawford probably told you, I am deeply
06:18:29   4    disturbed that the FBI continues its incomprehensible
06:18:39   5    policy of not recording interviews.  We spent this week
06:18:46   6    for one reason and one reason only in this case, because
06:18:52   7    the Bureau does not record interviews.  Shame on the
06:18:57   8    Bureau.  It makes no sense.  It gives the Bureau an
06:19:04   9    unfair advantage.  You come in here in your coat and tie
06:19:08  10    and say, I'm from the FBI, and I do not lie, and
06:19:12  11    everybody believes it.  You already come in with an
06:19:16  12    overwhelming advantage because of the Bureau you work
06:19:19  13    for and the esteem and respect in which we all hold it,
06:19:24  14    myself included.  I've worked with your agents for more
06:19:27  15    than 30 years.   And quite candidly, rarely, if ever,
06:19:31  16    have I had a question about their veracity.  But it
06:19:38  17    enhances the advantage you already have and the
06:19:42  18    government already has not to record interviews.  They
06:19:46  19    tape record -- they videotape them across the street,
06:19:50  20    across the mall in the Toledo Police Department.  You
06:19:53  21    have an undercover operation; you wire the informant for
06:19:56  22    every single drug transaction.  Why do you do it?   Best
06:20:00  23    possible record.  That's why.  But you get in an
06:20:05  24    interrogation room with nobody else except a 20 year old
06:20:10  25    defendant, and you -- your Bureau sees fit at that

06:20:14  1    moment, the most crucial moment of any investigation,

06:20:19  2    not to record what he says and what you say; "you,"

06:20:24  3    collectively incorporated.  And that's shameful.  It's

06:20:29  4    intolerable in any society under any government that

06:20:33  5    values the rights of its citizens to a fair trial.

06:20:40  6             I know my saying this is out of role and

06:20:43  7    perhaps out of place.  I know that there is nothing you

06:20:46  8    can do about it.  But quite simply, somebody has to tell

06:20:50  9    the Bureau, there's at least one federal judge in whose

06:20:56  10   estimation the FBI diminishes when it comes in the

06:21:00  11   courtroom and it says, we didn't record the statement.

06:21:05  12   I was tempted to ask the simple question, What would

06:21:10  13   have been the indisputable proof of what was said in

06:21:14  14   that room?  And you would have had to answer, a

06:21:21  15   recording.  I was that close to doing it.  But I decided

06:21:27  16   not to put my thumb on the scales.  I'm not so sure next

06:21:32  17   time it happens I will be quite so discreet.  This

06:21:35  18   young man is looking at 15 years in prison if he gets

06:21:39  19   convicted.  If he did what he did, it's appalling.  It's

06:21:46  20   insufferable.  He deserves to go to prison.  But he

06:21:52  21   also deserves the fairest possible trial our government

06:21:55  22   can give him.  And every time the FBI does not show up

06:22:01  23   with a recording device, it cheats that suspect and

06:22:06  24   ultimately that defendant.  It's not playing fair.  I

06:22:11  25   expect more from our government law enforcement agents.

| 06:22:14 | 1 | You send in an undercover agents, peephole cameras, you |
| 06:22:20 | 2 | wire rooms, you record by law every conversation that's |
| 06:22:23 | 3 | heard on a Title III.  But it comes to the occasion when |
| 06:22:30 | 4 | most cases are determined, namely when you sit down in a |
| 06:22:37 | 5 | closed interview room with a suspect; that is the most |
| 06:22:42 | 6 | crucial moment of almost every case in an investigation, |
| 06:22:47 | 7 | the one-on-one interrogation, and you take advantage of |
| 06:22:51 | 8 | that by not recording it.  Shame on the Bureau.  And |
| 06:22:55 | 9 | tell them I said so.  Tell them they can do better.  We |
| 06:22:58 | 10 | deserve better.  I've said enough.  See you in the |
| 06:23:04 | 11 | morning. |
| 06:27:39 | 12 | (Recess taken.) |
| 06:27:39 | 13 | THE COURT:  I'd like the U.S. Attorney to |
| 06:27:46 | 14 | have a transcript made.  Agent, I know I'm yelling at |
| 06:27:55 | 15 | you.  I'm yelling at you as the best available |
| 06:27:58 | 16 | representative.  I know you have nothing to do with this |
| 06:28:00 | 17 | policy.  On the other hand, I thought Ms. Kelley had a |
| 06:28:03 | 18 | good point.  You're the case agent.  You could have |
| 06:28:06 | 19 | asked the SAC.  And I've got to believe that next time |
| 06:28:10 | 20 | any agent in the Western Division, Toledo, Lima, or |
| 06:28:13 | 21 | Sandusky asks for that permission, they're going to get |
| 06:28:16 | 22 | it.  I'm telling you right now, I expect you to ask. |
| 06:28:19 | 23 | And if you don't, what I tell the jury the next time may |
| 06:28:21 | 24 | be a lot more pointed and a lot more unfair and may |
| 06:28:24 | 25 | result in somebody not getting convicted who deserves to |

06:28:29  1  be convicted.  But I will not tolerate the fundamental

06:28:33  2  unfairness of what the FBI does day in and day out,

06:28:38  3  trial in and trial out, interrogation and interrogation

06:28:44  4  and interrogation after another.  It is unpardonable.

06:28:49  5  In this courtroom in front of this judge it is

06:28:51  6  unacceptable.  And it will not happen again.  Or if it

06:28:55  7  does, I will give a strongly worded instruction.  I will

06:28:57  8  exercise my right to question the agent.  And I will

06:29:01  9  also exercise my right to comment on the evidence.

06:29:07  10  Enough said.  Let's get about the business.

06:29:11  11            MR. SECOR:  Your Honor, the government would

06:29:12  12  offer Exhibits 21, 22, and 23.  These were the

06:29:18  13  appendices to Mr. Vassel's report.

06:29:24  14            MS. KELLEY:  No objection.

06:29:25  15            THE COURT:  They'll be admitted.

06:29:28  16            MS. KELLEY:  And we would ask that the Court

06:29:30  17  admit Defendant's Exhibit 116, which is the 302, date of

06:29:35  18  transcription 9/20/10 by Agent Schulte and Smith.

06:29:41  19            MR. SECOR:  No objection.

06:29:43  20            MS. KELLEY:  And then Defendant's Exhibit

06:29:44  21  117, another 302, date of transcription 9/20/2010 by

06:29:51  22  Agent Schulte and Pape.

06:29:54  23            MR. SECOR:  No objection.

06:29:58  24            THE COURT:  The one thing I did do, the

06:30:02  25  other stuff I changed, I should mention, to the

06:30:15　1　boilerplate about disregarding questions to which an

06:30:19　2　objection was sustained:  If I sustained an objection or

06:30:23　3　if a question was withdrawn, you must disregard the

06:30:28　4　question and answer, if any, to the question.  Do not

06:30:30　5　speculate about what an answer might have been where I

06:30:35　6　sustained an objection to a question.

06:30:38　7　　　　　　　MR. SECOR:  Fine, no problem.

06:30:40　8　　　　　　　MS. KELLEY:  That's fine, Your Honor.

06:30:43　9　　　　　　　THE COURT:  I apologize for losing my

06:30:45　10　temper.

06:30:46　11　　　　　　　MR. SECOR:  I'm used to it after 25 years.

06:30:52　12　　　　　　　THE COURT:  No -- I hope I don't.

06:30:55　13　　　　　　　MR. SECOR:  You don't remember how it used

06:30:56　14　to be 25 years ago.

06:30:58　15　　　　　　　THE COURT:  Old timer's disease.  I do want

06:31:02　16　to say it's a pleasure having you.  I can't imagine

06:31:05　17　you've never tried a case to me.

06:31:07　18　　　　　　　MR. SECOR:  A couple times a long time ago.

06:31:10　19　　　　　　　THE COURT:  I assume so.  But I don't --

06:31:12　20　　　　　　　MR. SECOR:  A long time ago.

06:31:15　21　　　　　　　THE COURT:  Ms. Kelley, you've done an

06:31:16　22　excellent job.

06:31:17　23　　　　　　　MS. KELLEY:  Thank you.

06:31:18　24　　　　　　　THE COURT:  And Gene and Tom, you have too.

06:31:20　25　It's been a pleasure.  Perhaps not for you on occasion.

```
1              (Adjourned at 3:12 p.m.)

2                        -  -  -

3

4               C E R T I F I C A T E

5

6      I certify that the foregoing is a correct transcript

7   from the record of proceedings in the above-entitled

8   matter.

9

10  /s Tracy L. Spore_____      _____

11  Tracy L. Spore, RMR, CRR              Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3   Examinations                                    Page

 4

 5   JERRY COOK, DIRECT EXAMINATION                   267

 6   BY MS. KELLEY:

 7   GARY KOCHHAISER, DIRECT EXAMINATION              276

 8   BY MS. KELLEY:

 9   MARK VANCE, DIRECT EXAMINATION                   282

10   BY MS. KELLEY:

11   MARK VANCE, CROSS-EXAMINATION                    285

12   BY MR. SECOR:

13   MARK VANCE, REDIRECT EXAMINATION                 287

14   BY MS. KELLEY:

15   ANN VANCE, DIRECT EXAMINATION                    289

16   BY MS. KELLEY:

17   ALEX COOK, DIRECT EXAMINATION                    295

18   BY MS. KELLEY:

19   ALEX COOK, CROSS-EXAMINATION                     328

20   BY MR. CRAWFORD:

21   ALEX COOK, REDIRECT EXAMINATION                  337

22   BY MS. KELLEY:

23   MARK VASSEL, DIRECT EXAMINATION                  347

24   BY MS. KELLEY:

25   MARK VASSEL, CROSS-EXAMINATION                   360
```

```
 1    BY MR. CRAWFORD:

 2    MARK VASSEL, REDIRECT EXAMINATION                        373

 3    BY MS. KELLEY:

 4    MARK VASSEL, RECROSS-EXAMINATION                         379

 5    BY MR. CRAWFORD:

 6    MARK VASSEL, FURTHER REDIRECT EXAMINATION                380

 7    BY MS. KELLEY:

 8    DAVID MORFORD, DIRECT EXAMINATION                        382

 9    BY MR. CRAWFORD:

10    DAVID MORFORD, CROSS-EXAMINATION                         386

11    BY MS. KELLEY:

12    IAN DOUGLAS, DIRECT EXAMINATION                          389

13    BY MR. SECOR:

14    IAN DOUGLAS, CROSS-EXAMINATION                           396

15    BY MS. KELLEY:

16    PAUL PAPE, DIRECT EXAMINATION                            401

17    BY MR. SECOR:

18    PAUL PAPE, CROSS-EXAMINATION                             407

19    BY MS. KELLEY:

20    CRAIG SCHULTE, DIRECT EXAMINATION                        419

21    BY MR. CRAWFORD:

22    CRAIG SCHULTE, CROSS-EXAMINATION                         427

23    BY MS. KELLEY:

24

25
```