```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION


 3


 4   UNITED STATES OF AMERICA,-    Docket No. 3:10-cr-522
                               -
 5       Plaintiff,            -    Toledo, Ohio
                               -    September 9, 2011
 6          v.                 -    Trial
                               -
 7   ALEX DAVID COOK,          -
                               -
 8       Defendant.            -
     -------------------------------
 9
                            VOLUME 5
10                      TRANSCRIPT OF TRIAL
             BEFORE THE HONORABLE JAMES G. CARR
11         UNITED STATES DISTRICT JUDGE, AND A JURY

12   APPEARANCES:

13   For the Plaintiffs:  United States Attorneys' Office
                          By:  Thomas O. Secor
14                             Gene Crawford
                          Four SeaGate, Suite 308
15                        Toledo, OH 43604
                          (419) 259-6376
16
     For the Defendant:   Elizabeth Kelley
17                        Suite 285
                          13938 A Cedar Road
18                        Cleveland, OH 44118-3204
                          (216) 410-6923
19
     Court Reporter:      Tracy L. Spore, RMR, CRR
20                        1716 Spielbusch Avenue
                          Toledo, Ohio 43624
21                        (419) 213-5520

22

23
     Proceedings recorded by mechanical stenography,
24   transcript produced by notereading.

25
```

1                    (Reconvened at 8:40 a.m.)

2                    THE COURT:  Ready to go?

00:00:02    3          MS. KELLEY:  Yes, Your Honor.

00:00:03    4          THE COURT:  I'm embarrassed to tell you,

00:00:06    5    you're supposed to renew your Rule 29 motion to renew

00:00:10    6    your rights.

00:00:11    7          MS. KELLEY:  I thought about that last

00:00:13    8    night.  Theoretically I should have done that at the

00:00:16    9    end.  I could do it again this morning for purposes of

00:00:19   10    the record.

00:00:19   11          THE COURT:  Nothing's happened in between.

00:00:23   12          MS. KELLEY:  For purposes of the record,

00:00:24   13    Your Honor, I'd like to renew our Rule 29 motion.

00:00:29   14          THE COURT:  I'll take it under advisement.

00:00:31   15          MS. KELLEY:  Also, could the government and

00:00:33   16    I approach you at sidebar?  There's one matter before

00:00:38   17    the jury.

00:03:16   18          (Whereupon the following discussion was had

00:03:16   19    at the bench:)

00:03:16   20          MS. KELLEY:  I just wanted to clarify matter

00:03:16   21    in case anyone comes forward later.  Last night when I

00:03:16   22    exited the courthouse to the parking lot across the

00:03:16   23    street, I could see juror number -- I believe 7 is the

00:03:16   24    woman with the red hair.  And she was on her cell phone.

00:03:17   25    She was frantically gesturing.  And then as I was

| | | |
|---|---|---|
| 00:03:17 | 1 | crossing the street a tow truck came along.  She looked |
| 00:03:17 | 2 | very, very distressed.  And I said to her, would you |
| 00:03:17 | 3 | like me to call the Judge's bailiff to provide some |
| 00:03:17 | 4 | assistance?  And she said, no, everything was all right. |
| 00:03:18 | 5 | At that point I moved.  But I wasn't having any ex |
| 00:03:18 | 6 | parte -- |
| 00:03:18 | 7 | THE COURT:  I understand. |
| 00:03:18 | 8 | MS. KELLEY:  In case anyone saw. |
| 00:03:18 | 9 | THE COURT:  That's quite appropriate. |
| 00:03:18 | 10 | (End of sidebar discussion.) |
| 00:03:18 | 11 | THE COURT:  Any problem with the |
| 00:03:18 | 12 | instructions? |
| 00:03:18 | 13 | MR. SECOR:  Other than page 27.  We've |
| 00:03:19 | 14 | already hashed that around. |
| 00:03:19 | 15 | THE COURT:  Ms. Kelley, any problem with the |
| 00:03:19 | 16 | instructions? |
| 00:03:19 | 17 | MS. KELLEY:  No, I gave my comments to Amy |
| 00:03:19 | 18 | last night. |
| 00:03:19 | 19 | THE COURT:  I believe I was able to |
| 00:03:19 | 20 | incorporate everything into the final version.  If you |
| 00:03:19 | 21 | note something when you read along with me, if you see |
| 00:03:19 | 22 | something, give a holler; we'll stop and fix it.  It's |
| 00:03:22 | 23 | my experience no matter how hard you try, there's always |
| 00:03:31 | 24 | some glitch. |
| 00:03:36 | 25 | (Jury enters the courtroom.) |

00:04:24  1              THE COURT:  Good morning.  You can be

00:04:25  2   seated.  Each of you should have on your chairs there a

00:04:29  3   copy of the instructions which I'm about to read.  As I

00:04:33  4   said before I read the initial instructions, I would

00:04:39  5   encourage you to read along, but I would also ask that

00:04:42  6   you not read ahead.  Just follow along.  You can mark

00:04:48  7   them up.  If you don't care to read along, that's fine;

00:04:51  8   You can just listen to the instructions.

00:05:01  9              Members of the jury, I will now instruct you

00:05:04  10  about the law that you must follow in deciding this

00:05:07  11  case.

00:05:08  12             First, I will explain your duties the and

00:05:12  13  the general rules that apply in every criminal case.

00:05:15  14             Then I will explain the elements, or parts,

00:05:18  15  of the crimes that the defendant is accused of

00:05:21  16  committing.  The government must prove each element

00:05:26  17  beyond a reasonable doubt for you to return a guilty

00:05:29  18  verdict; if it does not, you must return a not guilty

00:05:34  19  verdict.

00:05:35  20             Then I will explain some rules that you must

00:05:38  21  use in evaluating particular testimony and evidence.

00:05:41  22             And last, I will explain the rules that you

00:05:45  23  must follow during your deliberations in the jury room,

00:05:48  24  and the possible verdicts that you may return.

00:05:51  25             Although you have your own written copy of

00:05:54   1   the instructions, which you will have with you in the

00:05:57   2   jury room, please listen carefully to everything I say.

00:06:02   3            Jurors' duties.  You have two main duties as

00:06:07   4   jurors.  The first is to decide what the facts are from

00:06:12   5   the evidence that you see and hear in court.  Deciding

00:06:16   6   what the facts are is your job, not mine; nothing I say

00:06:22   7   or do during this trial is meant to influence your

00:06:26   8   decision about the facts.

00:06:28   9            Your second duty is to take the law that I

00:06:33  10   give you, apply it to the facts, and decide if the

00:06:38  11   government has proved the defendant guilty beyond a

00:06:42  12   reasonable doubt.  It is my job to instruct you about

00:06:46  13   the law, and you are bound by the oath that you took at

00:06:50  14   the beginning of the trial to follow my instructions,

00:06:53  15   even if you personally disagree with them.  This

00:06:58  16   includes the instructions that I gave you before and

00:07:01  17   during the trial, and these instructions.  All

00:07:05  18   instructions are important, and you should consider them

00:07:09  19   together as a whole.

00:07:11  20            I do want simply to remind you in the event

00:07:18  21   you detect any variance between the instructions that I

00:07:22  22   give you at the outset and these instructions, these

00:07:25  23   instructions are the ones you are to follow.  I made a

00:07:29  24   couple -- a few changes, and I don't think, quite

00:07:35  25   candidly, they affect the substance of the instructions,

00:07:38  1   but just so that you're clear, if you recall any

00:07:42  2   variance between what I told you when the trial began

00:07:45  3   and what I am telling you today, these are the

00:07:48  4   instructions that control your deliberations.

00:07:52  5          The lawyers may refer to the law during

00:07:57  6   their opening statement and closing arguments.  If what

00:08:01  7   they say differs from what I tell you about the law, you

00:08:05  8   must follow what I say.  What I say about the law

00:08:08  9   controls.

00:08:09  10         Perform these duties fairly.  Do not let any

00:08:14  11  bias, sympathy, or prejudice that you may feel toward

00:08:18  12  one side or the other influence your decision in any

00:08:25  13  way.

00:08:25  14         Presumption of innocence, burden of proof,

00:08:29  15  reasonable doubt.

00:08:31  16         An indictment is not any evidence at all of

00:08:37  17  guilt.  It is just the formal way that the government

00:08:42  18  tells the defendant what crimes it accuses the defendant

00:08:45  19  of committing.  But an indictment alone does not even

00:08:50  20  raise any suspicion of guilt.

00:08:52  21         The defendant starts the trial with no

00:08:56  22  evidence at all against him.  The law presumes he is

00:09:00  23  innocent.  This presumption of innocence stays with the

00:09:05  24  defendant unless and until the government presents

00:09:10  25  evidence sufficient to overcome the presumption and

1 convince you beyond a reasonable doubt that he is

2 guilty.

3       This means the defendant has no obligation

4 to present any evidence at all or to prove to you in any

5 way that he is innocent. The government has the burden

6 of proving that he is guilty. This burden stays on the

7 government from start to finish. You must find the

8 defendant not guilty unless the government convinces you

9 beyond a reasonable doubt that he is guilty.

10       The government must prove every element of

11 the crimes charged beyond a reasonable doubt. Proof

12 beyond a reasonable doubt does not mean proof beyond all

13 possible doubt. Possible doubts or doubts based purely

14 on speculation are not reasonable doubts. A reasonable

15 doubt is a doubt based on reason and common sense. It

16 may arise from the evidence, the lack of evidence, or

17 the nature of the evidence.

18       Proof beyond a reasonable doubt means proof

19 which is so convincing that you would not hesitate to

20 rely and act on it in making the most important

21 decisions in your own lives. If you are convinced that

22 the government has proved the defendant guilty beyond a

23 reasonable doubt, say so by returning a guilty verdict.

24 If you are not so convinced, say so by returning a not

25 guilty verdict.

00:11:01   1          Evidence defined.

00:11:04   2          You must base your decision only on the

00:11:08   3   evidence that you saw and heard, including the exhibits

00:11:13   4   which will be with you in the jury room.  Do not let

00:11:16   5   anything else that you may have seen or heard influence

00:11:20   6   your decision in any way.

00:11:22   7          The evidence in this case includes only what

00:11:26   8   the witnesses said while they were testifying under oath

00:11:30   9   and the exhibits allowed into evidence.

00:11:33  10          Nothing else is evidence.  The lawyers'

00:11:37  11   statements and arguments are not evidence.  Their

00:11:41  12   questions and objections are not evidence -- what the

00:11:45  13   witnesses say in response to those questions is

00:11:48  14   evidence.  My legal rulings are not evidence.  And my

00:11:53  15   comments and questions are not evidence.

00:11:56  16          If I have sustained an objection, or if a

00:12:01  17   question was withdrawn, you must disregard the question

00:12:04  18   and answer, if any, to the question.  Do not speculate

00:12:10  19   about what an answer might have been where I sustained

00:12:14  20   an objection to a question, or the question was

00:12:18  21   withdrawn.

00:12:20  22          Base your decision only on the evidence, as

00:12:23  23   I define "the evidence" in these instructions, and

00:12:28  24   nothing else.

00:12:34  25          Consideration of evidence.  Use your common

00:12:37  1   sense in weighing the evidence.  Consider it in light of

00:12:42  2   your everyday experience with people and events, and

00:12:46  3   give it whatever weight you believe it deserves.  If

00:12:51  4   your experience tells you that certain evidence

00:12:53  5   reasonably gives rise to an inference or leads to a

00:12:57  6   conclusion based on that evidence, you may draw that

00:13:03  7   inference or draw that conclusion.

00:13:08  8          Direct and circumstantial evidence.  There

00:13:15  9   are two general types of evidence: "Direct evidence" and

00:13:21  10  "circumstantial evidence."

00:13:23  11         Direct evidence is simply evidence, like the

00:13:26  12  testimony of an eyewitness, which, if you believe it,

00:13:29  13  directly proves a fact.  If a witness testified that he

00:13:34  14  saw it raining outside, and you believed him, that would

00:13:38  15  be direct evidence that it was raining.

00:13:41  16         Circumstantial evidence is simply evidence

00:13:45  17  that indirectly proves a fact.  If someone walked into

00:13:51  18  the courtroom wearing a raincoat covered with drops of

00:13:54  19  water and carrying a wet umbrella, that would be

00:13:57  20  circumstantial evidence from which you could conclude

00:14:00  21  that it was raining.

00:14:02  22         The law makes no distinction between the

00:14:05  23  weight that you should give to either direct or

00:14:08  24  circumstantial evidence or says that one is any better

00:14:12  25  evidence than the other.  You should consider all the

00:14:15  1  evidence, both direct and circumstantial, and give it

00:14:19  2  whatever weight you believe it deserves.

00:14:24  3  Counsel, can you approach one second please.

00:14:28  4  I'm going to pause right here.  Do not turn to page 8.

00:16:20  5  (Whereupon the following discussion was had

00:16:20  6  at the bench outside the hearing of the jury:)

00:16:20  7  THE COURT:  Amy, did you do these from the

00:16:20  8  second set?  I thought I took out this typo.  I can

00:16:20  9  check the sequence here.

00:16:20  10  Elizabeth, you asked me to change the

00:16:20  11  sequence.

00:16:20  12  MS. KELLEY:  Yes, six and 27 towards the

00:16:20  13  very end.

00:16:20  14  THE CLERK:  I printed out the one you said

00:16:21  15  "final."

00:16:21  16  THE COURT:  No, I sent a second one.

00:16:21  17  THE CLERK:  Right.

00:16:21  18  MS. KELLEY:  Yeah, the inversion didn't take

00:16:21  19  place.

00:16:21  20  THE COURT:  This isn't the set.  That's the

00:16:21  21  only issue.  I think otherwise we have some typos in

00:16:21  22  here.  The government's capital G, small G, and the one

00:16:21  23  typo you picked up, Tom.

00:16:21  24  MR. SECOR:  It was on page 18.

00:16:21  25  THE COURT:  I'll find it.

00:16:21  1          MR. SECOR:  No, it's changed.

00:16:21  2          (End of side-bar discussion.)

00:16:25  3          THE COURT:  Now you may turn to page 8, and

00:16:27  4  I'll resume reading.

00:16:28  5          Credibility of witnesses.  In evaluating the

00:16:33  6  evidence, you must decide how credible or believable

00:16:36  7  each witness was.  It is up to you, not to me, to decide

00:16:43  8  if a witness' testimony was believable, and how much

00:16:46  9  weight you think it deserves.  You are free to believe

00:16:50  10  everything that a witness said, part of it, or none of

00:16:54  11  it at all.  But you must act reasonably and carefully in

00:16:58  12  making these decisions.

00:17:00  13          Some of the things you should consider in

00:17:04  14  evaluating each witness' testimony are:

00:17:07  15          Could the witness clearly see, hear, or

00:17:12  16  otherwise experience the things the witness testified

00:17:15  17  about?  Sometimes even an honest witness may not have

00:17:20  18  been able to see, hear, or experience what was

00:17:24  19  happening, and may make a mistake.

00:17:26  20          How well could the witness recall the events

00:17:31  21  about which he testified?  Did the witness seem able to

00:17:35  22  accurately remember what happened?

00:17:38  23          Ask yourself if there was anything else that

00:17:42  24  may have interfered with the witness' ability to

00:17:46  25  perceive or remember the events.

| | | |
|---|---|---|
| 00:17:50 | 1 | How did the witness act while testifying? |
| 00:17:54 | 2 | Did the witness appear truthful or untruthful? |
| 00:17:58 | 3 | Did the witness have any relationship to the |
| 00:18:01 | 4 | government or the defendant, or anything to gain or lose |
| 00:18:06 | 5 | from the case, that might influence the witness' |
| 00:18:10 | 6 | testimony?  Did the witness have any bias, or |
| 00:18:14 | 7 | prejudice, or any other reason for testifying that might |
| 00:18:19 | 8 | cause the witness to lie or to slant the testimony in |
| 00:18:23 | 9 | favor of one side or the other? |
| 00:18:26 | 10 | Did the witness testify inconsistently while |
| 00:18:30 | 11 | on the witness stand, or was his testimony inconsistent |
| 00:18:36 | 12 | in a material way with something that the witness said |
| 00:18:39 | 13 | or did, or failed to say or do at some other time?  If |
| 00:18:46 | 14 | you believe that the witness was inconsistent, consider |
| 00:18:50 | 15 | whether such inconsistency makes the witness' testimony |
| 00:18:56 | 16 | less believable.  Sometimes it may, other times it may |
| 00:19:08 | 17 | not.  Consider whether the inconsistency was about |
| 00:19:12 | 18 | something important or something insignificant. |
| 00:19:19 | 19 | Take out the word "was," and the word "did" |
| 00:19:22 | 20 | should be in there. |
| 00:19:25 | 21 | Did the inconsistency seem like an innocent |
| 00:19:29 | 22 | mistake or a deliberate falsehood? |
| 00:19:32 | 23 | How believable was the witness' testimony -- |
| 00:19:37 | 24 | how believable was the witness' testimony -- take out |
| 00:19:41 | 25 | the "was." |

|        |    |                                                                            |
|--------|----|----------------------------------------------------------------------------|
| 00:19:42 | 1  | How believable was the witness' testimony in |
| 00:19:45 | 2  | light of all the other evidence?   Was the witness' |
| 00:19:49 | 3  | testimony supported or contradicted by other evidence |
| 00:19:53 | 4  | that you found believable?   If you believe a witness' |
| 00:19:57 | 5  | testimony was contradicted by other evidence, remember |
| 00:20:00 | 6  | that people sometimes misperceive or forget things, and |
| 00:20:05 | 7  | that even two honest people who witness the same event |
| 00:20:09 | 8  | may not describe it exactly the same way. |
| 00:20:12 | 9  | These are some of the things that you may |
| 00:20:16 | 10 | consider in deciding how believable each witness was. |
| 00:20:20 | 11 | You may also consider other things that you think shed |
| 00:20:24 | 12 | some light on the witness' believability.  Use your |
| 00:20:28 | 13 | common sense and your everyday experience in dealing |
| 00:20:32 | 14 | with other people.  And then decide what testimony you |
| 00:20:35 | 15 | believe, and how much weight you think it deserves. |
| 00:20:41 | 16 | Number of witnesses.  Do not make any |
| 00:20:46 | 17 | decision based only on the number of witnesses who |
| 00:20:48 | 18 | testified.  What is more important is how believable the |
| 00:20:52 | 19 | witnesses were, and how much weight you think their |
| 00:20:55 | 20 | testimony deserves.  Concentrate on that, not the |
| 00:20:59 | 21 | numbers. |
| 00:21:03 | 22 | Lawyers' objections. |
| 00:21:09 | 23 | The lawyers for both sides sometimes |
| 00:21:11 | 24 | objected to some of the things that were said or done |
| 00:21:14 | 25 | during the trial.  Do not hold that against either side |

00:21:17  1   or the attorneys.  A lawyer properly objects whenever he

00:21:21  2   or she thinks that your hearing or seeing the evidence

00:21:25  3   would be contrary to the Rules of Evidence.  Those rules

00:21:29  4   are designed to make sure that both sides receive a fair

00:21:33  5   trial.

00:21:34  6           Do not interpret my rulings on objections as

00:21:39  7   any indication of how I think this case should be

00:21:43  8   decided.  My rulings were based on the Rules of

00:21:48  9   Evidence, not on how I feel about the case.  Remember

00:21:52  10  that your decision must be based only on the evidence

00:21:56  11  that you saw and heard here in court.

00:22:02  12          Defining the crime and related matters.

00:22:09  13  Introduction.  That concludes the part of my

00:22:12  14  instructions explaining your duties and the general

00:22:15  15  rules that apply in every criminal case.

00:22:17  16          Before I proceed to define the crimes with

00:22:20  17  which the defendant is charged and the elements of each

00:22:25  18  which the government must prove beyond a reasonable

00:22:28  19  doubt before you can find him guilty, I emphasize that

00:22:31  20  the defendant is on trial for only the particular crimes

00:22:36  21  charged in the indictment.  Your job is limited to

00:22:40  22  deciding whether the government has proved any or all of

00:22:44  23  the crimes charged.

00:22:48  24          Separate consideration -- single defendant

00:22:54  25  charged with multiple crimes.  The defendant has been

charged with three crimes.  The number of charges is not evidence of guilt, and this should not influence your decision in any way.  It is your duty to separately consider the evidence that relates to each charge, and return a separate verdict for the elements of each one. For each charge, you must decide separately whether the government has presented proof beyond a reasonable doubt that the defendant is guilty of that particular charge.

Your decision on one charge, whether guilty or not guilty, should not influence your decision as to any other charge.

On or about.  Each count of the indictment charges that the crimes occurred, quote, "on or about," close quote, the date or dates specified in that count. The government does not have to prove that the crimes happened on those exact dates.  But the government must prove that the crimes happened reasonably close to those dates.

Inferring required mental state. Ordinarily, there is no way that a defendant's state of mind can be proved directly.  No one can read another person's mind and know what that person is thinking.

But a defendant's state of mind can be proved indirectly from the surrounding circumstances. These can include such things as what the defendant

00:24:49  1  said, what the defendant did, how the defendant acted,

00:24:53  2  and any other facts or circumstances in evidence to show

00:24:57  3  what was in the defendant's mind.

00:25:00  4          You may also consider the natural and

00:25:04  5  probable results of any acts that the defendant

00:25:07  6  knowingly did or did not do, and whether it is

00:25:11  7  reasonable to conclude that the defendant intended those

00:25:15  8  results.

00:25:18  9          Charges set forth in the indictment:

00:25:21  10          Defendant Alex D.  Cook is charged with one

00:25:25  11  count of receipt of visual depictions of minors engaged

00:25:30  12  in sexually explicit conduct, in violation of Title 18,

00:25:35  13  United States Code, Section 2252(a)(2); one count of

00:25:41  14  distribution of child pornography, in violation of Title

00:25:45  15  18, United States Code, Section 2252(a)(2), and one

00:25:51  16  count of possession of child pornography, in violation

00:25:54  17  of Title 18, United States Code, Section 2252(a)(4)(B).

00:26:03  18          I will now inform you of the elements of

00:26:06  19  each charged offense.

00:26:15  20          Charging statute - Receiving and

00:26:19  21  Distributing Material Involving Sexual Exploitation of

00:26:22  22  Minors - Section 2252(a)(2).

00:26:27  23          The statute which is alleged to have been

00:26:29  24  violated in counts 1 and 2 in Title 18, United States

00:26:37  25  Code, Section 2252(a)(2).  As relevant here, that

```
00:26:43   1    statute provides that:
00:26:45   2                    A.  A person who --
00:26:49   3                    2.  knowingly receives, or distributes, any
00:26:52   4    visual depiction that has been mailed, or has been
00:26:56   5    shipped or transported in interstate or foreign commerce
00:27:01   6    if.
00:27:02   7                    A.  The production of such visual depiction
00:27:05   8    involves the use of a minor engaging in sexually
00:27:09   9    explicit conduct; and
00:27:12  10                    B.  such visual depiction is of such
00:27:14  11    conduct,
00:27:15  12                    shall be guilty of a criminal offense
00:27:18  13    against the United States.
00:27:21  14                    Elements of Offense - Receiving and
00:27:24  15    Distributing Material Involving Sexual Exploitation of
00:27:28  16    Minors - 18 U.S. Code Section 2252(a)(2).
00:27:33  17                    Section 2252(a)(2) makes it a federal crime
00:27:39  18    or offense for any person to knowingly receive or
00:27:45  19    distribute any visual depiction that has been shipped or
00:27:50  20    transported in interstate or foreign commerce by any
00:27:55  21    means, including by computer, if the production of such
00:28:00  22    visual depiction involved the use of a real minor
00:28:04  23    engaging in sexually explicit conduct and the visual
00:28:08  24    depiction is of such conduct.
00:28:10  25                    For you to find the defendant guilty of
```

00:28:17  1   either or both of the offenses charged in Count 1 or 2,

00:28:22  2   you must find that the government has proven each of the

00:28:26  3   following elements beyond a reasonable doubt:

00:28:30  4        First:  The defendant knowingly received or

00:28:37  5   distributed a visual depiction;

00:28:41  6        Second: Such visual depiction was shipped or

00:28:46  7   transported in interstate or foreign commerce by any

00:28:50  8   means, including by computer;

00:28:54  9        Third: The production of such visual

00:28:58  10  depiction involved the use of a real minor engaging in

00:29:02  11  sexually explicit conduct;

00:29:05  12        Fourth: Such visual depiction is of a minor

00:29:11  13  engaging in sexually explicit conduct; and

00:29:15  14        Fifth: The defendant knew that at least one

00:29:19  15  of the individuals in such visual depiction was a minor

00:29:24  16  and knew that the visual depiction was of such minor

00:29:30  17  engaged in sexually explicit conduct.

00:29:34  18        Now I will give you more detailed

00:29:36  19  instructions on some of the terms used in this statute.

00:29:44  20        To "receive" a visual depiction means to

00:29:49  21  take possession of it.  This includes knowing acceptance

00:29:54  22  of a depiction previously requested.  "Receiving"

00:30:01  23  includes the downloading of a photograph or video by

00:30:05  24  means of internet.

00:30:07  25        To "distribute" means to disseminate or

00:30:13  1   transfer possession to another person.

00:30:16  2           A "visual depiction" includes any

00:30:22  3   photograph, film, video or picture, and data stored on

00:30:27  4   computer disk or by electronic means which is capable of

00:30:31  5   conversion into a visual image.

00:30:35  6           The government must prove that the defendant

00:30:39  7   received or distributed the depiction "knowingly. " An

00:30:47  8   act is done "knowingly" when it is done voluntarily and

00:30:52  9   intentionally and not because of accident, mistake or

00:30:57  10  some other innocent reason.

00:30:59  11          The term "computer" means an electronic,

00:31:06  12  magnetic, optical, electrochemical, or other high speed

00:31:11  13  data processing device performing logical, arithmetic,

00:31:17  14  or storage functions, and includes any data storage

00:31:21  15  facility or communications facility directly related to

00:31:24  16  or operating in conjunction with such device.

00:31:32  17          "Minor" and "Sexually Explicit Conduct"

00:31:39  18  defined.

00:31:40  19          The term "minor" means any person under the

00:31:45  20  age of 18 years.

00:31:47  21          "Sexually explicit conduct" means actual or

00:31:52  22  simulated :

00:31:53  23          A.  Sexual intercourse, including

00:31:57  24  genital-genital, oral-genital, anal-genital, or

00:32:02  25  oral-anal, whether between persons of the same or

00:32:05  1  opposite sex;

00:32:06  2              B.  bestiality;

00:32:09  3              C.  masturbation;

00:32:11  4              D.  sadistic or masochistic abuse; or

00:32:16  5              E.  lascivious exhibition of the genitals or

00:32:20  6  pubic area of any person.

00:32:22  7              The government must prove that the

00:32:26  8  pornographic images in this case depicted real children

00:32:30  9  under the age of 18 years.  You may rely on your

00:32:33  10  observation and judgment in evaluating the images to

00:32:37  11  determine whether they depict real children under the

00:32:39  12  age of 18 years.

00:32:42  13              The government need not present expert or

00:32:45  14  other testimony on whether the children are, in fact,

00:32:50  15  real children as opposed to, say, youthful adults or

00:32:54  16  computer generated images of children.

00:32:59  17              The government also need not present expert

00:33:01  18  or other testimony on the ages of the children depicted.

00:33:06  19  Rather, the government may meet its burden of proving

00:33:09  20  the pornographic images depict real children under the

00:33:13  21  age of 18 years by presenting the images to you, the

00:33:16  22  jury, and allowing you to evaluate the images for

00:33:20  23  yourselves.

00:33:23  24              Lascivious exhibition defined.  Not every

00:33:36  25  exposure of the genitals or pubic area constitutes

00:33:40  1   "lascivious exhibition."  Whether a picture or image of

00:33:46  2   the genitals or pubic area constitutes such a

00:33:51  3   "lascivious exhibition" requires a consideration of the

00:33:55  4   overall content of the material.  It is for you to

00:33:58  5   decide the weight or lack of weight to be given to any

00:34:00  6   of the following factors:

00:34:01  7          You may consider such factors as:

00:34:05  8          A.  whether the focal point of the picture

00:34:07  9   or image is on the child's genitals or pubic area;

00:34:11  10          B.  whether the setting of the picture or

00:34:13  11   image is sexually suggestive, that is, in a place or

00:34:18  12   pose generally associated with sexual activity;

00:34:23  13          C.  whether the child is depicted in an

00:34:25  14   unnatural pose or in inappropriate attire, considering

00:34:31  15   the age of the minor.

00:34:32  16          D.  whether the child is fully or partially

00:34:36  17   clothed, or nude;

00:34:38  18          E.  whether the picture or image suggests

00:34:41  19   sexual coyness or a willingness to engage in sexual

00:34:44  20   activity; and.

00:34:46  21          F.  whether the picture or image is intended

00:34:49  22   or designed to elicit a sexual response in the viewer.

00:34:54  23          A visual depiction or image need not involve

00:34:58  24   all these factors to constitute a "lascivious

00:35:02  25   exhibition" of the genitals or pubic area.

00:35:10  1          Interstate commerce.

00:35:12  2          The term "interstate or foreign commerce"

00:35:16  3  means the movement of property from one state to another

00:35:20  4  state, or from one state to another country, or from

00:35:23  5  another country to a state.  The term "state" includes a

00:35:29  6  state of the United States, the District of Columbia,

00:35:32  7  and any commonwealth, territory, or possession of the

00:35:36  8  United States.

00:35:37  9          The phrase "transported in interstate or

00:35:41  10  foreign commerce" means that the visual depiction or

00:35:45  11  image, at any time, travelled or moved between one state

00:35:52  12  and another state, or between a foreign country and a

00:35:55  13  state.  Evidence that an image was produced in a state

00:36:01  14  other than Ohio, or in a foreign country, is sufficient

00:36:05  15  to prove that the visual depiction or image has been

00:36:09  16  transported in interstate or foreign commerce.

00:36:14  17          Evidence that a visual depiction or image

00:36:17  18  was transmitted or received electronically by a computer

00:36:22  19  connected to the internet is sufficient to establish

00:36:26  20  that the visual depiction or image was transported or

00:36:30  21  moved in interstate or foreign commerce.  It is for you

00:36:36  22  to determine if the material containing the visual

00:36:40  23  depiction had been transmitted or received over the

00:36:43  24  internet or was produced using materials that had been

00:36:48  25  transmitted or received over the internet.

00:36:51  1          It is not necessary for the government to

00:36:56  2   prove that the defendant transported the material

00:37:00  3   containing the visual depiction in interstate or foreign

00:37:03  4   commerce.  It is not necessary for the government to

00:37:06  5   prove the defendant knew that the material containing

00:37:10  6   the visual depiction had moved in interstate or foreign

00:37:14  7   commerce.  It is sufficient that the government prove

00:37:17  8   that at some point the material containing the visual

00:37:21  9   depiction travelled in interstate or foreign commerce.

00:37:32  10          Essential elements of Section

00:37:34  11   2252(a)(4)(B) - defined.

00:37:40  12          The defendant is charged in Count 3 of the

00:37:43  13   indictment with possession of child pornography in

00:37:47  14   violation of Title 18, United States Code, Section

00:37:51  15   2252(a)(4)(B).

00:37:54  16          For you to find the defendant guilty of the

00:37:59  17   offense charged in Count 3, you must find that the

00:38:03  18   government has proven each of the following elements

00:38:07  19   beyond a reasonable doubt:

00:38:09  20          First, that the defendant knowingly

00:38:13  21   possessed photographic computer files which the

00:38:18  22   defendant knew contained visual depictions of real

00:38:23  23   minors engaged in sexually explicit conduct;

00:38:30  24          Second, the defendant knew the visual

00:38:33  25   depictions contained in the photographic computer image

00:38:37  1   files shows minors engaged in sexually explicit conduct;

00:38:42  2          Third, the defendant knew that production of

00:38:47  3   such visual depiction involved the use of a minor in

00:38:50  4   sexually explicit conduct; and

00:38:54  5          Fourth, that the visual depictions had been

00:38:58  6   either;

00:39:00  7          a.  mailed, shipped or transported in

00:39:02  8   interstate or foreign commerce, or

00:39:05  9          b.  produced using material that had been

00:39:08  10  mailed, shipped or transported in interstate or foreign

00:39:12  11  commerce by computer or other means.

00:39:15  12         I have already defined for you the terms

00:39:19  13  "visual depiction," "minor," "knowingly," and "sexually

00:39:28  14  explicit conduct."  Those definitions apply as well to

00:39:32  15  the elements of the crime charged in Count 3.

00:39:35  16         "Producing" means producing, direction,

00:39:39  17  manufacturing, issuing, publishing or advertising.

00:39:46  18         Possession.

00:39:50  19         To prove the defendant "possessed" the

00:39:55  20  illegal material, the government does not necessarily

00:39:58  21  have to prove that the defendant physically possessed

00:40:02  22  the child pornography.  The law recognizes two kinds of

00:40:08  23  possession - "actual" possession and "constructive"

00:40:14  24  possession.  Either one of these, if proved by the

00:40:20  25  government beyond a reasonable doubt, is enough to

00:40:22  1   convict.

00:40:23  2          To establish "actual possession" the

00:40:30  3   government must prove that the defendant had direct

00:40:33  4   physical control over the child pornography and knew

00:40:38  5   that he had control over it.

00:40:39  6          To establish "constructive" possession, the

00:40:43  7   government must prove that the defendant has the right

00:40:47  8   to exercise physical control over the child pornography,

00:40:50  9   and knew that he had this right, and that he intended to

00:40:55  10  exercise physical control over the child pornography at

00:40:59  11  some time, either directly or through other persons.

00:41:06  12         For example, if you left something with a

00:41:09  13  friend intending to come back later and pick it up, or

00:41:13  14  intending to send someone else to pick it up for you,

00:41:18  15  you would have "constructive" possession of it while it

00:41:23  16  was in the "actual" possession of your friend.

00:41:28  17         But understand that just being present where

00:41:31  18  something is located does not equal possession.  The

00:41:34  19  government must prove that the defendant had actual or

00:41:38  20  constructive possession of the child pornography, and

00:41:43  21  knew that he did, for you to find him guilty of this

00:41:46  22  crime.  This, of course, is all for you to decide.

00:41:54  23         First Amendment does not protect child

00:41:59  24  pornography.  The First Amendment of the United States

00:42:03  25  Constitution does not protect visual depictions of a

00:42:07  1   minor engaged in sexually explicit conduct as charged in

00:42:11  2   the indictment.

00:42:15  3              Special evidentiary matters - introduction.

00:42:20  4              That concludes the part of my instructions

00:42:22  5   explaining the elements of the crimes.  Next I will

00:42:25  6   explain some rules that you must use in considering some

00:42:29  7   of the testimony and evidence.

00:42:35  8              Statement by the defendant.

00:42:40  9              You have heard testimony that the defendant

00:42:43  10  on September 15, 2011 made a statement in which the

00:42:49  11  government -- in which the government claims he admitted

00:42:54  12  certain facts.

00:42:56  13             Do you want to approach?

00:42:58  14             MR. SECOR:  Briefly.

00:42:59  15             THE COURT:  Please turn back to the previous

00:43:03  16  page.

00:43:51  17             MR. SECOR:  A small matter.  September,

00:43:51  18  2010.

00:43:51  19             THE COURT:  Thanks, Tom.

00:43:54  20             (End of side-bar discussion.)

00:44:11  21             THE COURT:  Now you can turn back to page

00:44:13  22  27.  I'll start from the beginning.  There is a mistake

00:44:20  23  in the year.  It's 2010, not 2011.

00:44:27  24             Statement by the defendant.

00:44:29  25             You've heard testimony that the defendant on

00:44:31  1   September 15, 2010 made a statement in which the

00:44:36  2   government claims he admitted certain facts.  The

00:44:41  3   defendant disputes the government's version, typed by

00:44:44  4   Agent Pape, of the statement.  It is for you to

00:44:47  5   determine what it was the defendant said to the agent

00:44:50  6   and what weight to give to what he told him.

00:44:53  7           In determining what the defendant told the

00:44:56  8   agent you should consider all of the evidence about the

00:45:00  9   statement, including the circumstances under which the

00:45:04  10  defendant spoke to the agent and the agent, in turn,

00:45:07  11  created his typewritten version of the statement.

00:45:10  12          In determining what the defendant told the

00:45:13  13  agent, you may also consider the failure of the agent to

00:45:16  14  have recorded the interview and the oral statement made

00:45:21  15  by the defendant to the agent.

00:45:23  16          You may not convict the defendant solely

00:45:26  17  upon his own uncorroborated statement or admission.

00:45:38  18          Closing arguments by counsel.

00:45:41  19          I remind you that the closing arguments

00:45:45  20  which you are about to hear, closing arguments of

00:45:48  21  counsel, are not evidence.  They are counsel's

00:45:50  22  expression of their view of the evidence and how they

00:45:53  23  believe you should interpret it in light of these

00:45:55  24  instructions.

00:45:57  25          Because the government has the burden of

| | | |
|---|---|---|
| 00:46:00 | 1 | proof, its attorney will present closing argument first. |
| 00:46:06 | 2 | Next, the defendant's attorney will present her closing |
| 00:46:09 | 3 | argument.  The government will conclude with its final, |
| 00:46:13 | 4 | or rebuttal argument. |
| 00:46:15 | 5 | Following completion of the closing |
| 00:46:19 | 6 | arguments, I will give you some concluding instructions |
| 00:46:23 | 7 | about the conduct of your deliberations, and you will |
| 00:46:27 | 8 | retire to the jury room to begin your deliberations. |
| 00:46:31 | 9 | Ladies and gentlemen, I'm going to stop |
| 00:46:33 | 10 | here.  You'll have closing argument of counsel.  And may |
| 00:46:40 | 11 | I suggest, counsel -- Mr. Secor or Mr. Crawford will be |
| 00:46:44 | 12 | presenting? |
| 00:46:44 | 13 | MR. CRAWFORD:  I will, Judge. |
| 00:46:46 | 14 | THE COURT:  May I suggest at the conclusion |
| 00:46:47 | 15 | of your closing argument we take our midmorning break, |
| 00:46:51 | 16 | then Ms. Kelley will give hers, and you'll give your |
| 00:46:56 | 17 | rebuttal.  Is that agreeable to the jury?  It will be |
| 00:47:00 | 18 | what, a half hour, 45 minutes? |
| 00:47:03 | 19 | MR. CRAWFORD:  That's correct. |
| 00:47:04 | 20 | THE COURT:  Fine.  You may proceed. |
| 00:47:11 | 21 | MR. CRAWFORD: Ladies and gentlemen, the |
| 00:47:12 | 22 | evidence is in.  Now it's time for you to do your job to |
| 00:47:16 | 23 | return to the deliberation room and render a verdict on |
| 00:47:19 | 24 | the evidence that you've heard here in court.  Of |
| 00:47:24 | 25 | course, you've listened to it carefully.  Now I'll |

00:47:26  1  provide you with a closing argument from the

00:47:29  2  government's perspective about what the evidence shows.

00:47:32  3          This is a straightforward child pornography

00:47:34  4  investigation by the FBI.  You heard the testimony of

00:47:37  5  Special Agent Whisman in Oklahoma.  He conducted an

00:47:41  6  undercover download session using LimeWire.  He

00:47:45  7  downloaded child pornography, learned that the child

00:47:49  8  pornography was coming from an IP address.  That IP

00:47:52  9  address was linked to the internet account of the

00:47:55  10  defendant, Mr. Cook.

00:47:57  11          Agent Whisman didn't run and get an

00:47:59  12  indictment.  No, he continued the investigation.  He

00:48:03  13  sent that information to Special Agent Schulte here at

00:48:08  14  the FBI office in Lima.

00:48:10  15          Special Agent Schulte conducted an

00:48:12  16  investigation, conducted surveillance, and learned, yes,

00:48:15  17  Mr. Cook did live there, a roommate as well.  Did some

00:48:19  18  background on Mr. Cook.  They served a search warrant.

00:48:23  19  And what happened?  Mr. Cook admitted there was child

00:48:27  20  pornography on this computer when they served the search

00:48:32  21  warrant, Special Agent Pape testified.

00:48:34  22          But don't take his word for it, because you

00:48:37  23  heard Mr. Cook's testimony yesterday; he told Special

00:48:40  24  Agent Pape, yeah, there might be child pornography on my

00:48:43  25  computer.

00:48:46  1          Well, now the FBI is getting somewhere.  Mr.

00:48:51  2   Cook voluntarily goes down to the FBI office.  He's not

00:48:54  3   arrested.  He's not handcuffed.  He's not told he has to

00:48:58  4   go down there.  He goes down there voluntarily.  What do

00:49:01  5   they do?  Read him his Miranda rights, provide him a

00:49:05  6   Miranda form that he reads and signs.  He gives a

00:49:08  7   statement.  What does that statement say?   The very

00:49:11  8   first sentence of that statement says, in regards to

00:49:14  9   having child pornography on his computer, I do have

00:49:17  10  child pornography images on my computer, on my personal

00:49:20  11  laptop computer, which is in my bedroom in my apartment.

00:49:23  12  That's the first sentence.  It's not buried in the

00:49:27  13  middle.  It's the first sentence.  He gives that

00:49:30  14  statement to Special Agent Pape.

00:49:31  15          And you heard testimony about yelling and

00:49:33  16  screaming and whatnot, calling someone an idiot for

00:49:36  17  three or four hours.  You heard Special Agent Schulte;

00:49:40  18  he said, yeah, there was a bathroom break in the middle.

00:49:43  19  So I assume when he came back, the yelling and screaming

00:49:46  20  continued.  Special Agent Schulte is sitting right

00:49:48  21  outside the room.  He didn't hear yelling and screaming.

00:49:51  22  It was a standard interview.  A statement was taken.

00:49:54  23  I'm sure presumably after this yelling and screaming

00:49:58  24  went on, Special Agent Pape just said, hey, let's stop

00:50:01  25  and write a letter to the prosecutor telling him to drop

00:50:04  1  the case.  Credibility issues; those are things for you

00:50:08  2  to decide.

00:50:11  3         What should you decide about that statement?

00:50:13  4  Well, you have to consider all the circumstances.  Is

00:50:16  5  there other information that corroborates it?  You've

00:50:19  6  heard testimony about Boy Scouts, camp leaders, learning

00:50:22  7  disabilities.  The question is whether or not the

00:50:24  8  statement is the truth.  And there's every reason to

00:50:28  9  believe that it is the truth.

00:50:31  10        Eight months later Mr. Cook went to see Dr.

00:50:34  11 Graves, and what did he tell Dr. Graves?  Yes, I had

00:50:38  12 seen child pornography on my computer.  Yes, I know how

00:50:40  13 to use LimeWire; I use it to download music; I use it to

00:50:44  14 download adult pornography.  Don't know anything about

00:50:47  15 that child pornography stuff, but I know about all the

00:50:50  16 other stuff.  He saw child pornography on his computer.

00:50:54  17 Isn't that the same thing he told Special Agent Pape?

00:50:58  18        He said, well, equivocally, maybe he

00:51:02  19 believed it was child pornography.  But he was able to

00:51:04  20 tell Dr. Graves it was a 14 or 15 year old girl with

00:51:08  21 small breasts and no body hair.  That's what he told Dr.

00:51:12  22 Graves, and Dr. Graves admitted that to you.

00:51:15  23        Third, this statement matches the other

00:51:19  24 evidence in the case.  Look at the forensics.  What do

00:51:23  25 the forensics tell you?  You heard Detective Morford.

00:51:26 1  He looked at this computer.  He did a forensic analysis

00:51:30 2  of it.  He made an image of the hard drive to see what

00:51:33 3  was there.  You saw the screen shots, the Government's

00:51:36 4  Exhibit 15 of what Mr. Cook's computer looked like when

00:51:39 5  it was turned on using the virtual machine.  You saw

00:51:42 6  Windows Explorer.  What was in that LimeWire saved

00:51:46 7  folder?  Right in there mixed with music from Carrie

00:51:49 8  Underwood, Jimmie Hendrix, Deep Purple, you had images

00:51:54 9  entitled, PTHC; we understood that to mean preteen

00:51:59 10 hardcore; Lolita; underage; illegal.  Who opens -- who

00:52:04 11 has files on their computer, downloads files that have

00:52:08 12 the word "illegal"?  PEDO; hussy; kiddie porn; 12 YO, we

00:52:13 13 understood that stands for 12 year old; nine year old;

00:52:17 14 ten year old.  It was right there with all the music

00:52:20 15 files and adult pornography.  You saw the screens.

00:52:26 16        Pay attention to what Mr. Cook's own experts

00:52:28 17 said about these files.  He viewed them.  He said in his

00:52:31 18 testimony, yeah, the jury could conclude that this is

00:52:35 19 child pornography.  That's their expert, what their

00:52:37 20 expert say said.

00:52:41 21        He talked about the LimeWire incomplete

00:52:44 22 folder which contained information about files that

00:52:48 23 someone had selected for download from LimeWire but had

00:52:52 24 not yet been complete.  So their expert wasn't able to

00:52:56 25 actually look at these files to determine whether they

| | | |
|---|---|---|
| 00:52:59 | 1 | were child pornography because they hadn't been |
| 00:53:01 | 2 | downloaded, but he could look at the names, and he knew |
| 00:53:05 | 3 | that was suspected child pornography.  That's their |
| 00:53:06 | 4 | expert.  Don't take Detective Morford's word for it. |
| 00:53:10 | 5 | Don't take Agent Schulte's word for it.  Listen to their |
| 00:53:14 | 6 | expert. |
| 00:53:14 | 7 | Credibility.  Is credibility important? |
| 00:53:17 | 8 | Sure, it's important.  You have to decide what you |
| 00:53:19 | 9 | believe about the witnesses, who's believable and who's |
| 00:53:22 | 10 | not.  That's your job. |
| 00:53:25 | 11 | Special Agent Pape told you about the |
| 00:53:26 | 12 | confession.  He stood by, sat on the stand twice, talked |
| 00:53:30 | 13 | about this confession, how he wrote it, how he did the |
| 00:53:33 | 14 | interview, how he shared it with Mr. Cook, how he |
| 00:53:36 | 15 | collaborated with Mr. Cook.  He gave Mr. Cook an |
| 00:53:39 | 16 | opportunity to read it and sign it.  As he said, the |
| 00:53:43 | 17 | very first sentence, admits the allegation of child |
| 00:53:47 | 18 | pornography.  It's the first thing he would have read. |
| 00:53:52 | 19 | You have to weigh that against what?   Well, |
| 00:53:55 | 20 | Mr. Cook testified.  Consider what Mr. Cook told you. |
| 00:53:59 | 21 | All right.  Since this began in September of 2010 for |
| 00:54:05 | 22 | Mr. Cook, he's got about four stories that have been |
| 00:54:07 | 23 | floating around.  The first one is the one he told |
| 00:54:10 | 24 | Special Agent Pape.  Yes, I downloaded child pornography |
| 00:54:12 | 25 | on my computer.  That's the story in his statement; |

00:54:15  1   that's the story that's consistent with the forensics

00:54:18  2   and all the other evidence in the case.

00:54:21  3                He comes back from the FBI office.  You

00:54:23  4   heard Ian Douglas' testimony.  He told Ian Douglas, it's

00:54:27  5   identity theft.

00:54:28  6                Then he goes to see Dr. Graves and says,

00:54:30  7   well, yeah, I guess I saw some child pornography on my

00:54:33  8   computer.  Yes, I downloaded adult pornography on

00:54:37  9   LimeWire.  Yes, I use LimeWire for music.  I don't know

00:54:40  10  anything about that child pornography stuff.

00:54:41  11               The third story he's telling Dr. Graves; he

00:54:48  12  also talks about Ian Douglas, obviously has a huge ax to

00:54:52  13  grind with Ian Douglas.   But interestingly, he does

00:54:57  14  tell doesn't tell Dr. Graves, I think he downloaded

00:55:01  15  child pornography on my computer.

00:55:02  16               That's the forth story.  That's the one he's

00:55:05  17  telling you.   You have to decide, Special Agent Pape's

00:55:08  18  testimony or Mr. Douglas' [sic].

00:55:10  19               Let's talk about the elements of the

00:55:12  20  offense.  As the Court instructed you, it's the

00:55:15  21  government's burden of proof, beyond a reasonable doubt,

00:55:17  22  each and every element of the offense charged.  There's

00:55:21  23  three offenses charged, two of them are similar; they

00:55:24  24  have similar elements.  Then there's a third one which

00:55:27  25  is possession.   The first one is receipt of child

|          |    |                                                                  |
|----------|----|------------------------------------------------------------------|
| 00:55:30 | 1  | pornography.   The first element says we must prove the          |
| 00:55:32 | 2  | defendant knowingly received a visual depiction.  Again,         |
| 00:55:42 | 3  | you heard the computer forensics.  You heard Detective           |
| 00:55:46 | 4  | Morford, the government's expert.  You heard Mr. Vassel,         |
| 00:55:47 | 5  | their expert.  They agreed.  They analyzed the computer.         |
| 00:55:52 | 6  | They agree there is LimeWire populated with saved music,         |
| 00:55:55 | 7  | populated with pornography and other sorts of images.           |
| 00:55:59 | 8  | It's Mr. Cook's computer.  Did he know he                        |
| 00:56:02 | 9  | was downloading visual depictions?  He told you himself          |
| 00:56:06 | 10 | he used LimeWire.  He used it to download music.   Used          |
| 00:56:09 | 11 | it to download adult pornography.  Did he use it to              |
| 00:56:13 | 12 | download child pornography?   The evidence suggests so.          |
| 00:56:16 | 13 | You've heard what LimeWire is.  LimeWire is                      |
| 00:56:20 | 14 | a worldwide network.  It's a computer program that              |
| 00:56:23 | 15 | allows LimeWire users to search other LimeWire users            |
| 00:56:26 | 16 | throughout the world to see what files they're sharing.         |
| 00:56:29 | 17 | So when you enter a search in LimeWire, you get to see          |
| 00:56:32 | 18 | what other LimeWire users have; you get to pick it.  And        |
| 00:56:34 | 19 | what happens?  It makes it to your computer.  That's            |
| 00:56:39 | 20 | the nature of LimeWire.  Mr. Cook knows that.  He               |
| 00:56:42 | 21 | admitted using LimeWire.  He knows what it is.                  |
| 00:56:44 | 22 | Second, we have to prove that these visual                      |
| 00:56:47 | 23 | depictions were shipped or transported through                 |
| 00:56:50 | 24 | interstate or foreign commerce.  In the first charge           |
| 00:56:52 | 25 | we're talking about receiving child pornography.  You          |

00:56:54  1  heard the testimony of Amy Allen, the Department of

00:56:58  2  Homeland Security, and the testimony of Detective Roy

00:57:03  3  Shepherd from the state of Washington.  They both

00:57:05  4  investigated known victims that were in images found on

00:57:11  5  this computer.

00:57:12  6  　　　　　　Amy Allen investigated the victim in

00:57:15  7  Michigan.  Pictures made in Michigan; it moves to Ohio.

00:57:22  8  Interstate commerce.

00:57:23  9  　　　　　　The same thing for Detective Roy Shepherd.

00:57:25  10  The victim's in Washington; the images travel from

00:57:28  11  Washington to Ohio.  Interstate commerce.

00:57:30  12  　　　　　　And if you look at the instructions again,

00:57:32  13  as you will also notice that the use of a computer on

00:57:36  14  the internet by its very nature is a means of interstate

00:57:40  15  commerce, can fulfill that element.

00:57:44  16  　　　　　　Third and fourth elements are the production

00:57:49  17  of these visual depictions involved the use of a minor

00:57:53  18  engaged in sexually explicit conduct, and then that

00:57:57  19  those resulting images do, in fact, depict that minor

00:57:59  20  engaged in sexually explicit conduct.  You saw the

00:58:02  21  images in court.  Right.  The government, we don't show

00:58:07  22  that to torture you.  We show you that because we have

00:58:10  23  to determine -- we have to prove beyond a reasonable

00:58:12  24  doubt whether or not they were actual children engaged

00:58:16  25  in sexually explicit conduct.  And we also do it to

00:58:20  1   prove the fifth element, which is knowledge that the

00:58:23  2   defendant knew these were children engaged in sexually

00:58:27  3   explicit conduct.

00:58:29  4          Getting back to the third and fourth

00:58:32  5   element, whether these are real minors.  You can rely on

00:58:35  6   your own judgment.  You heard the testimony of Special

00:58:38  7   Agent Schulte describing what's often looked for in

00:58:43  8   deciding whether or not these are children under the age

00:58:45  9   of 18:  breast development; pubic hair; the environment

00:58:49  10  in which they're in; the poses in which these children

00:58:52  11  are put in; whether there's sadomasochistic abuse,

00:58:59  12  bondage, and the like.   Those are all things taken into

00:59:02  13  consideration whether these are real children engaged in

00:59:05  14  sexually explicit conduct.

00:59:06  15          Fifth, there must be proof that the

00:59:08  16  defendant knew that the images on this computer were

00:59:14  17  images of real children and that he knew that those

00:59:16  18  children were real and that they were engaged in

00:59:19  19  sexually explicit conduct.  If you have an image of a

00:59:23  20  girl who is 17 years and 11 months old in lascivious

00:59:30  21  exhibition, by statute that's child pornography, under

00:59:33  22  the age of 18.  But in order to get a conviction, you've

00:59:36  23  got to prove that the defendant knew that girl was 17

00:59:41  24  years and 11 months.  That's a tough case.  Compare that

00:59:45  25  with what you saw here.  Compare it with what you saw

00:59:49   1   here.   Would anyone looking at those pictures not know

00:59:54   2   that they are children engaged in sexually explicit

00:59:58   3   conduct?   Real children?   It's for you to decide.

01:00:10   4           You heard Mr. Cook testify that he used

01:00:12   5   LimeWire for adult pornography and music.  Is it at all

01:00:17   6   plausible to believe that he didn't use it for child

01:00:21   7   pornography?  Again, you saw his screen shots.  That was

01:00:24   8   what he was using.   How could he miss those files

01:00:27   9   titled preteen hardcore?   You've seen the nature of the

01:00:32  10   images.   You've also heard testimony about the length of

01:00:36  11   time he had this computer.  Images that Special Agent

01:00:42  12   Whisman located in June of 2010 were still on this

01:00:45  13   computer when it was seized in September of 2010.  It's

01:00:51  14   a good three months they were on this computer.  Mr.

01:00:55  15   Cook had this computer the whole time and never saw a

01:00:58  16   single one of them?   Does that sound plausible to you?

01:01:06  17           Detective Morford reviewed several images

01:01:10  18   that he talks about in his FTK report, identified

01:01:15  19   several that were during the month of May, it's alleged

01:01:18  20   in the indictment.

01:01:22  21           The distribution of child pornography.  The

01:01:25  22   elements, other than receipt, we're talking about

01:01:30  23   distribution, are the same as the charges I just

01:01:32  24   described to you.  Distribution, however, is a little

01:01:35  25   different.  There must be proof that Mr. Cook knowingly

01:01:39   1    distributed these images.  He was a LimeWire user.  He

01:01:43   2    was searching other people's computers for files.  How

01:01:47   3    could he not know other people were searching his

01:01:50   4    computer for files?  It's the way LimeWire works.  You

01:01:54   5    have Special Agent Whisman's testimony about the

01:01:55   6    undercover session and his IP address.  The IP address

01:01:59   7    was Mr. Cook's internet service account.  It pointed

01:02:03   8    directly to him.  And LimeWire itself beats the user

01:02:07   9    over the head every time you use it to tell you you are

01:02:10  10    sharing files with the world.  You saw the screen shots

01:02:17  11    in the public share folder of LimeWire.  It says

01:02:21  12    conspicuously in the middle of the screen, "Files on

01:02:24  13    this list are shared anonymously with the world."  Right

01:02:28  14    above that sentence, all those files, preteen hardcore,

01:02:32  15    Lolita, underage, hussy fan.  It's right there.  How can

01:02:37  16    you not know that other people -- that he was not

01:02:41  17    sharing these with other people?

01:02:44  18          You saw Government's Exhibit 19 which was a

01:02:46  19    slide show that showed the installation process of

01:02:50  20    LimeWire.  It explains in there, files using the public

01:02:55  21    shared folder are going to be shared, and you have the

01:02:57  22    option of turning that feature off.  That's how it's

01:03:01  23    installed.  Their expert indicated that LimeWire was

01:03:06  24    installed on that computer July of 2009.  It could have

01:03:09  25    been changed, but it wasn't.  Sharing was left on.

01:03:15  1          You heard a lot of testimony about MAC

01:03:18  2   addresses.  The testimony is simply this:  You have an

01:03:22  3   IP address.  Sure, you could have several computers

01:03:26  4   using the same IP address.   If you had a MAC address

01:03:29  5   that might narrow it down to an individual computer.

01:03:32  6   None of that changes this set of facts:  Special Agent

01:03:35  7   Whisman in Oklahoma downloaded child pornography from an

01:03:39  8   IP address linked to Mr. Cook's account.  The FBI went

01:03:46  9   to Mr. Cook's apartment; they found this computer, they

01:03:50  10  did a forensic analysis of it, and the exact same files

01:03:55  11  that Special Agent Whisman downloaded in Oklahoma were

01:03:58  12  still on this computer.  Don't take Detective Morford's

01:04:03  13  word for it, don't take Agent Whisman's word for it;

01:04:06  14  their expert told you that.  He testified yesterday,

01:04:09  15  yes, everything that Agent Whisman downloaded is still

01:04:13  16  on this computer.  Now, do you need a MAC address to

01:04:17  17  convince you that the files Special Agent Whisman

01:04:21  18  downloaded in Oklahoma came from that computer?

01:04:31  19          The second element for distribution,

01:04:33  20  interstate or foreign commerce.  Special Agent Whisman

01:04:37  21  is in Oklahoma.  He's downloading things there.  It

01:04:40  22  comes from an IP address in Lima, Ohio.  Oklahoma to

01:04:45  23  Ohio, it's interstate commerce.

01:04:48  24          Third and fourth elements, the visual

01:04:49  25  depictions involved the use of a real minor engaged in

01:04:52  1   sexually explicit conduct.  Those visual depictions

01:04:57  2   actually depicted these minors engaged in sexually

01:05:01  3   explicit conduct.  Ladies and gentlemen, for the same

01:05:03  4   reasons I just explained to you, you can decide for

01:05:05  5   yourself whether or not this element is met.  You've

01:05:08  6   seen the images; you can make that determination.

01:05:10  7           Lastly, did the defendant know that these

01:05:14  8   images he was sharing came from real children engaged in

01:05:20  9   sexually explicit conduct?  Once again, for the same

01:05:23  10  reasons I just explained, you can conclude that.  They

01:05:26  11  were staring you in the face every time he turned

01:05:28  12  LimeWire on.  He couldn't miss it.  And again, you've

01:05:32  13  seen the nature of the images.  Any way he could have

01:05:35  14  been confused that these were adults?  It's for you to

01:05:39  15  decide.

01:05:40  16          Lastly is possession.  And possession,

01:05:42  17  again, relies on the same facts I just stated.

01:05:46  18          Of course the defendant knowingly possessed

01:05:48  19  these photographic computer files.  You've heard the

01:05:52  20  testimony about LimeWire.  Is it at all plausible to use

01:05:57  21  it for adult pornography, to use it for music; he just

01:06:01  22  doesn't know anything about that child pornography

01:06:02  23  stuff?  He was on his computer.  There's no dispute

01:06:05  24  that's his computer.  It was found in his bedroom.  He

01:06:10  25  told Special Agent Pape twice he had child pornography

01:06:14  1  on his computer: he told Special Agent Pape in his

01:06:18  2  apartment when they searched the search warrant; he told

01:06:20  3  him again when they went down to the FBI office in Lima

01:06:24  4  for the interview.   He told Dr. Graves, yeah, I've seen

01:06:28  5  child pornography on my computer.  And, of course, the

01:06:29  6  forensic analysis fully supports he had child

01:06:33  7  pornography on that computer.  Did he know the visual

01:06:41  8  depictions of minors engaged in sexually explicit

01:06:47  9  conduct?   You've seen it.

01:06:52  10        Lastly, interstate or foreign commerce.

01:06:55  11  Again, you've heard the testimony of Amy Allen and Roy

01:06:59  12  Shepherd.  You heard the testimony of Agent Whisman

01:07:02  13  about the interstate nature and the use of computers in

01:07:05  14  this case.

01:07:07  15        As I mentioned, it's a straightforward case,

01:07:10  16  ladies and gentlemen.  You've heard the evidence.  You

01:07:12  17  can decide who to believe and who not to believe.  What

01:07:14  18  story is plausible, what aren't?  What do the parties

01:07:18  19  agree?  What do the experts agree?   Those are things to

01:07:21  20  consider in deciding whether the government's met its

01:07:23  21  burden of proving this case.

01:07:25  22        I'll have a rebuttal argument shortly to

01:07:27  23  address some other issues, then I'll ask you to return

01:07:30  24  to the jury room and return a verdict, we believe is the

01:07:33  25  only verdict at this point with the evidence, and that's

01:07:36  1  a verdict of guilty on all charges.  Thank you.

01:07:43  2          THE COURT:  How long do you think your

01:07:45  3  argument will be?

01:07:50  4          MS. KELLEY:  I don't know, Your Honor.  If

01:07:54  5  you're asking should we go for a break now, it's

01:07:57  6  immaterial to me.  Whatever the jury wants.

01:07:59  7          THE COURT:  Okay.  If we continue, ladies

01:08:03  8  and gentlemen -- let's keep going.  Anybody disagree

01:08:06  9  about that?

01:08:15  10         Ms. Kelley, you may present your closing

01:08:17  11 argument.

01:08:25  12         MS. KELLEY:  Good morning, ladies and

01:08:29  13 gentlemen.  First of all on behalf of Alex and his

01:08:31  14 family, we want to thank you for basically giving up

01:08:34  15 this week and, more importantly, giving Alex and his

01:08:39  16 case your time and your consideration.

01:08:43  17         You may remember on Tuesday during my

01:08:46  18 opening argument I said that this case would boil down

01:08:51  19 to three things and that our evidence and our testimony

01:08:56  20 would support three things:

01:08:59  21         Number 1.  Did Alex knowingly put those

01:09:03  22 disgusting images on his computer?

01:09:07  23         Number 2.  Did he confess to a crime he did

01:09:13  24 not commit?

01:09:15  25         Number 3.  Did the government have the right

01:09:18    1    person?

01:09:21    2                I'll address each of those issues in turn.

01:09:24    3                First of all, did Alex knowingly put those

01:09:29    4    objects on his computer?   There has been some

01:09:34    5    discussion, a lot of discussion about the deleted files.

01:09:42    6    Our expert, Mark Vassel, testified to you that there

01:09:47    7    were some deleted files put in the recycle bin.  He

01:09:52    8    testified to you that based on his expertise and his

01:09:55    9    experience people who are obsessed with child

01:10:00   10    pornography do not delete files.  They do not put them

01:10:04   11    in the recycle bin.  They save them.  They try and

01:10:08   12    access them again and again and again to feed their

01:10:14   13    hunger.  Alex didn't do it.

01:10:19   14                Now, Alex, contrary to what the government

01:10:23   15    has said, has been absolutely consistent in his

01:10:27   16    statement about those deleted files.  Yeah, when the

01:10:33   17    agents were talking to him outside his apartment, what

01:10:37   18    he said was this: Yes, there are some deleted files on

01:10:44   19    my computer.  He explained that to you on the stand.  He

01:10:51   20    talked about how when he came home one day he clicked on

01:10:55   21    his screen and there those were, and he deleted them.

01:10:59   22    And when you go back to your jury deliberation room and

01:11:03   23    you read the instructions, you will see that "knowingly"

01:11:09   24    is not innocent possession; it's not possession by

01:11:13   25    accident.  They were there.  He didn't put them there.

| | | |
|---|---|---|
| 01:11:17 | 1 | And he got rid of them as fast as humanly possible. |
| 01:11:24 | 2 | Interestingly enough, when you look at the |
| 01:11:27 | 3 | agent's 302 back in your deliberation room, go through |
| 01:11:31 | 4 | that 302.  Nowhere in that 302 will you see subject Alex |
| 01:11:41 | 5 | Cook confessed to me outside the apartment that there |
| 01:11:45 | 6 | was child pornography. |
| 01:11:46 | 7 | MR. CRAWFORD:  Judge, I object to that |
| 01:11:48 | 8 | characterization.  If we could speak at the side, |
| 01:11:52 | 9 | please. |
| 01:13:14 | 10 | (Whereupon the following discussion was had |
| 01:13:14 | 11 | at the bench outside the hearing of the jury:) |
| 01:13:14 | 12 | MR. CRAWFORD: Judge, Agent Pape's testimony |
| 01:13:14 | 13 | is I recorded what he told me in a 498, which is a |
| 01:13:14 | 14 | polygraph report that we agreed yesterday would not be |
| 01:13:14 | 15 | discussed.  So to say that there is no writing of him |
| 01:13:14 | 16 | saying it. |
| 01:13:14 | 17 | THE COURT:  No writing in evidence. |
| 01:13:15 | 18 | MS. KELLEY:  Nothing on the 302. |
| 01:13:15 | 19 | MR. CRAWFORD:  Well, the suggestion is |
| 01:13:15 | 20 | there's no written -- |
| 01:13:15 | 21 | THE COURT:  There's no writing in evidence, |
| 01:13:15 | 22 | and the 498 is not evidence. |
| 01:13:15 | 23 | MS. KELLEY:  There's no suggestion in the |
| 01:13:15 | 24 | 302. |
| 01:13:15 | 25 | MR. CRAWFORD: But the characterization is it |

01:13:15  1   was never written down.

01:13:15  2                 MS. KELLEY:  It wasn't.

01:13:16  3                 MR. CRAWFORD: It was written down, Judge.

01:13:16  4                 THE COURT:  But it's not in evidence.  It's

01:13:16  5   not in evidence.

01:13:17  6                 (End of side-bar discussion.)

01:13:21  7                 MS. KELLEY:  Ladies and gentlemen, simply

01:13:22  8   look at that 302.  No mention whatsoever that subject

01:13:28  9   Alex Cook confessed to me that there was child

01:13:33  10  pornography on his computer.  In contrast, you will see

01:13:38  11  on another 302 that when they spoke with Ian Douglas,

01:13:42  12  they put everything about that conversation in that 302.

01:13:52  13                Alex also has been consistent with Dr.

01:13:56  14  Graves.  He said to Dr. Graves and Dr. Graves told you

01:13:59  15  that Alex said, yeah, there was some child pornography

01:14:02  16  on my computer, and I deleted it.  That's what the

01:14:07  17  deletion is about.  That is the only child pornography

01:14:11  18  that Alex had any knowledge of being on his computer.

01:14:20  19                We are here because of 34 different things

01:14:27  20  that the undercover agent found during his

01:14:30  21  investigation; 30 images, and four movies.  You saw them

01:14:38  22  during the course of this trial.  The dates those ended

01:14:43  23  up on the computer were from May of 2010 until September

01:14:51  24  of 2010.  Coincidentally, the time that Ian Douglas was

01:14:56  25  in the apartment.

01:15:00  1          Now, what's important about those dates

01:15:06  2   other than the sheer coincidence is the fact that Mark

01:15:12  3   Vassel, our computer forensic expert, told you that the

01:15:17  4   LimeWire, Alex's LimeWire, was downloaded in July of

01:15:23  5   2010.  Alex explained to you that the computer was a

01:15:28  6   graduation present.

01:15:29  7          MR. CRAWFORD: Judge, another objection.

01:15:31  8          THE COURT:  Approach, please.

01:15:33  9          (Whereupon the following discussion was had

01:16:29  10  at the bench outside the hearing of the jury:)

01:16:29  11         MR. CRAWFORD: The testimony is that LimeWire

01:16:29  12  was put on the computer in July of 2009.  The statement

01:16:29  13  is 2010.

01:16:29  14         MS. KELLEY:  I made a mistake.  I'm sorry.

01:16:29  15         MR. CRAWFORD: It's critical, Judge.  It

01:16:29  16  needs to be corrected.

01:16:29  17         THE COURT:  She'll correct it.

01:16:29  18         MS. KELLEY:  I appreciate your pointing it

01:16:30  19  out.

01:16:30  20         (End of sidebar discussion.)

01:16:31  21         THE COURT:  You may continue.

01:16:32  22         MS. KELLEY:  Thank you.

01:16:35  23         Mr. Morford [sic] just proffered a very

01:16:38  24  important point.  In fact, it's a crucially helpful

01:16:40  25  point to us, and that is the LimeWire was not installed

| | | |
|---|---|---|
| 01:16:45 | 1 | in July of 2010; it was installed in July of 2009.  And |
| 01:16:53 | 2 | the reason why this is so important is because that |
| 01:16:59 | 3 | LimeWire had been on Alex's computer almost a year |
| 01:17:03 | 4 | before the undercover operation started.  And it's even |
| 01:17:10 | 5 | more important because -- and I'll talk more about this |
| 01:17:14 | 6 | later -- in the so-called confession Alex supposedly |
| 01:17:19 | 7 | says to the Detective, I started looking at child |
| 01:17:26 | 8 | pornography when I was on the road travelling on my |
| 01:17:29 | 9 | construction job.  Ladies and gentlemen, I respectfully |
| 01:17:33 | 10 | submit to you that if Alex had been looking at that |
| 01:17:37 | 11 | stuff as early as July of 2010 [sic] when he was on the |
| 01:17:46 | 12 | road when the LimeWire was installed, they would have |
| 01:17:51 | 13 | nabbed him; the government would have nabbed him.  But |
| 01:17:55 | 14 | instead, the first inkling they have is not until July |
| 01:17:59 | 15 | of 2010 when the undercover agent received those objects |
| 01:18:07 | 16 | from Alex's IP address. |
| 01:18:15 | 17 | Now, you're going to look at some of the |
| 01:18:18 | 18 | attachments, and you're going to find a couple titles |
| 01:18:21 | 19 | which precede May of 2010.  You're going to find a |
| 01:18:27 | 20 | couple from April of 2010.  And those are pretty easily |
| 01:18:33 | 21 | explainable. |
| 01:18:34 | 22 | Number one, we heard testimony from Mr. |
| 01:18:40 | 23 | Vassel that when you make a LimeWire request, it's |
| 01:18:43 | 24 | basically a bulk order, and you're going to get a lot of |
| 01:18:47 | 25 | junk; you're going to get a lot of stuff you don't want; |

01:18:50  1   you're going to get a lot of stuff you may not even know

01:18:54  2   about.  And also we heard testimony about the problems

01:18:58  3   with LimeWire and the concerns with LimeWire.  And

01:19:03  4   indeed, LimeWire has been shut down.

01:19:08  5           Now, one of the things we emphasized again

01:19:14  6   and again and again and, in particular, Mr. Vassel

01:19:18  7   emphasized with those 34 objects was that the creation

01:19:24  8   date was virtually the same as the access date.

01:19:29  9           Then Mr. Morford -- Mr. Crawford, I'm sorry,

01:19:33  10  Mr. Crawford pointed out that in that huge, huge

01:19:37  11  attachment that you're going to have in the jury room

01:19:40  12  called "Saved," all of the access and all of the

01:19:43  13  creation dates were the same on that; that's not

01:19:48  14  significant.  Because you were supposed to see a Perry

01:19:57  15  Mason moment, that is to say, when Mr. Crawford asked

01:20:02  16  Agent Morford to access one of those files, and you

01:20:08  17  supposedly should magically see a new access time and

01:20:12  18  date, which would have been yesterday afternoon, and you

01:20:17  19  didn't see it, well, the reason is very simple, that was

01:20:21  20  a virtual demonstration, not an actual demonstration

01:20:26  21  like someone actually sitting down at the keyboard using

01:20:30  22  the hard drive would engage in.  It's apples and

01:20:35  23  oranges.  And our expert, Mr. Vassel, testified that

01:20:39  24  the updating device was, indeed, on.

01:20:49  25           Now, I want to move on to the second major

01:20:53  1   topic, the second major issue, the second major bone of

01:20:58  2   contention: the so-called confession.  First of all, I

01:21:05  3   want to discuss the content.  There were huge material

01:21:13  4   misstatements of fact in that confession, things that

01:21:18  5   were downright goofy.  For instance, that Alex

01:21:23  6   supposedly told the agent he taught Sunday school.  His

01:21:27  7   father and the pastor got on the stand and said, no,

01:21:32  8   thank you very much, Alex doesn't teach Sunday school

01:21:35  9   because, quite frankly, he doesn't go to church often

01:21:39  10  enough.

01:21:40  11          Secondly, he supposedly told the agent about

01:21:43  12  an ex-fiancée' who reminded him of one of the little

01:21:48  13  girls on these images.  His father didn't know anything

01:21:54  14  about an ex-fiancée, and Alex certainly denied having an

01:21:59  15  ex-fiancée.  Why would he tell the Detective that?  It

01:22:04  16  doesn't make any sense.

01:22:06  17          I already talked about the fact that Alex

01:22:09  18  supposedly told the agent that he had been looking at

01:22:12  19  pornography for a while, indeed ever since the time he

01:22:17  20  started going on the road working construction.  The

01:22:21  21  forensics don't support that.

01:22:24  22          And then there's the supposed statement that

01:22:27  23  Alex made about going to Boy Scout camp and being

01:22:31  24  molested.  His father, the man, the human being with

01:22:39  25  whom he is the closest of anyone on the planet, said

01:22:45   1    that Alex never told him about that.  Ladies and

01:22:52   2    gentlemen, if he's not willing to tell his own father

01:22:56   3    that he was molested, why on earth is he going to tell

01:23:01   4    an FBI agent who he's known for a grand total of three

01:23:05   5    hours?  It doesn't make any sense.

01:23:09   6              And then the Scoutmaster, you remember him,

01:23:12   7    the gentleman in uniform, he said that Scouting has a

01:23:16   8    very, very strict policy that if you are inappropriately

01:23:21   9    touched, you tell an adult.  And that type of report was

01:23:27  10    never done.  And, ladies and gentlemen, wouldn't you

01:23:33  11    also think that if this agent had taken a so-called

01:23:37  12    statement from a young man who supposedly confessed to

01:23:44  13    having child pornography on his computer, a young man

01:23:49  14    who supposedly teaches Sunday school, a young man who

01:23:54  15    seemingly has access to small and vulnerable children,

01:23:59  16    that that agent or someone from his office would pick up

01:24:02  17    a phone and call the pastor and say, hey, you've got a

01:24:08  18    pervert, you've got a pedophile in your midst, terminate

01:24:14  19    the Sunday school contract.  Did not happen.

01:24:22  20              Why did Alex talk to this gentleman in the

01:24:26  21    first place?  Ladies and gentlemen, we are not saying

01:24:34  22    that Agent Schulte or Agent Pape or anyone in that

01:24:38  23    office beat a confession out of him or pounded a

01:24:43  24    confession out of him.  I don't know if Agent Pape

01:24:48  25    yelled.  I don't care.  He may have raised his voice.

01:24:52  1   He may have whispered.  He may have spoken in Spanish.

01:24:56  2   He may have spoken in Spanish or in Swaheli.  It does

01:25:01  3   not matter.  What matters is how did Alex feel?  He was

01:25:09  4   probably scared.  He was 19 years old at the time.  No

01:25:13  5   prior involvement with law enforcement.  Ten guys and a

01:25:20  6   couple women come in his door early in the morning, some

01:25:23  7   of them with guns.  They search his apartment.  He was

01:25:26  8   probably scared.  But he willingly went down to

01:25:30  9   headquarters, and he willingly talked with these guys.

01:25:39  10  Why?  Because he trusted them, and he respected them.

01:25:48  11  That's the way he's been raised.  You saw him on the

01:25:53  12  stand.  Everything to the U.S. Attorney's office and to

01:25:58  13  me and to the Judge has been "yes, sir," "no, sir,"

01:26:05  14  "yes, ma'am," "no, ma'am."  I didn't teach him that for

01:26:10  15  purposes of trial.  We didn't clean him up and give him

01:26:14  16  a buzz cut and put him in a suit to sit at trial today.

01:26:18  17  We didn't teach him what to say on the stand.  That's

01:26:21  18  who he is.  That's the way he was raised.

01:26:27  19           I don't know what happened in that room.  I

01:26:31  20  know the agents are busy.  Maybe they got him mixed up

01:26:35  21  with someone else.  But too much, too much is wrong

01:26:41  22  about that confession.  I asked the agent on

01:26:45  23  cross-examination some very, very basic questions like

01:26:51  24  "Why didn't you print him out a hard copy so he could

01:26:55  25  take it away?"  Ladies and gentlemen, in virtually

01:26:59  1  every single transaction of our lives we have some sort

01:27:03  2  of record.  We have some sort of receipt.  You go to

01:27:06  3  McDonald's, you buy a cup of coffee for $1.25, they give

01:27:11  4  you a receipt; they give you evidence of that

01:27:13  5  transaction.  You go to Dunkin' Donuts and they tell

01:27:18  6  you, If we don't give you a receipt, your order is free.

01:27:21  7  You rent a car, you fill out lots of paperwork, and you

01:27:24  8  get copies.  Lord knows you buy a house and you get tons

01:27:28  9  of copies of mortgage documents.  Then why didn't they

01:27:33  10  give him a copy of this supposed statement that he

01:27:38  11  signed when he went to the FBI office?  If you can get

01:27:45  12  evidence of a transaction for buying a cup of coffee,

01:27:49  13  then why can't you get evidence at the time it happens

01:27:52  14  that you confessed to a federal crime?  It doesn't make

01:27:57  15  any sense, particularly if you have a printer in the

01:28:02  16  room.

01:28:03  17          You heard the whole dynamic about the review

01:28:08  18  of the statement.  You probably wondered what I was up

01:28:13  19  to when I had the agent read the advice of rights form,

01:28:17  20  and then I had him read the statement.  There was a

01:28:21  21  method to my madness.  That advice of rights form took

01:28:27  22  45 seconds to read.  It was one page, double spaced,

01:28:33  23  some of it bold across the top.  It took him well over 3

01:28:37  24  minutes to read the two-page single-spaced so-called

01:28:44  25  confession.  And beyond that every person who has ever

01:28:50  1  watched a Law & Order type show on TV in 21st century

01:28:55  2  America has heard you have the right to remain silent,

01:28:58  3  et cetera, et cetera, et cetera.  Alex knew the rhythm.

01:29:04  4  But then Alex, a young man with documented longstanding

01:29:11  5  reading disabilities, was shown a so-called confession

01:29:19  6  on a computer screen with the agent scrolling down.

01:29:27  7  Think about it.  It doesn't make sense.

01:29:30  8            I asked the agent about the manufacture of

01:29:34  9  the document itself:

01:29:37  10           Why didn't you have the person write out a

01:29:39  11  statement, and then you can retype it?

01:29:42  12           That's not my policy.

01:29:44  13           Why don't you have the person sit at the

01:29:46  14  keyboard and write it out?

01:29:48  15           Well, I don't like other people touching my

01:29:50  16  keyboard.

01:29:51  17           I can understand that, but get over it.

01:29:55  18  This is a man's life.  This is important.  This is a

01:29:57  19  confession seemingly.

01:30:01  20           Now, I understand that within the first 30

01:30:03  21  seconds of conversation, meeting someone, you do not

01:30:07  22  say, by the way, ma'am/sir, do you have a reading

01:30:11  23  disability?  I understand that.  But nonetheless,

01:30:15  24  consider those circumstances.  In the morning Alex is

01:30:21  25  scared; he trusts this guy.   He has a reading

01:30:25  1   disability.  He's embarrassed about it.  He's shown this

01:30:28  2   long statement on a screen, big words like

01:30:35  3   desensitization are on the confession.  He wants to get

01:30:39  4   out of there.  You or I may not have confessed to a

01:30:42  5   crime we did not commit, but Alex, given who he is,

01:30:46  6   given who he was, at that moment in time, did.  And he

01:30:52  7   didn't find out the weight or the import of what he had

01:30:57  8   signed until he was in the middle of this case.  It's

01:31:03  9   patently, it's disgustingly unfair.

01:31:08  10          And one piece of equipment would have laid

01:31:12  11  all of this ambiguity to rest, and that would be either

01:31:17  12  a tape recorder, or that would be some type of other

01:31:21  13  recording of what really happened in that room.  I

01:31:27  14  understand, I think we all understand that Agent Schulte

01:31:31  15  and Agent Pape, while very, very conscientious men, do

01:31:36  16  not set FBI policy, and recording of interrogations is

01:31:43  17  only done in extraordinary circumstances.  Well, to Alex

01:31:51  18  and his family, that morning of September 15 was

01:31:54  19  extraordinary, absolutely, unambiguously extraordinary.

01:31:54  20

01:29:18  21  and would, to high Heaven, Agent Schulte or agent Pape

01:29:21  22  call their superiors and ask for extraordinary

01:29:26  23  permission under this extraordinary circumstance for

01:29:32  24  this extraordinary young man to record that confession?

01:29:40  25  They didn't.  We understand that.  And we understand FBI

01:29:44  1   policy.  And some day it may change.  But in the

01:29:50  2   meantime, ladies and gentlemen, I implore you, do not

01:29:56  3   hold Alex the victim of that circumstance.  Do not hold

01:30:03  4   him responsible for supposedly confessing to something

01:30:08  5   he did not do because as you will read in the

01:30:13  6   instructions, we do not have any evidence of it.  We do

01:30:20  7   not have any, what we call, corroboration.

01:30:28  8            The final topic I would like to discuss is

01:30:33  9   whether the government has the right person.

01:30:44  10            You may remember the first time when Agent

01:30:48  11   Morford was on the stand.  I asked him point blank:  Do

01:30:53  12   you know who was in front of that keyboard?

01:31:01  13            No.  No, he said.  All he knows is what came

01:31:07  14   from that IP address.

01:31:12  15            I also asked Agent Whisman, the gentleman

01:31:16  16   from Oklahoma:  Sir, I know you were in computer

01:31:20  17   conversation with this IP address, but did you have

01:31:23  18   anything like a camera in that apartment above that

01:31:26  19   computer, above that keyboard, above that IP address?

01:31:38  20            No, he said.

01:31:39  21            In the jury room you're going to take a look

01:31:41  22   or you're going to have the opportunity to see a

01:31:45  23   correspondence with Time Warner, and you will see on one

01:31:48  24   of those documents it says, Time Warner makes no

01:31:51  25   representation as to the identity of the person of this

01:31:56   1    IP address.  Time Warner itself can't vouch.

01:32:04   2            Now, was it Ian who's responsible for

01:32:18   3    putting those objects on the computer?  Probably.  But

01:32:22   4    this trial is not a whodunit.  But nonetheless, Ian

01:32:30   5    bears some very, very serious consideration.  First of

01:32:36   6    all, as I previously mentioned, isn't it strangely

01:32:42   7    perversely coincidental that the dates on the undercover

01:32:47   8    project match Ian's move-in date?  And isn't it

01:32:57   9    interesting that those are times when Ian, not Alex, was

01:33:04  10    home?  Alex, who during this time was working, going to

01:33:11  11    school, going home on weekends to visit his parents; and

01:33:18  12    Ian, who's sitting around the apartment all day, yes,

01:33:23  13    going to school a little bit, but doesn't haven't a job,

01:33:26  14    and basically hanging out.  Huge, huge reasonable doubt,

01:33:34  15    ladies and gentlemen.

01:33:40  16            There were five surveillance operations on

01:33:47  17    the part of the FBI office in that parking lot.  This

01:33:53  18    was basically an apartment building with lots of trucks,

01:34:01  19    lots of college students, and there's an undercover car

01:34:06  20    there on five different occasions?  Don't you think

01:34:14  21    someone noticed?  Wouldn't you think that Ian, who's

01:34:20  22    sitting at home most of the time, would spot a rather

01:34:25  23    interesting and unusual vehicle in the parking lot just

01:34:30  24    observing?

01:34:32  25            And isn't it interesting that Ian went

01:34:35  1    through three different laptops during the time he lived

01:34:42  2    in that apartment?   I think my laptop is about ten

01:34:49  3    years old.  It doesn't make sense.

01:34:52  4            And then you heard the testimony from Alex's

01:34:55  5    father that during that first week of May they saw Ian

01:35:03  6    using Alex's computer.

01:35:06  7            These are two young students sharing an

01:35:09  8    apartment, sharing everything, sharing the food, sharing

01:35:14  9    clothing, everything I'm told but baseball caps, and

01:35:19  10   sharing computers.  Alex knew Ian's password.  And even

01:35:27  11   though Alex had some biometric contraption on his own

01:35:33  12   computer, that didn't prevent someone, someone else,

01:35:40  13   someone other than Alex, from using the computer.  Ian

01:35:47  14   or anyone else could have been sitting at that keyboard,

01:35:52  15   Ian or anyone else could have been putting that stuff on

01:35:56  16   Alex's computer.

01:36:10  17           As I was driving into work or I was driving

01:36:14  18   to the courthouse this morning, I passed a Triple-A

01:36:17  19   office.  And there was a sign up on its message board

01:36:24  20   and it said, Remember 9/11.  And during this week, in

01:36:30  21   this beautiful stately courtroom, we have seen at play

01:36:38  22   many of the reasons why we all so love and respect our

01:36:43  23   country, principles which underscore our criminal

01:36:52  24   justice system, the right of the accused, even someone

01:39:48  25   accused of the most horrible of crimes like Alex, to

| | | |
|---|---|---|
| 01:39:52 | 1 | have a trial by jury, the burden of proof placed on the |
| 01:40:00 | 2 | government to prove its case beyond a reasonable doubt, |
| 01:40:08 | 3 | the right of the accuser to know the evidence to be |
| 01:40:14 | 4 | brought against him, the fact that the accused is bathed |
| 01:40:22 | 5 | in the presumption of innocence, and the right of the |
| 01:40:28 | 6 | accused to confront his accusers. |
| 01:40:33 | 7 | Ladies and gentlemen, during this week you |
| 01:40:38 | 8 | have seen Alex, a 20 year old man, confront his |
| 01:40:46 | 9 | accusers, respectfully confront his accusers, |
| 01:40:56 | 10 | respectfully confront the federal government which had |
| 01:41:04 | 11 | an undercover agent monitor him, which had surveillance |
| 01:41:12 | 12 | duty watch him, which claimed he confessed to a crime he |
| 01:41:20 | 13 | did not do. For that, we should be grateful for those |
| 01:41:30 | 14 | rights; we should all be grateful. And in the meantime, |
| 01:41:37 | 15 | ladies and gentlemen, on behalf of Alex and his parents |
| 01:41:42 | 16 | and everyone who believes in him, we ask you to return a |
| 01:41:46 | 17 | verdict of not guilty. Thank you. |
| 01:41:55 | 18 | THE COURT: Mr. Crawford, do you want to |
| 01:41:58 | 19 | proceed with rebuttal? |
| 01:41:59 | 20 | MR. CRAWFORD: That would be fine, Judge. |
| 01:42:01 | 21 | THE COURT: I'll conclude the charge for |
| 01:42:04 | 22 | about five minutes after you, and the jury can retire. |
| 01:42:11 | 23 | MR. CRAWFORD: Ladies and gentlemen, Ian |
| 01:42:12 | 24 | Douglas is a red herring. |
| 01:42:22 | 25 | THE JUROR: Excuse me? |

| | | |
|---|---|---|
| 01:42:24 | 1 | MR. CRAWFORD:  Ladies and gentlemen, Ian |
| 01:42:25 | 2 | Douglas is a red herring.  You heard the testimony of |
| 01:42:28 | 3 | their expert yesterday about files that were in the |
| 01:42:31 | 4 | LimeWire incomplete folder.  He testified about that. |
| 01:42:36 | 5 | That's Exhibit 21.  Those are files that were to be |
| 01:42:39 | 6 | downloaded but had not yet been downloaded.  One of the |
| 01:42:44 | 7 | files in Exhibit 21 is entitled -- one was entitled |
| 01:42:52 | 8 | "Virgin teen gets raped in her own house."  Date |
| 01:42:57 | 9 | created, 4/19/2010.  Another was entitled "German school |
| 01:43:02 | 10 | girls in pretty orgy, Lolita, child PEDO, et cetera; |
| 01:43:06 | 11 | date created, April 2, 2010. |
| 01:43:11 | 12 | I asked Mr. Vassel specifically:  "So, for |
| 01:43:18 | 13 | example, on April 19, 2010, someone using this computer, |
| 01:43:22 | 14 | using LimeWire, selected a file from LimeWire to |
| 01:43:24 | 15 | download entitled "Virgin teen gets raped in her own |
| 01:43:28 | 16 | house"? |
| 01:43:28 | 17 | The answer was, "Yes." |
| 01:43:31 | 18 | I asked him, "It's also true on April 2, |
| 01:43:34 | 19 | 2010, someone using LimeWire selected a file entitled |
| 01:43:38 | 20 | "German school girl in pretty orgy, et cetera?  They |
| 01:43:41 | 21 | selected that file for download; is that correct? |
| 01:43:44 | 22 | And Mr. Vassel's answer was, "That's |
| 01:43:46 | 23 | correct." |
| 01:43:47 | 24 | Detective Morford came in yesterday, and you |
| 01:43:49 | 25 | saw a short piece of a video entitled "Two 13 year old |

01:43:54  1    little girls get come in face;" date created, April 19,

01:44:01  2    2010.  Mr. Cook testified that he moved into that

01:44:04  3    apartment at the end of April.  Mr. Cook's father

01:44:08  4    testified that he moved into that apartment the last

01:44:11  5    week of April.  Mr. Douglas testified that they moved in

01:44:15  6    at the beginning of May.  Ladies and gentlemen, someone

01:44:21  7    was putting that pornography on this computer before Mr.

01:44:25  8    Douglas even came into the picture.  Look at the dates.

01:44:33  9            You heard evidence about date created, last

01:44:36  10   access time, and so forth.  The explanation is now

01:44:39  11   Detective Morford wasn't actually running his computer.

01:44:42  12   Detective Morford came in and talked about his forensic

01:44:45  13   analysis.  He talked about making an mirror image.  He

01:44:49  14   talked about using virtual box to use that computer and

01:44:52  15   how virtual box was the same as starting up the

01:44:55  16   computer.  And there was no objection to that.  That's

01:44:58  17   where all these screen shots came from.  There was no

01:45:00  18   objection about the accuracy of these screen shots.

01:45:03  19   It's the same process he used to determine whether this

01:45:06  20   last updated feature was turned on or not.  Mr. Vassel

01:45:11  21   didn't actually turn the computer on himself.  He

01:45:14  22   looked at a mirror image.  So are we to believe that's

01:45:18  23   apples and oranges too?  All the files in that LimeWire

01:42:32  24   saved, each given file, has a date created, date and

01:42:38  25   time, and the same last accessed date and time.

01:45:31  1    Detective Morford testified, as he tested Mr. Cook's

01:45:35  2    computer, that feature by default on Windows Vista is

01:45:40  3    turned off.  Why else would all 800-plus files in the

01:45:43  4    LimeWire saved folder appear to have never been

01:45:46  5    accessed?  Mr. Vassel was asked about that.  He was

01:45:52  6    asked, are we to conclude that there were just 800 files

01:45:55  7    sitting on this computer that had never been listened to

01:45:58  8    or viewed or anything?

01:46:01  9           Mr. Vassel's answer:  In this attachment,

01:46:04  10   referring to the stack of printouts, you can conclude

01:46:07  11   that they haven't been opened or viewed or displayed.

01:46:09  12          Question:  Why on earth would someone have a

01:46:11  13   bunch of music on a computer and not listen to it?

01:46:14  14          Answer:  They don't know where it is.  They

01:46:16  15   haven't turned their computer on.  Or they may not even

01:46:19  16   know how to navigate.

01:46:21  17          Does that sound like Alex Cook?  He

01:46:23  18   testified to you he used LimeWire.  He knows where the

01:46:26  19   music is.  He knows how all that stuff works.  Could it

01:46:29  20   be possible he has all of those files on that computer

01:46:32  21   and not have a clue where they are?  Never turned on the

01:46:34  22   computer?  It's completely implausible.  Completely

01:46:38  23   implausible.

01:46:40  24          Beyond that, with respect to Mr. Douglas

01:46:44  25   clearly there's an ax to grind there.  You heard the

01:46:47   1   statements that he made to Dr. Graves; he called Ian

01:46:54   2   Douglas a jerk; he owed him for bills, wrecked his

01:46:59   3   four-wheeler.  He didn't tell him about the child

01:47:03   4   pornography.  He waited to trial to blame Mr. Douglas

01:47:07   5   for that.  Ian Douglas, he didn't have anything to do

01:47:10   6   with this.  He came in to testify.  You heard the

01:47:12   7   testimony.  You can judge it for yourself.

01:47:14   8                There's been evidence and there's been talk

01:47:17   9   about evidence of key word searching.  I suppose there's

01:47:20   10  no evidence of key word searching for child pornography

01:47:23   11  if you completely ignore the way LimeWire works.

01:47:27   12  LimeWire is a key word search based program.  You open

01:47:32   13  LimeWire; you type in key words; you get results; you

01:47:37   14  pick the files, and you download them.  I suppose it

01:47:40   15  could be true that Mr. Cook was looking for a copy of

01:47:44   16  the book Lolita and he typed in Lolita and all this

01:47:47   17  child pornography came up.  But the fact is that child

01:47:51   18  pornography is what ended up on the computer.  Key word

01:47:54   19  searches for child pornography is not a crime.

01:47:56   20  Downloading it from LimeWire and putting it on your

01:47:59   21  computer, that's the crime, and that's what happened.

01:48:08   22                Special Agent Pape's testimony.  Would it

01:48:14   23  have been better had Special Agent Pape taped the

01:48:18   24  confession?  Sure, it would have been.  But you heard

01:48:22   25  the explanation of why he didn't do it.  There's an FBI

01:48:25  1   policy.  And, of course, the ultimate question is, as I

01:48:28  2   said in my first argument:  Is this the truth?   You

01:48:33  3   don't have to have a recording to decide whether this is

01:48:36  4   the truth.  Every single government witness provided

01:48:41  5   corroborating evidence that this is the truth.  Evidence

01:48:44  6   about surveillance, evidence about downloads sessions,

01:48:51  7   IP, forensic analysis all corroborates what's going on

01:48:57  8   here.

01:48:57  9          Yes, you've heard from Boy Scout leaders,

01:49:00  10  church leaders; you heard about ex-fiancées.   Ladies

01:49:04  11  and gentlemen, when Special Agent Pape sat down with

01:49:07  12  Alex Cook, he didn't know the guy.   How's he going to

01:49:11  13  know to put in this statement about Boy Scout camp?  A

01:49:16  14  lucky guess?  How's he going to know -- he put in here

01:49:19  15  he went to church in Knox County.  Lucky guess?  They

01:49:24  16  talked about this.  Read this statement.  Read the

01:49:29  17  statement about Boy Scout camp.  Read the statement

01:49:34  18  about the fiancée.  Read the statement about the

01:49:37  19  curiosity.  Read the statement about the curiosity with

01:49:40  20  the fiancée, children in the low teen range.  Compare

01:49:46  21  that to the images you saw.  Ladies and gentlemen, this

01:49:51  22  statement reads like someone who's just realized that

01:49:56  23  they're in a whole lot of trouble and they better start

01:49:59  24  coming up with some excuses really quick.  This is what

01:50:04  25  Mr. Cook told Agent Pape when he signed it, and all the

01:50:08  1    other evidence in this case supports it.

01:50:16  2            And of course, at the end of the day we went

01:50:18  3    over the elements.  Nowhere in those elements is there

01:50:22  4    an element that the government prove beyond a reasonable

01:50:26  5    doubt Alex Cook confessed to the crime.  It's just

01:50:29  6    evidence, like everything else you've seen.  So even at

01:50:32  7    the end of the day if you choose not to believe it,

01:50:34  8    you've still got to look at the other evidence in the

01:50:37  9    case.

01:50:38  10           The Court has a couple other comments for

01:50:40  11   you, then you will retire to deliberate.  We would ask

01:50:43  12   you to look carefully at the evidence, weigh it, come to

01:50:45  13   a decision, and we believe that the only decision

01:50:48  14   consistent with that evidence is the government has met

01:50:51  15   its burden on all charges.  We would ask you to return

01:50:54  16   a verdict of guilty.  Thank you.

01:51:00  17           THE COURT:  Ladies and gentlemen, I will now

01:51:01  18   read my final set of instructions which relate to your

01:51:19  19   conduct during deliberations.

01:51:27  20           Duty to deliberate.

01:51:28  21           Now you are free to talk about the case in

01:51:31  22   the jury room.

01:51:32  23           In fact, it is your duty to talk with each

01:51:35  24   other about the evidence, and to make every reasonable

01:51:38  25   effort to reach unanimous agreement.  Talk with each

01:51:42  1   other, listen carefully and respectfully to each other's

01:51:49  2   views, and keep an open mind as you listen to what your

01:51:52  3   fellow jurors have to say.  Try your best to work out

01:51:56  4   your differences.

01:51:57  5          You must decide for yourself if the

01:52:02  6   government has proved the defendant guilty beyond a

01:52:06  7   reasonable doubt of the charges in the indictment.  Do

01:52:11  8   not hesitate to change your mind if you are convinced

01:52:15  9   that other jurors are right and that your original

01:52:19  10  position was wrong.  But do not change your mind just

01:52:23  11  because other jurors see things differently, or just to

01:52:28  12  get the case over with.  In the end, your vote must be

01:52:32  13  exactly that, your own vote.  It is important for you to

01:52:37  14  reach unanimous agreement, but only if you can do so

01:52:41  15  honestly and in good conscience.

01:52:44  16         No one will be allowed to hear your

01:52:48  17  discussions in the jury room, and no record will be made

01:52:52  18  of what you say.  You should all feel free to speak your

01:52:55  19  minds.

01:52:59  20         Procedure during deliberations.  The first

01:53:02  21  thing you should do in the jury room is choose your

01:53:05  22  foreperson.  This person will help guide your

01:53:07  23  discussions, and will speak for you here in court.

01:53:11  24         Once you start deliberating, do not talk to

01:53:15  25  the clerk or, or me, or anyone else except each other

01:53:19  1   about the case.  Your discussions, moreover, can occur

01:53:22  2   only when all 12 of you are together in the jury room,

01:53:26  3   if any juror is not in the jury room, do not discuss the

01:53:30  4   case until that juror joins you.  While your

01:53:33  5   deliberations are continuing, do not discuss the case

01:53:36  6   outside the jury room, either with your fellow jurors or

01:53:40  7   anyone else.

01:53:42  8        If you have any questions or messages, they

01:53:48  9   should be written, signed by the foreperson, and given

01:53:51  10  to the clerk to give to me.  I may have to talk to the

01:53:55  11  lawyers before responding, so it may take me some time

01:53:59  12  to get back to you.

01:54:00  13       In any communication with the Court or

01:54:04  14  clerk, do not write down, tell, or indicate in any way

01:54:10  15  whatsoever how you stand on your vote.

01:54:15  16       Remember that you must make your decision

01:54:17  17  based only on the evidence that you saw and heard here

01:54:23  18  in court.  Do not try to gather any information about

01:54:26  19  the case on your own by any means whatsoever while you

01:54:31  20  are deliberating.

01:54:32  21       Turn to number 7 on the next page.  It's out

01:54:39  22  of order.

01:54:44  23       Your verdict, whether it is guilty or not

01:54:47  24  guilty, must be unanimous.  To find the defendant

01:54:51  25  guilty, every one of you must agree that the government

01:54:54  1  has overcome the presumption of innocence with evidence

01:54:57  2  that proves his guilt beyond a reasonable doubt.

01:55:04  3          Turn back to number six.

01:55:06  4          If you unanimously find the defendant guilty

01:55:09  5  beyond a reasonable doubt, then it will be my job to

01:55:13  6  determine what the appropriate punishment should be.

01:55:16  7  Deciding what the punishment should be is my job, not

01:55:19  8  yours.  It would violate your oaths as jurors to even

01:55:24  9  consider the possible punishment in deciding your

01:55:27  10  verdict.

01:55:31  11          I have prepared a verdict form for you to

01:55:35  12  record your verdict.  On the completion of your

01:55:39  13  deliberations, after you have reached unanimous

01:55:42  14  agreement as to your verdicts, sign the form and notify

01:55:46  15  the clerk that you have concluded your deliberations.

01:55:49  16          If you'll turn to the very last page,

01:55:58  17  please.  The form reads:  United States District Court

01:56:04  18  for the Northern District of Ohio, Western Division.

01:56:08  19  United States of America, plaintiff, versus Alex D.

01:56:11  20  Cook, defendant.  Case number 3:10-CR-522.  My name.

01:56:16  21  Verdict:  We, the jury, on the issues joined,

01:56:20  22  unanimously find:

01:56:23  23          1.  As to Count 1: Guilty, not guilty.

01:56:27  24          2.  As to Count 2: Guilty, not guilty.

01:56:32  25          3.  As to Count 3: Guilty, not guilty.

01:56:37  1              Then signature lines for all 12 jurors.

01:56:46  2              Return to page 31.

01:56:47  3              I remind you that nothing I have said or

01:56:51  4    done during this trial has been meant to influence your

01:56:54  5    decision in any way.  You decide for yourselves if the

01:56:57  6    government has proved the defendant guilty beyond a

01:56:59  7    reasonable doubt.

01:57:00  8              At the outset of this case alternate jurors

01:57:03  9    were selected in the event of any misfortune to a member

01:57:07  10   of the panel.  It will not be necessary for the

01:57:09  11   alternate jurors to serve further.  Do not tell anyone

01:57:13  12   how you would have voted, and do not discuss the case

01:57:16  13   with anyone until you have learned that the jury has

01:57:19  14   returned.  And the alternates whom I will excuse now are

01:57:25  15   Mr. Destazio and Ms. Chapman.  I'm sorry to send you on

01:57:28  16   your way.  It's a bit like the runners who have trained

01:57:34  17   hard for the race, show up at the track, and there's no

01:57:38  18   room or space for you to run.  I apologize, but as I

01:57:44  19   say, it's necessary to impanel -- it's customary to

01:57:47  20   impanel alternate jurors just in case somebody has an

01:57:53  21   accident or problem at home or becomes ill or for

01:57:55  22   whatever reason is not able to continue to serve as a

01:57:58  23   juror.  So you are excused now.

01:58:02  24              And, Amy, do they have their things back in

01:58:05  25   the jury room?

01:58:10   1          You can go back with the jurors, but do not

01:58:14   2   participate in any way in the deliberations, and the

01:58:16   3   panel should not begin deliberations until Mr. Destazio

01:58:21   4   and Ms. Chapman have left the room.

01:58:26   5          Ladies and gentlemen, as I've indicated two

01:58:30   6   or three times, the schedule is now in your hands.  You

01:58:33   7   can begin deliberations immediately, you can decide to

01:58:38   8   take whatever break you want.  You can decide to adjourn

01:58:42   9   for the day and come back on Monday if you wish.  All

01:58:44  10   of that is entirely up to you.  I only ask that if you

01:58:48  11   do either take a break in your deliberations, let Amy

01:58:55  12   know, and certainly if you adjourn for the day, let Amy

01:59:00  13   know.  And also let her know, and she'll tell us when

01:59:05  14   you resume your deliberation.  As I say, the schedule is

01:59:09  15   entirely up to you.  We thank you in advance for the

01:59:17  16   diligence and attention which you give to your

01:59:20  17   deliberations.  And we await your verdict.  You may

01:59:23  18   retire.

02:00:04  19          (Jury exits the courtroom.)

02:00:06  20          THE COURT:  For the record, any objections

02:00:08  21   to the charge?

02:00:09  22          MS. KELLEY:  None, Your Honor.  Thank you.

02:00:11  23          THE COURT:  Again, I don't know if you have

02:00:13  24   to renew your Rule 29 motion.  I just don't know the

02:00:17  25   procedure.

02:00:18   1          MS. KELLEY:  For the sake of the record I

02:00:19   2   will, Your Honor.

02:00:20   3          THE COURT:  And I will take it under

02:00:21   4   advisement.  Amy will be telling the jurors that the

02:00:26   5   exhibits will be up there in a moment.  Can you each

02:00:29   6   check to make sure your exhibits are all together?  It's

02:00:32   7   up to each of you to see to it that the ones go back

02:00:35   8   that should and nothing goes back that shouldn't.  Where

02:00:43   9   will you be waiting, back in your office?

02:00:46  10          MR. SECOR:  More than likely back at the

02:00:47  11   office.  Amy has our cell phones.

02:00:50  12          THE COURT:  Ms. Kelley?

02:00:52  13          MS. KELLEY:  I'll probably be in the

02:00:54  14   courthouse.

02:00:54  15          THE COURT:  If you want to go up to the

02:00:56  16   library, there's a computer up there and so forth.

02:00:59  17   Whatever suits your pleasure.  Okay.  Let's wait until

02:01:06  18   Amy gets back.  Are your exhibits all together, or does

02:01:09  19   Amy have them?

02:01:10  20          MR. SECOR:  I know she has some of them.

02:01:12  21          THE COURT:  Why don't you guys put them

02:01:16  22   together, then I'll step down.

02:01:19  23          MR. CRAWFORD: Judge, the initial list, of

02:01:21  24   course, for the JURS system was submitted beforehand.

02:01:24  25   There was some paper here --

02:01:26   1          THE COURT:  Amy can help you work that out.

02:01:26   2          (Adjourned at 10:42 a.m.)

02:01:26   3                    - - -

04:19:23   4          (Reconvened at 1:00 p.m. in chambers.)

04:19:23   5          THE COURT:  We have a question from the

04:19:29   6   jury:  We would like a list of the 34 porn files with

04:19:36   7   dates and files names excluding other files signed by --

04:19:50   8   it looks like Daniel somebody or other.

04:19:56   9          Tom, first of all, do you know what they're

04:19:58  10   talking about?  It's not an exhibit, is it?

04:20:01  11          MR. SECOR:  It's in the FTK disk exhibit,

04:20:07  12   that information.

04:20:08  13          THE COURT:  So we would have to open up the

04:20:10  14   disk?

04:20:14  15          MR. SECOR:  What you'd have to do if you did

04:20:16  16   it that way is you'd have to -- you'd have to bring the

04:20:22  17   agent over and have it played, or I'm told that the one

04:20:31  18   agent, Morford, who testified can print this information

04:20:34  19   out and it can go in as, I don't know, a supplemental.

04:20:43  20          THE COURT:  Exhibit whatever that disk is,

04:20:50  21   portion or whatever?

04:20:51  22          MR. SECOR:  Correct.

04:20:52  23          THE COURT:  But the information actually has

04:20:58  24   been admitted, even though it's not instantly apparent

04:21:02  25   or accessible?

04:21:04  1            MR. SECOR:  Exactly.  Now, also I'm told

04:21:07  2   that it's in Vassel's report.

04:21:14  3            MS. KELLEY:  It's an attachment labeled

04:21:16  4   "Undercover Files on PC."  It's six pages.

04:21:20  5            THE COURT:  Did his report go in?

04:21:22  6            MS. KELLEY:  Only portions.  And then also

04:21:24  7   in --

04:21:25  8            THE COURT:  Was this part of it?

04:21:26  9            MS. KELLEY:  This was not one of the ones

04:21:29 10   that went in.  But this was one of his attachments.

04:21:32 11   Then I prepared, based on that, just a one-paragraph --

04:21:39 12   if Amy -- Amy offered to scan that.

04:21:46 13            THE COURT:  Tom, which is easier, scan or

04:21:49 14   fax?

04:21:50 15            MR. SECOR:  Unfortunately we are at Real

04:21:53 16   Seafood right now finishing lunch.

04:21:57 17            THE COURT:  You should have stayed in the

04:21:59 18   building; we had our picnic today.

04:22:05 19            MS. KELLEY:  I didn't think it proper to

04:22:08 20   fraternize with you at the picnic.

04:22:12 21            THE COURT:  I wouldn't have paid attention

04:22:14 22   to you; those are my friends down there.

04:22:18 23            MR. SECOR:  We can leave here in five

04:22:20 24   minutes and be there in probably 15.

04:22:23 25            THE COURT:  If you want to see it, I'm sure

| | | |
|---|---|---|
| 04:22:26 | 1 | that what Elizabeth has done is probably very sensible |
| 04:22:30 | 2 | because what you've done basically is they didn't want |
| 04:22:33 | 3 | the names, right?  They do want the names? |
| 04:22:36 | 4 | MS. KELLEY:  And what I might suggest is if |
| 04:22:39 | 5 | my list goes to the jury, that that -- or this just be |
| 04:22:46 | 6 | redacted. |
| 04:22:50 | 7 | THE COURT:  Why don't we just give them |
| 04:22:52 | 8 | this.  Tom, wait a minute.  Why don't I just send -- |
| 04:22:57 | 9 | well, you probably should be here.  I'll wait. |
| 04:23:00 | 10 | MR. SECOR:  I think, yeah, I should be |
| 04:23:02 | 11 | there. |
| 04:23:03 | 12 | THE COURT:  Okey-doke. |
| 04:40:41 | 13 | (Recess taken at 1:03 p.m.) |
| 04:41:54 | 14 | (Reconvened in the courtroom at 1:22 p.m.) |
| 04:41:54 | 15 | THE COURT:  Here's what she's suggesting be |
| 04:41:56 | 16 | sent back; is that correct, Ms. Kelley? |
| 04:41:59 | 17 | MS. KELLEY:  I shared a copy with the |
| 04:42:00 | 18 | government. |
| 04:42:01 | 19 | THE COURT:  Let me, for the record, we |
| 04:42:03 | 20 | received a question at 12:49 this afternoon:  We would |
| 04:42:07 | 21 | like a list of the 34 porn files with the dates and file |
| 04:42:15 | 22 | names excluding other files.  It's signed by -- I'm not |
| 04:42:21 | 23 | sure which juror is the foreman; Daniel -- |
| 04:42:32 | 24 | THE CLERK:  Cobb. |
| 04:42:36 | 25 | THE COURT:  And you would suggest, Ms. |

04:42:38  1    Kelley, that perhaps we should mark this as simply

04:42:44  2    exhibit --

04:42:46  3              MS. KELLEY:  I had suggested a couple

04:42:49  4    things.  First of all, Your Honor, we could either

04:42:53  5    submit the attachment from Mr. Vassel's report labeled

04:42:58  6    "Undercover Files."  That addresses their issues of

04:43:03  7    date, time, and name.  Or for purposes of brevity, that

04:43:09  8    particular document which I prepared, however that

04:43:12  9    particular document omits the file names.

04:43:15  10             THE COURT:  I would assume they want to see

04:43:17  11   the file name.  They asked for that expressly.

04:43:21  12             MS. KELLEY:  So I would suggest Mr. Vassel's

04:43:24  13   attachment.

04:43:25  14             THE COURT:  Should we -- I can tell them

04:43:30  15   that this is -- why don't I simply:  In response to your

04:43:35  16   request, please see attached Exhibit 201, just for the

04:43:40  17   record.  Is that okay?

04:43:43  18             MR. SECOR:  However you want to do it,

04:43:44  19   Judge.  I don't see that you need to bring them back in.

04:43:47  20   Just send this in.

04:43:57  21             THE COURT:  Do we need a copy?

04:44:00  22             MS. KELLEY:  It should be a six-page copy,

04:44:03  23   "Undercover Files found on PC."

04:44:34  24             THE COURT:  Should I put on it this is a

04:44:36  25   portion of Mr. Vassel's report which was not previously

04:44:39    1    introduced into evidence?

04:44:41    2                    MS. KELLEY:  Yes, please.

04:44:45    3                    MR. SECOR:  I don't really have an

04:44:47    4    objection, but I don't know that it needs to be

04:44:51    5    identified.  They're only looking for a list.

04:44:54    6                    THE COURT:  I'll just leave it as is.

04:44:57    7                    MR. SECOR:  I'm reluctant to add anything to

04:45:03    8    what they asked for.

04:45:09    9                    THE COURT:  Okay.  It's 1:27, and today's

04:45:14   10    the 9th.

04:45:25   11                    I won't send back the single sheet.

04:45:29   12                    Joint exhibit; any objection?

04:46:34   13                    Something occurs to me -- I'll try to speak

04:46:49   14    loudly.  Do the jurors tell you before they take a

04:46:56   15    recess or adjourn?

04:47:01   16                    THE CLERK:  They do.

04:47:01   17                    THE COURT:  Because there are so many of the

04:47:04   18    defendant's family and friends and other spectators, and

04:47:08   19    you really should not have any contact of any kind with

04:47:11   20    the jurors.

04:47:12   21                    Amy, when the jurors notify you that they're

04:47:16   22    taking a recess, do you folks -- do they wait out in the

04:47:21   23    lobby here?

04:47:23   24                    THE CLERK:  When the jurors took their

04:47:25   25    break, they went down to the first floor.

| | | |
|---|---|---|
| 04:47:27 | 1 | THE COURT:  Otherwise -- I'm sure nothing |
| 04:47:30 | 2 | improper may occur; it just might be awkward for you or |
| 04:47:34 | 3 | the jurors.  I wouldn't want that.  I'm not suggesting |
| 04:47:36 | 4 | there would be any improper contact, it's just being |
| 04:47:41 | 5 | proximate to each other.  When we have our new |
| 04:47:46 | 6 | courthouse 50 years from now that won't be a problem, |
| 04:47:51 | 7 | and I won't have to walk through the corridors, which |
| 04:47:56 | 8 | also sometimes creates an awkward moment.  Nor will we |
| 04:48:00 | 9 | be bringing prisoners through the corridors either. |
| 04:48:00 | 10 | (Adjourned at 1:28 p.m.) |
| 04:48:00 | 11 | - - - |
| 06:32:23 | 12 | (Reconvened at 3:15 p.m.) |
| 06:32:27 | 13 | (Jury enters the courtroom.) |
| 06:34:16 | 14 | THE COURT:  Ladies and gentlemen, I |
| 06:34:17 | 15 | understand you have a verdict.  And if you do, will the |
| 06:34:21 | 16 | foreperson please hand the verdict form to the clerk. |
| 06:34:38 | 17 | The clerk will read the verdict. |
| 06:34:43 | 18 | THE CLERK:  In the United States District |
| 06:34:45 | 19 | Court for the Northern District of Ohio, Western |
| 06:34:48 | 20 | Division.  United States of America, plaintiff, versus |
| 06:34:51 | 21 | Alex D. Cook, defendant.  Case number 3:10-CR-522. |
| 06:34:56 | 22 | Verdict:  We, the jury, on the issues joined, |
| 06:35:00 | 23 | unanimously find as to Count 1:  Guilty. |
| 06:35:04 | 24 | As to Count 2:  Guilty. |
| 06:35:06 | 25 | As to Count 3:  Guilty. |

| | | |
|---|---|---|
| 06:35:09 | 1 | Signed by all 12 jurors. |
| 06:35:12 | 2 | THE COURT:  Do you want the jury polled? |
| 06:35:15 | 3 | MS. KELLEY:  Yes, please, Your Honor. |
| 06:35:17 | 4 | THE COURT:  Is that your verdict, Mr. Cobb? |
| 06:35:20 | 5 | Is that correct?  I'm going to ask each of you.  Is that |
| 06:35:25 | 6 | your verdict? |
| 06:35:26 | 7 | THE JUROR:  Yes, sir. |
| 06:35:26 | 8 | THE COURT:  Is that your verdict? |
| 06:35:28 | 9 | THE JUROR:  Yes, it is. |
| 06:35:28 | 10 | THE COURT:  Is that your verdict? |
| 06:35:29 | 11 | THE JUROR:  Yes. |
| 06:35:29 | 12 | THE COURT:  Is that your verdict? |
| 06:35:30 | 13 | THE JUROR:  Yes. |
| 06:35:31 | 14 | THE COURT:  And is that your verdict? |
| 06:35:32 | 15 | THE JUROR:  Yes. |
| 06:35:33 | 16 | THE COURT:  The second lady from the end? |
| 06:35:35 | 17 | THE JUROR:  Yes. |
| 06:35:36 | 18 | THE COURT:  Is that your verdict? |
| 06:35:38 | 19 | THE JUROR:  Yes. |
| 06:35:38 | 20 | THE COURT:  Is that your verdict? |
| 06:35:39 | 21 | THE JUROR:  Yes. |
| 06:35:40 | 22 | THE COURT:  Is that your verdict? |
| 06:35:40 | 23 | THE JUROR:  Yes. |
| 06:35:41 | 24 | THE COURT:  Is that your verdict? |
| 06:35:42 | 25 | THE JUROR:   Yes. |

06:35:43    1                    THE COURT:  Is that your verdict?

06:35:44    2           THE JUROR:  Yes.

06:35:45    3           THE COURT:  Is that your verdict?

06:35:46    4           THE JUROR:  Yes.

06:35:46    5           THE COURT:  The jurors have been polled.

06:35:51    6    The unanimity of the verdict will be accepted for

06:35:54    7    filing.

06:35:55    8                    Ladies and gentlemen, your service in this

06:35:56    9    case obviously has come to an end.  If you could wait

06:36:00   10    for a few minutes I would like to speak with you just

06:36:03   11    briefly about your service and get whatever feedback you

06:36:07   12    may want to give to me, particularly about how things

06:36:11   13    could have been better for you.  I said at the outset of

06:36:14   14    the trial and I will say now, I will say in a moment

06:36:18   15    that I sincerely hope that you leave your experience, as

06:36:24   16    difficult as it no doubt has been for each and every one

06:36:28   17    of you and for all of you collectively, with a better

06:36:31   18    understanding of our jury system and how it works and

06:36:35   19    how it protects the rights of all our citizens.  I said

06:36:39   20    at the outset and will repeat again because I feel it as

06:36:43   21    strongly as I feel anything about the law that the

06:36:46   22    rights of all of us are for more secure in the hands of

06:36:50   23    12 ordinary citizens than they would ever be in my own

06:36:55   24    hands or that of any other elected or appointed judge.

06:37:00   25    Ours is a practically unique system of justice in that

06:37:03  1  we retain the 12-person jury in criminal cases.  And I

06:37:07  2  have absolutely no doubt that it is the best system ever

06:37:10  3  devised to insure fair and equal justice based upon the

06:37:15  4  facts and the law.  Thank you for your service, and you

06:37:18  5  may adjourn to the jury room.

06:38:00  6                    (Jury exits the courtroom.)

06:38:03  7            THE COURT:  Mr. Cook, you will be required

06:38:05  8  to report to the Pretrial Service and Probation Office

06:38:08  9  to commence a presentence investigation.  That will

06:38:12  10  begin with an interview with a probation officer.  You

06:38:18  11  have the right to have Ms. Kelley with you at that and

06:38:22  12  any other investigation for the pretrial investigation.

06:38:27  13  That process usually takes about ten weeks.  Ms. Kelley

06:38:31  14  will receive a copy of the presentence report, a

06:38:33  15  preliminary copy of the initial disclosure, and she will

06:38:37  16  review that with you and call to the attention of the

06:38:41  17  probation officer any corrections or changes that should

06:38:43  18  be made, and likewise if there are any objections to the

06:38:47  19  computation of the sentence under the Federal Sentencing

06:38:51  20  Guidelines.  Sentencing will occur a few weeks after

06:38:57  21  that.  Does the government have any objection if I were

06:39:02  22  to continue the same conditions of pretrial release?

06:39:11  23            MR. SECOR:  No, Your Honor.

06:39:13  24            THE COURT:  Mr. Cook, I will permit you to

06:39:15  25  remain free under the same conditions, terms and

06:39:20  1  conditions of pretrial release that you have complied

06:39:23  2  with successfully so far.  I simply want to caution you

06:39:26  3  that as frightful as the prospect of imprisonment will

06:39:34  4  be, and imprisonment is very likely; I believe there's a

06:39:38  5  mandatory minimum term; is that correct?

06:39:39  6            MR. SECOR:  There is, Your Honor.

06:39:40  7            THE COURT:  Nonetheless, failure to appear

06:39:43  8  or otherwise fail -- other failure to comply with each

06:39:47  9  and all the conditions of pretrial release will simply

06:39:51  10  create conditions and circumstances every bit as grave

06:39:56  11  as those with which you are now confronted.  Most simply

06:40:02  12  put, in today's computerized age, it is impossible for a

06:40:10  13  person to successfully permanently and successfully to

06:40:13  14  avoid reapprehension in the event that he absconds from

06:40:20  15  conditions of pretrial release.  And I simply want to

06:40:25  16  caution you about that.

06:40:29  17            Anything further from the government?

06:40:31  18            MR. SECOR:  No, Your Honor.

06:40:31  19            THE COURT:  Ms. Kelley?

06:40:33  20            MS. KELLEY:  No, Your Honor.

06:40:34  21            THE COURT:  Some of the jurors may want to

06:40:36  22  talk to counsel afterwards.  I don't know.  I'm going to

06:40:39  23  meet with them for probably five or ten minutes.  If you

06:40:42  24  wish to talk to the jurors, you may remain in the

06:40:45  25  courtroom.  I would ask the courtroom otherwise in due

06:40:49  1    course be cleared.

06:40:51  2                    That will conclude this proceeding.

3                    (Concluded at 3:21 p.m.)

4                              - - -

5

6                    **C E R T I F I C A T E**

7

8        I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled

10   matter.

11

12   /s Tracy L. Spore_____            _____

13   Tracy L. Spore, RMR, CRR                    Date

14

15

16

17

18

19

20

21

22

23

24

25